1   EVAN R. CHESLER (*pro hac vice* to be filed)
    PETER T. BARBUR (*pro hac vice* to be filed)
2   ELIZABETH L. GRAYER (*pro hac vice* to be filed)
    CRAVATH, SWAINE & MOORE LLP
3   825 Eighth Avenue
    New York, NY 10019
4   Telephone: 212.474.1000
    Facsimile: 212.474.3700
5
    WILLIAM S. BOGGS (Bar No. 053013)
6   BRIAN A. FOSTER (Bar No. 110413)
    TIMOTHY S. BLACKFORD (Bar No. 190900)
7   DLA PIPER US LLP
    401 B Street, Suite 1700
8   San Diego, CA 92101-4297
    Telephone: 619.699.2700
9   Facsimile: 619.699.2701

10  Attorneys for Defendant
    QUALCOMM INCORPORATED
11

FILED

08 APR 30 AM 11: 18

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____
                    DEPUTY

'08 CV 0786 WQH JMA

12              UNITED STATES DISTRICT COURT

13              SOUTHERN DISTRICT OF CALIFORNIA

14

15  MERDAD VALIKHANI, an individual, on          CASE NO.
    behalf of himself, the general public and all
    others similarly situated,                   **QUALCOMM INCORPORATED'S**
16                                                **NOTICE OF REMOVAL**
                Plaintiff,
17
        v.
18
    QUALCOMM INCORPORATED, a
19  Delaware corporation, and DOES 1-100,

20              Defendants.

21

22          Pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446 and 1453, Defendant Qualcomm

23  Incorporated ("Qualcomm" or "Defendant") files this Notice of Removal to remove this putative

24  class action, and all claims and causes of action therein, from the Superior Court of the State of

25  California for the County of San Diego to the United States District Court for the Southern

26  District of California, as follows:

27  /////

28  /////

DLA PIPER US LLP
SAN DIEGO
SD\1816907.1
1-6

-1-

1      1.      On April 18, 2008, Plaintiff Merdad Valikhani commenced the action entitled

2  Valikhani v. Qualcomm, Inc., Case No. 37-2008-00082231, in the Superior Court of the State of

3  California for the County of San Diego.  (A true and correct copy of Plaintiff's Summons and

4  Class Action Complaint is attached hereto as Exhibit A.)

5      2.      In the Complaint, Plaintiff alleges that Defendant intentionally deceived private

6  standards-determining organizations ("SDOs") into incorporating its patents into a mobile

7  telephone standard known as UMTS.  Plaintiff further alleges that Defendant and its licensees

8  combined to restrict and prevent "competition in manufacturing, making, sale and/or purchase of

9  UMTS devices" and that Defendant achieved these trusts through the use of coercive and

10  deceptive tactics designed to procure the unwilling cooperation of these licensees.  (Compl.

11  ¶ 107.)

12      3.      Qualcomm is a corporation organized under the laws of Delaware, with its

13  principal place of business located at 5775 Morehouse Drive, San Diego, California.  Qualcomm

14  was served with the Summons and Complaint on April 23, 2008.

15      4.      Pursuant to 28 U.S.C. § 1446(b), this notice of removal is being filed within thirty

16  days of service on Defendant of a copy of Plaintiff's Complaint.  This notice of removal is timely

17  filed in accordance with 28 U.S.C. §§ 1446(b) and 1453(b).

18      5.      Defendant bases this notice of removal upon 28 U.S.C. § 1441(a), which permits

19  defendants to remove any state court civil action over which the district courts of the Untied

20  States have original jurisdiction.

21      6.      This Court has original jurisdiction over Plaintiff's Complaint pursuant to 28

22  U.S.C. § 1332(d)(2), because the matter in controversy is a putative class action in which a

23  member of the putative class of plaintiffs is a citizen of a State different from the Defendant and

24  the amount in controversy exceeds $5 million, exclusive of interest and costs.

25      7.      This action is a putative class action as defined in Federal Rule of Civil Procedure

26  23 and California Code of Civil Procedure § 382.  The Complaint sets forth "Class Certification

27  Allegations" that describe a class of "all persons who purchased a UMTS-capable cellular device

28  (the 'Device Class')" and a class of "all persons who purchased cellular service from any carrier

-2-

DLA PIPER US LLP
San Diego

SD\1816907.1
1-6

1    in the United States which bundles its cellular service with subsidized UMTS-compliant devices

2    (the 'Service Class')." (Compl. ¶¶ 89, 93).

3          8.      Upon information and belief, diversity jurisdiction as defined in 28 U.S.C.

4    § 1332(d) exists among the putative class of plaintiffs and the Defendant.  Plaintiff's Complaint

5    states that "[t]his is a national class action" that covers the sale of "326 million UMTS devices"

6    and "roughly 76 million subscribers." (Compl. ¶¶ 1, 90, 94).  Defendant Qualcomm is a

7    Delaware corporation with its headquarters in California.  Upon information and belief, there are

8    putative class members of this "national class action" who are citizens of states other than

9    Delaware or California.

10          9.      Upon information and belief, the matter in controversy exceeds $5 million,

11   exclusive of interest and costs.  Plaintiff seeks treble damages, injunctive relief and restitution

12   under the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726) and California Unfair

13   Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.) on the basis of alleged

14   anticompetitive behavior, which supposedly led to, inter alia, "supracompetitive prices" charged

15   to consumers.  (Compl. ¶¶ 109-10, 115).  Plaintiff contends these "supracompetitive prices" were

16   charged to device consumers (who allegedly purchased 326 million UMTS devices over the last

17   three years) and service consumers (who are an estimated 76 million subscribers).  The combined

18   effect of the sheer number of individuals in the defined classes and the relief sought by Plaintiff[1]

19   makes clear that the amount in controversy exceeds $5 million, exclusive of interest and costs.

20          10.     This action is related to a putative class action pending in this Court before the

21   Honorable William Q. Hayes, captioned Meyer v. Qualcomm Inc., Case No. 08-CV-0655-WQH

22   (LSP).

23          11.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings

24   and orders served upon Defendant in this case are attached hereto as Exhibit A.

25   _____

26   [1]  A court may take into account a plaintiff's request for treble damages in determining the
     amount in controversy.  See Chabner v. United Omaha Life Ins. Co., 225 F.3d 1042, 1046 n.3

27   (9th Cir. 2000); In re Intel Corp. Microprocessor Antitrust Litig., 436 F. Supp. 2d 687, 690 (D.
     Del. 2006) (including treble damages in determining the amount in controversy exceeds $5

28   million).

DLA PIPER US LLP
SAN DIEGO

SD\1816907.1
1-6

1    12.    Pursuant to 28 U.S.C. § 1446(d), Plaintiff is being provided with written notice of

2    the filing of this notice of removal.

3    13.    Pursuant to 28 U.S.C. § 1446(d), a copy of this notice of removal is being filed

4    with the Clerk of the Superior Court of the State of California for the County of San Diego.

5    WHEREFORE, Qualcomm removes this action from the Superior Court of California for

6    the County of San Diego to this Court.

7

Dated: April 30, 2008

8

DLA PIPER US LLP

9

10    By _____

11    WILLIAM S. BOGGS
      BRIAN A. FOSTER
      TIMOTHY S. BLACKFORD

12

13    CRAVATH, SWAINE & MOORE LLP
      Evan R. Chesler
      Peter T. Barbur

14    Elizabeth L. Grayer

15    Attorneys for Defendant
      QUALCOMM INCORPORATED

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

SD\1816907.1
1-6

-4-

**EXHIBIT A**

# SUI_IONS
*(CITACIÓN JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
QUALCOMM INCORPORATED, a Delaware Corporation, and
DOES 1-100, inclusive

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*
CIVIL BUSINESS
CENTRAL DIVISION

2008 APR 18  A 10: 16

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MERDAD VALIKHANI, an individual, on behalf of
himself, the general public and all others similarly
situated

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Central
330 West Broadway
330 West Broadway
San Diego, California  92101

**CASE NUMBER:**
*(Número del Caso):* 37-2008-00082231-CU-AT-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David C. Parisi                                                   (818) 501-7852
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California    91403

DATE: APR 18 2008              Clerk, by _____ C. Beutler _____, Deputy
*(Fecha)*                          *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

(SEAL)

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**



Code of Civil Procedure §§ 412.20, 465


**EXHIBIT** A   **PAGE** 5

1  David C. Parisi, Esq. (162248)
   Suzanne Havens Beckman, Esq. (188814)
2  PARISI & HAVENS LLP
   15233 Valleyheart Drive
3  Sherman Oaks, California 91403
   (818) 990-1299 (phone)
4  (818) 501-7852 (facsimile)
   dcparisi@parisihavens.com
5  shavens@parisihavens.com

6
   Attorneys for plaintiff Merdad Valikhani,
7  on behalf of himself, the general public
   and all others similarly situated
8

9
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
10
                     FOR THE COUNTY OF SAN DIEGO
11

12
13  MERDAD VALIKHANI, an individual, on )   CASE NO.: 37-2008-00082231-CU-AT-CTL
    behalf of himself, the general public and all )
14  others similarly situated,               )   CLASS ACTION COMPLAINT FOR:
                                             )
15              Plaintiff,                    )   (1) Violation of the Cartwright Act (Cal.
                                             )       Bus. & Prof. Code §§ 16720, 16726);
16  v.                                       )       and
                                             )   (2) Unfair Business Practices in Violation
17  QUALCOMM INCORPORATED, a             )       of Calif. Bus. & Prof. Code § 17200, *et*
    Delaware Corporation, and DOES 1-100, )       *seq.*
18  inclusive,                              )
                                             )   DEMAND FOR JURY TRIAL
19              Defendants.                  )
20

21

22

23

24

25

26

27

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

                              Class Action Complaint

EXHIBIT A PAGE 6

1    Plaintiff Merdad Valikhani ("Valikhani" or "Plaintiff"), on behalf of himself, the

2  general public and all others situated, against defendant Qualcomm Incorporated

3  ("Qualcomm"), alleges as follows upon information and belief, based upon, *inter alia*,

4  investigation conducted by and through his attorneys, except as to those allegations

5  pertaining to Plaintiff, which are alleged upon knowledge:

6                                **Nature of the Action**

7        1.      This is a national class action brought under the Cartwright Act on

8  behalf of all persons who (1) purchased one or more cellular devices that either contain the

9  Wideband Code Division Multiple Access ("WCDMA") technology or that are compatible

10  with the Universal Mobile Telecommunications System ("UMTS") standard (the "Device

11  Class") and (2) purchased cellular service from any carrier in the United States which

12  bundles its cellular service with subsidized UMTS-compliant devices (the "Service Class").

13        2.      This complaint arises from defendant Qualcomm's illegal and

14  anticompetitive conduct in the markets for the technology and chipsets that operate cell

15  phones employing WCDMA, a third generation ("3G") technology that is implemented

16  through the UMTS standard.  Qualcomm, by its intentional deception of private standards-

17  determining organizations ("SDOs") has monopolized certain markets for cellular telephone

18  technology and components.

19        3.      Qualcomm holds certain patents that it has asserted are "essential" to

20  WCDMA technology and the UMTS standard.  Thus, in order to maintain fair competition

21  in the UMTS markets, international and United States SDOs only adopted UMTS as a

22  mobile telephone standard after Qualcomm represented in writing that it would license its

23  patents on fair, reasonable and non-discriminatory terms (that is, so-called "FRAND")

24  terms.

25        4.      The adoption of the UMTS standard led mobile telephone services

26  carriers to invest billions of dollars in developing UMTS phone systems, and has led cellular

27  device manufacturers to spend billions of dollars investing in technology compliant with the

28  UMTS standard.  After spending so much money to develop UMTS phone systems, cellular

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1799

                                -2-
                        Class Action Complaint

1 telephone services carriers and cellular device manufacturers cannot economically switch to

2 another standard and thus are locked into the UMTS standard.

3      5.      After the UMTS standard was adopted, Qualcomm disregarded its

4 FRAND commitments. With the power of its WCDMA patents entrenched in the UMTS

5 standard, Qualcomm coerced device manufacturers and service carriers who are locked into

6 the UMTS standard into paying supracompetitive prices to license Qualcomm's WCDMA

7 technology.

8      6.      Qualcomm's anticompetitive licensing practices impose enormous costs

9 on UMTS device manufacturers. These costs are passed on to consumers. If the

10 participants in the UMTS standard-setting process had known that Qualcomm would not

11 license its patents on FRAND terms, they could have and would have selected a different

12 standard that did not implicate Qualcomm's patents, resulting in a more competitive market

13 for UMTS devices and ultimately cheaper UMTS devices for consumers.

14      7.      Qualcomm's licensing practices violate California's Cartwright Act (Cal.

15 Bus. & Prof. Code §§ 16720, 16726) and California's unfair competition law (Cal. Bus. &

16 Prof. Code § 17200, *et seq.*). This lawsuit seeks remedies for consumers against Qualcomm,

17 including damages (and treble damages under the Cartwright Act), restitution, and

18 injunctive relief restraining Qualcomm from similar anticompetitive acts in the future under

19 the Cartwright Act (Cal. Bus. & Prof. Code § 16750) and the unfair competition law (Cal.

20 Bus. & Prof. Code § 17203).

21

                                    **Parties**

22

23      8.      Plaintiff Merdad Valikhani ("Plaintiff") is a resident of Los Angeles

County, California. Plaintiff receives cellular service from AT&T and purchased an LG-

24 CU500 cell phone AT&T. AT&T subsidized the purchase of his cell phone.

25      9.      Defendant Qualcomm Incorporated is a Delaware corporation that

26 maintains its headquarters at 5775 Morehouse Drive, San Diego, California. Qualcomm

27 commercializes technology involved in cellular communications and applications. The

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-3-
Class Action Complaint


EXHIBIT A PAGE 8

1 | revenues from Qualcomm's Technology Licensing Segment ("QTL"), which licenses the
2 | patents relevant to this complaint, comprised 27%, 32%, and 35% of total consolidated
3 | revenues in fiscal years 2004, 2005, and 2006, respectively.  QTL's revenues for fiscal year
4 | 2006 were $2.63 billion, and were $1.84 billion and $1.33 billion in fiscal years 2005 and
5 | 2004, respectively.

6 |        10.      Plaintiff is currently ignorant of the true names and capacities, whether
7 | individual, corporate, associate, or otherwise, of the defendants sued herein under the
8 | fictitious names Does 1 through 100, inclusive, and therefore, sues such defendants by such
9 | fictitious names.  Plaintiff will seek leave to amend this complaint to allege the true names
10 | and capacities of said fictitiously named defendants when their true names and capacities
11 | have been ascertained.  Plaintiff is informed and believes and based thereon alleges that
12 | each of the fictitiously named Doe defendants is legally responsible in some manner for the
13 | events and occurrences alleged herein, and for the damages suffered by the Plaintiff and the
14 | classes identified in this complaint.

15 |        11.      Plaintiff is informed and believes and based thereon alleges that all
16 | defendants, including the fictitious Doe defendants, were at all relevant times acting as
17 | actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees
18 | of all other defendants, and that all acts alleged herein occurred within the course and scope
19 | of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and
20 | with the express and/or implied permission, knowledge, consent, authorization and
21 | ratification of their co-defendants; however, each of these allegations are deemed
22 | "alternative" theories whenever not doing so would result in a contraction with the other
23 | allegations.

24 |        12.      As used in this complaint, the terms "Qualcomm" and "Defendant" refer
25 | to defendant Qualcomm Incorporated and Does 1 through 100, inclusive.

26 |
27 |
28 |

EXHIBIT A  PAGE 9

## Jurisdiction and Venue

13.     This Court has subject matter jurisdiction over this class and representative action pursuant to Calif. Bus. & Prof. Code § 17200, *et seq.* and Cal. Code of Civ. Proc. § 382.

14.     Venue is proper in this judicial district because Qualcomm maintains its executive office and headquarters in this County, Qualcomm conducts substantial business within this County, many of the acts described in this Complaint occurred in and/or were directed from this judicial district, and defending an action here would pose no undue burden on Qualcomm.  Further, venue in this judicial district is proper pursuant to Cal. Bus & Prof. Code § 16750(a) which provides in part that "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefore in any court having jurisdiction in any county where the defendant resides or is found . . . ."

15.     This Court has personal jurisdiction over Defendant pursuant to Cal. Code Civ. Proc. § 410.10 because it maintains its corporate headquarters in, and the majority of the acts alleged herein were committed in, California.

### The Structure of the Wireless Industry

**A.     Wireless Carriers, Cell Phone Manufacturers, and Chipset Manufacturers**

16.     Wireless carriers provide cell phone service to consumers.  Carriers operate wireless systems that enable consumers to place and receive telephone calls, and send and receive data, on cell phones.

17.     Many companies around the world manufacture cell phones, and the manufacturers typically sell those phones to carriers, which in turn arrange for sale of the phones to consumers.

18.     Cell phones contain, among other components, one or more computer chipsets that deliver the cell phones' core ability to communicate with the wireless system.

EXHIBIT A PAGE 10

**B.    The Role of Standards Development Organizations**

19.    For a carrier's wireless system to function properly, all of the system's components (e.g., base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other.  This means that regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufacturers the system's components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system.

20.    Because of this demand for interoperability, several SDOs have worked with the wireless industry to develop wireless communications standards.

21.    On a worldwide basis, the International Telecommunications Union ("ITU") is the central telecommunications SDO.  The ITU is an international organization comprised of governments and firms in the private sector, which coordinates the operation of telecommunications systems and services and advances the development of communications technology.  The ITU's standardization activities are designed to foster the growth of new technologies, such as mobile telephony and the Internet, as well as the emerging global information infrastructure which handles a mix of voice, data and multimedia signals.  The ITU develops internationally agreed technical and operating standards to foster interconnection of the world's communications systems.

22.    The Telecommunications Industry Association ("TIA") is the leading U.S.-based SDO for the communications and information technology industry.  The TIA is comprised of member companies that manufacture or supply products and services used in global communications.  The European Telecommunications Standards Institution ("ETSI") is an SDO based in France with a leadership role in Europe.  The Alliance of Telecommunications Industry Solutions ("ATIS") is an SDO based in the United States.

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-6-

Class Action Complaint

EXHIBIT __A__ PAGE __11__

23.    In the past several years, standards bodies specific to wireless technology standards have developed. The Third Generation Partnership Project ("3GPP") has focused on the evolution of GSM and UMTS technology.

24.    The ownership of relevant intellectual property ("IP") and related IP licensing practices are critical issues in SDOs' consideration of standards proposals. If the implementation of a standard requires the use of particular IP, such as a patent, the IP owner may have the ability to prevent, delay or distort the development of technology implementing that standard (sometimes referred to as "patent hold-up") and thereby undermine the purpose of the SDO. Accordingly, SDOs typically require that their members declare whether they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory ("FRAND") terms. Patents necessary to implement a particular standard are known as "essential patents" for the standard to which they relate. Each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard.

C.    **Cellular Standards**

25.    Two technology paths, or families of standards, are in widespread use today: "CDMA," which stands for "code division multiple access" and "GSM," which stands for "global system for mobility." Among major cellular service providers in the US, Verizon Wireless and Sprint Communications operate CDMA-path networks, and Cingular (now AT&T) and T-Mobile operate GSM-path networks.

26.    The CDMA and GSM paths have evolved through four generations, which reflect the evolution and improvement of these technologies over time. This complaint refers to the first generation as "1G," the second generation as "2G," and so on. The 1G standard used in the United States is the Advanced Mobile Phone System ("AMPS"). Cellular carriers are required to provide AMPS service until early 2008. See

EXHIBIT __A__ PAGE __12__

1 | Public Mobile Services and Personal Communications Services, 67 Fed. Reg. 77,175 (Dec.

2 | 17, 2002) (codified at 47 C.F.R. 22.901(b)).

3 |       27.    2G standards reflect the advent of digital technology and the replacement

4 | of analog standards. The two primary 2G standards are 1) Code Division Multiple Access

5 | ("CDMA") and 2) Global System for Mobile communications ("GSM"). By 2000,

6 | essentially all cellular devices on the market employed either the GSM 2G standard or the

7 | CDMA 2G standard.

8 |       28.    Carriers are in the process of deploying newer technologies that cannot

9 | be neatly characterized as either 2G or 3G, and may be called 2.5G or 2.75G. On the GSM

10 | branch, GSM carriers have implemented the GPRS and EDGE standards, which offer

11 | respectively faster data speeds. Implementation of Section 6002(b) of the Omnibus Budget

12 | Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions

13 | With Respect to Commercial Mobile Services, Eleventh Report, 21 FCC Rcd 10947, ¶ 107

14 | (Sept. 26, 2006) ("Eleventh Report"). Likewise, on the CDMA branch, CDMA carriers

15 | have deployed the CDMA2000 and the EVDO standards, again offering respectively faster

16 | data speeds. *Id.*, ¶ 108.

17 |       29.    3G standards evolved from the specifications defined in the International

18 | Mobile Telecommunications-2000 standard ("IMT-2000"). 3G standards support greater

19 | concentrations of voice and data subscribers and higher data rates at lower incremental cost

20 | than 2G standards. The two 3G standards most widely slated for implementation in the

21 | United States are UMTS (operating on the GSM branch) and 3G CDMA (operating on the

22 | CDMA branch). UMTS allows substantially faster data transfer speeds than the GPRS or

23 | EDGE standards. *Id.*, ¶ 107.

24 |

25 |

26 |

27 |

28 |



EXHIBIT A PAGE 13

30.    Thus, the evolution of cellular standards is as follows:

| GENERATION | GSM Path | CDMA Path |
|---|---|---|
| 3g | UMTS | CDMA 2000/3G CDMA |
| 2.5g/2.75g | GPRS/EDGE | CDMA 2000/EVDO |
| 2g | GSM | CDMA |
| 1g | Advanced Mobile Phone System | |

31.    Contemporary cell phones primarily use 2G and 3G standards. Other standards built on top of the UMTS standard will allow still faster download speeds – for instance, High Speed Data Packet Access ("HSDPA") technology may double the download speeds of UMTS. *Id.*

32.    The CDMA and GSM technology paths are not interoperable; equipment and technologies used in one cannot be used in the other. For this reason, each technology path has its own standard or set of standards.

33.    The UMTS standard was created by the ETSI and its SDO counterparts in the United States and elsewhere after a lengthy evaluation of available alternative equipment and technologies. The UMTS standard was designed to permit economical transition from 2G GSM-based systems to a 3G standard; UMTS therefore works with WCDMA and is reverse-compatible with GPRS/EDGE operating systems and GSM operating systems.

34.    An industry-wide standard necessarily eliminates previously available alternative technologies, which can no longer be used and are no longer competitive. The adoption of an industry-wide standard, therefore, confers monopoly power on the holders of patents essential to implementing that standard.

**Substantive Allegations**

35.    Qualcomm supplies some of the essential technology that the ETSI ultimately included in the UMTS standard, and holds intellectual property rights ("IPRs"), such as patents, in this technology.

36.    Given the potential for owners of IPRs, through the exercise of their rights, to exert undue control over the implementation of industry-wide standards, the ETSI

-9-

Class Action Complaint

EXHIBIT A PAGE 14

1  requires a commitment from vendors whose technologies are included in standards to

2  license their technologies on FRAND terms.  Neither ETSI nor the other relevant SDOs

3  further define FRAND.

4        37.      The ETSI included Qualcomm's proprietary technology in the UMTS

5  standard only after, and in reliance on, Qualcomm's commitment to license UMTS

6  technology on FRAND terms.  Qualcomm's "essential" technology is called wideband

7  CDMA ("WCDMA," which is a GSM-compatible technology and should not be confused

8  with the CDMA technology path).

9        38.      Qualcomm's WCDMA patents are essential to the manufacture of

10  UMTS-compliant cell phones and other UMTS-compliant devices, and are also essential for

11  the implementation of the UMTS standard.  The licensing of Qualcomm's patents therefore

12  is a barrier to entry into the relevant product market.  Certainly, Qualcomm takes that

13  position and is heavily engaged in patent litigation to that effect.  One of Qualcomm's recent

14  10-Ks states: "[O]ur intellectual property rights include a valuable patent portfolio that

15  includes *patents essential to implementation of each of the 3G CDMA alternative standards*

16  . . ." Qualcomm Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*,

17  at 10-11 (emphasis added).  "[A]t this time most, if not all, companies recognize that any

18  company seeking to develop, manufacture and/or sell products that use CDMA technologies

19  [including WCDMA] will require a patent license from us." *Id.* at 23-24.

20        39.      **Transition to 3G Is Path-Dependent.**  The CDMA and GSM standards

21  are mutually incompatible: CDMA phones cannot be used with GSM carriers, and vice

22  versa.  Moreover, technologies built on top of the GSM standard are not compatible with

23  technologies built on top of the CDMA standard.

24        40.      Consequently, the transition from 2G to 3G is path-dependent: it is

25  immensely cheaper for carriers to upgrade from CMDA to 3G CDMA and from GSM to

26  WCDMA than it is to switch from CDMA to WCDMA or from GSM to CDMA2000.  By

27  making the transition to the next generation of the technology that a carrier has already

28

EXHIBIT A PAGE 15

1  selected – whether CDMA or GSM for 2G services — the carrier can avoid the generally

2  insurmountable expense entailed in switching between technologies.

3       41.     In Qualcomm's own words, "the CDMA2000 mode enables a direct and

4  more economical conversion for current cdmaOne networks. . . . [The WCDMA]

5  infrastructure network has been specifically designed to be compatible with the GSM

6  network, which is why it is expected that most GSM operators will migrate to WCDMA

7  rather than to CDMA2000." *Id.* at 10.

8       42.     **Lock-in Effect.** Due to the high cost of switching between the two

9  major technology paths, carriers (and cellular device manufacturers) face a substantial

10  "lock-in" effect after implementation of the UMTS standard. Qualcomm's technology is

11  not interchangeable with or substitutable for other technologies.

12       43.     **SDOs and Commitments to FRAND Licensing.** To guard against

13  anticompetitive patent hold-up, most SDOs (including all SDOs relevant to this Action)

14  require firms supplying essential technologies for inclusion in a prospective standard to

15  commit to licensing their technologies on FRAND terms. The absence of irrevocable

16  FRAND assurances may cause an SDO to withhold approval of standards known to

17  incorporate essential, proprietary technologies. The FRAND commitments, or lack thereof,

18  are therefore key indicators of the cost of implementing a potential technology. In this case,

19  due to the "lock in" effect associated with a carrier's choice operating standard, industry

20  participants' mutual representation and commitment to license any intellectual property

21  applicable to the UMTS standard on FRAND terms was an essential part of the formulation

22  and adoption of the UMTS standard.

23       44.     **Qualcomm's Representations of FRAND Licensing to SDOs.** Upon

24  information and belief, Qualcomm made repeated and express written representations to

25  SDOs, including the ITU, ETSI, and 3GPP, that Qualcomm would license any of its

26  essential WCDMA patents on FRAND terms prior to the adoption of the UMTS standard.

27  Essentially, Qualcomm monopolized markets for WCDMA technology by inducing the

28  relevant SDOs to include Qualcomm's patented technology as an essential element of the

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-11-

Class Action Complaint

**EXHIBIT** A    16

1  UMTS standard.  On information and belief, Qualcomm made these representations from its

2  headquarters, located in California.

3         45.      Qualcomm's WCDMA technology was incorporated into the UMTS

4  standard only after, and in reliance on, Qualcomm's commitment to license the patents for

5  the WCDMA technology on FRAND terms.  The selection of Qualcomm's technology

6  excluded other patent holders competing to have their patents incorporated into the standard

7  which would have licensed their patents on FRAND terms.  However, even if Qualcomm's

8  WCDMA technology was the only candidate for inclusion in the UMTS standard, it still

9  would not have been selected by the relevant SDOs absent a FRAND commitment.  This is

10  because each SDO relevant to this action requires that owners of essential patents agree to

11  FRAND licensing terms before the SDO will agree to include the technology that depends

12  upon those patents in any industry standard.

13         46.      Qualcomm's false commitments to license its patents on FRAND terms

14  were intended to, and did, cause the SDOs to adopt the UMTS standard.  Qualcomm's

15  misrepresentations conferred an unfair advantage and bias in the competitive process in

16  favor of WCDMA's inclusion in the UMTS standard.  By distorting choices through

17  deception, Qualcomm obscured the relative merits of alternatives and prevented an efficient

18  selection process.  Qualcomm also obscured the costs of including its proprietary

19  technology in the standard.  Qualcomm has taken advantage of industry participants who

20  now are locked into the UMTS standard by violating its FRAND commitments, thus

21  extracting supracompetitive royalties for the licensing of its WCDMA patents.

22        **Qualcomm's UMTS Licensing Practices Are Anticompetitive**

23         47.      Qualcomm never intended to offer its patent portfolio on FRAND terms.

24  Qualcomm's commitment to FRAND licensing to the relevant SDOs was intentionally false.

25         48.      After the widespread adoption of the UMTS standard, Qualcomm

26  reneged on its FRAND commitments to the ETSI and other SDOs as alleged in more detail

27  below.  Qualcomm's licensing of the UMTS patents ("UMTS Licensing Practices" or

28

PARISI & HAVENS LLP
15233 Ventura Drive
Sherman Oaks, CA 91403
(818) 990-1299

-12-
Class Action Complaint

1  "UMTS Licensing") have not been fair or reasonable, nor have they been non-

2  discriminatory.

3       49.    Qualcomm has used its monopoly power in the WCDMA market, as

4  well as its false commitment to license its WCDMA patents of FRAND terms, to force

5  industry participants into accepting Qualcomm's UMTS Licensing Practices. Qualcomm

6  has unnaturally prolonged high prices for UMTS chipsets and UMTS devices, and has

7  significantly deterred non-price competition (improved products and functionality).

8  Consequently, prices for UMTS chipsets are supracompetitive, and innovation in, *e.g.*,

9  enhanced functionality has been undermined.

10       50.    **Qualcomm's Acquisition of Market Power.** As any other patentee,

11  Qualcomm exercises exclusive control over the market for its WCDMA-related patents.

12  Qualcomm derives its market power in the UMTS market from the incorporation of

13  WCDMA-related patents into the UMTS standard and the widespread adoption of that

14  standard. Qualcomm's deceptive conduct, in the context of a consensus-driven private

15  standard-setting environment, harmed (and continues to harm) competition and provides

16  Qualcomm with monopoly power over the UMTS chipset market.

17       51.    Qualcomm communicates with its licensees and potential licensees, and

18  its UMTS Licensing Practices emanate, from its headquarters in California. Qualcomm's

19  UMTS Licensing Practices include, but are not limited to, the following:

20       52.    **Discrimination Against Non-Qualcomm UMTS Chipsets via**

21  **WCDMA Patent Royalty Rates.** On information and belief, UMTS Licensing requires

22  cellular manufacturers to pay multi-million dollar fees, which may be waived, but only on a

23  discriminatory basis – for example, if cell phone manufacturers agree to purchase

24  Qualcomm's UMTS chipsets exclusively. No legitimate relationship exists between

25  licensing of cell phone technology and the purchase of chipsets.

26       53.    Qualcomm's royalty rate discrimination furthers no legitimate

27  competitive interest or business need. Rather, Qualcomm's royalty rate discrimination is

28  intended to harm, and has the effect of harming, competition in the UMTS chipset market.

EXHIBIT A PAGE 18

54.     **Discrimination Against Non-Qualcomm UMTS Chipsets via WCDMA Patent Royalty Calculations: Price Netting.** Qualcomm's UMTS Licensing also discriminates through a form of tying products together, called "price netting." The royalty paid under UMTS Licensing is based on the end-user price for the entire UMTS device, if the cell phone uses a chipset made by a competitor of Qualcomm. However, if licensees use a Qualcomm chipset, they may deduct (or "net out") the price paid to Qualcomm for the Qualcomm chipset from the end-user price of the UMTS device before calculating the royalty. "Price-netting" explicitly ties the patent royalty (fees paid on a license for Qualcomm's WCDMA patents) to UMTS chipsets manufactured by Qualcomm. "Price-netting" does not further any legitimate business interest, but rather is intended to harm competition. This UMTS Licensing Practice ensures that every non-Qualcomm UMTS chipset purchased by a device manufacturer carries a hefty financial penalty.

55.     UMTS Licensing's discrimination against non-Qualcomm UMTS chipsets does not reflect any legitimate competitive interest or business need, but is intended to and does harm competition in the UMTS chipset market.

56.     Qualcomm executives have publicly confirmed that UMTS Licensing involves price discrimination. Qualcomm's President, Steve Altman, stated in the earnings call for Qualcomm's 2005 fourth quarter: "We have provided a small discount for using our chips to companies currently selling WCDMA handsets in Europe, which we believe to be nothing more than legitimate and lawful price examination [sic]." *Full Transcript of Qualcomm's 4Q05 Conference Call — Prepared Remarks (QCOM)*, at http://seekingalpha.com/article/4317-full-transcript-of-qualcomms-4q05-conference-call-prepared-remarks-qcom (November 16, 2005).

57.     **UMTS Licensing Requires Unfair and Discriminatory Double Royalty Payments.** Upon information and belief, Qualcomm requires licenses from both chipset manufacturers and cell phone manufacturers. This UMTS Licensing Practice requires that cellular device manufacturers pay a royalty rate based on the sales price of each UMTS cell phone sold: chipset manufacturers cannot sell UMTS chipsets to cell phone

EXHIBIT __A__ PAGE __19__

1   manufacturers without a Qualcomm license, and UMTS device manufacturers cannot buy

2   UMTS chipsets from manufacturers without a Qualcomm license. Further, device

3   manufacturers pay the same royalty regardless of whether they purchased the UMTS chipset

4   or manufactured it themselves – although (as alleged above) manufacturers do receive a

5   discount if they purchase the chipsets directly from Qualcomm. Hence, Qualcomm's

6   royalty scheme enables it to collect royalties at two levels of the UMTS device market.

7       58.    By requiring an individual license from each chipset supplier and UMTS

8   device manufacturer, Qualcomm has also gained control over the interactions between

9   suppliers and manufacturers, which is used to discriminate between customers depending on

10  whether they use Qualcomm or non-Qualcomm chipsets.

11      59.    On information and belief, Qualcomm has threatened UMTS device

12  manufacturers with termination of their licenses and patent and/or breach of contract

13  litigation if they purchase UMTS chipsets from any company that does not have its own

14  license from Qualcomm. Qualcomm has made these threats notwithstanding its knowledge

15  that at least some of those cell phone manufacturers have paid a royalty on UMTS chipsets

16  and are licensed to sell UMTS cell phones incorporating UMTS chipsets. None of the other

17  patent owners with patents essential to the UMTS standard require this double royalty. This

18  double royalty violates Qualcomm's FRAND obligations, not only because it is unfair and

19  unreasonable, but also because it imposes different effective royalty rates (for the same

20  bundle of rights) on UMTS device manufacturers that use third party UMTS chipsets than

21  on those that use self-manufactured chipsets. This exacerbates the effect of UMTS

22  Licensing's discrimination against manufacturers that use non-Qualcomm UMTS chipsets

23  and increases costs to consumers.

24      60.    **UMTS Licensing Extends Royalty Payments to Unpatented**

25  **Components of UMTS Chipsets.** Upon information and belief, UMTS Licensing requires

26  royalty payments on certain components of a UMTS chipset that are not covered by

27  Qualcomm's WCDMA patents. This UMTS Licensing Practice discriminates against other

28  UMTS chipset manufacturers who may seek to improve and enhance the functionality of

EXHIBIT ___A___ PAGE __20__

1     their UMTS chipsets. This UMTS Licensing Practice is unreasonable, unfair, and

2     anticompetitive, because it dampens the economic incentives of UMTS licensees to improve

3     and add functionality to UMTS chipsets.

4         61.     **UMTS Licensing Requires Unreasonable Royalty Demands**

5     **Contrary to FRAND Commitments.** The royalty rates charged by Qualcomm to UMTS

6     chipset manufacturers for Qualcomm's WCDMA technology are far greater than the rates

7     charged by any other company proclaiming to be an essential WCDMA patent holder.

8         62.     In addition, Qualcomm publicly represents that it charges the same

9     royalty rate for licensing its WCDMA patents as it does for its 3G CDMA patents, even

10     though its patents cover a much smaller proportion of the UMTS standard than the 3G

11     CDMA standard. Thus, *Qualcomm's patents add far less value to the 3G UMTS standard*

12     *than to the 3G CDMA standard, though Qualcomm charges the same license rate for both.*

13     This UMTS Licensing Practice lessens competition in the UMTS market and encourages

14     competition in the 3G CDMA market. Using this UMTS Licensing Practice as leverage,

15     Qualcomm has increased its market power over the entire market for 3G cellular devices.

16         63.     Steve Altman stated at Qualcomm's May 5, 2005 Spring Analyst

17     Meeting that Qualcomm's licensees are obliged to pay the same royalty rates regardless of

18     whether any of its patents expire and regardless of the number or percentage of WCDMA

19     essential patents held, provided that at least "one claim of one patent applies." Qualcomm's

20     2006 10-K states:

21

22            Generally, we have licensed substantially all of our patents to our CDMA licensees. Under each of our existing license agreements covering multiple CDMA standards,

23            the royalty rate paid to us for sales of licensed 3G CDMA (regardless of whether it is CDMA2000, WCDMA, TD-CDMA or TD-SCDMA) subscriber products *is no less*

24            *than the rate that such licensee pays for its licensed second generation cdmaOne* [2G CDMA] *subscriber products.*

25            Qualcomm Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006,* at 10-11 (emphasis added).

26         64.     Similarly, Qualcomm has rejected attempts by other WCDMA essential

27     patent holders to set up a government-or-SDO-approved ceiling on the royalty rate at which

28

EXHIBIT A    PAGE 21

1    all WCDMA technology for cell phones would be licensed in order to encourage adoption

2    and proliferation of the technology.

3         65.    **UMTS Licensing Requires Unfair Grant-back Provisions.**  Upon

4    information and belief, Qualcomm demands that UMTS licensees grant back to Qualcomm

5    licenses for their own patents on terms much more favorable to Qualcomm.  This UMTS

6    Licensing Practice requires UMTS licensees to provide to Qualcomm substantially broader

7    licenses for their own patents than what Qualcomm grants to the UMTS licensees.  This

8    UMTS Licensing Practice violates Qualcomm's FRAND commitments because the grant-

9    back provisions are not reciprocal, but are overly broad.  Qualcomm's insistence on an

10   asymmetrical grant-back has the additional anticompetitive effect of discouraging

11   innovation by Qualcomm's licensee-competitors and thus, undermines competition for

12   UMTS chipsets and technology.  This UMTS Licensing Practice is anticompetitive, because

13   it creates an imbalance of power between Qualcomm and its competitors that threatens to

14   seriously hamper those competitors over the long-term.  It is also discriminatory in that it

15   affects licensees with extensive relevant patent portfolios more than it affects those without

16   such a portfolio.

17        66.    **Pricing Data Exchange Under UMTS Licensing Is Anticompetitive.**

18   Upon information and belief, UMTS Licensing requires UMTS chipset licensees to provide

19   to Qualcomm sensitive sales and pricing information, even when those licensees are

20   competing directly with Qualcomm.  This UMTS Licensing Practice discourages price

21   competition and lacks any legitimate business justification.  The effect is to prevent

22   competition to the detriment of consumers.

23        67.    **Qualcomm Offers Incentives to Device Manufacturers to Foreclose**

24   **Competition in the UMTS Chipset Market.**  Upon information and belief, Qualcomm

25   provides discounts, marketing incentives, payments and/or other rewards to cell phone

26   manufacturers who use Qualcomm UMTS chipsets exclusively.  These inducements

27   undermine competition from other UMTS chipset manufacturers by increasing the costs of

28   firms who seek to sell UMTS chipsets to device manufacturers relative to Qualcomm's

PARISI & HAVENS LLP
15233 Ventura Blvd Drive
Sherman Oaks, CA 91403
(818) 990-1799

-17-

Class Action Complaint

EXHIBIT A  PAGE 22

1  costs, and by defeating competition that would expand UMTS chipset output, improve

2  quality and reduce the price of UMTS cell phones. These inducements may amount to tens

3  of millions of dollars per cell phone manufacturer licensee.

4         68.     **UMTS Licensing Harms Competition.** Collectively and individually,

5  Qualcomm's UMTS Licensing Practices have restrained, eliminated, curbed, and reduced

6  competition and undermined innovation in the UMTS chipset market, as well as the market

7  for UMTS-capable devices. Competition could accelerate the decline in prices in the UMTS

8  device market and facilitate other non-price competition, including advances in functionality

9  and quality. Qualcomm intended to restrain competition when it implemented the UMTS

10 Licensing Practices, to protect itself from competition on the merits.

11        69.     The anticompetitive impact of UMTS Licensing can be inferred from

12 Qualcomm's own statements. For instance, out of 36 HSDPA-capable devices on the

13 market, only two use non-Qualcomm chipsets. Qualcomm, *Qualcomm Press Conference*, at

14 18 (Feb. 12, 2007), at http://www.qualcomm.com/press/PDF/3gsm07_pressbriefing.pdf.

15 Qualcomm provides manufacturers with the chipset for all 41 laptops with HSDPA-

16 embedded chipsets. *Id.* at 19. Qualcomm has over 80 UMTS vendor licensees. *Id.* at 20.

17 Indeed, revenue from UMTS Licensing composes more and more of Qualcomm's overall

18 income: Qualcomm estimates that "the ratio of WCDMA reported royalties to total reported

19 royalties was 49% [in fiscal year 2006], up from 41% reported in [fiscal year 2004]."

20 Qualcomm Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*, at 45.

21                         **The Relevant Product Markets**

22        70.     **Device Market.** The relevant product market ("Device Market") is the

23 global market for UMTS-capable devices.

24        71.     Plaintiff is an end consumer in the UMTS device market. Plaintiff

25 purchased an LG-CU500 cell phone.

26        72.     Plaintiff has suffered harm from Qualcomm's anticompetitive UMTS

27 Licensing Practices. Both UMTS chipset and UMTS device manufacturers suffer direct

28 anticompetitive harm from Qualcomm's UMTS Licensing Practices. This anticompetitive

EXHIBIT A  PAGE 23

1    harm includes supracompetitive prices and impaired non-price competition in innovation of
2    UMTS functionality. Because the entire UMTS chipset and device industries are uniformly
3    subject to the effects of UMTS Licensing, no individual competitor in those markets has any
4    economic incentive to absorb these costs. Instead, UMTS chipset manufacturers pass
5    UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers
6    pass those costs down to their vendors, and the vendors ultimately pass those costs on to end
7    consumers, such as Plaintiff.

8         73.    Since the inception of cellular service in the United States, cellular
9    carriers have competed not only through their cellular service, but have also bundled their
10   services with cellular devices compatible with (and necessary to use) that cellular service.
11   Carriers have subsidized the cost of these bundled devices for over fifteen years.

12        74.    Despite these subsidies, end consumers who purchase their devices
13   through cellular carriers pay more for UMTS devices than they would in the absence of the
14   anticompetitive effects of Qualcomm's UMTS Licensing. Indeed, the carriers' ability to
15   offer subsidies on UMTS devices is curtailed and limited by those same anticompetitive
16   effects. Further, end consumers pay sales tax on the entire cost of the device –
17   notwithstanding the carriers' subsidy. UMTS devices are no longer a niche market, but now
18   constitute a burgeoning new consumer technology, and are well on their way to becoming
19   the next ubiquitous consumer standard in cellular technology. Qualcomm executives
20   estimated in a 2006 earnings conference call that approximately 96 million WCDMA units
21   shipped in 2006, up from 50 million units in 2005. *Qualcomm Incorporated F2Q06*
22   *(Quarter ending Mar 26, 2006) Earnings Conference Call Transcript (QCOM)*, at
23   http://seekingalpha.com/article/9210-qualcomm-inc-f2q06-quarter-ending-mar-26-2006-
24   earnings-conference-call-transcript-qcom (Apr. 20, 2006). Qualcomm's recent estimate for
25   UMTS sales in 2007 is 180 million units. *Qualcomm Incorporated F3Q07 (Qtr End*
26   *6/30/07) Earnings Call Transcript*, at http://seekingalpha.com/article/42372-qualcomm-
27   f3q07-qtr-end-6-30-07-earnings-call-transcript (July 20, 2007).
28

PARISI & HAVENS LLP
11223 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-19-
Class Action Complaint

EXHIBIT __A__ PAGE __24__

75.    **Alternative Device Market.** Qualcomm has leveraged its market power over UMTS devices and chipsets to increase its market power over the entire market for cellular devices using any 3G standard.

76.    Qualcomm exercises exclusive control over the patents needed to use the 3G CDMA standard, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm substantially controls the patent portfolio needed to manufacture 3G CDMA devices.

77.    The market for 3G CDMA-related patents is significant because of the adoption of the 3G CDMA standard by, among others, Verizon Wireless and Sprint Communications. Qualcomm therefore derives significant market power from its 3G CDMA patents.

78.    The UMTS Licensing Practices undermine competition between UMTS device and chipset manufacturers and the manufacturers of 3G CDMA devices and chipsets. Through the UMTS Licensing Practices, Qualcomm imposes an anticompetitive penalty on competitors seeking to manufacture UMTS devices and chipsets. Qualcomm uses its market power over the IPRs necessary to use the 3G CDMA standard to eliminate, limit, or mitigate this penalty for manufacturers of 3G CDMA devices and chipsets. Consequently, the UMTS Licensing Practices make 3G CDMA device and chipsets a more attractive market than UMTS devices and chipsets, while deterring investment in the UMTS standard.

79.    Because UMTS and 3G CDMA are the only standards that current 3G chipset and device manufacturers can use, the UMTS Licensing Practices can reasonably be expected to drive chipset and device manufacturers from investing and competing in the UMTS standard to investing and competing in the 3G CDMA standard. The 3G CDMA standard benefits from the network effects of increased investment, making it more attractive relative to the UMTS standard (or any other possible alternative cellular standard). Because there are relatively fewer IPR owners with an interest in the 3G CDMA standard, additional investments in the 3G CDMA standard and additional competition in the market

1  for 3G CDMA devices increases Qualcomm's market power over the entire 3G cellular
2  device market.

3      80.    Qualcomm uses its market power over UMTS devices and chipsets to
4  increase its market power over the entire 3G cellular device market by deterring investment
5  in the UMTS standard (or any other possible alternative standard to the 3G CDMA
6  standard) and driving investment into the 3G CDMA standard. Qualcomm's leveraging of
7  its market power comes at the expense of competition in the market for UMTS devices and
8  chipsets: the UMTS Licensing Practices have the effect of prolonging high prices for and
9  undermining innovation in UMTS chipsets and UMTS devices.

10      81.    In addition and/or in the alternative to the Device Market, the relevant
11  product market is the global market for 3G cellular devices ("Alternate Device Market").

12      **The Relevant Service Market**

13      82.    The subsidies that cellular carriers provide to their subscribers are not
14  costless, and some portion of the carriers' cellular service fees is attributable to these
15  subsidies. In effect, the carriers distribute the cost of these subsidies to each and every one
16  of their subscribers (regardless of whether these subscribers used or purchased a subsidized
17  cellular device).

18      83.    Some portion of carriers' costs of subsidizing the purchase of UMTS-
19  compliant devices is attributable to Qualcomm's anticompetitive conduct. Carriers pay
20  supracompetitive prices to purchase UMTS devices that can be sold to their cellular service
21  customers at subsidized prices. These supracompetitive fees are passed on to the carriers'
22  consumers.

23      84.    On information and belief, however, the supracompetitive fees
24  attributable to Qualcomm's anticompetitive conduct are not distinctly allocated to the price
25  of the UMTS devices sold through the carriers to their cellular subscribers. Rather, these
26  supracompetitive fees are effectively distributed through carriers' service fees to all their
27  customers. Plaintiff and the other cellular service subscribers have paid higher prices for
28  their cellular service because of Qualcomm's anticompetitive conduct.

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-21-
Class Action Complaint

EXHIBIT A PAGE 26

85.     Plaintiff does not seek to determine whether cellular carriers' rates are reasonable, but rather to eliminate and redress the anticompetitive impact of Qualcomm's conduct – which impact may be measured, in part, by cellular carriers' fees.

86.     The relevant service market ("Service Market") is the cellular service of every carrier which bundles its cellular service with subsidized UMTS-compliant devices in the United States.

## CLASS CERTIFICATION ALLEGATIONS

87.     Plaintiff seeks certification of a Device Class and a Service Class. The Device Class seeks injunctive relief under state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased a UMTS-capable cellular device. The Service Class seeks injunctive relief under state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased cellular service from a carrier that bundled its cellular services with subsidized UMTS-capable devices.

88.     Plaintiff seeks certification California Code of Civil Procedure section 382. Plaintiff brings this action as a private attorney general, and to vindicate and enforce an important right affecting the public interest. Plaintiff is therefore entitled to an award of attorneys fees under California Code of Civil Procedure § 1021.5 for bringing this action.

### Allegations for Certification of Device Class

89.     **Definition of the Device Class.** Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased a UMTS-capable cellular device (the "Device Class"). Excluded from the Device Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-22-
Class Action Complaint

EXHIBIT __A__ PAGE __27__

90.    **Device Class Numerosity.** Joinder of all Device Class members is impracticable. Qualcomm itself estimates some 326 million UMTS devices were sold globally in the last three years. Qualcomm estimates that UMTS-based phone sales represented approximately 41% of all manufacturer handset sales in Western Europe during the period from April 2006 through June 2006. *Qualcomm Incorporated, Form 10-K For the Fiscal Year Ended September 24, 2006*, at 45. There were an estimated 2.3 million 3G cellular handsets and more than 2.3 million HSDPA-capable PC cards in service in the United States at the end of 2005. *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report*, 21 FCC Rcd 10947, ¶ 165 (Sept. 26, 2006) ("*Eleventh Report*").

91.    **Device Class Commonality.** Common questions of fact and law exist as to all Device Class members and predominate over the questions affecting only individual Class members. These common questions include:

a)    Whether Qualcomm's patents are essential to manufacturing UMTS chipsets or UMTS devices;

b)    Whether Qualcomm has represented its patents are essential to manufacturing UMTS chipsets or UMTS devices to relevant manufacturers, and said manufacturers have relied on those representations;

c)    Whether Qualcomm represented or committed that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

d)    Whether Qualcomm intentionally misrepresented that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

e)    Whether Qualcomm has committed the UMTS Licensing Practices alleged above;

f)    Whether the UMTS Licensing Practices alleged above are fair, reasonable and non-discriminatory;

g)    Whether Qualcomm reneged on its commitments to license its UMTS patents on FRAND terms;

h)   Whether the UMTS Licensing Practices have anticompetitive effects, including supracompetitive pricing and impair non-price competition in the form of deterred innovation;

i)   Whether the UMTS Licensing Practices' anticompetitive effects are passed on to end consumers of UMTS devices;

j)   What portion of end-user prices for UMTS devices are attributable to Qualcomm's anticompetitive conduct alleged herein;

k)   Whether UMTS Licensing creates a trust in violation of the California Cartwright Act;

l)   Whether Qualcomm's UMTS Licensing Practices are unlawful and otherwise unfair, and thereby constitutes a violation of California's unfair competition law; and

m)   Whether Plaintiff and the Device Class are entitled to relief, and the nature of such relief.

92.     **Device Class Typicality.** Plaintiff's claims are typical of the claims of other Device Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Device Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

### Allegations for Certification of Service Class

93.     **Definition of the Service Class.** Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices (the "Service Class"). Excluded from the Service Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

94.     **Service Class Numerosity.** Joinder of all Service Class members is impracticable. In December 2005, the two largest GSM-based carriers collectively had roughly 76 million subscribers. *See Eleventh Report*, Table 4. Both these carriers subsidize

EXHIBIT __A__ PAGE __29__

1  their subscribers' purchase of UMTS devices, and the size of their subscriber base is

2  sufficient for numerosity without considering any regional cellular carriers.

3       95.    **Service Class Commonality.** Common questions of fact and law exist

4  as to all Service Class members and predominate over the questions affecting only

5  individual Class members.  In addition to the common questions raised by the Device Class,

6  these common questions include:

7

8      a)    Whether the UMTS Licensing Practices' anticompetitive effects are passed on
        to cellular subscribers of carriers which subsidize their subscribers' purchase
        of UMTS devices;

9

10      b)    What portion of prices for cellular service are attributable to Qualcomm's
        anticompetitive conduct alleged herein;

11      c)    Whether Plaintiff and the Service Class are entitled to relief, and the nature of
        such relief.

12

13       96.    **Service Class Typicality.** Plaintiff's claims are typical of the claims of

14  other Service Class members, as the wrongful conduct of Defendant threatens the Plaintiff

15  and other Service Class members with the same injury and/or damages arising out of and

16  based upon the same transactions, made uniformly to the Plaintiff and the public.

17

18       **Allegations Common to the Device Class and Service Class**

19       97.    **Adequate Representation.** Plaintiff will fairly and adequately represent

20  and protect the interests of the other members of the Device and Service Classes, and has

21  retained counsel competent and experienced in complex class actions.  Plaintiff has no

22  interest antagonistic to the members of either Class, and Defendant has no defenses unique

23  to Plaintiff.

24       98.    **Predominance and Superiority.** This class action is appropriate for

25  certification, because class proceedings are superior to all other available methods for the

26  fair and efficient adjudication of this controversy.  Joinder of all members of the Classes is

27  impracticable.  The damages suffered by each individual member of the respective Classes

28  will likely be relatively small, especially given the burden and expense of individual

PARISI & HAVENS LLP
15233 Ventura Blvd
Sherman Oaks, CA 91403
(818) 990-1299

-25-
Class Action Complaint

1  prosecution of the complex litigation necessitated by the actions of Defendant. It would be

2  virtually impossible for the Class or Subclass members individually to obtain effective relief

3  from the misconduct of Defendant. Even if members of the Class or Subclass themselves

4  could sustain such individual litigation, it would still not be preferable to a class action,

5  because individual litigation would increase the delay and expense to all parties due to the

6  complex legal and factual controversies presented in this Complaint. By contrast, a class

7  action presents far fewer management difficulties and provides the benefits of single

8  adjudication, economy of scale, and comprehensive supervision by a single Court.

9  Economies of time, effort, and expense will be fostered and uniformity of decisions will be

10  ensured.

11    99.    **Policies Generally Applicable to the Classes.** This class action is also

12  appropriate for certification because Defendant has acted or refused to act on grounds

13  generally applicable to the members of both Classes, thereby making appropriate final

14  injunctive relief and/or corresponding declaratory relief with respect to the Classes as a

15  whole. The policies of the Defendant challenged herein apply and affect the Classes

16  uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct, not on

17  facts or law applicable only to Plaintiff.

18    100.    **Market Power.** Qualcomm acquired market power – the power to raise

19  prices and restrict output – in the Relevant Markets through the incorporation of its

20  WCDMA patents in the UMTS standard and the widespread adoption of the UMTS

21  standard by cellular carriers.

22    101.    **Willful Acquisition of Monopoly Power Through Intentional**

23  **Misrepresentation.** Qualcomm acquired monopoly power by intentionally misrepresenting

24  to the relevant SDOs and their members that Qualcomm would license its WCDMA patents

25  on fair, reasonable, and non-discriminatory terms.

26    102.    **SDOs' Adoption of UMTS Standard.** The UMTS standard was

27  adopted in a consensus-oriented, private standard-setting environment. Every relevant SDO

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-26-
Class Action Complaint

EXHIBIT ___A___ PAGE __31__

1  and all of their members relied on Qualcomm's intentional misrepresentations about its

2  commitment to license its WCDMA patents on FRAND terms.

3      103.    **Qualcomm Reneged on its FRAND Commitments.** Qualcomm has

4  reneged on its commitments to licensing under FRAND terms. Qualcomm's UMTS

5  Licensing is unfair, unreasonable, and discriminatory – and has serious anticompetitive

6  effects.

7      104.    **Leveraging Monopoly Power.** Qualcomm exercises exclusive control

8  over its 3G CDMA-related patents, and derives significant market power over the market for

9  3G CDMA devices from those patents. Qualcomm uses its market power over UMTS

10 devices and chipsets as a leverage to increase its market power over the entire 3G cellular

11 device market by deterring investment in the UMTS standard (or any other possible

12 alternative cellular standard) and driving investment into the 3G CDMA standard.

13     105.    **Causal Antitrust Injury.** Defendant's actions have injured Plaintiff and

14 the Device and Service Class members and threaten them with additional antitrust injury in

15 the form of more expensive UMTS cellular devices, reduced selection, and lessened non-

16 price competition. Plaintiff and the Class Members have sustained antitrust injuries from

17 the Defendant's actions in the form of increased costs for UMTS cellular devices than they

18 would have otherwise.

19
                        **FIRST CAUSE OF ACTION**
20
                        **Against all Defendants**
21
                   **Cal. Bus. & Prof. Code §§ 16720, 16726**
22
     106.    Plaintiff incorporates the above allegations by reference.
23
     107.    Through the UMTS Licensing, Qualcomm and its various licensees
24
   formed a combination of capital, skill and/or acts by two or more persons for the purpose of
25
   creating restrictions and preventing competition in manufacturing, making, sale and/or
26
   purchase of UMTS devices. Qualcomm used (and continues to use) coercive and deceptive
27
   tactics to impose restraints upon otherwise uncooperative licensees, and procured (and
28

1  continues to procure) the unwilling cooperation of these licensees through threats and

2  intimidation. The UMTS Licensing therefore creates a trust prohibited by California's

3  Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726).

4       108.    In addition or in the alternative to the foregoing allegations, the UMTS

5  Licensing Practices constitute a trust in violation of the Cartwright Act, even if Qualcomm's

6  commitment to FRAND licensing was not intentionally false at the time it was made and

7  Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for

8  the UMTS patents and engaging in the UMTS Licensing Practices.

9       109.    The UMTS Licensing has caused antitrust injury to Plaintiff and the

10  other members of the Device and Service Classes and threatens additional antitrust injury if

11  it is allowed to continue. This antitrust injury consists of damages from supracompetitive

12  prices (which are passed down from Qualcomm's licensees to UMTS vendors, including

13  cellular carriers, to end consumers of UMTS devices and cellular services), as well as

14  impaired non-price competition in the form of deterred innovation.

15       110.    Plaintiff, on his own behalf and on behalf of the other Device and

16  Service Class members, seeks treble damages (with interest), injunctive relief enjoining the

17  UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including

18  reasonable attorneys' fees, under the Cartwright Act (Cal. Bus. & Prof. Code § 16750).

19

20  

**SECOND CAUSE OF ACTION**

**Against all Defendants**

**Cal. Bus. & Prof. Code § 17200,** *et seq.*

21

22       111.    Plaintiff incorporates the above allegations by reference.

23

24       112.    Qualcomm's UMTS Licensing Practices, as alleged above, are unlawful
business acts or practices.

25

26       113.    The UMTS Licensing Practices are unfair business acts or practices. In

27  addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices are
unfair or deceptive business acts or practices even if Qualcomm's commitment to FRAND

28

1    licensing was not intentionally false at the time it was made and Qualcomm committed an

2    unfair or deceptive business act or practice by simply reneging on its commitment to

3    FRAND licensing for the UMTS patents.

4        114.    The UMTS Licensing has damaged Plaintiff and the other members of

5    the Device and Service Classes and threatens damage if it is allowed to continue. This

6    damage consists of supracompetitive prices (which are passed down from Qualcomm's

7    licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices

8    and cellular services), as well as impaired non-price competition in the form of deterred

9    innovation.

10       115.    Plaintiff, on behalf of the general public, on his own behalf and on behalf

11   of the members of the Device and Service Classes, seeks injunctive relief, including

12   restitution of all supracompetitive fees, under California's unfair competition law (Cal. Bus.

13   & Prof. Code § 17203).

14

15       WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor

16   and against Defendant as follows:

17       a)    Certifying the action as a class action and designating Plaintiff and his counsel
             as representatives of the Device Class and the Service Class;

18
         b)    With respect to the First Cause of Action, treble damages in an amount to be
19             determined at trial against Qualcomm and in favor of the Device Class and the
               Service Class;
20
         c)    With respect to all causes of action, an injunction against further
21             anticompetitive acts, and the costs of the suit, including reasonable attorneys'
               fees, against Qualcomm and in favor of the Device Class and the Service
22             Class;

23       d)    With respect to the Second Cause of Action, equitable relief including an
               accounting, a constructive trust and restitution, in an amount to be determined
24             at trial, and attorneys' fees, against Qualcomm and in favor of the Injunctive
               Class;
25
         e)    Awarding pre- and post-judgment interest; and
26
         f)    Granting such other and further relief as the Court may deem just and proper.
27

28

EXHIBIT __A__ PAGE _34_

DATED: April 17, 2008

PARISI & HAVENS LLP

By
David C. Parisi
Suzanne Havens Beckman
Attorneys for plaintiff Merdad Valikhani, on
behalf of himself, the general public and all others
similarly situated

PARISI & HAVENS LLP
15233 Ventura Drive
Sherman Oaks, CA 91403
(818) 990-1299

-30-
Class Action Complaint

EXHIBIT A PAGE 85

## DEMAND FOR JURY TRIAL

1    Plaintiff hereby demands a trial by jury of all claims and causes

2

3    of action in this lawsuit.

4

5    DATED: April 17, 2008                    PARISI & HAVENS LLP

6

7                                             By:

8                                             David C. Parisi
                                              Suzanne Havens Beckman
9                                             Attorneys for plaintiff Merdad Valikhani, on
                                              behalf of himself, the general public and all others
10                                            similarly situated

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARISI & HAVENS LLP
15233 Ventura Drive
Sherman Oaks, CA 91403
(818) 990-1299

-31-
Class Action Complaint

EXHIBIT __A__ PAGE __36__

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

| | |
|---|---|
| STREET ADDRESS: | 330 West Broadway |
| MAILING ADDRESS: | 330 West Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 685-6028 |

PLAINTIFF(S) / PETITIONER(S):      Merdad Valikhani

DEFENDANT(S) / RESPONDENT(S): Qualcomm Incorporated

VALIKHANI VS. QUALCOMM INCORPORATED

| NOTICE OF CASE ASSIGNMENT | CASE NUMBER:<br>37-2008-00082231-CU-AT-CTL |
|---|---|

Judge: William R. Nevitt, Jr.                                    Department: C-64

COMPLAINT/PETITION FILED: 04/18/2008

### CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

COMPLAINTS: Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

DEFAULT: If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

**NOTICE OF CASE ASSIGNMENT**

EXHIBIT __A__ PAGE 37


## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2008-00082231-CU-AT-CTL        CASE TITLE: Valikhani vs. Qualcomm Incorporated

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non- binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

EXHIBIT A PAGE_____

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

EXHIBIT __A__ PAGE __38__

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS:      330 West Broadway | |
| MAILING ADDRESS:      330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA  92101-3827 | |
| BRANCH NAME:          Central | |

| PLAINTIFF(S):   Merdad Valikhani |
|---|
| DEFENDANT(S): Qualcomm Incorporated |
| SHORT TITLE:    VALIKHANI VS. QUALCOMM INCORPORATED |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221) | CASE NUMBER:<br>37-2008-00082231-CU-AT-CTL |
|---|---|

Judge: William R. Nevitt, Jr.                                    Department: C-64

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

☐  Court-Referred Mediation Program                    ☐  Court-Ordered Nonbinding Arbitration

☐  Private Neutral Evaluation                          ☐  Court-Ordered Binding Arbitration (Stipulated)

☐  Private Mini-Trial                                  ☐  Private Reference to General Referee

☐  Private Summary Jury Trial                          ☐  Private Reference to Judge

☐  Private Settlement Conference with Private Neutral  ☐  Private Binding Arbitration

☐  Other (specify): _____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate: (mediation & arbitration only) _____

Date: _____                    Date: _____

_____                          _____
Name of Plaintiff                                Name of Defendant

_____                          _____
Signature                                        Signature

_____                          _____
Name of Plaintiff's Attorney                     Name of Defendant's Attorney

_____                          _____
Signature                                        Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

IT IS SO ORDERED.

Dated: 04/18/2008                          _____
                                           JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 01-07)     **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**          Page: 1

3



EXHIBIT ___A___ PAGE ___39___

JS 44 (Rev. 12/07)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
MERDAD VALIKHANI, an individual, on behalf of himself, the general public and all others similarly situated

**DEFENDANTS**
QUALCOM INCORPORATED, a Delaware Corporation, and DOES 1-100, inclusive

08 APR 30

**(b)** County of Residence of First Listed Plaintiff Los Angeles
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant San Diego
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
David C. Parisi
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91402
(818) 990-1299

Attorneys (If Known)
William S. Boggs
DLA PIPER US LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
(619) 699-2700

'08 CV 0786 WQH JMA

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) | |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** / **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court |
| ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation |
| ☐ 7 Appeal to District Judge from Magistrate Judgment | | |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC Section 1332(d)
Brief description of cause:
Alleged claims for antitrust violations and unfair business practices

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Exceeds $5 million
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions): JUDGE William Q. Hayes     DOCKET NUMBER 3:08-cv-0655-WQH-LSP

DATE
April 30, 2008

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT # 150865     AMOUNT $350     APPLYING IFP     JUDGE     MAG. JUDGE
TB 04/30/08

American LegalNet, Inc.
www.FormsWorkflow.com

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 150365    — MB

# April 30, 2008
# 11:20:57

## Civ Fil Non-Pris
USAO #.: 08CV0786 CIVIL FILING
Judge..: WILLIAM Q HAYES
Amount.:                    $350.00 CK
Check#.: BC763297

## Total—>  $350.00

FROM: MERDAD VALIKHANI VS
          QUALCOM INC