UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


Broadcom Corporation,          .      Docket #CV-05-3350 (MLC)
                               .
        Plaintiff.             .
                               .      United States Courthouse
           V.                  .      Trenton, New Jersey
                               .      April 25, 2008
Qualcomm Incorporated,         .      2:00 p.m.
                               .
        Defendant.             .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .


TRANSCRIPT OF DISCOVERY HEARING
BEFORE THE HONORABLE JOHN J. HUGHES
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For The Plaintiff:          David Stone, Esq.
                            Boeis Schiller & Flexner, LLP
                            150 JFK Parkway
                            Short Hills, NJ 07078

                            Marc Selwyn, Esq.
                            1117 California Ave.
                            Palo Alto, CA 94301

                            Kate Saxton, Esq.
                            WilmerHale
                            60 State Street
                            Boston, MA 02109

                            James C. Burling, Esq.
                            WilmerHale
                            60 State Street
                            Boston, MA 02109

                            Leon B. Greenfield, Esq.
                            WilmerHale
                            1875 Pennsylvania Ave., NW
                            Washington, DC 20037


EXHIBIT __2__ PAGE __77__

```
For The Defendant:          William J. O'Shaugnhessy, Esq.
                            McCarter & English
                            Four Gateway Center
                            100 Mulberry Street
                            Newark, NJ 07102

                            Peter Barbur, Esq.
                            Cravath Swaine & Moore, LLP
                            825 Eighth Ave.
                            New York, NY 10019

                            Evan Chesler, Esq.
                            Cravath Swaine & Moore, LLP
                            825 Eighth Ave.
                            New York, NY 10019

                            Thomas Kuhnle, Esq.
                            Bingham McCutchen, LLP
                            1900 University Ave.
                            East Palo Alto, CA 94303

                            Robert Feltoon, Esq.
                            Conrad O'Brien
                            1515 Market Street-15th Fl.
                            Philadelphia, PA 19102

Audio Operator:

Transcribing Firm:          Writer's Cramp, Inc.
                            6 Norton Rd.
                            Monmouth Jct., NJ 08852
                            732-329-0191
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

EXHIBIT __2__ PAGE __78__

            THE COURT:  This is <u>Broadcom vs. Qualcomm</u>, 05-3350
(MLC) and we have an array of attorneys.  I don't think I need
Have us enter appearances.  Everybody has signed the sign-in
sheet?

            ALL:  Yes, Your Honor.

            THE COURT:  Who's the local for the Plaintiffs?
Mr. Stone?

            MR. STONE:  Yes, Your Honor.

            THE COURT:  Who's the local for the Defendants?
Mr. O'Shaugnhessy?

            MR. O'SHAUGNHESSY:  Yes, Sir.

            THE COURT:  Stay awake everybody.

     (Laughter)

            THE COURT:  Who's -- any attorneys here from the
California case?

            ALL:  (No verbal response).

            THE COURT:  Interesting, huh, Mr. Chesler?  Very
interesting.

            MR. CHESLER:  Very interesting.

            UNIDENTIFIED SPEAKER:  We have appearances to come I
guess.

            THE COURT:  Okay, well, you're not the ones I'm
looking for.  But anyhow, today's hearing is a discovery

EXHIBIT __2__ PAGE __79__

4

conference.  I decided to do it on the record, so in case
anyone has some question about what we discuss we can consult
the audiotape or the transcript or whatnot.

This emanates from the advice to the Court by counsel in
March, I guess, that there were some problems in the {quote},
"second wave of discovery," the case having come back from the
3rd Circuit.  And the Court having -- and the parties having
conducted considerable discovery in the -- prior to the granted
Summary Judgment Motion.

And as a first order of business I just want to let you
know I'm filing an order today that will carry the May 14th
conference to August 14th.  As nice as it is to see you all I'm
not going to require that you come back within a month.  I
think it's more timely and it will be more productive if we
have it in August.  And again, the purpose of that hearing will
be to discuss the conclusion of fact discovery later that year,
and the settlement, and Summary Judgment Motion practice --
further Summary Judgment Motion practice, or final I guess
Summary Judgment Motion practice, and a date for a final
pretrial conference.  I think the expert discovery carries us
just into the new year.  In any event, that's August 14th.

To get to the business at hand today, the parties had
identified -- well, after a conference call the parties -- it
was suggested by the Court that the parties meet and confer and

EXHIBIT 2 PAGE 80

5

come up with whatever discreet discovery differences they had.
True to form, and I don't mean to disparage anyone, we got
three from one side, five from the other, and they didn't
necessarily mesh.  So I will try and figure out what the issues
are.  In other words, I'm not quite sure you all agree on what
the issues are, which is problematic for a Judge when he
doesn't even know what we're supposed to decide.  But we'll
muddle through it the best we can.

What I want to get out of the way initially is if it's
still a problem the 683 odd unidentified nonparty witnesses
that were identified 26(a)(1) disclosure by Qualcomm, correct?

MR. O'SHAUGNHESSY:  Yes, Your Honor, they were
identified by Broadcom.

THE COURT:  Identified by Broadcom, and you objected
to them?

MR. O'SHAUGNHESSY:  Correct, Your Honor.

THE COURT:  Yes, okay.  And who speaks for Broadcom
on this issue?

MR. BURLING:  I can speak, Your Honor.

THE COURT:  Yes, they think it's a devious way of you
to get over the 40 limit deposition that were imposed.  What do
you say about that?

MR. BURLING:  Well, I don't think -- my name's Jim
Burling, Your Honor, by the way, from Wilmer Hale in Boston.

EXHIBIT ___2___ PAGE ___81___

6

        We disclosed the entities as we knew them, who we thought

could have evidence.  Most of the companies that have been

disclosed to third parties are either actual or potential

customers of us combined, or members of the various, and/or,

members of the various standard setting bodies that  involved

here in the complaint who might know of the alleged practices.

 And we very reason to believe should know of the alleged

practices and the STO rules.

        I think as I read the letter there were two principal

objections to the disclosure.  One was the absolute number of

them, and the other was that we didn't identify named

individuals for each of those companies.  I think the answer to

both of those objections is essentially the same.  We can only

disclose what we know, we don't know at this time the

individuals.  We think Qualcomm should know them better than us

as to the customers with whom they dealt -- they might have

intimidated or influenced not to deal with us with patent

threats.  And we believe that as discovery proceeds --

                THE COURT:  If they did in fact do that.

                MR. BURLING:  If they did do that.  Of course that's

our allegation.  We believe that to be so.  And we think as

discovery proceeds primarily --

                THE COURT:  One would suspect, and I apologize to all

counsel for interrupting, but it helps me focus and it helps

EXHIBIT  2  PAGE 82

7

you move along, one would suspect that having made that claim perhaps you had a witness among the 683 that you thought you might use at a trial on the matter saying that there was that {quote}, "intimidation."

MR. BURLING:  Well, with --

THE COURT:  Wouldn't you think?

MR. BURLING:  With -- from the third -- we certainly have our own people who have that belief.  But we're talking about witnesses from the third parties.

THE COURT:  No, but do you have any third parties that you -- if we were trying this case on Monday, do you have any third party customers that you would offer as a proponent of that claim that, you know, they were somehow intimidated by Qualcomm?

MR. BURLING:  I don't think any that we were able to identify --

THE COURT:  Okay.

MR. BURLING:  -- with certainty at the time of the disclosures.

THE COURT:  Okay, all right, that's fair.  Okay, that's fair.

MR. BURLING:  And the concern, of course, was had we not done this identification, you would then have received a letter later when we tried to take a deposition from somebody

EXHIBIT __2__ PAGE __83__

8

not on the list saying that we were precluded from doing so
because we hadn't included them in the initial disclosure.  So
did we err on the side of over inclusion from that concern?
Perhaps.  But we thought better to err that way and to get all
of them out there than to unduly narrow that list.

    And I might add, I don't believe, and I've tried to keep
up with all the correspondence, I do not believe Qualcomm has
identified any third party witnesses, at least that was the
case as of the time of the correspondence that I had gone over
in this matter.

        THE COURT:  I'm not sure what that means.

        MR. BURLING:  Well, so I think -- we've given them
the best information we could, which is more than they have, is
what I'm trying to say to the Court.

        THE COURT:  Yes, I understand.  I think that -- you
know, and that's an interesting point.  I think you know my
favorite rules, Rule 1 and 26(b)(2),(c)(3), proportionality and
so forth.  683 witnesses, I hope to retire before that trial
should occur, wouldn't you think?

        MR. BURLING:  I'm sure I'll be retired long before as
well.

        THE COURT:  Yes, okay.

        MR. BURLING:  We'll certainly try to winnow it down
as soon as we're able to.  We're starting to go through

EXHIBIT __2__ PAGE __84__

9

documents and talk to more people.  I would hope we could do that very quickly.

THE COURT:  Well, before I hear from the other side, I must -- you know, I think 683 witnesses, it's a staggering number, obviously, but I'm not convinced you did not offer it in good faith or had some devious reason for doing it.  But there has to be some mechanism where pursuant to 26(e) you continue to disclose these supplementally as you learn them, because if we get to a final pretrial conference or to a certification and a Summary Judgment Motion where some third party appears that has not been disclosed, you know of course what will happen to that witness.

MR. BURLING:  We do.  And we hope, Your Honor, to winnow this down.  As I say, we may be using, you know, 30(b)(6) subpoenas to take depositions of some of these.

THE COURT:  Yes, okay.

MR. BURLING:  They'll offer an individual.  Then we'll have the name that we can advance.

THE COURT:  Okay.

MR. BURLING:  And certainly when we get to the pretrial that will be a much winnowed down list.  We can't try a case with that many witnesses, we know that.

THE COURT:  Qualcomm please.

MR. BARBUR:  Good afternoon, Your Honor, Peter Barbur

EXHIBIT __2__ PAGE __85__

from Cravath Swaine & Moore.

I wanted to correct one misstatement that counsel made. What happened is we originally exchanged Rule 26(a) disclosures. We had identified a few third parties. Ms. Saxton, who is sitting in the back row, then sent a letter to us complaining that they didn't think we had listed enough third parties. So we went back and we identified a bunch more third parties in order to take care of that objection.

But what we're now met with is a letter from Mr. Selwyn to the Court -- he's in the back row over there too now -- saying that in fact Rule 26 doesn't require disclosure of third parties. What happened is they told us we had to do it, we did it. We said, you should identify in good faith those third party individuals that you think you might actually use, they said, no, different rule applies to them. No need for Broadcom to identify third parties at all.

       THE COURT:  But they did it anyhow.

       MR. BARBUR:  No, they didn't --

       THE COURT:  To the tune of 683.

       MR. BARBUR:  It's actually 163 --

       THE COURT:  Or whatever it is.

       MR. BARBUR:  -- but they're not individuals, Your Honor.  They're companies.

       THE COURT:  Yes, I understand that.

EXHIBIT 2    PAGE 86

MR. BARBUR:  And the rule specifically says you have to identify individuals who you believe may have relevant evidence that you may rely on.  You can't in good faith list a third party if you haven't identified the individual who in fact might have the relevant evidence.  They don't have a basis for listing 163 third parties if they haven't yet identified any individual who might have relevant evidence.

THE COURT:  Well, they're listing customers, either theirs or yours that they think you have intimidated.  And maybe I'm substituting the word intimidated for whatever.

MR. BARBUR:  Interesting point, Your Honor.  We served on them interrogatories a couple of months ago and just got their responses this week.  One of the things we asked them to do was they had alleged in their complaint that we had made threats directly to their customers, said they needed a license from Qualcomm and they didn't have one.  We said, okay, identify all these threats that you allege occurred.  They came back with zero support for their allegation.

THE COURT:  Well, see, that's why I asked them which one of the 1 -- what is it, 136?

MR. BURLING:  163, I believe, Your Honor.

THE COURT:  163.  Good thing I'm a lawyer not an accountant.

MR. BARBUR:  So obviously if they can't identify in

EXHIBIT __2__ PAGE __87__

their interrogatory responses any third party that they think
actually got a threat how can they list 163 as potentially
having relevant evidence relating to threats?

       THE COURT:  Well --

       MR. BARBUR:  And it also leaves us in a terribly
awkward position because we're facing a very short discovery
time to finish discovery here.  We have a limit of 40
depositions per side.  Broadcom has actually been arguing it
should only be 30 per side.  Your Honor gave us 40.  How do we
begin to deal with 163 companies?  Do we have to take a
30(b)(6) deposition of each company that they've listed in
order to figure out what relevant information they think they
might have?

       THE COURT:  What would you ask them?  Let's suppose
we noticed the deposition, say #1 on the list.  What would you
ask in a 30(b)(6) witness?  Or deposition.  Did we intimidate
you?

       MR. BARBUR:  Do you have any -- we'd have to run
through all the allegations in the complaint and whether they
had any information that would lend any support to them.  We
don't think they do.  They are our customers by and large.  Or
people that we deal with.  But we're not aware of any threats.

       THE COURT:  Okay.

       MR. BARBUR:  They're not aware of any threats.  But

EXHIBIT  2  PAGE  88

13

they've listed 163 companies --

THE COURT:  What's the remedy that you seek for a party listing either bogus -- unidentified or bogus third party or, you know -- I'm trying to think of the third one.  But unidentified, bogus or -- well, let's leave it there.  What's the remedy that you seek?

MR. BARBUR:  I think they should be ordered to serve a new set of Rule 26(a) disclosures on which they disclose only those individuals at companies that they think have relevant information they might rely on.  Not just companies, only individuals, and only individuals where they have a basis for believing that they actually have relevant information.  That would then serve as a real guide for us in taking discovery.  And after all, that's the point of Rule 26(a) disclosures, is to help the parties figure out what discovery they need to take.

THE COURT:  What do you say to that?

MR. BURLING:  Well, I think, Your Honor, we have the same problem, but from the other side.  And it's really a question almost of your philosophy under the disclosure rule.  We don't know what third parties they may add at -- we don't have much of a guide now either, except for one or two names that they have currently listed.

So the question is do we start that those that we

EXHIBIT __2__ PAGE __89__

reasonably believe will have evidence and winnow down?

       THE COURT:  Well --

       MR. BURLING:  Or do we have belated additions as we go forward?

       THE COURT:  Well, let's try and figure it out as if we're going to actually try the case and complete discovery. Because you know, the rule only permits discovery for two purposes.  You know what they are?  Settlement and preparation for trial.  And so that's what we're going to focus on.  And I think that the way to do it is to craft some order, and I'll leave it up to your vivid imaginations to come up with the language that will require timely, on both sides, timely 26(b) identification of specific third party individuals sufficiently in advance of the conclusion of fact discovery to permit a deposition.  And if it's not so timely disclosed that witness will be precluded.  How's that?

       MR. BURLING:  I think that's fine.  But we still need to get rid of the 163 that are on their current list because -- or we have --

       THE COURT:  How about you don't have to depose anybody until that 26(e) designation comes in?

       MR. BURLING:  That's fine, Your Honor.

       THE COURT:  I mean, why create more -- I mean, what you folks give me is enough paper.  Why do we have to do any

EXHIBIT __2__ PAGE __90__

more paper?  Why can't we just do it that way?

MR. BARBUR:  I think we can do that.  We would then -- of course I think each of us would want the opportunity to supplement as additional witnesses became known.

THE COURT:  Well, that's what 26(e) is for.  What I don't want to have happen is that in December 1st all of a sudden we get 15 witnesses from one or the other or both saying, oh, by the way, we got these customers who say, X, Y or Z, or A, B, C or whatever it is.  That's the problem.  And believe me, the Judges in this District have no hesitation about precluding witnesses that are violative of 26(a)(1) or (e).  So having said that, you're all experienced, you all know that.  So I think we have to -- Mr. Stone and Mr. O'Shaugnhessy as part of the order that emanates from this hearing that will be #1 that 26(e) disclosures, including specific identification of witnesses, shall be timely made sufficiently in advance of the conclusion of the fact discovery to prevent their depositions.  Otherwise they will be precluded.  And you can work on the language if you want.  Any problem with that?

MR. BARBUR:  That's fine, Your Honor, thank you.

MR. BURLING:  Thank you.

THE COURT:  Secondly, that I want to really head off at the pass is the number of custodians, and that is Qualcomm I think identified 120?  Is that right or do I have it the other

EXHIBIT __2__ PAGE __91__

way around?

       MR. BARBUR:  You're right, Your Honor.

       THE COURT:  Yes, 120 custodians.  And you want all

120 to search for {quote}, "relevant information," correct?

       MR. STONE:  Yes, we do, Your Honor, and

Mr. Greenfield is prepared to address this issue.

       THE COURT:  Mr. Greenfield, what do you say about

that?  Why isn't -- I think it was Mr. Barbur's letter, I'm not

sure, why isn't a 30 sampling of sorts a first -- a reasonable

first step?

       MR. GREENFIELD:  I think the problem we're facing

here, Your Honor, is that, you know, this is a case about

nondisclosures and fraudulent misrepresentations.  The evidence

comes from their files in large part in those issues.  They

themselves identified 120 custodians with relevant information.

 The burden falls on them --

       THE COURT:  You identified 163.  I see  -- I'm having

nightmares about these numbers.

       MR. GREENFIELD:  120 custodians, Your Honor.

       THE COURT:  No, no, 120 custodians, 163 third party

potential -- unidentified witnesses.

       MR. GREENFIELD:  Right.

       THE COURT:  Just try and zero in -- I don't mean to

cut you off, take as time as you want, why we can't do a

sampling?  I have four custodians in my Chambers.  Pretty much everything on my PC is on their PC.  Why do all four of us have to look for the same thing?

MR. GREENFIELD:  Well, I don't think we're asking for looking for the same thing, Your Honor.  I think what we are concerned about sampling 30 is that we have no way to know whether the correct 30 have been sampled.  You know, we're not operating against a talia rose here.  We have real problems in the San Diego action with, you know, just a massive --

THE COURT:  I'll tell you, if I were Qualcomm that alone would have a very prophylactic affect on providing discovery in this case.  But that's just me.

MR. GREENFIELD:  Well, I mean, we've been provided, Your Honor, no basis to limit to only 30 custodians, and you know, frankly, Your Honor, 81 of these custodians were gone through before.  And it's a matter of running some new search terms that are oriented to the additional 39 custodians and updating the search.  And you know, we have seen no evidence that this can't be done in the required time frame.  And frankly, we're concerned about doing a sampling of 30, not getting the right custodians, having no way to know that, and being left with insufficient time to get documents from, you know, the many custodians who may be excluded who have relevant information, as they disclose themselves.

EXHIBIT  2  PAGE  93

18

THE COURT:  What do you say?

MR. KUHNLE:  Good afternoon, Your Honor.

THE COURT:  Nice to see you again.

MR. KUHNLE:  Nice to be hear, Your Honor, it is.

Let me just put a couple of facts in the record if I may
so we're all on the same page in terms of facts.  We identified
81 custodians in the original discovery in this case.  There
were 170 approximately search terms agreed between the parties
on which we searched the files of those 81 custodians.  That
resulted in just under 7 million pages of documents that came
out of that search effort.

It took us four months to interview, collect and search
for those documents.  And we then had 20 lawyers working 12
hours a day to review the documents, and given that it was
about 7 million pages, took us eight months.

Now in the California case which was stayed in favor of
moving those allegations here, we had additional 31 -- 39,
excuse me, custodians that we identified.  What Broadcom is
telling us they want us to do, and they're demanding we do
this, we go back to all the 81 and we run now a total of 200 --
no, excuse me, about 400 search terms, that is the 170 from the
first case and 230 from the second case, against all of those
81 custodians for the two year -- for all time, all the way
back to 2000, up to the present.  Which includes a two-year

EXHIBIT __2__ PAGE __94__

19

update from where the discovery cutoff was in the first round of this litigation.

Then we take the additional 39 custodians and we run those 400 search terms against them as well for the entire period of time. Now our best estimate, and we've have people working very hard oncoming up with this, and it's quite -- it's not at all a surprising estimate in light of the volume from the first time, that if we go back and run those 400 search terms against the -- all of the original custodians plus the new universe of custodians for those various periods of time, we're gonna get out of that result approximately 10 million pages of additional documents. If we again took --

      THE COURT: Let me interrupt you for a motion.

      MR. KUHNLE: Yes, Your Honor.

      THE COURT: And I've often wondered, because I go to these things just to get out of the Courthouse, has anyone analyzed in any given case, not necessarily this case, how many duplicate documents there are in a search of that nature? You understand what I'm saying?

      MR. KUHNLE: Yes, I understand that exactly, Your Honor. And the answer is, we do that all the time, and here's the problem. There is gonna be some percentage of duplication. Because as you say, your law clerks and you have many duplicates, you get the same, you're on the same distribution

EXHIBIT __2__ PAGE __95__

20

--

        THE COURT:  Let's hope my law clerk has more on his
than I have on mine.

        MR. KUHNLE:  I say that to the associates who work
with me all the time, Your Honor.

    But here's the problem.  As the rules provide, and there's
no quarrel about this from our side, if you get an e-mail from
somebody else that has five people on the distribution list,
and then you forward it with just two words in it, take a look
at this, three or four words, it's no longer a duplicate, even
though the underlying document is the same.  We have an
obligation to produce that as well under the rules.

    So while there's some discounting for absolute -- what we
call mirror image duplicates, there are in this kind of a
universe millions of nonduplicate duplicates, where documents
get forward with additional comments.  Sometimes the comment is
of substantive importance.  I think this is stupid, could be a
substantively important one liner that's added to a five-page
e-mail that's otherwise identical in 10 people's files.

    So deduping is itself part of why it takes so many months
even with all the technology we have, to actually get the
discreet documents that are unique from one another.

        THE COURT:  How would the Plaintiff decide which 30,
or how would you decide which 30 of the 120 to produce?

EXHIBIT  2   PAGE  96

MR. KUHNLE: All right. What we've offered and they've turned down is, they're free to give us all 30 of those names, or any part of those 30. We'll propose them. The answer is, they've got the production from the whole first wave, whatever was deemed responsive from the 7 million pages we reviewed the first time. They've had a long time to read them. They can presumably read them and say, you know what, the people who seem to be at the core of the issues we care most about, at least from that first universe of 81, are the following 15 people. We want them in the first wave.

If they cant do that, and I frankly -- these are good lawyers on the other side -- I'd be surprised if they don't have a pretty good handle on what's in all those documents, then we'll make a good faith effort. And by the way, we didn't say 30 is a drop dead number. We just had to pick a number that had some chance in our communal lifetimes of getting done. If it turns out that they want to add 5 or 10 and say 30 isn't the right number, let's go back and get 40, 40 is a long way from the number we're otherwise dealing with of 120, we're sure we can come to some agreement about that. What we think --

THE COURT: Strike -- go ahead, I'm sorry.

MR. KUHNLE: What we think is just wrong headed here, and in fact in one instance totally inappropriate, is just two things. One, what's just not well advised is the idea that

EXHIBIT 2 PAGE 97

22

we're gonna get through maybe 10 million pages between now and December, the cutoff date, when it took as long as it did to get through 7 million before, that just isn't gonna happen in any real world sense.

The part that I find totally inappropriate, Your Honor, and I want to put this on the record because counsel alluded to it, I was hoping they'd come here today and not do that, is the 1958 case, the California case they're so fond of talking about. I want to make this as clear as I can make it to counsel through the Court.

I am lead counsel in this case. The Wilmer Hale firm was once upon a time the Washington DC office of the Cravath Swaine & Moore firm. I doubt that these lawyers have come here honestly suggesting that I and my law firm are gonna do anything inappropriate in discovery here. They filed a paper in California, and I was out there at the beginning of this week in a conference before Magistrate Judge Major in that case, in which they cited to our effort to cut down to a reasonable number of custodians in this case as quote, and these are their words, "unabated gamesmanship."

Now the time for gamesmanship I would respectfully submit, Your Honor, is over. We're all professionals, we have a job to do here. The job is to get the documents produced in somebody's lifetime. We're not engaged in a gamesmanship. We

EXHIBIT ___2___ PAGE __98__

cannot get through 120 custodians in 10 million pages within the confines of this schedule. If you want to set a three-year schedule we'll do it. I don't think Your Honor wants to do that, and we surely don't want you to.

So we're trying to find a reasonable accommodation. But I do take exception to the suggestion that we're engaged in some kind of inappropriate activity. We --

THE COURT: I understand, and I will cut you off. My history with this case has not been the same as Judge Major, and she has a history in that case that will serve her well. The reason I highlighted the local attorneys at the outset of this hearing was to make sure that we don't commingle the two cases, let's put it that way.

MR. KUHNLE: Understood, Your Honor.

THE COURT: And I think that with respect to this #2 issue, we have to cut to the chase. It strikes me as reasonable given a McPeek type sampling to permit the Plaintiff to pick half, 40, of their -- of the 81 custodians they have some familiarity with, and half of the -- what did you say, it's 29?

MR. KUHNLE: 39, Your Honor.

THE COURT: 39, half of that. So we're at 60 custodians. And I think that that's where I would probably draw the line. And that's half, and I don't see  -- I think

EXHIBIT _2_ PAGE _99_

that's a reasonable amount.

        MR. KUHNLE:  Your Honor, we'll get --

        THE COURT:  As to how they pick the, you know, 40 of the new custodians, that's up to them.

        MR. KUHNLE:  I frankly don't care.  I mean, it's their discovery.  We'll do whatever we have to do to find the responsive documents.

        THE COURT:  So that's half as much of a problem, that's 5 million documents instead of 10 million, maybe.

        MR. KUHNLE:  Maybe.

        THE COURT:  Yes?

        MR. BURLING:  Your Honor, I would only ask that if discovery points to the need for additional custodians that on a reasonable discussion about that that we could ask for some more.

        THE COURT:  There's no question I think that, you know, that would operate as -- on a good cause application, and that can be in paragraph 2 of the order that the Plaintiff is limited to 40 custodians be selected from the original 81 -- what is it, 39?  You know, I'm going to give you 15 of the new custodians for a total of 55.  Right, is that right?

        MR. STONE:  Yes, Your Honor, that's the right amount.

        THE COURT:  And that the Plaintiff may reapply for additional custodians upon a showing of good cause.  Now

EXHIBIT 2 PAGE 100

showing good cause is one of the people you pick something
comes up that may necessarily lead to somebody else or some
string of e-mails or something like that.  But that's -- you
know, that's -- you may never come to that point.  Any problem
with this?

        MR. KUHNLE:  No, Your Honor.  May I ask a question of
the Court?

        THE COURT:  Sure.

        MR. KUHNLE:  We had -- our proposal had been that
each side gets the same number of custodians of the other side.
 May I assume this is a bilateral?

        THE COURT:  Sure.  I think what's sauce for the goose
is sauce for Broadcom and Qualcomm.

        MR. KUHNLE:  Fine, Your Honor, 55%.

        THE COURT:  That's #2.  What else -- now, we get into
I guess the substantive matters here.  And let's see.  And by
substantive matters I mean the request 4768 and 80, and IEEE
802 and Ms. -- is it Ms. Thailer?  Who's Ms. Thailer?  Is that
it?

        UNIDENTIFIED SPEAKER:  That issue I think has been
resolved.

        THE COURT:  Both the -- the 802 issue?

        UNIDENTIFIED SPEAKER:  No, the Thailer issue.

        THE COURT:  Thailer?

EXHIBIT 2  PAGE 101

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  I think it's 802 and on my score card a project called -- an alleged project called Koala and another called Stockholm.

THE COURT:  Stockholm, right?

MR. O'SHAUGNHESSY:  Yes, Your Honor.

THE COURT:  So I think the Defendant Qualcomm wants discovery of Stockholm and Koala, correct?  Is that it?

MR. O'SHAUGNHESSY:  Yes, Your Honor.

THE COURT:  And Plaintiff wants responses to the three -- to 4768 and 80.  Is that where we are?

MR. STONE:  Yes.

THE COURT:  You know, really, I've got to -- it was not easy to figure that out.

(Laughter)

UNIDENTIFIED SPEAKER:  Two points for the Court, Your Honor.

THE COURT:  Yes, it's really not easy.

UNIDENTIFIED SPEAKER:  I think there you mentioned 802 the first time around, but not the second.  I think that's still alive except for Ms.  Thailer.

THE COURT:  Yes, okay, it's funny, and --

UNIDENTIFIED SPEAKER:  So there are three on each

EXHIBIT 2  PAGE 102

side by my count, Your Honor.

THE COURT:  Yes, okay.  And let me -- you want me to -- and it's Qualcomm wants that information, correct?

MR. O'SHAUGNHESSY:  They wanted additional information into other 802 --

THE COURT:  Yes.

MR. O'SHAUGNHESSY:  -- groups.

THE COURT:  Yes, and want to limit it to 802.20.

MR. O'SHAUGNHESSY:  And we offered 16 as a compromise, and I'll explain why.

THE COURT:  Okay.

MR. O'SHAUGNHESSY:  So to 80220 and 802.16.

THE COURT:  All right, well, let's go with -- I forget the chronological, you know, first letter I got.  But let's go with what you want with respect to 4768 and 80.  Quite frankly I read it a couple times and I'm not sure I understand it.  So enlighten me.

MR. BURLING:  Your Honor, I will deal with 47, and then Mr. Greenfield will deal with the other two.  With Your Honor's permission.

THE COURT:  Go ahead.

MR. BURLING:  Let me begin, I think we've all come to this assuming that Your Honor recalls at least some of the basic outlines of the case from prior occasions.  If I need to

EXHIBIT 2  PAGE 103

refresh on any point I'm sure Your Honor will ask me to do that.

Essentially as Your Honor knows, this is an antitrust case.  Broadcom and Qualcomm are competitors for cell phone chip sets --

THE COURT:  Right.

MR. BURLING:  -- in short.  The charges are that Qualcomm misbehaved in connection with standard setting activities in a variety of standard setting organizations and a variety of standards.  The misbehavior was primarily of two types; one called patent ambush, where they would not timely disclose a patent, the technology that that patent covered would then be adopted as a standard, sometimes with their help pushing it in that direction, and then after it became a standard and everybody was locked into it, the patent would be revealed, Qualcomm would be in the driver's position and could extract certain concessions as a result.  Chief among those concessions that involve buying chip sets from Qualcomm rather than Broadcom and that's how Broadcom is heard in that context.

The other principal, misbehavior, was on occasions where there was disclosure in several of the standard setting organizations.  The standard setting organization required what's called a FRAND Commitment which, Your Honor, may recall, is fair, reasonable and non-discriminatory.  The allegation is

EXHIBIT 2 PAGE 104

that Qualcomm sometimes gave those commitments not meaning to follow through and, indeed, in subsequent licensing practices have not compiled with FRAND.  That again, has cast a pall over people who need to practice the standard or face threatened intellectual property claims, and that results in people buying relatively more chip sets from Qualcomm and Broadcom not being able fairly to compete.  That's the essence of the claim.

The -- you will hear today, I think you've already mentioned them, there are several standard setting organizations and standards involved.  The one I'm gonna talk about under Request 47 is a set of standards called CDMA Technology.  There are three or four standards set by the TIA in the United States.

The other two standards you will hear about today in passing, there is one called UMTS, that is set primarily by the Etsie Group in Europe and, lastly, we just mentioned that the IEEE, The International Engineers Association has this 802.20 Standard.  There's also a video compression standard that doesn't come up in the discovery today, disputes today, so I'm not gonna talk about.

THE COURT:  And what is 47-1?  What does your request 47-1 --

MR. BURLING:  47 is seeking discovery about plans for CDMA Technology, licensing, marketing and development.  And

EXHIBIT 2  PAGE 105

CDMA and the standard setting efforts about it are the subject
of extensive allegations in the Complaint, Your Honor.

THE COURT:  And this is part of the Amended
Complaint, correct?

MR. BURLING:  The Second Amended Complaint, yes, Your
Honor.

THE COURT:  Yes.

MR. BURLING:  The allegations say that through this
misbehavior that we spoken of, Qualcomm wrongfully obtained a
technology, monopoly in CDMA Standard Technology.  It
thereafter through abusing that position obtained a chip set
technology in CDMA chip set --

THE COURT:  All right, that's a -- who responds on
behalf of Qualcomm?

BARBUR:  I'll be responding on this Your Honor.

THE COURT:  What's the problem with this?

BARBUR:  The problem is, Your Honor, this case is not
a case about CDMA.  It's a case about what was just mentioned,
UMTS.  There was an allegation in the case, a claim for
monopoly maintenance related to CDMA, which was dismissed by
Judge Cooper and that dismissal was affirmed by the 3rd
Circuit.  There are no claims -- contrary to what was just
said, there is not a claim in this case for a monopolization of
any market involving CDMA or CDMA chip sets.  The two markets

EXHIBIT 2 PAGE 106

at issue are UMTS markets as a technology market and a chip set
market for UMTS.  The only reason CDMA is in here is because
they use it in by way of sort of background allegations in the
Complaint.

        THE COURT:  They, -- you mean the Plaintiff.

        BARBUR:  The Plaintiffs.  There are certain
background allegations in the Complaint relating to CDMA but it
does not go to the core of any of their claims.

        THE COURT:  You would agree that this constitutes
subject matter jurisdiction and not claim jurisdiction -- or
discovery, since the case -- the claim was dismissed.

        BURLING:  I --

        THE COURT:  26(b)(1), you know what I'm talking
about?

        BURLING:  Yes, I do Your Honor and I fear my windup
was so long, I didn't get to the pitch.  And the pitch --

        THE COURT:  I interrupted you, don't blame yourself.

        BURLING:  And the pitch is this; the allegations, and
I didn't say and didn't suggest that there were claims from
monopolization in this Complaint, but there are allegations
that thats what's happened.

        THE COURT:  Yes.

        BURLING:  And they are important and they are in the
Complaint, because the allegation is, and it's recognized by

EXHIBIT  2  PAGE  104

the 3rd Circuit, almost verbatim, even though they dismissed the CDMA claim, the allegation is that Qualcomm is repeating just that behavior with respect to UMTS.  And because it's incumbent upon Broadcom --

THE COURT:  Well, wait a minute, if they either conducted the behavior or they didn't on the second one, why do you have to have the first one?

BURLING:  Because it's incumbent upon Broadcom to show that what they're doing is an intentional attempt to monopolize, if they've done it before and it's succeeded it shows intent.  It's also incumbent upon Broadcom to show dangerous probability of success, if they did just these practices before and they're doing them again and it's succeeded before, it's probable to happen again.

There are two other reasons why this discovery is relevant.  First, and again this is recognized explicitly by the 3rd Circuit; Broadcom, sorry Qualcomm, has used its monopoly position of over CDMA, sometimes I get these acronyms confused, has used its monopoly position over CDMA and the customers who purchase both CDMA and UMTS chips --

THE COURT:  Am I missing something here or if CDMA was actually a claim, articulated in the first Complaint, and Judge Cooper dismissed it and she was affirmed by the 3rd Circuit, you're telling me you conducted no discovery with

EXHIBIT  2   PAG_ 108

respect to CDMA in the first go around?

        BURLING:  We did Your Honor.  And that --

        THE COURT:  Then why are we having this song and dance now?

        BURLING:  Well I -- Your Honor the discovery was not completed with respect to the first go around, and I must say at this time, we are not trying to discover and re-litigate an entire claim on CDMA, this is one request that simply asks for high-level planning documents so that we can show this intent and probable success, and we also want to show licensing practices which Qualcomm itself uses as a reference point to validate the same licensing practices that they are using with UMTS.

    And we agreed to some extent that they are using the same licensing practices, but we say those practices led to a monopoly position in CDMA, and they are planning to do that and they are likely to do that with UMTS.  In the 3rd Circuit in dismissing the claim, nonetheless, several times recognized the connection between UMTS and CDMA, and they said they dismissed the claim for standing.  They said you're not close enough to it, and they went on to say, and besides the harm that you complain about that you will get that anyhow with respect to the existing claims that you have for UMTS.  So I think they recognized the relevance while not allowing us to pursue

EXHIBIT 2 PAGE 109

34

directly a claim.

THE COURT: Bingo. You feel compelled to say anything?

MR. BARBUR: Well there's a lot I'd like to say --

THE COURT: Listen to the question. Do you feel compelled to say anything?

MR. BARBUR: I don't feel compelled, no, Your Honor.

THE COURT: The Court will deny the application for now, and Mr. Stone and Mr. O'Shaughnessy take some notes if you please. Based on a finding by the Court that the #47 relates to subject matter discovery, pursuant to 26(b)(1) and the Plaintiff, at present, has not been able to demonstrate good cause justifying that discovery. However, pursuant to 26(b)(2)(c)(i), the Court will permit inquiry at deposition discovery with respect to CDMA inquiry on that, and you can re-apply for further documentation discovery, document discovery, if you want. Does anybody want -- everybody understand what I just said?

THE COURT: Great.

MR. BURLING: Yes, Your Honor.

BARBUR: Thank you, Your Honor.

THE COURT: Great, what's next? Number 68. And incidentally, #68, #80, the Defendant has alleged that you didn't meet and confer confer on this. What do you say about

EXHIBIT 2 PAGE 110

that?

MR. STONE:  Your Honor we did talk about in meet and confer sessions these requests.  I mean I think frankly there was a misunderstanding about whether we had a dispute about request #68, and once we realized that there was a dispute, we brought it to the Court's attention as quickly as we could.

THE COURT:  Do you think there's a dispute Mr. Barbur with respect to 68 and 80?

MR. BARBUR:  It's hard to tell Your Honor, and part of the reason is that they, in fact, did not raise these issues during the meet and confer process.  We actually had a protocol, we agreed to and explained to the Court, we set a deadline for completing the meet and confer discussions on March 21, we agreed by March 21 --

THE COURT:  All right, I don't need to --

MR. BARBUR:  -- to send Your Honor a letter identifying these dispute --

THE COURT:  This is intoxicating information, but I don't need to hear it.  We'll take a break at 3 o'clock and you and counsel can spend 10 minutes and see whether you can resolve these issues, and I'll address it if you can't.

MR. BARBUR:  That's fine Your Honor.

THE COURT:  Great.  Now we move into the Qualcomm request and who speaks with the IEEE 802 issue?

EXHIBIT  2  PAGE 111

MR. CHESLER:  I will Your Honor.

THE COURT:  Go ahead, why isn't 802.20 sufficient?
That's the one that's a dead issue, isn't it?

MR. CHESLER:  It used to be Your Honor, but it's not
the only one anymore because of this new Complaint they filed.
Let me explain --

THE COURT:  Sure.

MR. CHESLER:  -- if I may.  They allege that we
violated a variety of policies in the standards organizations
and, in particular, with respect to IEEE they say, and I'm
quoting now from Paragraph 252 of their Amended Complaint, "The
IEEE Project 802 policies" -- notice it's not 802 point
anything, 802 -- "policies and procedures prohibit dominance of
a working group by a single organization or committee."  That's
one of many examples I can cite --

THE COURT:  That's background, that's background
information.

MR. CHESLER:  No, they're alleging we violated it,
that is we dominate these organizations in violation of the
rules and that's part of this antitrust violation that they're
alleging against us.  Now, it turns out Your Honor, that the
reason they alleged 802 and they didn't say 802 dot 20 or 802
dot 16 is, the rules are the same and were the same at the
relevant time for all of the 802 organizations of which there

EXHIBIT  2  PAGE  112

are many, that's why they have a dot some other number.  Our
position is very simple; they say you're violating these rules
and by violating those rules, you have acted unlawfully.  We
say --

        THE COURT:  And I understand them to say that you're
violating 802.20.

        MR. CHESLER:  They're saying --

        THE COURT:  If I preclude them from offering any
argument otherwise, why do we have to do all of this discovery?

        MR. CHESLER:  Because, Your Honor, the conduct that
they claim was unlawful for us to have engaged in, in the IEEE
organization --

        THE COURT:  Yes.

        MR. CHESLER:  -- which they allege is the basis for
the antitrust violation, is conduct we intent to show is
exactly what they were doing in other dot point some number in
the same 802 section.

        THE COURT:  Well give me, give me some number.

        MR. CHESLER:  Well, for example --

        THE COURT:  I'll give you some number.

        MR. CHESLER:  I'll give you an example; 802.11, okay?

        THE COURT:  Bingo.

        MR. CHESLER:  802.11 is the WiFi Group, and you know
who WiFi is --

EXHIBIT 2 PAGE 113

THE COURT:  Yes, I know WiFi.

MR. CHESLER:  All right.  So we say if what we were doing in 802.20 was inappropriate, that seems very interesting since you were doing exactly the same thing at 802.11.  What they want is to say, you know, we're only gonna look at what you did in dot 20 we're not gonna let you take discovery of what we did in dot 11.  We're saying the course of conduct in these standard setting organizations where they have the same rules, the course of conduct is what is illuminating and will be to the jury of whether -- about whether or not what we were doing was inappropriate or not.  Okay, we have an unclean adds defense, among other things.

THE COURT:  So your position is that you seek all documentation, electronic or otherwise, relating to the IEEE 802 any point section that they have and you will agree that they can do it to what you have.

MR. CHESLER:  Yes.

THE COURT:  What do you say to that?

MR. STONE:  Well, Your Honor, there are no allegations that we have violated any working of the rules for 802 anything, #1.

THE COURT:  No, but his point is that you have conducted similar conduct with respect to one standard that they conducted with respect to another standard, so if you

EXHIBIT __2__ PAGE _114_

didn't violate it how can you say that they violated it?

        MR. STONE:  Because Your Honor the stamp -- well two responses if I may?

        THE COURT:  Sure.

        MR. STONE:  First, just so we're working on the same playing field here; the allegations, which are in paragraph 251 of the Complaint -

        THE COURT:  Is that what he just referenced, Mr.. Chesler just referenced?

        MR. STONE:  I think Mr. Chesler was referring to that.

        THE COURT:  Okay.

        MR. CHESLER:  I was reading from 252 Your Honor, but it's a series of them.  I was reading one example.

        THE COURT:  Okay.

        MR. STONE:  They do not involve only 802.20 rules and regulations.

        THE COURT:  Right.

        MR. STONE:  They involve overall IEEE rules.

        THE COURT:  Right.

        MR. STONE:  They involve 802 rules and they involve separate 802.20 rules.  And the -- so if you want to say, but we're entitled to look at everybody's conduct over all the rules cited, then you can keep broadening this out until you've taken

EXHIBIT  2   PAGE  115

every standard setting effort --

        THE COURT:  That seems silly to me, but I mean --

        MR. STONE:  So we have to draw a line, it seems to me.  We think because 802.20, which has plenty of room within it to compare behavior and understanding among all the members over eight years is plentiful enough.  But because, Your Honor, albeit in a different context, it previously ruled that this is a case about mobile wireless, about cell phone standards.  And because Qualcomm had made some allegations about how activities in 802.16 affected what happened in 802.20.  We said, fine, as a compromise we'll let you go, we'll offer to go that next step out from 802.20 to 802.16, but going beyond that to all the 802 groups is not willing to.

        THE COURT:  I don't know whether you just picked it out of the sky, but why not point 11?  He seems to think that that's a parallel standard?

        MR. STONE:  Well first of all, it's not cell phones, it's not mobile wireless, it's a computer, computer wireless; second, there are not allegations that connect that to 802.20.  They did make some allegations, albeit it's only that in their letter saying that there were activities in 802.16 that they claim to have prevented 802.20 from going forward.  And thirdly, you can't -- again it's line drawing, you could go -- they're seeking five other groups here, I think, Your Honor.

EXHIBIT 2 PAGE 116

802 includes all kinds of wireless, computer-to-computer,
computer-to-local WiFi and they're only two wireless standards
in there and those are what we have offered --

       THE COURT:  Mr. Chesler why can't I be consistent and
rule that you are entitled to discover not only point 20 but
any other standard relating to cell phones, and that you can
conduct deposition discovery as to computer standards or
conduct or whatever and then you come back to me if you want
some documentation?

       MR. CHESLER:  Well may I respond, Your Honor?

       THE COURT:  Sure.

       MR. CHESLER:  We know -- we're not talking about all
of 802, we're talking about four particular subcommittees.  I
mentioned eleven, there were three others.  We know right now
that they were doing in those committees what they're claiming
was unlawful for us to do in 20.  They just want to put the
light on the one where they think we have too many people
involved that we're doing inappropriate things.  This
distinction between cell phones and these other technologies is
really a distinction between where we were spending our efforts
and they said was unlawful, and where they were spending
theirs.

    They have, Your Honor, 16 voting members on the point 11
committee alone.  That's the reason they don't want us to look

EXHIBIT__2__ PAGE_\\7

there.  It's not because it's about WiFi computers, it's because the same rules are in the book for that group as our group, but they were hanging out in 11, we were hanging out in 20, and they don't want us to look there.

Respectfully, Your Honor, we're talking about four and rather than go through the exercise of us now taking their depositions to demonstrate what we already know, which is that they were engaged in the same kind of conduct that they're complaining about, we're only asking for discovery about that kind of conduct.  We're not saying every document that was generated in the course of those standards organizations. Conduct that relates to the same practice allegations that they were talking about in their Complaint with respect to four committees.

MR. STONE:  If I --

THE COURT:  Sure.

MR. STONE:  If I may briefly Your Honor?  It's not the same for two reasons, quickly.

THE COURT:  You say it's not what?

MR. STONE:  One, the conduct in those other 802 groups is not the same.  For two reasons, one --

THE COURT:  Well that's a matter of argument.  It's not a matter of discoverability.

MR. STONE:  No, but I think it's a matter of accepted

EXHIBIT  2  PAGE 118

fact --

       THE COURT:  If he wants one other section, I'll give him one other section.  If that what he wants point 11, I'll let him have it.

       MR. STONE:  Instead of the 16 that we offered?

       THE COURT:  Yes, sure, why not?

       MR. STONE:  So they can have -- if they want 11 instead of 16 that's fine with us.  We just want it to go to one of them.

       THE COURT:  Great, that'll be the fourth ruling I think we're up to, and pursuant to, again 26(b)(2)(c)(ii), I think you'll have ample opportunity, given the sampling, as it were, of the different standards, 820 and 811 to see where we go and see if you need to follow up for anything else.  Go ahead.

       MR. BARBUR:  At the risk of wearing out my welcome and being sent back to the other side of the river, Your Honor, may I just raise one other thing?

       THE COURT:  Sure.

       MR. BARBUR:  We had, I think as we had come in already, had agreement, and counsel can correct me if I'm wrong, that because 16 sort of picked up procedurally within 802, where 20 had left off with respect to the same disputes, that 16 was already on the table.  We'll happily stop with 11,

EXHIBIT 2 PAGE 119

but we need 20 and 16.  They were a continuation over time of a

continuous dispute that moved from one working group to

another.  So I ask, Your Honor, if we can to be confined to 16,

20 and 11 so we get a chance to point to their conduct and both

parties get discovery with respect to the dispute about cell

phone technology which continued over time through two

committees.

          THE COURT:  What do you say?

          MR. STONE:  Well, two things Your Honor.  First of

all, 802.20 is the only group that the IEEE has ever disbanded

from its behavior and there's a report on that.  Second, while

there's a claim that we behave the same, the allegations in the

letter aren't the same.  We did have multiple members on other

committees, that's not a violation.  The problem Qualcomm had

which the IEEE cites is that they didn't disclose the

affiliations that many of the members had.  So the members

thought that the chairman and others were independent and not

acting in Qualcomm's interest, when, in fact, they were on the

payroll.  They don't have information that that happened with

respect to Broadcom, what they've cited to you in letters, is

simply that Broadcom had multiple members on certain other 802

groups which they did and which many people do and as to which

there is nothing wrong whatsoever.

          THE COURT:  I understand counsel to be saying that 16

EXHIBIT 2  PAGE 120

is related to 20 and that one is a committee that evolved into the other, or something like that.  That's what I heard him say.

MR. STONE:  Well they made an allegation to that and as a compromise we offer that, now they take that and want more is what I'm hearing them say.  But yes, they did allege that there's a connection, Your Honor.

THE COURT:  Yes, well I mean --

MR. STONE:  But 802.11 has no more relationship to 802.16 or 20 than any of the other 802 groups.

THE COURT:  All right, 820 -- 802.20 and 802.11 for now, you come back if you need something else.

Let's see, what else do we have here?  Project Stockholm. Where did you come up with the name?  Let me ask them, where did you come up with the name of that?  Project Stockholm, what's that all about?

MR. STONE:  Your Honor, I don't know the answer.  I think it's a name that they have mentioned --

THE COURT:  They gave it to you?

MR. STONE:  There may be something that can be identified by that name.  I, frankly, don't know it.  I apologize to the Court.  The allegation is that this is a name that applies to communications between Broadcom and a number of other companies about common legal interest in combating

EXHIBIT  2  PAGE 121

Qualcomm patents and licensing practices.

THE COURT:  It's a code name.  It's a code name.

MR. STONE:  I think it's a label people put on it,
maybe it's a code name.  I don't know that, in fact, it
designates anything in particular.

THE COURT:  All right, let Mr. Chesler take it
separately.  Stockholm and Keoler, or whatever it is.  Kola?

MR. CHESLER:  Koala.

THE COURT:  Koala.

MR. CHESLER:  Yes Sir.

THE COURT:  It's been awhile since I met a Koala
bear.

MR. CHESLER:  Right.

THE COURT:  Actually, I think it's the first time in
seventeen years I had to deal with Koala bears.

(Laughter)

THE COURT:  You never know.  It's a great job, it
really is.

MR. CHESLER:  Isn't it a great job?

THE COURT:  It's unbelievable.  Stockholm --

MR. CHESLER:  Yes, Your Honor.

THE COURT:  What do you want -- what -- give me a
little background and you want them to search their engines,
search their servers or whatever for anything having to do with

EXHIBIT 2  PAGE 122

Project Stockholm?

        MR. CHESLER:  Let me give you a little background.

        THE COURT:  Yes.

        MR. CHESLER:  First of all, Your Honor, they produced documents to us which have Project Stockholm called by that in their own documents, we didn't invent the name --

        THE COURT:  Okay.

        MR. CHESLER:  -- they did.  What we understand this to be is a working group among six horizontal competitors of which Broadcom is one.

        THE COURT:  Okay.

        MR. CHESLER:  The others are Nokia, Ericksen, NEC, Panasonic, and Texas Instruments.  And from what we can glean from public sources, and there's been a lot of talk about this in the industry, and what we've learned through an investigation going on in the EU where each one of those six companies filed parallel complaints with the enforcement agency at the EU about Qualcomm, three of them, represented by the same law firm, which was at least at one point counsel in this case, although they're not here today, is that these six groups have gotten together under this umbrella called Project Stockholm and they have worked together, we believe, by both formal and informal agreements, to basically gang up on Qualcomm.  And they're doing it in a variety of ways.  They're

EXHIBIT  2  PAGE 123

48

doing it through going to the DG Comp people in the EU and filing parallel complaints on or about the same day --

THE COURT:  And you have antitrust counterclaims against them?

MR. CHESLER:  We have --

THE COURT:  Or unfair competition claims.

MR. CHESLER:  We have filed two things.  We filed a declaratory judgement claims here, as I'm sure Your Honor knows, counterclaims that what we've done is lawful.

THE COURT:  Yes.

MR. CHESLER:  And we have filed an affirmative defense of unclean hands against them which, in part, involves their participation in Project Stockholm.  We have not affirmatively asserted an antitrust claim in this case yet. So, what we believe is going on, Your Honor, is this --

THE COURT:  Unclean hands -- okay, go ahead.

MR. CHESLER:  Because they're seeking injunctive ruling.

THE COURT:  Yes, I understand.

MR. CHESLER:  In this -- what this boils down to very simply is this, they say our licensing terms for our intellectual property are not fair, not reasonable, and in fact they, Broadcom, rejected our licensing terms because they are unfair and unreasonable.

EXHIBIT  2   PAGE  24

49

THE COURT:  I understand.

MR. CHESLER:  We say they're fair, they're reasonable, and in fact you didn't reject them because they're unreasonable, you rejected them because that's part of the Project Stockholm strategy.  You did it quite deliberately.  And in fact you're doing -- this is part of a much broader strategy of which not taking our license is a part, because if you took our license, you could not sue us for antitrust violations and say, or it at least would be a lot harder, to come into Court and say your licensing terms are not fair and reasonable, notwithstanding the fact that scores of other people in the industry have signed up for them.  We turned you down because they're unfair.  We say that's not true, you turned us down because it's part of this overarching deal you were working out with five of our other competitors.  What they're saying is --

THE COURT:  It's like a -- remember James Bond?  It's like Spector.

(Laughter)

THE COURT:  Really.

MR. CHESLER:  They could've called it Spector.  They called it Stockholm.  They didn't even have to change the linens, they had "S's" on them already on the towels, I don't know.

So our concern, Your Honor, is very simple.  It is

EXHIBIT  2  PAGE 125

absolutely the core of our defense here that this is trying to
do in a courtroom what they don't or they can't do in the
marketplace.  They feel that they're much better off --

THE COURT:  There's a lot of this going around you
know so I wouldn't feel special, you know.

MR. CHESLER:  Oh I don't feel --

THE COURT:  Using litigation to gain market
advantage.

MR. CHESLER:  I don't feel special at all, Your
Honor.  It pays my children's way through college, to be
perfectly honest, so I'm not complaining about it, I'm just
saying that's what they're up to.

THE COURT:  Well, what is it you want, I mean let's
get to the scope of the Project Stockholm request.

MR. CHESLER:  Right, right.  I don't have -- I guess
we pulled the request out.  Basically what we're saying is that
the documents that relate to their participation in Stockholm
as they relate to Qualcomm and Qualcomm practices should all be
produced.  Now we've heard them say from time-to-time among
many other things that they may well be privileged.  I'm,
frankly, having a hard time figuring out how that could be if
we're talking about six independent parallel competitors with
one another, how they can be privileged.  But let's assume for
the moment somehow they're very creative lawyers and they come

EXHIBIT  2   PAGE 126

up with a privilege claim.  Okay, then log all of the
responsive documents and let us move against it if it looks
like it's inappropriate.

THE COURT:  See, it strikes me, if you have like a
anti -- you know, monopoly counterclaim against them and you
somehow showed this collusion conspiracy among these
competitors to freeze you out of the market that's one thing.
You've got an unclean hands claim and I'm not even sure, you
know, what that actual unclean hands is, that they're up to no
good, I guess.

MR. CHESLER:  Well what we're saying is, Your Honor,
we may, we may have a good antitrust claim against them, I
don't know.  I only know what I've read in the newspapers, but I
would respectfully submit, it shouldn't be the case that I have
to file an antitrust case against these six major competitors
to get discovery into our defense, our defense is very simple.
 You didn't turn down the terms that 50 or 60 or a 100 other
competitors accepted, because they were unreasonable.  You
turned them down because you got together with these other
competitors, you've cooked up a strategy, a critical part of
that strategy is to assert exactly what you're asserting
against us, and you can't have it both ways.  You can't take the
terms, and claim we're violating the antitrust laws and you've
cooked this up in a conference room somewhere in Stockholm, and

EXHIBIT 2 PAGE 127

we want to get discovery to defend ourselves.

      THE COURT:  Who speaks to Project Stockholm?

      MR. BURLING:  I will, Your Honor.  You know, counsel rather avoided your request, what exactly is it that you want, and I submit that that was done for a reason.  And the reason is this, we have agreed to produce -- they say they already have a Stockholm document, well where did that come from, I guess from us, it's not clear to me.  But we have agreed to produce everything that has just been described to you in response to other requests.  We have agreed to produce everything dealing with the negotiations between Qualcomm and Broadcom and the reasons that we didn't deal with them, non-privileged of course.

      THE COURT:  Well, wait let me ask you something.  I mean if they -- if I made a request, they made a request, you know, and you had your IT come up with the appropriate search term, but was Project Stockholm.  I want everything, any e-mails related to Project Stockholm from this custodian, or whatever, for the year 2005.  Why can't you produce that?

      MR. BURLING:  It could be done but the burden of assembling a privileged log on that and looking for documents is significant.

      THE COURT:  What's the privilege?  What privilege do you have for this?

EXHIBIT __2__ PAGE __128__

MR. BURLING:  I think it's a joint defense privilege, Your Honor, there are groups in which I'm sure counsel --

THE COURT:  But they say, you know they say in criminal cases, you've virtually admitted his argument just by saying that, but you never -- you always try and have -- you never talk to your co-defendants in a conspiracy case.  It's bad enough they make you sit together.

MR. BURLING:  It's not a conspiracy case.  There are groups in which I'm sure every law firm represented here is involved, when a patent -- seeks to prosecute a patent against a group of defendants.  There are joint defense strategies and conversations among those who have similar interests, and I think the joint defense privilege normally protects those.  We have already submitted a very extensive log, I think in connection with the first time around --

THE COURT:  Well I can't rule on the vitality of the joint defense -- that's one of the few things that wasn't put before me in this massive letter writing campaign, but I don't know.

MR. BURLING:  My point though is this Your Honor, I don't want to interrupt --

THE COURT:  What have you agreed to give him with respect to Project Stockholm?

MR. BURLING:  What we have agreed to give them I

EXHIBIT 2 PAGE 129

think is everything that was identified.  Anything -- and this
is through other requests that don't talk about Project
Stockholm but would encompass all examples just given.  We have
agreed to give them everything about licensing negotiations,
between Qualcomm and Broadcom, including all the non-privileged
information why we did or didn't accept a proposal.  We have
agreed to give them all documentation about what we think FRAND
means, what anybody thought FRAND means, the regulations of the
SDL's, again non-privileged.  So all of the examples that you
have heard, they already have.  I think this is an effort to
drag into this already enormous lawsuit --

        THE COURT:  Yes.

        MR. BURLING:  -- about which they've been complaining
in the first half of these proceedings, a number of litigations
around the globe involving five other companies in Europe and
everywhere else, in order to shift the spotlight of inquiry
from whether they complied with their obligations to the
standard setting organizations to some different, and I think
their hope is, unseemly other area of inquiry.  But they are
getting what is relevant to this case.  They don't have an
antitrust case.  Their two declarations don't really -- that
they seek have nothing to do and just can't connect with
Stockholm.  The two declarations they seek in their counter-
claim are 1) that they timely disclosed patents.  It doesn't

EXHIBIT  2  PAGE 130

have anything to do with anybody else's motive.  And 2) that
they have complied with their FRAND obligations in making
proposals to us.  Again, that doesn't connect to our motive or
anybody else's motive.  Now, to be sure they have peppered
their counter-claim with all kinds of allegations in an effort
·to bootstrap up this discovery effort they connect mostly to an
affirmative defense in their counter-claim.  I submit it's a
bit peculiar to have lots of allegations connect only to an
affirmative defense.

            THE COURT:  Yes.

            MR. BURLING:  And in addition the only -- in addition
to it being out of order because no answer has yet been filed,
the only counts that are not subject to a Motion to Dismiss --

            THE COURT:  The answer to --

            MR. BURLING:  -- are the anti-trust counts.

            THE COURT:  The answer has not been filed.  Your
answer to their --

            MR. BURLING:  Their answer to our anti-trust claims
--

            THE COURT:  Why hasn't --

            MR. BURLING:  -- has not yet been filed.

            THE COURT:  Why hasn't it been filed?

            MR. BURLING:  Because there --

            UNIDENTIFIED SPEAKER:  Because -- sorry, Your Honor.

EXHIBIT   2   PAGE  131

MR. BURLING:  Because there was an order that they --
well they have take the position that they filed a Motion to
Dismiss with respect to other claims.

THE COURT:  Oh, okay.

MR. BURLING:  And therefore they need not answer --

THE COURT:  Okay.  All right.

MR. BURLING:  -- these claims.

THE COURT:  This went right by me.  Go ahead.

MR. BURLING:  But the -- so the affirmative defense
of unclean hands presumably relates primarily if not
exclusively to the anti-trust counts.  And it's black letter
law that there's no unclean hands defense to an antitrust
claim.

THE COURT:  Yes.  It kind of threw me, but what he
wants --

MR. CHESLER:  Your --

THE COURT:  Yes.  Go head.

MR. CHESLER:  Your Honor, counsel ascribed my failure
to, as he said, answer your question to some ulterior motive,
it was literally --

THE COURT:  No.  No.

MR. CHESLER:  -- I didn't have the request in front
of me.

THE COURT:  Yes.  Right.

EXHIBIT 2 PAGE 132

MR. CHESLER:  I'm happy to put it now so counsel can rest his conscience --

THE COURT:  Yes.

Mr. Chesler:  -- that I'm not up to anything insidious here.  Let me read to Your Honor into the record, there's only two requests, and they're not terribly different. Let me read #123, because it's not at all what counsel's just said.  "All documents relating to communications between or among Broadcom and any of Nokia, Ericsson, NEC, Panasonic, TI" -- those are the Project Stockholm members -- "or any other person relating to, 1) Qualcomm's IPR including it's disclosure to any standards organization, enforciblity or value; 2) any proposed or consummated licenses between Qualcomm and any person, including any rate, term or condition" -- which is what they're complaining about.  "3) Qualcomm sales of or efforts to sell integrated circuits for use in wireless phones," -- also what they're complaining about --  "and 4) Broadcom's design or sale or efforts to design and sell integrated circuits for use in GSM, GPRS, Edge or UMTS wireless phones, other wireless consumer devices or network infrastructure equipment."  Okay.

We did not ask for a single additional custodian for any of this.  All we're talking about is searching for and producing these documents, which are talking about the communications among the members of Stockholm with respect to

EXHIBIT 2 PAGE 133

what they've alleged in this case from the same custodians they were otherwise searching for responsive documents from anyway. And their response, contrary to counsel's remark that we have it all already was, unless clarified and narrowed by Qualcomm no response is necessary. So they set up --

THE COURT: Yes. Well that's a pretty broad request, I think. You may think it's different, but I think it's pretty broad. What do you say about this?

MR. BURLING: Well, I -- that would have been my first comment. My second is that if you look at Qualcomm's request, and I'm just putting this down for the record, 4, 9, 91, 92, 93, 97, which don't explicitly refer to Stockholm, but these --

THE COURT: What is that, years? What is that?

MR. BURLING: Those are numbers for the document requests from Qualcomm to Broadcom --

THE COURT: Yes.

MR. BURLING: -- specification numbers. If you look at those and the subject matters they encompass, which is the meaning of FRAND, the IPR rights that Qualcomm enjoys, the essential IPR's, the negotiations between Broadcom and Qualcomm and why you didn't license. They are getting all the documents and we've agreed to under those categories, so that if there's anything relevant in connection with Stockholm --

EXHIBIT 2 PAGE 134

THE COURT:  Well, what they're after are documents that you say you're providing them under other categories that implicates communications between you and these four other companies.

MR. BURLING:  If --

THE COURT:  Are you giving them that?

MR. BURLING:  If there are communications within the subject matters, which are the only relevant subject matters, of FRAND, the negotiations --

THE COURT:  Yes.

MR. BURLING:  -- and why we didn't deal, in their IPR rights, they get those pursuant to those other specifications that I just identified.

THE COURT:  What's wrong with that?

MR. CHESLER:  Your Honor, there's something weird here because then why are they objecting to this request?

THE COURT:  Well, I'd be objecting -- well first of all we have a fanciful James Bond kind of conspiracy theory and moniker, and second of all, what's the guy going to do go back to the office and say, "Look I want you to get a very broad, you know, eight prong, give me this, that and the other thing about, you know, Broadcom and these five other companies."

MR. CHESLER:  But, Your Honor, I think respectively, they are very specific subject matters.  They just -- take the

EXHIBIT 2 PAGE 135

first of them.  Qualcomm's intellectual property rights
including it's disclosure to any standards organization.  We're
talking about from the same custodians, if Broadcom is
communicating with one or more of the other members of this
group, we didn't make up the existence of the group, we didn't
make up the name, there's public reports that this group is --

        THE COURT:  But wait a minute.  Didn't he just say --
maybe I'm missing it.  Didn't counsel just say that if they have
documents relating to that that they have with Nokia, they're
going to give you that?  That's what I heard him say.

        MR. CHESLER:  We do not understand that to be the
case, Your Honor.

        THE COURT:  Is that the case?

        MR. BURLING:  Yes, Your Honor.  If there are
communications with Nokia about -- and I'm sorry I was looking
for the --

        THE COURT:  Yes.  Go ahead.

        MR. BURLING:  -- the exact specs when you --

        THE COURT:  Read it over -- read the request again.

        MR. CHESLER:  "Qualcomm's IPR, including it's
disclosure to any SDO, enforcability or value."  That's part one
of the request.

        THE COURT:  Yes.

        MR. BURLING:  I don't have these at my finger tips.

EXHIBIT 2  PAGE 136

THE COURT:  Well, you know what?  This is problematic for me because I am confronted with a ships passing in the night.  I not quite sure we've had a meaningful meet and confer on what it is you want, what it is, you know, you're going to provide.  I think it's the way that the request is couched, almost anticipating an antitrust counter-claim rather than this murky unclean hands, and this conspiracy through Specter and the Stockholm or whatever it is, and I don't see it.  I'm not sure -- and then I hear the Plaintiff saying, wait a minute, if you ask us about what any documents where we talk about a strategy to say your licensing is unfair and sue you, or something like that.  I heard him say if they have a communication with Nokia, for example, they're going to provide that.  That's what I heard him say.

MR. CHESLER:  Well, I did, I meant -- if I didn't say it I need to make sure that I say non-privileged because that's what our response says.

THE COURT:  Yes.  Well, privilege is privilege.  I mean that's -- and it's not fairly before me.  If you have a joint defense agreement that's a whole other kettle of fish.  But, you know, you'll have to provide a privilege log and then we'll have to flush that out.

MR. BURLING:  We've already given them an extensive privilege log and to the extent things fall within the request

EXHIBIT 2 PAGE 137

that I enumerated as to which privilege claim is made, we would of course include those under subsequent law.

   THE COURT:  Well, here's the -- yes.  Go ahead.

   MR. BARBUR:  Your Honor, may I -- look, I -- believe me, I don't want to waste, Your Honor's time with non-dispute disputes.

   THE COURT:  Yes.  Okay.

   MR. BARBUR:  I've been here enough in this courtroom to know you don't like it and I don't want to bring them to you.

   THE COURT:  Do you know any Judge who does like it?

   (Laughter)

   THE COURT:  Because I might be able to work a deal with them.

   MR. BARBUR:  I'm taking the 5th Amendment, Your Honor.

   THE COURT:  Okay.

   MR. BARBUR:  So, let me try to crystalize what I think the disconnect here is.  Ninety-three is one of the request counsel mentioned.

   THE COURT:  Right.

   MR. BARBUR:  He said, here are all the requests we're producing.

   THE COURT:  Right.

   MR. BARBUR:  Okay.  Here's 93, "All documents relating to Broadcom's interpretation of the term, FRAND, without regard

EXHIBIT  2  PAGE  138

to any time limitation." So if they've got documents that say

what they think FRAND means, 93 asked for those, okay? Now,

let me got back to the first portion of 123 of the four sub-

parts of 123 I read. "It's communications between or among the

members of this group relating to 1) Qualcomm's IPR" --

Intellectual Property Rights -- "including it's disclosure to

any SDO, enforcability or value." Those are not exactly the

same thing. I'm sure there are lots of documents in which they

say, we think FRAND means A, B, C, that have nothing to do with

the members of this group, which they admit exists, talking

about our Intellectual Property Rights. That's the core of our

defense. So, for them to say, "We'll give you any documents that

mention one or more of those companies that happen to be

responsive to these other sections, but we won't give you" --

and they've said right here, "We're not giving it to you," that's

what their response to 123 is. "We won't give you the stuff

where we're talking to each other about your Intellectual

Property Rights," is not -- we don't get our defensive documents

that way.

       THE COURT: Well, there's two situations. It's not

that they won't give it to you. They've responded to it largely

by saying it's privileged material.

       MR. BARBUR: Well, they -- some of it apparently they

claim is privilege. And when counsel says we've given them an

EXHIBIT 2 PAGE 139

extensive privilege log I would ask through the Court whether
counsel's prepared to represent, for example, that any
privilege claim documents which are responsive to 123, the one
I read to you earlier, are on that log. We don't believe they
are. Because they've said to us, oh, we have lots of
privileged documents that we're not prepared to put on a log
that are responsive to 123, not to 93, the one we read before.
So, it's -- you know, saying that there are lots of documents
that are on the log is like saying Obama got a lot of votes in
Pennsylvania last week. It doesn't happen to answer who won.
We asked --

        THE COURT: It's a mystery for the ages.

        MR. BARBUR: A mystery for the ages. We're asking
for different documents and as I understand it they've given us
in writing a response that said, "No." So, I don't understand
how counsel can come in here and say, the answer was yes, when
they give a written response that said it's no.

        MR. BURLING: Counsel didn't come in here and say
that with respect, Your Honor. Counsel -- we objected to that,
to the request about Stockholm, that's why we're here. We're not
interested in wasting your time or our time either. What I
said was that the relevant subject matters that might implicate
the Stockholm communications fall under other requests and that
Counsel chose a request, but not the corresponding requests --

EXHIBIT __2__ PAGE __140__

THE COURT:  Well --

MR. BURLING:  The corresponding request was 92 to what he just said, not 91 or 93.

THE COURT:  Well, we're bouncing around a little much.  I think -- I have the answer -- it's so illusive it's like, you know, on a Friday night solving the problems of the world and you come so close, but it strikes me as you're resisting this because you don't want to legitimatize the Stockholm conspiracy.  In other words, if you said, give me -- if they propounded on your request, give me all your documents related to FRAND, you know, whatever it is, and included in that are some communications with Nokia, that presumably are not privilege under the joint defense agreement, you would have given them to the Defendant, correct?

MR. BARBUR:  We did.  Our response to 92 was, we will produce the non-privileged documents.  And so I would turn it the other way, what is there outside of these that I have mentioned?  What kind of document or communication under this imagined Project Stockholm is there that they want that we already haven't produced, and as to which they can make a claim that is relevant?  We've said we will give them documents about an essential IPR.  We will give them documents about FRAND.  We will give them documents about the negotiations between the two of us, including why we turned down their proposals.  Okay?

EXHIBIT  2  PAGE 141

They have those and they have from the first wave --

THE COURT:  Their request that they are referencing under the Stockholm thing are a little more --

MR. BARBUR:  Well they are broad --

THE COURT:  -- different and detailed than that.

MR. BARBUR:  They are, but whether that addition encompasses anything relevant --

THE COURT:  Well, wait a minute now.  You're bouncing all over the place.  I got a privilege, I got relevance, I got, you know, we already gave it to them.  I think we have to figure out which is which.

MR. BARBUR:  Well, it's shades of all three, but in different respects.  And let me say it very quickly.

THE COURT:  Shades.  Now, we have not only three, but shades of all -- go ahead.  I don't mean to -- it's just -- it really --

MR. BARBUR:  I haven't been clear.  Let me try to be clear, Your Honor.  Those things which might fall under the Stockholm request, which are relevant to this case, have been given them through other requests.  Okay?  Those things which are not relevant to this case, which fall under the Stockholm request have --

THE COURT:  Like what?

MR. BARBUR:  Well, that's what mystifies me.  I don't

EXHIBIT__2__ PAGE_142_

67

know what else there could be.  We objected though because we
don't -- just on general principals that we don't know what
other kind documentation they're talking about, and if they're
talking about privileged communications between us and them
about claims that just results in another privilege log.  But I
think they should identify for us -- they're bringing their
Motion to Compel here, the should identify for us what they
don't have that they want.

        THE COURT:  Well.  This is an informal motion to --
an informal application to compel discovery.  I think, the way
to handle this is to require that you have a meet and confer,
and figure out what you already produced that you believe
responsive to these Stockholm requests -- what you think is
irrelevant and what you specifically say is privileged based on
this joint defense privilege.  And then Qualcomm is free to,
you know, make a formal application.  I think you would be
better off after some deposition discovery.

    I am more and more of a mind that we can't do the
traditional.  Let's complete all the written discovery, ad
infinitum for years and then start back deposition, which I --
parenthetically when you come back August 14th, don't think
you're getting another 90 days to complete written discovery
before you begin fact deposition.  But I think that's the way
to do it and I just -- I think I want to do a formal notice of

EXHIBIT  2  PAGE 143

68

motion, because I think, quite frankly, it may well be these
other companies to have some standing if there is a joint
defense agreement to assert the privilege.  I don't know, but
that's the way we're going to do it.

The paragraph should read that with respect to the request
by Qualcomm for {quote}, "Stockholm documents" it is denied
without prejudice to renew by formal application -- by formal
motion after a meet and confer with the Plaintiff as to other
responses that are responsive to these requests.  The objection
based -- the specific objections based on relevance and
specific assertion of privilege.  Are we clear on that?

And then as I say the timing is up to you.  It's America,
you can file a motion whenever you want.  I think you will be
much better served if you have some, you know, identification
of this Stockholm, and believe me, you are free to ask any
deponent anything you want about these Stockholm -- you know,
this Stockholm Specter conspiracy.

MR. BARBUR:  That's fine, Your Honor.  May I?  May I?

THE COURT:  Sure.

MR. BARBUR:  We will do that and I have no problem
with having another round of meet and confer, and then putting
a formal motion in front of Your Honor.  We will do precisely
that.

THE COURT:  Well, don't do it until you have the meet

EXHIBIT 2  PAGE 144

and confer because --

        MR. BARBUR:  Of course -- no.  The meet and confer --

        THE COURT:  -- the purpose is to resolve it at the
meet and confer.  Yes.

        MR. BARBUR:  -- if we can't resolve it.  I note this,
Your Honor, and that is that if I was listening -- I was
listening carefully to counsel, and I believe he just told the
Court that, in one sentence, that while he wasn't sure there
were any documents that we weren't already getting that were in
their view relevant, he didn't want to have to go through the
process of creating a privilege log of those documents.  There
would have to be something to put on that privilege log and I
would just make this one suggestion, because I know what's
going to happen when we go to the meet and confer, when we get
to the third category Your Honor's just mentioned, which is
documents which should be -- that may be withheld on privilege
claim, we're not going to be able to have much of a discussion
about those because they're asserting a privilege claim, and I
don't expect them to show me the inside of the tent --

        THE COURT:  Right.

        MR. BARBUR:  -- at a meet and confer.  I would
suggest that we at least consider that when this gets teed up
to the extent there are documents which they are going to put
on this privilege log under this joint defense agreement we've

EXHIBIT  2  PAGE 145

heard about today, that some selection of those documents be given to Your Honor for in camera review. Even if it's a small set.

THE COURT: You know you were doing so well.

(Laughter)

MR. BARBUR: Even if it's a small set.

THE COURT: Well, you know, what I got to tell -- well, we'll see -- maybe we'll see. To see whether it's indeed privileged or it's indeed relevant?

MR. BARBUR: Both, because they're saying -- I heard him say -- counsel say, I think he said shades of all three. I think that what we was saying was on the first instance we're gonna argue they're not relevant and if we lose that we're gonna argue they're privileged. Well, we've got -- we only have a finite amount of time. We understanding we're not coming back to ask for more time, but this is all about our defense to very serious charges and we want to get that discovery done in the amount of time allotted, and therefore, if we're going to be met with a joint defense privilege among people who have a -- what was called a mythical organization that doesn't exist which is named in their documents, they now have a joint defense privilege, I think that we're going to push very hard for the Court to look at some of the privileged documents --

THE COURT: Well, I --

EXHIBIT _2_ PAGE_146_

MR. BARBUR:    -- under the joint defense privilege by the organization that doesn't exist.

THE COURT:  All right.  Let me be clear. If -- you're going to have a meet and confer, you're either going to be satisfied that they've given you the documents in responses to other requests that are responsive to this request on Stockholm.  You're either going to be satisfied or you're not.  We're not giving you this because it's not relevant. Okay?

MR. BARBUR:  Right.

THE COURT:  If it's not relevant, you come back to me, you send me letters, I'll have two people come in, we'll whack that out right to begin with.  The privilege aspect of it I'm not looking at it, just drop it off one day.  We'll do a formal motion practice with notice or an opportunity for other people to weight in on this who may not be parties to this lawsuit.

MR. BARBUR:  That's fine, Your Honor, that's fine.

THE COURT:  Okay?

MR. BARBUR:  Now, we haven't -- should we deal with Koala or are we just dealing with this as one?

THE COURT:  I would assume that the Koala would kind of match up with the request for the Stockholm.

MR. BURLING:  I think that's fair, Your Honor.  And

EXHIBIT  2  PAGE  147

just -- I need --

THE COURT:  Although Koala is a nickname for
Qualcomm.  Right, isn't that the assertion?

MR. BURLING:  It is, Your Honor.  Koala does exist
and it is a nickname -- not a nickname, it's the code name, if
you will, that is used to identify them within Broadcom.

THE COURT:  Yes.  Well, what's --

MR. BURLING:  And --

THE COURT:  -- but does it impact these other
entities, the other conspirators, as it were?

MR. BURLING:  As I understand it and what's mythical
here is the allegation of conspiracy, not that an entity --

THE COURT:  Well, whatever.

MR. BURLING:  -- exists or not.  Because as I
understand it the allegation they make about Koala --

THE COURT:  Yes.

MR. BURLING:  First of all, they go from Koala, the
code name to something called Project Koala.

THE COURT:  Yes.  Okay.

MR. BURLING:  And then they say that doesn't involve,
as I understand it, these other companies but rather is some
kind of litigation strategy that Broadcom has not only with
respect to this suit, but with respect to filing a number of
other suits around the country.

EXHIBIT  2   PAGE 148

THE COURT:  Yes.  Well, when I read these requests I kind of differentiated between Stockholm and Koala, because, you know, if I -- if you sue me and you have, you know, some nickname for or code name for use I want to see what it is that you're saying about them.  That's a little different from this Stockholm conspiracy where you, you know, whatever.  And so I was inclined to permit that given some reasonable perimeters. It's not like, give me every document for, you know, the last 20 years where Koala or Project Koala was used.

MR. BURLING:  Well, there are two things I think I would say, Your Honor.  One, Koala is used as a name within Broadcom.  They say there's not a particular burden in searching for that because they only want, the so called Project Koala documents, as opposed to every time the word Koala is used.  Nonetheless, the request that they are seeking to compel here informally is for us to look for every document that mentions Koala.  This is another variation -- if I had that wrong I'm sure you'll correct me, but I do believe that that was the request.

MR. BARBUR:  I'll wait to correct you until you're finished.

MR. BURLING:  That a search -- that there is a search term Koala and that we are asked to search for every document bearing the word Koala.

EXHIBIT 2 PAGE 149

THE COURT:  Any time period?

MR. BURLING:  I assume there is one.  I don't know off the top of my head about the time period.  Then we are asked to produce from that anything relating to Project Koala, so there's a big source review and then a smaller production. But I think its another variation on the same theme as Stockholm, albeit potentially on a smaller scale.  Instead of being global and involving five companies this involves apparently all the various litigation between Qualcomm and Broadcom, and there is a fair amount in jurisdictions, as Your Honor knows.

THE COURT:  Well, I would assume and Mr. Chesler can respond to this because I'm sure he's faced it on his end in this or other cases, but I would assume that if Qualcomm is the nickname for the Defendant in this litigation and probably in California, and any number --

MR. BURLING:  It's the litigation name.  Yes, Your Honor.

THE COURT:  I mean, how -- what kind of privilege review would that cost you to go through what's Attorney/Client and what's, you know, work product and what's this, that and the other thing?

MR. BURLING:  It would enormous.  I think by definition if this is an accusation of that we had a litigation

EXHIBIT  2  PAGE  150

strategy or that when we couldn't --

       THE COURT:  Doesn't that -- isn't that sort of --

       MR. BURLING:  That's privilege by definition.

       THE COURT:  I'm mean, that's like, you know, what do they call that?  What do they call that, Mr. Chelser?  I mean, if you ask for litigation strategy, isn't that privileged on its face almost?

       MR. CHESLER:  No, I don't think so, Your Honor, if I may respond?

       THE COURT:  Sure.

       MR. CHESLER:  There well be privileged documents in the file.  I'm not presuming to say otherwise.  May I respond to counsel's comments and answer your question?

       THE COURT:  Sure. Absolutely.

       MR. CHESLER:  First of all, here's the request we're talking about.  The actual words, #132.  "All documents relating to Broadcom's Project Koala," those are two initial capitals, P and K, "including but not limited to any documents generated in connection with Project Koala, and any internal or external communications made in relation to Project Koala. Now, again, counsel keeps saying we're making things up. Project Koala comes from some of the documents we already have.  We didn't make up the name.  It's their name.

       THE COURT:  Yes.  Okay.  They admit that.

EXHIBIT __2__ PAGE __151__

MR. CHESLER:  And it's -- well I don't think --

THE COURT:  They admit Koala.  I don't know about Project.

MR. CHESLER:  Koala's a code name.  He said, we call it Project Koala.  I beg to differ.  They call it Project Koala.  Okay?

THE COURT:  Well, whatever.

MR. CHESLER:  And that's important here, Your Honor, because they describe it in those few documents we have as a litigation enabled negotiating strategy.  A litigation enabled negotiating strategy.

THE COURT:  Okay.  Okay.

MR. CHESLER:  Now, to the extent, to the extent that there are documents in support of or related to that litigation enabled negotiating strategy, which are privileged, they're presumably not going to produce those.  They're going to hold them out and they're going to log them.  To the extent that there are documents that are responsive that are not privileged, and for example, we've asked for any outside communications that were done pursuant to this project, and there may well be communications, business people to business people about this project, as they're negotiating.  We had negotiations with them when which they walked away and refused to take a license for the reasons, I believe, I described

EXHIBIT  2  PAGE  152

before.  Those are not privileged.  As Your Honor said at the
outset of this discussion, if you were sued by somebody and it
turned out they had a code name for you that related directly
to their litigation enabled negotiation strategy it wouldn't be
unreasonable to ask to see what those documents are, and that's
all we're talking about.  It is -- I agree with Your Honor, it
is different in several respects from Stockholm.

        THE COURT:  Yes.  I think it is --

        MR. CHESLER:  -- because it doesn't involve anybody
else.

        THE COURT:  Yes.  And I think it's just a matter of
getting a -- and you would agree with me that if you impact
litigation and Koala that you're going to -- if you told some
IT to search what we've established, 55 custodians, right, for
Koala litigation that that would necessarily force up hundreds
of thousands of documents that are probably privileged based on
litigation with you two.

        MR. CHESLER:  I have no idea, it may.

        THE COURT:  Yes.  Well, what I'm saying is that this
is like, you know, it's nice and so forth but that's one of the
concerns of -- and you two litigants are not of concern to the
Courts because you're flush, but this is -- well, what I'm
getting at -- I'm meandering.  I think that I am inclined to
grant your application if limited in time or custodian to get a

EXHIBIT 2  PAGE 153

sampling of, you know, what we're talking about here.  You
understand what I'm saying?

       MR. CHESLER:  I do, Your Honor.

       THE COURT:  You go to one, you know, something and
give me a month or six months, whatever you can figure out that
is reasonable.  You leave it up to me, I think I have an idea
what's reasonable, but just to get a sampling of what this is
and presumably it will regurgitate both privilege materials,
you know, letters about let's sue him on Friday, that would be
privileged and then there may be other stuff that's not
privileged.  Let's use suing these people to gain some market
advantage, which I don't think is privileged.  Do you
understand my point?

       MR. CHESLER:  I understand, Your Honor.  I assume
that based upon some kind of sampling algorithm we can come to
an agreement with them, and if we come back to Your Honor and
say, "Here's what we found" --

       THE COURT:  Yes.

       MR. CHESLER:  -- "now can we expand" --

       THE COURT:  Yes.

       MR. CHESLER:  -- "this in some way?"  You're going to
hear our application.

       THE COURT:  And theoretically you might be able in
that search, depending on the technology, somehow use more

EXHIBIT 2 PAGE 154

refined search terms to exclude the stuff that came up in the
original regurgitation as obviously privileged material.  You
understand what I say?

        MR. CHESLER:  I do.

        THE COURT:  And I think that with respect to this
aspect I am inclined to put in the order that the Defendant's
application is granted provided the parties can conduct a meet
confer with attorneys and ITs, and come up with a reasonable
protocol or sampling.  Do you understand what I just said?

        MR. CHESLER:  Understood, Your Honor.

        THE COURT:  You understand what I just said?

        MR. BURLING:  I understand, Your Honor.  May I submit
though that a sampling already has been done, in affect.

        THE COURT:  Why didn't anybody tell me this?

        MR. BURLING:  I'm hoping to right now, Your Honor.

        THE COURT:  Well, let's do -- well, go ahead and see
-- I'm going to make you do another one I think, but --

        MR. BURLING:  Well, again, this --

        THE COURT:  Go ahead.

        MR. BURLING:  The same specifications that I recited
to you in connection to with Project Stockholm that --

        THE COURT:  That doesn't count.  I'm treating Koala
different from --

        MR. BURLING:  No, I understand.

EXHIBIT 2  PAGE 155

THE COURT:  -- Stockholm.

MR. BURLING:  But when we say that we agreed to give them in response to requests FRAND documents, negotiation documents, their IP -- essential IP documents, those nets would encompass non-privileged documents that might pertain to this alleged Koala.

THE COURT:  Well, try and persuade them at the meet and confer that that's --

MR. BURLING:  We will do that.

THE COURT:  But I want a new one and if you have trouble you come back.

MR. BURLING:  All right.  We will confer with them again.  Thank you.

THE COURT:  Is there anything else I need discuss other than the meet and confer that Mr. Barbar is going to have with counsel on 68 and 80?

ALL:  (No verbal response).

THE COURT:  Great, let's take ten minutes and we can reconvene.

ALL:  Thank you, Your Honor.

(Court in recess)

THE COURT:  This is your request of Qualcomm, right, Mr. Barbar, want do we have?  Have we --

MR. BARBAR:  I think we reached an agreement on --

EXHIBIT 2 PAGE 156

I'll try and recite it, but if there's a disagreement they'll let me know.

THE COURT:  Okay.

MR. BARBAR:  Request #68 related to documents concerning communications between Qualcomm and its customers relating to Broadcom.  We've agreed that to the extent any of those communications involve a kind of threats or brandishing of intellectual property or claiming to a customer that Broadcom needs a license but doesn't have one we'll produced those, that's what we've agreed to.  I think that's an agreement.

MR. BURLING:  Yeah.  Let me just put on the record I think we can reach a language agreement on this.  I think we do have a concern about limiting this to actual threats because it could be something like, "Did you know Broadcom doesn't have a license," that could be relevant to our claim.  And I don't want to limit it to the word threats, but I think we can work out language that excludes, you know -- that makes us -- make them not have to produce all documents that mention Broadcom.

THE COURT:  How do you do this?  I mean, how do -- do you have -- are we talking about written documents or electronic documents or what?  Do you know?

MR. BARBAR:  These are mostly electronic documents we're talking about.

THE COURT:  Yes.  I mean, I guess it depends on the

EXHIBIT 2 PAGE 157

search terms that you use.

        MR. BURLING:  Yeah.

        MR. BARBAR:  Right, I mean -- the way that the process works is that we have hits that are generated by search terms --

        THE COURT:  Right.

        MR. BARBAR:  -- and then the documents are manually reviewed --

        THE COURT:  Right.

        MR. BARBAR:  -- for privilege to make sure they're responsive.

        THE COURT:  Exactly right.  Yes, right.  Yes.

        MR. BURLING:  I mean, I think it's just a -- I mean, we need some precise language and we'll work it out.

        THE COURT:  Yes.  Okay.  Great.  What about the other one?

        MR. BARBAR:  With respect to request #80, this asks for Qualcomm's analysis or evaluation of certain Intellectual Property Rights, IPR.  We had agreed to produce to the extent any IPR had been declared as essential to a standards development organization.  We've agreed through this supplemental meet and confer that if we publically stated in some other fashion that a patent is essential to a standard, we'll produce that as well.  I'm, frankly, a little unclear,

EXHIBIT  2  PAGE 158

we've certainly agreed on that part, whether that resolves
everything or not, I'm not entirely sure.

MR. BURLING:  Well, I think we have a bit of a
question here of whether we've resolved this.  Our concern is
that we not find out -- I mean, our whole case or part of our
whole case is about not disclosing patents, and we want to know
if they have a previously created analysis of patents that were
not disclosed to the SDO's like they were required to be
disclosed, and we don't want to limit that to anything that
they are now saying is -- they are now publicly saying it's
essential because we don't know that three weeks from now or
six months from now they won't declare all of a sudden that
they consider these patents essential to the public.  I mean,
all we're asking for is --

THE COURT:  It's like continuing medical treatment.
You just have to try to stay on top of it.

(Laughter)

MR. BURLING:  What we're trying to do, Your Honor.

THE COURT:  Yes, well, I don't know what you're going
to do.  I mean it's --

MR. BURLING:  Yeah.  I mean, all we are asking is to
go through the search terms and have them produce to us any
existing analysis of patents that may be essential to the
standards and not limit it to ones that they publicly to this

EXHIBIT  2  PAGE 159

point have said are essential in practicing standards.

        THE COURT:  Oh, I see, it's an ongoing thing.  I don't remember --

        MR. BARBAR:  Your Honor, the problem is it just completely changes the nature of the search we would have to do.  If it's publicly declared or publicly stated as essential we know what that is.  But within the company everyday thousands of engineers are evaluating patents for all sorts of purposes, and might they have said, this might be essential to this standard, might not have, it just completely changes the nature of the request.  Their theory of relevance here is that we held things and then surfaced them in a way that caused competitive harm to Broadcom.

        THE COURT:  Yes.

        MR. BARBAR:  Obviously if we have surfaced it, it will be publicly declared or we will have publicly stated that it's essential, and they'll have all the documents that they need.

        THE COURT:  Well, the publicly declared thing meant to me that like it's in a trade magazine -- you know, some other way than the standard process, you know, standards process that it somehow --

        MR. BARBAR:  Right if we filed a lawsuit and said --

        THE COURT:  Yes.  Yes.

**EXHIBIT  2  PAGE  160**

MR. BARBAR:  -- this patent is essential to this --

THE COURT:  Yes.

MR. BARBAR:  -- this standard.

THE COURT:  Yes.  I don't think it reaches an individual engineer telling somebody, you know, this is a good thing, but I don't know.

MR. BURLING:  Well, Your Honor, well just if I may? You know, I think we're talking about the same search terms here and we're --

THE COURT:  Yes. Probably.

MR. BURLING:  -- asking only, you know, as my colleague put it, I think the analogy medically is past diagnose.

THE COURT:  Yes.  Well, you have to have a cut off sometime.  You can't keep these guys checking their computers prospectively.

MR. BURLING:  Diagnosis up until when they make their production.  I mean, I don't --

THE COURT:  Fine.

MR. BARBAR:  I mean, any public declarations that are made in any form up until the time we complete the production they will get.

MR. BURLING:  No.  We object to the -- any public log analysis that related to these standards at issue in this case

EXHIBIT __2__ PAGE __161__

whether or not the fact that they believe it's essential has
yet be made public.

        MR. BARBAR:  But then it's --

        THE COURT:  I don't know what that means.

        MR. BARBAR:  -- a completely open ended request, Your
Honor.

        THE COURT:  Yes.  I don't know -- I thought it was
that has been made public.

        MR. BURLING:  Your Honor, this is a case about what
holding --

        THE COURT:  Wait a minute, don't tell me what the
case is.

        MR. BURLING:  Yeah.

        THE COURT:  Believe me, I have nightmares about it.

        MR. BURLING:  No, I mean, we just don't want to have
it sprung on us six months from now that actually there are 50
more patents that they're claiming are essential to the market
that we -- that they knew about when the standards were being
set and we haven't learned it.

        THE COURT:  Well, that's a different question, I
think, isn't it?

        MR. BARBAR:  Yeah, I mean, if in fact that happens we
can deal with it six months from now when the 50 patents are
declared essential.  I don't think that's going to happen but

EXHIBIT 2 PAGE 162

it's a speculation and we can deal with it then, but to term --
to have to produce all of these internal evaluation documents
about patents that are never -- have never been and will never
be declared as essential is an undue burden in our view.

        MR. BURLING:  I guess I'm not sure why if you have an
analysis that was made while the standards say activity was
going on, that says, you know, we believe these 50 patents are
essential to the standard and to this date you have not
disclosed those as essential, we're not entitled to that.

        THE COURT:  Well, you lost me because it's a --

        MR. BURLING:  Okay.  I --

        THE COURT:  This is a cautionary tale to lawyers that
you should try your own cases, you let a Judge do it for you,
you're in trouble.  See if you can work it out.  You can always
come back to me, but I thought it was two different questions.
 And I thought we were dealing with what's been publicly
disclosed -- patents that have been publicly disclosed as
essential.

        MR. BURLING:  If it --

        THE COURT:  Isn't that what you're --

        MR. BURLING:  If an engineer believes that a patent
is essential --

        THE COURT:  Right.

        MR. BURLING:  -- to the standards --

EXHIBIT 2 PAGE 163

THE COURT:  Right.

MR. BURLING:  -- that's relevant to our whole theory of the case.

THE COURT:  Well, maybe I screwed you up by saying that.  Maybe it is an engineer, I don't know.  And quite frankly I think if you do a search electronically that would come out.  Now, how are you going to know if some guy told somebody in a saloon that, hey, you know, this patent is essential?

MR. BURLING:  Exactly.  But if a search for the relevant terms produces analysis that particular patents -- that they believe particular patents are essential as standard, we want them.

THE COURT:  All right.  Well, why don't you put in the order if you have to you guys arrange a meet and confer with attorneys and IT's, and if you can't agree on the appropriate search language or perimeters you come back here with the IT's and we'll figure it out.

MR. CHESLER:  I think the distinction though, Your Honor, is whether patents have to have been declared publicly or not.  This lawsuit is about --

THE COURT:  Yes.  That's what I thought it was.

MR. CHESLER:  -- patents that they say -- right.  It has to be about publicly declared patents.  Not because one

EXHIBIT 2 PAGE 161

random engineer said this might be essential and another one said it might not be and there was a little debate back and forth, and no decision was made.  As opposed to Qualcomm saying in a public forum this is an essential patent.

THE COURT:  Well, I --

MR. CHESLER:  That's what the lawsuit is about, that's what they sued us for was for surfacing patents late.  If they haven't been surfaced they're not part of this lawsuit.

MR. BURLING:  We don't -- I'm sorry.  We don't want to have anything sprung on us later after the production and not have had evidence that you had available as of the production.

THE COURT:  That makes for the spontaneity of trial work.  Have a good weekend, everybody.  Get the order together Mr. O'Shaugnhessy and Mr. Stone.  Make sure everybody signs off on it and send it in to me.

MR. STONE:  Yes, Your Honor.

MR. BURLING:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. BARBUR:  Judge, I'm not entirely clear on where we stand on this last back and forth as to 68 and --

THE COURT:  Yes, 68, the parties will have a meet and confer with attorneys and IT's to agree on search language and other perimeters.  If they're unable to agree they will --

(End of recording)

EXHIBIT  2  PAGE 165

90

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          _____
Signature of Transcriber                        Date

EXHIBIT  2  PAGE 166