# SUI_IONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
QUALCOMM INCORPORATED, a Delaware Corporation, and
DOES 1-100, inclusive

FILED COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*
CIVIL BUSINESS
CENTRAL DIVISION

2008 APR 18  A 10: 16

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MERDAD VALIKHANI, an individual, on behalf of
himself, the general public and all others similarly
situated

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del caso):* 37-2008-00082231-CU-AT-CTL |
|---|---|

Central
330 West Broadway
330 West Broadway
San Diego, California  92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David C. Parisi                                    (818) 501-7852
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, California   91403

DATE: APR 18 2008      Clerk, by   **C. Beutler**   , Deputy
*(Fecha)*              *(Secretario)*                  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Legal Solutions Plus | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|---|

EXHIBIT 1  PAGE 249

1   David C. Parisi, Esq. (162248)
2   Suzanne Havens Beckman, Esq. (188814)
    PARISI & HAVENS LLP
3   15233 Valleyheart Drive
    Sherman Oaks, California  91403
4   (818) 990-1299 (phone)
    (818) 501-7852 (facsimile)
5   dcparisi@parisihavens.com
    shavens@parisihavens.com
6
    Attorneys for plaintiff Merdad Valikhani,
7   on behalf of himself, the general public
    and all others similarly situated
8

FILED
CIVIL BUSINESS OFFICE 5

2008 APR 18  A 10: 16

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

9
10              SUPERIOR COURT OF THE STATE OF CALIFORNIA
11                     FOR THE COUNTY OF SAN DIEGO
12

| 13 | MERDAD VALIKHANI, an individual, on behalf of himself, the general public and all others similarly situated, | ) ) ) ) | CASE NO.: 37-2008-00082231-CU-AT-CTL |
|---|---|---|---|
| 14 | | | CLASS ACTION COMPLAINT FOR: |
| 15 | Plaintiff, | ) ) ) | (1) Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726); and |
| 16 | v. | ) ) | |
| 17 | QUALCOMM INCORPORATED, a Delaware Corporation, and DOES 1-100, inclusive, | ) ) ) ) | (2) Unfair Business Practices in Violation of Calif. Bus. & Prof. Code § 17200, *et seq.* |
| 18 | | | |
| 19 | Defendants. | ) ) | DEMAND FOR JURY TRIAL |

20
21
22
23
24
25
26
27
28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

Class Action Complaint

EXHIBIT___7___ PAGE_250_

1    Plaintiff Merdad Valikhani ("Valikhani" or "Plaintiff"), on behalf of himself, the

2  general public and all others situated, against defendant Qualcomm Incorporated

3  ("Qualcomm"), alleges as follows upon information and belief, based upon, *inter alia,*

4  investigation conducted by and through his attorneys, except as to those allegations

5  pertaining to Plaintiff, which are alleged upon knowledge:

6                              **Nature of the Action**

7        1.        This is a national class action brought under the Cartwright Act on

8  behalf of all persons who (1) purchased one or more cellular devices that either contain the

9  Wideband Code Division Multiple Access ("WCDMA") technology or that are compatible

10 with the Universal Mobile Telecommunications System ("UMTS") standard (the "Device

11 Class") and (2) purchased cellular service from any carrier in the United States which

12 bundles its cellular service with subsidized UMTS-compliant devices (the "Service Class").

13        2.        This complaint arises from defendant Qualcomm's illegal and

14 anticompetitive conduct in the markets for the technology and chipsets that operate cell

15 phones employing WCDMA, a third generation ("3G") technology that is implemented

16 through the UMTS standard. Qualcomm, by its intentional deception of private standards-

17 determining organizations ("SDOs") has monopolized certain markets for cellular telephone

18 technology and components.

19        3.        Qualcomm holds certain patents that it has asserted are "essential" to

20 WCDMA technology and the UMTS standard. Thus, in order to maintain fair competition

21 in the UMTS markets, international and United States SDOs only adopted UMTS as a

22 mobile telephone standard after Qualcomm represented in writing that it would license its

23 patents on fair, reasonable and non-discriminatory terms (that is, so-called "FRAND")

24 terms.

25        4.        The adoption of the UMTS standard led mobile telephone services

26 carriers to invest billions of dollars in developing UMTS phone systems, and has led cellular

27 device manufacturers to spend billions of dollars investing in technology compliant with the

28 UMTS standard. After spending so much money to develop UMTS phone systems, cellular

PARISI & HAVENS LLP
15253 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-2-
Class Action Complaint

EXHIBIT ___1___ PAGE ___251___

1  telephone services carriers and cellular device manufacturers cannot economically switch to
2  another standard and thus are locked into the UMTS standard.

3      5.      After the UMTS standard was adopted, Qualcomm disregarded its
4  FRAND commitments. With the power of its WCDMA patents entrenched in the UMTS
5  standard, Qualcomm coerced device manufacturers and service carriers who are locked into
6  the UMTS standard into paying supracompetitive prices to license Qualcomm's WCDMA
7  technology.

8      6.      Qualcomm's anticompetitive licensing practices impose enormous costs
9  on UMTS device manufacturers. These costs are passed on to consumers. If the
10  participants in the UMTS standard-setting process had known that Qualcomm would not
11  license its patents on FRAND terms, they could have and would have selected a different
12  standard that did not implicate Qualcomm's patents, resulting in a more competitive market
13  for UMTS devices and ultimately cheaper UMTS devices for consumers.

14      7.      Qualcomm's licensing practices violate California's Cartwright Act (Cal.
15  Bus. & Prof. Code §§ 16720, 16726) and California's unfair competition law (Cal. Bus. &
16  Prof. Code § 17200, *et seq.*). This lawsuit seeks remedies for consumers against Qualcomm,
17  including damages (and treble damages under the Cartwright Act), restitution, and
18  injunctive relief restraining Qualcomm from similar anticompetitive acts in the future under
19  the Cartwright Act (Cal. Bus. & Prof. Code § 16750) and the unfair competition law (Cal.
20  Bus. & Prof. Code § 17203).

21                          **Parties**
22
23      8.      Plaintiff Merdad Valikhani ("Plaintiff") is a resident of Los Angeles
24  County, California. Plaintiff receives cellular service from AT&T and purchased an LG-
    CU500 cell phone AT&T. AT&T subsidized the purchase of his cell phone.
25
26      9.      Defendant Qualcomm Incorporated is a Delaware corporation that
    maintains its headquarters at 5775 Morehouse Drive, San Diego, California. Qualcomm
27  commercializes technology involved in cellular communications and applications. The
28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

                                -3-
                        Class Action Complaint

EXHIBIT  7  PAGE  252

1  revenues from Qualcomm's Technology Licensing Segment ("QTL"), which licenses the
2  patents relevant to this complaint, comprised 27%, 32%, and 35% of total consolidated
3  revenues in fiscal years 2004, 2005, and 2006, respectively. QTL's revenues for fiscal year
4  2006 were $2.63 billion, and were $1.84 billion and $1.33 billion in fiscal years 2005 and
5  2004, respectively.

6          10.      Plaintiff is currently ignorant of the true names and capacities, whether
7  individual, corporate, associate, or otherwise, of the defendants sued herein under the
8  fictitious names Does 1 through 100, inclusive, and therefore, sues such defendants by such
9  fictitious names. Plaintiff will seek leave to amend this complaint to allege the true names
10 and capacities of said fictitiously named defendants when their true names and capacities
11 have been ascertained. Plaintiff is informed and believes and based thereon alleges that
12 each of the fictitiously named Doe defendants is legally responsible in some manner for the
13 events and occurrences alleged herein, and for the damages suffered by the Plaintiff and the
14 classes identified in this complaint.

15         11.      Plaintiff is informed and believes and based thereon alleges that all
16 defendants, including the fictitious Doe defendants, were at all relevant times acting as
17 actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees
18 of all other defendants, and that all acts alleged herein occurred within the course and scope
19 of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and
20 with the express and/or implied permission, knowledge, consent, authorization and
21 ratification of their co-defendants; however, each of these allegations are deemed
22 "alternative" theories whenever not doing so would result in a contraction with the other
23 allegations.

24         12.      As used in this complaint, the terms "Qualcomm" and "Defendant" refer
25 to defendant Qualcomm Incorporated and Does 1 through 100, inclusive.

26

27

28

EXHIBIT  7   PAGE 253

## Jurisdiction and Venue

13.     This Court has subject matter jurisdiction over this class and representative action pursuant to Calif. Bus. & Prof. Code § 17200, *et seq.* and Cal. Code of Civ. Proc. § 382.

14.     Venue is proper in this judicial district because Qualcomm maintains its executive office and headquarters in this County, Qualcomm conducts substantial business within this County, many of the acts described in this Complaint occurred in and/or were directed from this judicial district, and defending an action here would pose no undue burden on Qualcomm.  Further, venue in this judicial district is proper pursuant to Cal. Bus & Prof. Code § 16750(a) which provides in part that "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefore in any court having jurisdiction in any county where the defendant resides or is found . . . ."

15.     This Court has personal jurisdiction over Defendant pursuant to Cal. Code Civ. Proc. § 410.10 because it maintains its corporate headquarters in, and the majority of the acts alleged herein were committed in, California.

### The Structure of the Wireless Industry

**A.     Wireless Carriers, Cell Phone Manufacturers, and Chipset Manufacturers**

16.     Wireless carriers provide cell phone service to consumers.  Carriers operate wireless systems that enable consumers to place and receive telephone calls, and send and receive data, on cell phones.

17.     Many companies around the world manufacture cell phones, and the manufacturers typically sell those phones to carriers, which in turn arrange for sale of the phones to consumers.

18.     Cell phones contain, among other components, one or more computer chipsets that deliver the cell phones' core ability to communicate with the wireless system.

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91423
(818) 990-1299

-5-
Class Action Complaint

EXHIBIT __7__ PAGE __254__

**B.    The Role of Standards Development Organizations**

19.    For a carrier's wireless system to function properly, all of the system's components (e.g., base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other. This means that regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufacturers the system's components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system.

20.    Because of this demand for interoperability, several SDOs have worked with the wireless industry to develop wireless communications standards.

21.    On a worldwide basis, the International Telecommunications Union ("ITU") is the central telecommunications SDO. The ITU is an international organization comprised of governments and firms in the private sector, which coordinates the operation of telecommunications systems and services and advances the development of communications technology. The ITU's standardization activities are designed to foster the growth of new technologies, such as mobile telephony and the Internet, as well as the emerging global information infrastructure which handles a mix of voice, data and multimedia signals. The ITU develops internationally agreed technical and operating standards to foster interconnection of the world's communications systems.

22.    The Telecommunications Industry Association ("TIA") is the leading U.S.-based SDO for the communications and information technology industry. The TIA is comprised of member companies that manufacture or supply products and services used in global communications. The European Telecommunications Standards Institution ("ETSI") is an SDO based in France with a leadership role in Europe. The Alliance of Telecommunications Industry Solutions ("ATIS") is an SDO based in the United States.

EXHIBIT __1__ PAG. 255

23.     In the past several years, standards bodies specific to wireless technology standards have developed. The Third Generation Partnership Project ("3GPP") has focused on the evolution of GSM and UMTS technology.

24.     The ownership of relevant intellectual property ("IP") and related IP licensing practices are critical issues in SDOs' consideration of standards proposals. If the implementation of a standard requires the use of particular IP, such as a patent, the IP owner may have the ability to prevent, delay or distort the development of technology implementing that standard (sometimes referred to as "patent hold-up") and thereby undermine the purpose of the SDO. Accordingly, SDOs typically require that their members declare whether they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory ("FRAND") terms. Patents necessary to implement a particular standard are known as "essential patents" for the standard to which they relate. Each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard.

## C.    Cellular Standards

25.     Two technology paths, or families of standards, are in widespread use today: "CDMA," which stands for "code division multiple access" and "GSM," which stands for "global system for mobility." Among major cellular service providers in the US, Verizon Wireless and Sprint Communications operate CDMA-path networks, and Cingular (now AT&T) and T-Mobile operate GSM-path networks.

26.     The CDMA and GSM paths have evolved through four generations, which reflect the evolution and improvement of these technologies over time. This complaint refers to the first generation as "1G," the second generation as "2G," and so on. The 1G standard used in the United States is the Advanced Mobile Phone System ("AMPS"). Cellular carriers are required to provide AMPS service until early 2008. See

EXHIBIT __7__ PAGE 256

1   Public Mobile Services and Personal Communications Services, 67 Fed. Reg. 77,175 (Dec.

2   17, 2002) (codified at 47 C.F.R. 22.901(b)).

3        27.    2G standards reflect the advent of digital technology and the replacement

4   of analog standards. The two primary 2G standards are 1) Code Division Multiple Access

5   ("CDMA") and 2) Global System for Mobile communications ("GSM"). By 2000,

6   essentially all cellular devices on the market employed either the GSM 2G standard or the

7   CDMA 2G standard.

8        28.    Carriers are in the process of deploying newer technologies that cannot

9   be neatly characterized as either 2G or 3G, and may be called 2.5G or 2.75G. On the GSM

10  branch, GSM carriers have implemented the GPRS and EDGE standards, which offer

11  respectively faster data speeds. Implementation of Section 6002(b) of the Omnibus Budget

12  Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions

13  With Respect to Commercial Mobile Services, Eleventh Report, 21 FCC Rcd 10947, ¶ 107

14  (Sept. 26, 2006) ("Eleventh Report"). Likewise, on the CDMA branch, CDMA carriers

15  have deployed the CDMA2000 and the EVDO standards, again offering respectively faster

16  data speeds. *Id.*, ¶ 108.

17       29.    3G standards evolved from the specifications defined in the International

18  Mobile Telecommunications-2000 standard ("IMT-2000"). 3G standards support greater

19  concentrations of voice and data subscribers and higher data rates at lower incremental cost

20  than 2G standards. The two 3G standards most widely slated for implementation in the

21  United States are UMTS (operating on the GSM branch) and 3G CDMA (operating on the

22  CDMA branch). UMTS allows substantially faster data transfer speeds than the GPRS or

23  EDGE standards. *Id.*, ¶ 107.

24

25

26

27

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

Class Action Complaint

EXHIBIT ___ PAGE ___

30.    Thus, the evolution of cellular standards is as follows:

| GENERATION | GSM Path | CDMA Path |
|---|---|---|
| 3g | UMTS | CDMA 2000/3G CDMA |
| 2.5g/2.75g | GPRS/EDGE | CDMA 2000/EVDO |
| 2g | GSM | CDMA |
| 1g | Advanced Mobile Phone System | |

31.    Contemporary cell phones primarily use 2G and 3G standards. Other standards built on top of the UMTS standard will allow still faster download speeds -- for instance, High Speed Data Packet Access ("HSDPA") technology may double the download speeds of UMTS. *Id.*

32.    The CDMA and GSM technology paths are not interoperable; equipment and technologies used in one cannot be used in the other. For this reason, each technology path has its own standard or set of standards.

33.    The UMTS standard was created by the ETSI and its SDO counterparts in the United States and elsewhere after a lengthy evaluation of available alternative equipment and technologies. The UMTS standard was designed to permit economical transition from 2G GSM-based systems to a 3G standard; UMTS therefore works with WCDMA and is reverse-compatible with GPRS/EDGE operating systems and GSM operating systems.

34.    An industry-wide standard necessarily eliminates previously available alternative technologies, which can no longer be used and are no longer competitive. The adoption of an industry-wide standard, therefore, confers monopoly power on the holders of patents essential to implementing that standard.

**Substantive Allegations**

35.    Qualcomm supplies some of the essential technology that the ETSI ultimately included in the UMTS standard, and holds intellectual property rights ("IPRs"), such as patents, in this technology.

36.    Given the potential for owners of IPRs, through the exercise of their rights, to exert undue control over the implementation of industry-wide standards, the ETSI

EXHIBIT __7__ PAGE __258__

1  requires a commitment from vendors whose technologies are included in standards to

2  license their technologies on FRAND terms. Neither ETSI nor the other relevant SDOs

3  further define FRAND.

4      37.    The ETSI included Qualcomm's proprietary technology in the UMTS

5  standard only after, and in reliance on, Qualcomm's commitment to license UMTS

6  technology on FRAND terms. Qualcomm's "essential" technology is called wideband

7  CDMA ("WCDMA," which is a GSM-compatible technology and should not be confused

8  with the CDMA technology path).

9      38.    Qualcomm's WCDMA patents are essential to the manufacture of

10  UMTS-compliant cell phones and other UMTS-compliant devices, and are also essential for

11  the implementation of the UMTS standard. The licensing of Qualcomm's patents therefore

12  is a barrier to entry into the relevant product market. Certainly, Qualcomm takes that

13  position and is heavily engaged in patent litigation to that effect. One of Qualcomm's recent

14  10-Ks states: "[O]ur intellectual property rights include a valuable patent portfolio that

15  includes *patents essential to implementation of each of the 3G CDMA alternative standards*

16  . . ." Qualcomm Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*,

17  at 10-11 (emphasis added). "[A]t this time most, if not all, companies recognize that any

18  company seeking to develop, manufacture and/or sell products that use CDMA technologies

19  [including WCDMA] will require a patent license from us." *Id.* at 23-24.

20      39.    **Transition to 3G Is Path-Dependent.** The CDMA and GSM standards

21  are mutually incompatible: CDMA phones cannot be used with GSM carriers, and vice

22  versa. Moreover, technologies built on top of the GSM standard are not compatible with

23  technologies built on top of the CDMA standard.

24      40.    Consequently, the transition from 2G to 3G is path-dependent: it is

25  immensely cheaper for carriers to upgrade from CMDA to 3G CDMA and from GSM to

26  WCDMA than it is to switch from CDMA to WCDMA or from GSM to CDMA2000. By

27  making the transition to the next generation of the technology that a carrier has already

28

EXHIBIT  7  PAGE 259

1  selected – whether CDMA or GSM for 2G services — the carrier can avoid the generally
2  insurmountable expense entailed in switching between technologies.

3      41.    In Qualcomm's own words, "the CDMA2000 mode enables a direct and
4  more economical conversion for current cdmaOne networks. . . . [The WCDMA]
5  infrastructure network has been specifically designed to be compatible with the GSM
6  network, which is why it is expected that most GSM operators will migrate to WCDMA
7  rather than to CDMA2000." *Id.* at 10.

8      42.    **Lock-in Effect.** Due to the high cost of switching between the two
9  major technology paths, carriers (and cellular device manufacturers) face a substantial
10 "lock-in" effect after implementation of the UMTS standard. Qualcomm's technology is
11 not interchangeable with or substitutable for other technologies.

12      43.    **SDOs and Commitments to FRAND Licensing.** To guard against
13 anticompetitive patent hold-up, most SDOs (including all SDOs relevant to this Action)
14 require firms supplying essential technologies for inclusion in a prospective standard to
15 commit to licensing their technologies on FRAND terms. The absence of irrevocable
16 FRAND assurances may cause an SDO to withhold approval of standards known to
17 incorporate essential, proprietary technologies. The FRAND commitments, or lack thereof,
18 are therefore key indicators of the cost of implementing a potential technology. In this case,
19 due to the "lock in" effect associated with a carrier's choice operating standard, industry
20 participants' mutual representation and commitment to license any intellectual property
21 applicable to the UMTS standard on FRAND terms was an essential part of the formulation
22 and adoption of the UMTS standard.

23      44.    **Qualcomm's Representations of FRAND Licensing to SDOs.** Upon
24 information and belief, Qualcomm made repeated and express written representations to
25 SDOs, including the ITU, ETSI, and 3GPP, that Qualcomm would license any of its
26 essential WCDMA patents on FRAND terms prior to the adoption of the UMTS standard.
27 Essentially, Qualcomm monopolized markets for WCDMA technology by inducing the
28 relevant SDOs to include Qualcomm's patented technology as an essential element of the

EXHIBIT __7__ PAGE 260

1  UMTS standard. On information and belief, Qualcomm made these representations from its
2  headquarters, located in California.

3       45.      Qualcomm's WCDMA technology was incorporated into the UMTS
4  standard only after, and in reliance on, Qualcomm's commitment to license the patents for
5  the WCDMA technology on FRAND terms. The selection of Qualcomm's technology
6  excluded other patent holders competing to have their patents incorporated into the standard
7  which would have licensed their patents on FRAND terms. However, even if Qualcomm's
8  WCDMA technology was the only candidate for inclusion in the UMTS standard, it still
9  would not have been selected by the relevant SDOs absent a FRAND commitment. This is
10 because each SDO relevant to this action requires that owners of essential patents agree to
11 FRAND licensing terms before the SDO will agree to include the technology that depends
12 upon those patents in any industry standard.

13      46.      Qualcomm's false commitments to license its patents on FRAND terms
14 were intended to, and did, cause the SDOs to adopt the UMTS standard. Qualcomm's
15 misrepresentations conferred an unfair advantage and bias in the competitive process in
16 favor of WCDMA's inclusion in the UMTS standard. By distorting choices through
17 deception, Qualcomm obscured the relative merits of alternatives and prevented an efficient
18 selection process. Qualcomm also obscured the costs of including its proprietary
19 technology in the standard. Qualcomm has taken advantage of industry participants who
20 now are locked into the UMTS standard by violating its FRAND commitments, thus
21 extracting supracompetitive royalties for the licensing of its WCDMA patents.

22             **Qualcomm's UMTS Licensing Practices Are Anticompetitive**
23      47.      Qualcomm never intended to offer its patent portfolio on FRAND terms.
24 Qualcomm's commitment to FRAND licensing to the relevant SDOs was intentionally false.
25      48.      After the widespread adoption of the UMTS standard, Qualcomm
26 reneged on its FRAND commitments to the ETSI and other SDOs as alleged in more detail
27 below. Qualcomm's licensing of the UMTS patents ("UMTS Licensing Practices" or
28

EXHIBIT __7__ PAGE _261_

1  "UMTS Licensing") have not been fair or reasonable, nor have they been non-
2  discriminatory.

3       49.     Qualcomm has used its monopoly power in the WCDMA market, as
4  well as its false commitment to license its WCDMA patents of FRAND terms, to force
5  industry participants into accepting Qualcomm's UMTS Licensing Practices. Qualcomm
6  has unnaturally prolonged high prices for UMTS chipsets and UMTS devices, and has
7  significantly deterred non-price competition (improved products and functionality).
8  Consequently, prices for UMTS chipsets are supracompetitive, and innovation in, *e.g.*,
9  enhanced functionality has been undermined.

10      50.     **Qualcomm's Acquisition of Market Power**. As any other patentee,
11 Qualcomm exercises exclusive control over the market for its WCDMA-related patents.
12 Qualcomm derives its market power in the UMTS market from the incorporation of
13 WCDMA-related patents into the UMTS standard and the widespread adoption of that
14 standard. Qualcomm's deceptive conduct, in the context of a consensus-driven private
15 standard-setting environment, harmed (and continues to harm) competition and provides
16 Qualcomm with monopoly power over the UMTS chipset market.

17      51.     Qualcomm communicates with its licensees and potential licensees, and
18 its UMTS Licensing Practices emanate, from its headquarters in California. Qualcomm's
19 UMTS Licensing Practices include, but are not limited to, the following:

20      52.     **Discrimination Against Non-Qualcomm UMTS Chipsets via**
21 **WCDMA Patent Royalty Rates.** On information and belief, UMTS Licensing requires
22 cellular manufacturers to pay multi-million dollar fees, which may be waived, but only on a
23 discriminatory basis – for example, if cell phone manufacturers agree to purchase
24 Qualcomm's UMTS chipsets exclusively. No legitimate relationship exists between
25 licensing of cell phone technology and the purchase of chipsets.

26      53.     Qualcomm's royalty rate discrimination furthers no legitimate
27 competitive interest or business need. Rather, Qualcomm's royalty rate discrimination is
28 intended to harm, and has the effect of harming, competition in the UMTS chipset market.

EXHIBIT __7__ PAGE __262__

54.    **Discrimination Against Non-Qualcomm UMTS Chipsets via WCDMA Patent Royalty Calculations: Price Netting.**  Qualcomm's UMTS Licensing also discriminates through a form of tying products together, called "price netting." The royalty paid under UMTS Licensing is based on the end-user price for the entire UMTS device, if the cell phone uses a chipset made by a competitor of Qualcomm. However, if licensees use a Qualcomm chipset, they may deduct (or "net out") the price paid to Qualcomm for the Qualcomm chipset from the end-user price of the UMTS device before calculating the royalty. "Price-netting" explicitly ties the patent royalty (fees paid on a license for Qualcomm's WCDMA patents) to UMTS chipsets manufactured by Qualcomm. "Price-netting" does not further any legitimate business interest, but rather is intended to harm competition. This UMTS Licensing Practice ensures that every non-Qualcomm UMTS chipset purchased by a device manufacturer carries a hefty financial penalty.

55.    UMTS Licensing's discrimination against non-Qualcomm UMTS chipsets does not reflect any legitimate competitive interest or business need, but is intended to and does harm competition in the UMTS chipset market.

56.    Qualcomm executives have publicly confirmed that UMTS Licensing involves price discrimination. Qualcomm's President, Steve Altman, stated in the earnings call for Qualcomm's 2005 fourth quarter: "We have provided a small discount for using our chips to companies currently selling WCDMA handsets in Europe, which we believe to be nothing more than legitimate and lawful price examination [sic]." *Full Transcript of Qualcomm's 4Q05 Conference Call — Prepared Remarks (QCOM)*, at http://seekingalpha.com/article/4317-full-transcript-of-qualcomms-4q05-conference-call-prepared-remarks-qcom (November 16, 2005).

57.    **UMTS Licensing Requires Unfair and Discriminatory Double Royalty Payments.**  Upon information and belief, Qualcomm requires licenses from both chipset manufacturers and cell phone manufacturers. This UMTS Licensing Practice requires that cellular device manufacturers pay a royalty rate based on the sales price of each UMTS cell phone sold; chipset manufacturers cannot sell UMTS chipsets to cell phone

EXHIBIT  7  PAGE 263

1 | manufacturers without a Qualcomm license, and UMTS device manufacturers cannot buy
2 | UMTS chipsets from manufacturers without a Qualcomm license. Further, device
3 | manufacturers pay the same royalty regardless of whether they purchased the UMTS chipset
4 | or manufactured it themselves – although (as alleged above) manufacturers do receive a
5 | discount if they purchase the chipsets directly from Qualcomm. Hence, Qualcomm's
6 | royalty scheme enables it to collect royalties at two levels of the UMTS device market.

7 |        58.     By requiring an individual license from each chipset supplier and UMTS
8 | device manufacturer, Qualcomm has also gained control over the interactions between
9 | suppliers and manufacturers, which is used to discriminate between customers depending on
10 | whether they use Qualcomm or non-Qualcomm chipsets.

11 |        59.     On information and belief, Qualcomm has threatened UMTS device
12 | manufacturers with termination of their licenses and patent and/or breach of contract
13 | litigation if they purchase UMTS chipsets from any company that does not have its own
14 | license from Qualcomm. Qualcomm has made these threats notwithstanding its knowledge
15 | that at least some of those cell phone manufacturers have paid a royalty on UMTS chipsets
16 | and are licensed to sell UMTS cell phones incorporating UMTS chipsets. None of the other
17 | patent owners with patents essential to the UMTS standard require this double royalty. This
18 | double royalty violates Qualcomm's FRAND obligations, not only because it is unfair and
19 | unreasonable, but also because it imposes different effective royalty rates (for the same
20 | bundle of rights) on UMTS device manufacturers that use third party UMTS chipsets than
21 | on those that use self-manufactured chipsets. This exacerbates the effect of UMTS
22 | Licensing's discrimination against manufacturers that use non-Qualcomm UMTS chipsets
23 | and increases costs to consumers.

24 |        60.     **UMTS Licensing Extends Royalty Payments to Unpatented**
25 | **Components of UMTS Chipsets.** Upon information and belief, UMTS Licensing requires
26 | royalty payments on certain components of a UMTS chipset that are not covered by
27 | Qualcomm's WCDMA patents. This UMTS Licensing Practice discriminates against other
28 | UMTS chipset manufacturers who may seek to improve and enhance the functionality of

EXHIBIT ___7___ PAGE __264__

1  their UMTS chipsets.  This UMTS Licensing Practice is unreasonable, unfair, and

2  anticompetitive, because it dampens the economic incentives of UMTS licensees to improve

3  and add functionality to UMTS chipsets.

4      61.    **UMTS Licensing Requires Unreasonable Royalty Demands**

5  **Contrary to FRAND Commitments.** The royalty rates charged by Qualcomm to UMTS

6  chipset manufacturers for Qualcomm's WCDMA technology are far greater than the rates

7  charged by any other company proclaiming to be an essential WCDMA patent holder.

8      62.    In addition, Qualcomm publicly represents that it charges the same

9  royalty rate for licensing its WCDMA patents as it does for its 3G CDMA patents, even

10 though its patents cover a much smaller proportion of the UMTS standard than the 3G

11 CDMA standard.  Thus, *Qualcomm's patents add far less value to the 3G UMTS standard*

12 *than to the 3G CDMA standard, though Qualcomm charges the same license rate for both.*

13 This UMTS Licensing Practice lessens competition in the UMTS market and encourages

14 competition in the 3G CDMA market.  Using this UMTS Licensing Practice as leverage,

15 Qualcomm has increased its market power over the entire market for 3G cellular devices.

16     63.    Steve Altman stated at Qualcomm's May 5, 2005 Spring Analyst

17 Meeting that Qualcomm's licensees are obliged to pay the same royalty rates regardless of

18 whether any of its patents expire and regardless of the number or percentage of WCDMA

19 essential patents held, provided that at least "one claim of one patent applies."  Qualcomm's

20 2006 10-K states:

21

22     Generally, we have licensed substantially all of our patents to our CDMA licensees.
       Under each of our existing license agreements covering multiple CDMA standards,
       the royalty rate paid to us for sales of licensed 3G CDMA (regardless of whether it is
23     CDMA2000, WCDMA, TD-CDMA or TD-SCDMA) subscriber products *is no less*
       *than the rate that such licensee pays for its licensed second generation cdmaOne* [2G
24     CDMA] *subscriber products.*
       Qualcomm Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006,*
25     at 10-11 (emphasis added).

26     64.    Similarly, Qualcomm has rejected attempts by other WCDMA essential

27 patent holders to set up a government-or-SDO-approved ceiling on the royalty rate at which

28

EXHIBIT ___1___ PAGE _265_

1    all WCDMA technology for cell phones would be licensed in order to encourage adoption

2    and proliferation of the technology.

3         65.    **UMTS Licensing Requires Unfair Grant-back Provisions.**  Upon

4    information and belief, Qualcomm demands that UMTS licensees grant back to Qualcomm

5    licenses for their own patents on terms much more favorable to Qualcomm. This UMTS

6    Licensing Practice requires UMTS licensees to provide to Qualcomm substantially broader

7    licenses for their own patents than what Qualcomm grants to the UMTS licensees. This

8    UMTS Licensing Practice violates Qualcomm's FRAND commitments because the grant-

9    back provisions are not reciprocal, but are overly broad.  Qualcomm's insistence on an

10   asymmetrical grant-back has the additional anticompetitive effect of discouraging

11   innovation by Qualcomm's licensee-competitors and thus, undermines competition for

12   UMTS chipsets and technology. This UMTS Licensing Practice is anticompetitive, because

13   it creates an imbalance of power between Qualcomm and its competitors that threatens to

14   seriously hamper those competitors over the long-term.  It is also discriminatory in that it

15   affects licensees with extensive relevant patent portfolios more than it affects those without

16   such a portfolio.

17        66.    **Pricing Data Exchange Under UMTS Licensing Is Anticompetitive.**

18   Upon information and belief, UMTS Licensing requires UMTS chipset licensees to provide

19   to Qualcomm sensitive sales and pricing information, even when those licensees are

20   competing directly with Qualcomm. This UMTS Licensing Practice discourages price

21   competition and lacks any legitimate business justification. The effect is to prevent

22   competition to the detriment of consumers.

23        67.    **Qualcomm Offers Incentives to Device Manufacturers to Foreclose**

24   **Competition in the UMTS Chipset Market.**  Upon information and belief, Qualcomm

25   provides discounts, marketing incentives, payments and/or other rewards to cell phone

26   manufacturers who use Qualcomm UMTS chipsets exclusively.  These inducements

27   undermine competition from other UMTS chipset manufacturers by increasing the costs of

28   firms who seek to sell UMTS chipsets to device manufacturers relative to Qualcomm's

-17-
Class Action Complaint

EXHIBIT ___7___ PAGE _266_

1  costs, and by defeating competition that would expand UMTS chipset output, improve

2  quality and reduce the price of UMTS cell phones. These inducements may amount to tens

3  of millions of dollars per cell phone manufacturer licensee.

4       68.  **UMTS Licensing Harms Competition.** Collectively and individually,

5  Qualcomm's UMTS Licensing Practices have restrained, eliminated, curbed, and reduced

6  competition and undermined innovation in the UMTS chipset market, as well as the market

7  for UMTS-capable devices. Competition could accelerate the decline in prices in the UMTS

8  device market and facilitate other non-price competition, including advances in functionality

9  and quality. Qualcomm intended to restrain competition when it implemented the UMTS

10 Licensing Practices, to protect itself from competition on the merits.

11      69.  The anticompetitive impact of UMTS Licensing can be inferred from

12 Qualcomm's own statements. For instance, out of 36 HSDPA-capable devices on the

13 market, only two use non-Qualcomm chipsets. Qualcomm, *Qualcomm Press Conference*, at

14 18 (Feb. 12, 2007), at http://www.qualcomm.com/press/PDF/3gsm07_pressbriefing.pdf.

15 Qualcomm provides manufacturers with the chipset for all 41 laptops with HSDPA-

16 embedded chipsets. *Id.* at 19. Qualcomm has over 80 UMTS vendor licensees. *Id.* at 20.

17 Indeed, revenue from UMTS Licensing composes more and more of Qualcomm's overall

18 income: Qualcomm estimates that "the ratio of WCDMA reported royalties to total reported

19 royalties was 49% [in fiscal year 2006], up from 41% reported in [fiscal year 2004]."

20 Qualcomm Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*, at 45.

21                          **The Relevant Product Markets**

22      70.  **Device Market.** The relevant product market ("Device Market") is the

23 global market for UMTS-capable devices.

24      71.  Plaintiff is an end consumer in the UMTS device market. Plaintiff

25 purchased an LG-CU500 cell phone.

26      72.  Plaintiff has suffered harm from Qualcomm's anticompetitive UMTS

27 Licensing Practices. Both UMTS chipset and UMTS device manufacturers suffer direct

28 anticompetitive harm from Qualcomm's UMTS Licensing Practices. This anticompetitive

**EXHIBIT** 7 PAGE 267

1   harm includes supracompetitive prices and impaired non-price competition in innovation of

2   UMTS functionality. Because the entire UMTS chipset and device industries are uniformly

3   subject to the effects of UMTS Licensing, no individual competitor in those markets has any

4   economic incentive to absorb these costs. Instead, UMTS chipset manufacturers pass

5   UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers

6   pass those costs down to their vendors, and the vendors ultimately pass those costs on to end

7   consumers, such as Plaintiff.

8       73.    Since the inception of cellular service in the United States, cellular

9   carriers have competed not only through their cellular service, but have also bundled their

10  services with cellular devices compatible with (and necessary to use) that cellular service.

11  Carriers have subsidized the cost of these bundled devices for over fifteen years.

12      74.    Despite these subsidies, end consumers who purchase their devices

13  through cellular carriers pay more for UMTS devices than they would in the absence of the

14  anticompetitive effects of Qualcomm's UMTS Licensing. Indeed, the carriers' ability to

15  offer subsidies on UMTS devices is curtailed and limited by those same anticompetitive

16  effects. Further, end consumers pay sales tax on the entire cost of the device –

17  notwithstanding the carriers' subsidy. UMTS devices are no longer a niche market, but now

18  constitute a burgeoning new consumer technology, and are well on their way to becoming

19  the next ubiquitous consumer standard in cellular technology. Qualcomm executives

20  estimated in a 2006 earnings conference call that approximately 96 million WCDMA units

21  shipped in 2006, up from 50 million units in 2005. *Qualcomm Incorporated F2Q06*

22  *(Quarter ending Mar 26, 2006) Earnings Conference Call Transcript (QCOM)*, at

23  http://seekingalpha.com/article/9210-qualcomm-inc-f2q06-quarter-ending-mar-26-2006-

24  earnings-conference-call-transcript-qcom (Apr. 20, 2006). Qualcomm's recent estimate for

25  UMTS sales in 2007 is 180 million units. *Qualcomm Incorporated F3Q07 (Qtr End*

26  *6/30/07) Earnings Call Transcript*, at http://seekingalpha.com/article/42372-qualcomm-

27  f3q07-qtr-end-6-30-07-earnings-call-transcript (July 20, 2007).

28

**EXHIBIT 7   PAGE 268**

75.    **Alternative Device Market.** Qualcomm has leveraged its market power over UMTS devices and chipsets to increase its market power over the entire market for cellular devices using any 3G standard.

76.    Qualcomm exercises exclusive control over the patents needed to use the 3G CDMA standard, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm substantially controls the patent portfolio needed to manufacture 3G CDMA devices.

77.    The market for 3G CDMA-related patents is significant because of the adoption of the 3G CDMA standard by, among others, Verizon Wireless and Sprint Communications. Qualcomm therefore derives significant market power from its 3G CDMA patents.

78.    The UMTS Licensing Practices undermine competition between UMTS device and chipset manufacturers and the manufacturers of 3G CDMA devices and chipsets. Through the UMTS Licensing Practices, Qualcomm imposes an anticompetitive penalty on competitors seeking to manufacture UMTS devices and chipsets. Qualcomm uses its market power over the IPRs necessary to use the 3G CDMA standard to eliminate, limit, or mitigate this penalty for manufacturers of 3G CDMA devices and chipsets. Consequently, the UMTS Licensing Practices make 3G CDMA device and chipsets a more attractive market than UMTS devices and chipsets, while deterring investment in the UMTS standard.

79.    Because UMTS and 3G CDMA are the only standards that current 3G chipset and device manufacturers can use, the UMTS Licensing Practices can reasonably be expected to drive chipset and device manufacturers from investing and competing in the UMTS standard to investing and competing in the 3G CDMA standard. The 3G CDMA standard benefits from the network effects of increased investment, making it more attractive relative to the UMTS standard (or any other possible alternative cellular standard). Because there are relatively fewer IPR owners with an interest in the 3G CDMA standard, additional investments in the 3G CDMA standard and additional competition in the market

PARISI & HAVENS LLP
15231 Valleyheart Drive
Sherman Oaks CA 91403
(818) 990-1299

Class Action Complaint

EXHIBIT ___7___ PAGE 269

1    for 3G CDMA devices increases Qualcomm's market power over the entire 3G cellular
2    device market.

3            80.     Qualcomm uses its market power over UMTS devices and chipsets to
4    increase its market power over the entire 3G cellular device market by deterring investment
5    in the UMTS standard (or any other possible alternative standard to the 3G CDMA
6    standard) and driving investment into the 3G CDMA standard.  Qualcomm's leveraging of
7    its market power comes at the expense of competition in the market for UMTS devices and
8    chipsets: the UMTS Licensing Practices have the effect of prolonging high prices for and
9    undermining innovation in UMTS chipsets and UMTS devices.

10            81.     In addition and/or in the alternative to the Device Market, the relevant
11    product market is the global market for 3G cellular devices ("Alternate Device Market").

12                                  **The Relevant Service Market**

13            82.     The subsidies that cellular carriers provide to their subscribers are not
14    costless, and some portion of the carriers' cellular service fees is attributable to these
15    subsidies.  In effect, the carriers distribute the cost of these subsidies to each and every one
16    of their subscribers (regardless of whether these subscribers used or purchased a subsidized
17    cellular device).

18            83.     Some portion of carriers' costs of subsidizing the purchase of UMTS-
19    compliant devices is attributable to Qualcomm's anticompetitive conduct.  Carriers pay
20    supracompetitive prices to purchase UMTS devices that can be sold to their cellular service
21    customers at subsidized prices.  These supracompetitive fees are passed on to the carriers'
22    consumers.

23            84.     On information and belief, however, the supracompetitive fees
24    attributable to Qualcomm's anticompetitive conduct are not distinctly allocated to the price
25    of the UMTS devices sold through the carriers to their cellular subscribers.  Rather, these
26    supracompetitive fees are effectively distributed through carriers' service fees to all their
27    customers.  Plaintiff and the other cellular service subscribers have paid higher prices for
28    their cellular service because of Qualcomm's anticompetitive conduct.

EXHIBIT___7___ PAGE_240

85.    Plaintiff does not seek to determine whether cellular carriers' rates are reasonable, but rather to eliminate and redress the anticompetitive impact of Qualcomm's conduct – which impact may be measured, in part, by cellular carriers' fees.

86.    The relevant service market ("Service Market") is the cellular service of every carrier which bundles its cellular service with subsidized UMTS-compliant devices in the United States.

## CLASS CERTIFICATION ALLEGATIONS

87.    Plaintiff seeks certification of a Device Class and a Service Class.  The Device Class seeks injunctive relief under state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased a UMTS-capable cellular device.  The Service Class seeks injunctive relief under state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased cellular service from a carrier that bundled its cellular services with subsidized UMTS-capable devices.

88.    Plaintiff seeks certification California Code of Civil Procedure section 382.  Plaintiff brings this action as a private attorney general, and to vindicate and enforce an important right affecting the public interest.  Plaintiff is therefore entitled to an award of attorneys fees under California Code of Civil Procedure § 1021.5 for bringing this action.

### Allegations for Certification of Device Class

89.    **Definition of the Device Class.**  Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased a UMTS-capable cellular device (the "Device Class").  Excluded from the Device Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

PARISI & HAVENS LLP
15233 Ventura Drive
Sherman Oaks, CA 91403
(818) 990-1299

-22-
Class Action Complaint

EXHIBIT___7___ PAGE 241

90.    **Device Class Numerosity.** Joinder of all Device Class members is impracticable. Qualcomm itself estimates some 326 million UMTS devices were sold globally in the last three years. Qualcomm estimates that UMTS-based phone sales represented approximately 41% of all manufacturer handset sales in Western Europe during the period from April 2006 through June 2006. *Qualcomm Incorporated, Form 10-K For the Fiscal Year Ended September 24, 2006,* at 45. There were an estimated 2.3 million 3G cellular handsets and more than 2.3 million HSDPA-capable PC cards in service in the United States at the end of 2005. *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report,* 21 FCC Rcd 10947, ¶ 165 (Sept. 26, 2006) ("*Eleventh Report*").

91.    **Device Class Commonality.** Common questions of fact and law exist as to all Device Class members and predominate over the questions affecting only individual Class members. These common questions include:

a)    Whether Qualcomm's patents are essential to manufacturing UMTS chipsets or UMTS devices;

b)    Whether Qualcomm has represented its patents are essential to manufacturing UMTS chipsets or UMTS devices to relevant manufacturers, and said manufacturers have relied on those representations;

c)    Whether Qualcomm represented or committed that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

d)    Whether Qualcomm intentionally misrepresented that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

e)    Whether Qualcomm has committed the UMTS Licensing Practices alleged above;

f)    Whether the UMTS Licensing Practices alleged above are fair, reasonable and non-discriminatory;

g)    Whether Qualcomm reneged on its commitments to license its UMTS patents on FRAND terms;

Class Action Complaint

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

EXHIBIT __7__ PAGE 272

h) Whether the UMTS Licensing Practices have anticompetitive effects, including supracompetitive pricing and impair non-price competition in the form of deterred innovation;

i) Whether the UMTS Licensing Practices' anticompetitive effects are passed on to end consumers of UMTS devices;

j) What portion of end-user prices for UMTS devices are attributable to Qualcomm's anticompetitive conduct alleged herein;

k) Whether UMTS Licensing creates a trust in violation of the California Cartwright Act;

l) Whether Qualcomm's UMTS Licensing Practices are unlawful and otherwise unfair, and thereby constitutes a violation of California's unfair competition law; and

m) Whether Plaintiff and the Device Class are entitled to relief, and the nature of such relief.

92. **Device Class Typicality.** Plaintiff's claims are typical of the claims of other Device Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Device Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

### Allegations for Certification of Service Class

93. **Definition of the Service Class.** Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices (the "Service Class"). Excluded from the Service Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

94. **Service Class Numerosity.** Joinder of all Service Class members is impracticable. In December 2005, the two largest GSM-based carriers collectively had roughly 76 million subscribers. *See Eleventh Report*, Table 4. Both these carriers subsidize

PARISI & HAVENS LLP
15233 Ventura Blvd
Sherman Oaks, CA 91403
(818) 990-1299

-24-

Class Action Complaint

EXHIBIT___7___ PAGE 273

their subscribers' purchase of UMTS devices, and the size of their subscriber base is sufficient for numerosity without considering any regional cellular carriers.

95.    **Service Class Commonality.** Common questions of fact and law exist as to all Service Class members and predominate over the questions affecting only individual Class members. In addition to the common questions raised by the Device Class, these common questions include:

a)    Whether the UMTS Licensing Practices' anticompetitive effects are passed on to cellular subscribers of carriers which subsidize their subscribers' purchase of UMTS devices;

b)    What portion of prices for cellular service are attributable to Qualcomm's anticompetitive conduct alleged herein;

c)    Whether Plaintiff and the Service Class are entitled to relief, and the nature of such relief.

96.    **Service Class Typicality.** Plaintiff's claims are typical of the claims of other Service Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Service Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

**Allegations Common to the Device Class and Service Class**

97.    **Adequate Representation.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Device and Service Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to the members of either Class, and Defendant has no defenses unique to Plaintiff.

98.    **Predominance and Superiority.** This class action is appropriate for certification, because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Classes is impracticable. The damages suffered by each individual member of the respective Classes will likely be relatively small, especially given the burden and expense of individual

EXHIBIT __7__ PAGE 244

1  prosecution of the complex litigation necessitated by the actions of Defendant. It would be

2  virtually impossible for the Class or Subclass members individually to obtain effective relief

3  from the misconduct of Defendant. Even if members of the Class or Subclass themselves

4  could sustain such individual litigation, it would still not be preferable to a class action,

5  because individual litigation would increase the delay and expense to all parties due to the

6  complex legal and factual controversies presented in this Complaint. By contrast, a class

7  action presents far fewer management difficulties and provides the benefits of single

8  adjudication, economy of scale, and comprehensive supervision by a single Court.

9  Economies of time, effort, and expense will be fostered and uniformity of decisions will be

10 ensured.

11      99.    **Policies Generally Applicable to the Classes.** This class action is also

12 appropriate for certification because Defendant has acted or refused to act on grounds

13 generally applicable to the members of both Classes, thereby making appropriate final

14 injunctive relief and/or corresponding declaratory relief with respect to the Classes as a

15 whole. The policies of the Defendant challenged herein apply and affect the Classes

16 uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct, not on

17 facts or law applicable only to Plaintiff.

18      100.    **Market Power.** Qualcomm acquired market power – the power to raise

19 prices and restrict output – in the Relevant Markets through the incorporation of its

20 WCDMA patents in the UMTS standard and the widespread adoption of the UMTS

21 standard by cellular carriers.

22      101.    **Willful Acquisition of Monopoly Power Through Intentional**

23 **Misrepresentation.** Qualcomm acquired monopoly power by intentionally misrepresenting

24 to the relevant SDOs and their members that Qualcomm would license its WCDMA patents

25 on fair, reasonable, and non-discriminatory terms.

26      102.    **SDOs' Adoption of UMTS Standard.** The UMTS standard was

27 adopted in a consensus-oriented, private standard-setting environment. Every relevant SDO

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

EXHIBIT ___ PAGE ___

1 and all of their members relied on Qualcomm's intentional misrepresentations about its
2 commitment to license its WCDMA patents on FRAND terms.

3      103.   **Qualcomm Reneged on its FRAND Commitments.** Qualcomm has
4 reneged on its commitments to licensing under FRAND terms. Qualcomm's UMTS
5 Licensing is unfair, unreasonable, and discriminatory – and has serious anticompetitive
6 effects.

7      104.   **Leveraging Monopoly Power.** Qualcomm exercises exclusive control
8 over its 3G CDMA-related patents, and derives significant market power over the market for
9 3G CDMA devices from those patents. Qualcomm uses its market power over UMTS
10 devices and chipsets as a leverage to increase its market power over the entire 3G cellular
11 device market by deterring investment in the UMTS standard (or any other possible
12 alternative cellular standard) and driving investment into the 3G CDMA standard.

13      105.   **Causal Antitrust Injury.** Defendant's actions have injured Plaintiff and
14 the Device and Service Class members and threaten them with additional antitrust injury in
15 the form of more expensive UMTS cellular devices, reduced selection, and lessened non-
16 price competition. Plaintiff and the Class Members have sustained antitrust injuries from
17 the Defendant's actions in the form of increased costs for UMTS cellular devices than they
18 would have otherwise.

19
## FIRST CAUSE OF ACTION
20
### Against all Defendants
21
### Cal. Bus. & Prof. Code §§ 16720, 16726
22
     106.   Plaintiff incorporates the above allegations by reference.
23
24      107.   Through the UMTS Licensing, Qualcomm and its various licensees
formed a combination of capital, skill and/or acts by two or more persons for the purpose of
25 creating restrictions and preventing competition in manufacturing, making, sale and/or
26 purchase of UMTS devices. Qualcomm used (and continues to use) coercive and deceptive
27 tactics to impose restraints upon otherwise uncooperative licensees, and procured (and
28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

-27-

EXHIBIT ___ PAGE ___

continues to procure) the unwilling cooperation of these licensees through threats and intimidation. The UMTS Licensing therefore creates a trust prohibited by California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726).

108. In addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices constitute a trust in violation of the Cartwright Act, even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for the UMTS patents and engaging in the UMTS Licensing Practices.

109. The UMTS Licensing has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of damages from supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation.

110. Plaintiff, on his own behalf and on behalf of the other Device and Service Class members, seeks treble damages (with interest), injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including reasonable attorneys' fees, under the Cartwright Act (Cal. Bus. & Prof. Code § 16750).

## SECOND CAUSE OF ACTION

### Against all Defendants

### Cal. Bus. & Prof. Code § 17200, *et seq.*

111. Plaintiff incorporates the above allegations by reference.

112. Qualcomm's UMTS Licensing Practices, as alleged above, are unlawful business acts or practices.

113. The UMTS Licensing Practices are unfair business acts or practices. In addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices are unfair or deceptive business acts or practices even if Qualcomm's commitment to FRAND

EXHIBIT __7__ PAGE __277__

1    licensing was not intentionally false at the time it was made and Qualcomm committed an

2    unfair or deceptive business act or practice by simply reneging on its commitment to

3    FRAND licensing for the UMTS patents.

4          114.      The UMTS Licensing has damaged Plaintiff and the other members of

5    the Device and Service Classes and threatens damage if it is allowed to continue. This

6    damage consists of supracompetitive prices (which are passed down from Qualcomm's

7    licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices

8    and cellular services), as well as impaired non-price competition in the form of deterred

9    innovation.

10          115.      Plaintiff, on behalf of the general public, on his own behalf and on behalf

11    of the members of the Device and Service Classes, seeks injunctive relief, including

12    restitution of all supracompetitive fees, under California's unfair competition law (Cal. Bus.

13    & Prof. Code § 17203).

14

15        WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor

16    and against Defendant as follows:

17        a)      Certifying the action as a class action and designating Plaintiff and his counsel as representatives of the Device Class and the Service Class;

18

19        b)      With respect to the First Cause of Action, treble damages in an amount to be determined at trial against Qualcomm and in favor of the Device Class and the Service Class;

20

21        c)      With respect to all causes of action, an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees, against Qualcomm and in favor of the Device Class and the Service Class;

22

23        d)      With respect to the Second Cause of Action, equitable relief including an accounting, a constructive trust and restitution, in an amount to be determined at trial, and attorneys' fees, against Qualcomm and in favor of the Injunctive Class:

24

25

26        e)      Awarding pre- and post-judgment interest; and

27        f)      Granting such other and further relief as the Court may deem just and proper.

28

-29-

Class Action Complaint

EXHIBIT ___7___ PAGE 278

DATED: April 17, 2008

PARISI & HAVENS LLP



By:
David C. Parisi
Suzanne Havens Beckman
Attorneys for plaintiff Merdad Valikhani, on
behalf of himself, the general public and all others
similarly situated

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT   7   PAGE 279

1

## DEMAND FOR JURY TRIAL

2      Plaintiff hereby demands a trial by jury of all claims and causes

3  of action in this lawsuit.

4

5  DATED: April 17, 2008                    PARISI & HAVENS LLP

6

7                                           By:

8                                           David C. Parisi
                                            Suzanne Havens Beckman
9                                           Attorneys for plaintiff Merdad Valikhani, on
                                            behalf of himself, the general public and all others
10                                          similarly situated

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

                                    -31-
                              Class Action Complaint

EXHIBIT___7___PAGE 280