EVAN R. CHESLER (*pro hac vice*)
PETER T. BARBUR (*pro hac vice*)
ELIZABETH L. GRAYER (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: 212.474.1000
Facsimile: 212.474.3700

WILLIAM S. BOGGS (Bar No. 053013)
BRIAN A. FOSTER (Bar No. 110413)
TIMOTHY S. BLACKFORD (Bar No. 190900)
DLA PIPER US LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: 619.699.2700
Facsimile: 619.699.2701

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERDAD VALIKHANI, an individual, on behalf of himself, the general public and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware corporation, and DOES 1-100,<br><br>Defendants. | CASE NO. 08 cv 0786 WQH (JMA)<br><br>**QUALCOMM INCORPORATED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**<br><br>Date:     June 23, 2008<br>Time:    11:00 a.m.<br>Judge:   Hon. William Q. Hayes |

DLA PIPER US LLP
SAN DIEGO

08 CV 0786 WQH (JMA)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ..................................................................................1
II.  BACKGROUND .........................................................................................................2
III. ARGUMENT................................................................................................................5
     A.   It Is Facially Apparent that the Amount in Controversy Is at Least
          $5 Million ..........................................................................................................5
     B.   The Evidence Shows that the Amount in Controversy Exceeds $5 Million ............8
          1.   The Size of the Purported Class and the Wireless Industry
               Demonstrates that the Damages Sought by Plaintiff Exceed $5
               Million ..................................................................................................8
          2.   The Cost of Complying with the Requested Injunction Would
               Alone Exceed $5 Million........................................................................9
IV.  CONCLUSION...........................................................................................................10

DLA PIPER US LLP
SAN DIEGO

-i-

08 CV 0786 WQH (JMA)

## TABLE OF AUTHORITIES

Page

### CASES

*Chabner v. United Life Ins. Co.*,
   225 F.3d 1042 (9th Cir. 2000) ..................................................................................6

*Frazier v. Pioneer Americas LLC*,
   455 F.3d 542 (5th Cir. 2006) ....................................................................................5

*Helm v. Alderwoods Group, Inc.*,
   No. 08-CV-1184, 2008 WL 2002511 (N.D. Cal. May 7, 2008) ...............................8

*In re Ford Motor Co.*,
   264 F.3d 952 (9th Cir. 2001) .................................................................................7, 9

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   436 F. Supp. 2d 687 (D. Del. 2006) ..................................................................6, 8, 9

*Korn v. Polo Ralph Lauren Corp.*,
   536 F. Supp. 2d 1199 (E.D. Cal. 2008) ....................................................................8

*Kroske v. U.S. Bank Corp.*,
   432 F.3d 976 (9th Cir. 2005) ....................................................................................8

*Lowdermilk v. United States Bank Nat'l Assoc.*,
   479 F.3d 994 (9th Cir. 2007) ....................................................................................7

*Matheson v. Progressive Specialty Ins. Co.*,
   319 F.3d 1089 (9th Cir. 2003) ...............................................................................5, 8

*Piazza v. EMPI, Inc.*,
   No. 07-CV-0954, 2008 WL 590494 (E.D. Cal. Feb. 29, 2008) ............................6, 8

*Singer v. State Farm Mut. Auto. Ins. Co.*,
   116 F.3d 373 (9th Cir. 1997) .................................................................................5, 8

*Tompkins v. Basic Research LL*,
   No. 08-CV-0244, 2008 WL 1808316 (E.D. Cal. Apr. 22, 2008) .................5, 7, 8, 9

*Valdez v. Allstate Ins. Co.*,
   372 F.3d 1115 (9th Cir. 2004) ..................................................................................8

*Willingham v. Morgan*,
   395 U.S. 402 (1969) ..................................................................................................8

*Yong v. Hyatt Regency Sacramento*,
   No. 06-CV-2257, 2007 WL 471008 (E.D. Cal. Feb. 9, 2007) .................................5

### STATUTES

28 U.S.C. § 1332 ..............................................................................................................1, 5

DLA PIPER US LLP
SAN DIEGO

## TABLE OF AUTHORITIES

**Page**

28 U.S.C. § 1441..................................................................................................................5

28 U.S.C. § 1446..................................................................................................................5

Cal. Bus. & Prof. Code § 16720,..........................................................................................2

Cal. Bus. & Prof. Code § 16726...........................................................................................2

Cal. Bus. & Prof. Code § 17200 *et seq.*..............................................................................2

Qualcomm Incorporated ("Qualcomm") respectfully submits this memorandum in opposition to Plaintiff's motion to remand.

## I. PRELIMINARY STATEMENT

On April 10, 2008, Jesse Meyer filed a putative national class action under the Sherman Act and the Cartwright Act, expressly seeking an amount in excess of $5 million and alleging Federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *Meyer v. Qualcomm, Inc.*, 08-CV-0655 (S.D. Cal.). Eight days later, Plaintiff Merdad Valikhani ("Valikhani" or "Plaintiff") commenced this action by filing a complaint that is virtually a word-for-word copy of the *Meyer* complaint. In order to recast the copied *Meyer* complaint as a state class action, Plaintiff simply deleted the Federal claims, failed to allege a specific amount in controversy and omitted to allege Federal jurisdiction under CAFA. The underlying substantive allegations, however, including the descriptions of the putative classes, are literally identical. Furthermore, both plaintiffs seek treble damages under the Cartwright Act, injunctive relief, and attorneys' fees. It is, therefore, abundantly clear that Plaintiff has no basis for excluding this case from Federal court and forcing Qualcomm and the court system to waste judicial resources (and risk inconsistent decisions) in two essentially identical proceedings.

The only ground for remand asserted by Plaintiff is that Qualcomm has failed to show that the amount in controversy in this case exceeds $5 million. However, Plaintiff's complaint provides the requisite showing by asserting claims on behalf of a class of 76 million cellular service subscribers (not to mention a separate class of device purchasers) and seeking treble damages, attorneys' fees, and wide-ranging injunctive relief. Even setting aside attorneys' fees and injunctive relief, the value of each individual claim would have to be miniscule—in the range of one or two cents per class member—for the amount in controversy to fall *below* $5 million. If those were the only amounts in controversy, then it is difficult to understand the "public interest" benefit of a claim for damages by the putative class. Moreover, in light of the breadth of the Device Class and the size of the wireless industry and Qualcomm's UMTS licensing business, it is clear that there is much more than $5 million in controversy. Thus, this case—like its identical and first-filed counterpart, *Meyer*—belongs in Federal court.

## II. BACKGROUND

On April 18, 2008, Valikhani commenced this action in the Superior Court of the State of California for the County of San Diego. Valikhani alleges that Qualcomm engaged in anticompetitive conduct in violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"). Valikhani alleges Qualcomm engaged in a variety of anticompetitive conduct, including the intentional deception of international standards developing organizations (Compl. ¶ 44) and the distortion of the wireless industry through Qualcomm's licensing practices (Compl. ¶¶ 47-69). Based on this alleged conduct, Valikhani asserts a claim under the Cartwright Act for a "combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in manufacturing, making, sale and/or purchase of UMTS devices" (Compl. ¶ 107) and under the UCL on the basis that Qualcomm's UMTS Licensing practices are unlawful, unfair and deceptive business acts or practices. (Compl. ¶¶ 111-15.)

Valikhani purports to represent two nationwide classes of end-consumers: (1) persons who purchased cellular devices containing "the Wideband Code Division Multiple Access ('WCDMA') technology or that are compatible with the Universal Mobile Telecommunications System ('UMTS') standard" (the so-called "Device Class"); and (2) persons who "purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices" (the so-called "Service Class"). (Compl. ¶ 1.) Valikhani does not allege the size of the Device Class, but notes that 326 million UMTS devices have been sold globally since 2005. (Compl. ¶ 90.) Valikhani alleges that the Service Class includes at least the 76 million subscribers to "the two largest GSM-based carriers." (Compl. ¶ 94.) Although not every one of these subscribers is alleged to have a UMTS-compliant device, they are *all* alleged to be members of the Service Class because, according to the complaint, "supracompetitive fees" charged to these GSM-based carriers "are effectively distributed through the carriers' service fees to *all* their customers." (Compl. ¶ 84 (emphasis added); *see also id.* ¶ 82

/////

-2-

08 CV 0786 WQH (JMA)

DLA PIPER US LLP
SAN DIEGO

1  ("In effect, the carriers distribute the cost of these subsidies to each and every one of their
2  subscribers (regardless of whether these subscribers used or purchased a subsidized device).").)
3      Valikhani's allegations relating to the size of the class and Qualcomm's allegedly
4  anticompetitive behavior are absolutely identical to those in the *Meyer* case, which explicitly
5  seeks more than $5 million in damages and alleges Federal jurisdiction under CAFA. (Huth Decl.
6  Ex. A (hereinafter "Meyer Compl.") ¶ 12.) The following chart shows, side-by-side, the identity
7  of claims between this case and *Meyer*.

|  | *Meyer* Complaint | *Valikhani* Complaint |
|---|---|---|
| Qualcomm Revenue | "QTL's revenues for fiscal year 2006 were $2.63 billion, and were $1.84 billion and $1.33 billion in fiscal years 2005 and 2004, respectively." (Meyer Compl. ¶ 10.) | "QTL's revenues for fiscal year 2006 were $2.63 billion, and were $1.84 billion and $1.33 billion in fiscal years 2005 and 2004, respectively." (Compl. ¶ 9.) |
| Device Class | "Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased a UMTS-capable cellular device (the 'Device Class')." (Meyer Compl. ¶ 87.) | "Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased a UMTS-capable cellular device (the 'Device Class')." (Compl. ¶ 89.) |
| Service Class | "Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices (the 'Service Class')." (Meyer Compl. ¶ 91.) | "Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices (the 'Service Class')." (Compl. ¶ 93.) |
| Double Royalty Payments | "Qualcomm requires licenses from both chipset manufacturers and cell phone manufacturers." (Meyer Compl. ¶ 55.) | "Qualcomm requires licenses from both chipset manufacturers and cell phone manufacturers." (Compl. ¶ 57.) |
| Royalty Payments for Unlicensed Components | "UMTS Licensing requires royalty payments on certain components of a UMTS chipset that are not | "UMTS Licensing requires royalty payments on certain components of a UMTS chipset that are not |

-3-

DLA PIPER US LLP
SAN DIEGO

08 CV 0786 WQH (JMA)

| | | |
|---|---|---|
| | covered by Qualcomm's WCDMA patents." (Meyer Compl. ¶ 58.) | covered by Qualcomm's WCDMA patents." (Compl. ¶ 60.) |
| Antitrust Injury | "This antitrust injury consists of damages from supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation." (Meyer Compl. ¶ 128.) | "This antitrust injury consists of damages from supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation." (Compl. ¶ 109.) |
| Prayer for Relief: Treble Damages | "With respect to Count III, treble damages in an amount to be determined at trial against Qualcomm and in favor of the Device Class and the Service Class." (Meyer Compl., Prayer for Relief (b).) | "With respect to the First Cause of Action, treble damages in amount to be determined at trial against Qualcomm and in favor of the Device Class and the Service Class." (Compl., Prayer for Relief (b).) |
| Prayer for Relief: Injunction | "With respect to Counts I, II, III, and IV an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees, against Qualcomm and in favor of the Device Class and the Service Class." (Meyer Compl., Prayer for Relief (c).) | "With respect to all causes of action, an injunction against further anticompetitive acts, and the costs of the suit, including reasonable attorneys' fees, against Qualcomm and in favor of the Device Class and the Service Class." (Compl., Prayer for Relief (c).) |
| Prayer for Relief: Equitable Relief | "With respect to Count IV, equitable relief including an accounting, a constructive trust and restitution, in an amount to be determined at trial, and attorneys' fees, against Qualcomm and in favor of the Injunctive Class." (Meyer Compl., Prayer for Relief (d).) | "With respect to the Second Cause of Action, equitable relief including an accounting, a constructive trust and restitution, in an amount to be determined at trial, and attorneys' fees, against Qualcomm and in favor of the Injunctive Class." (Compl., Prayer for Relief (d).) |

On April 30, 2008, Qualcomm timely removed this putative class action, and all claims and causes of action therein, from the Superior Court of the State of California for the County of

-4-

San Diego to the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446 and 1453.

## III. ARGUMENT

Under CAFA, Federal jurisdiction is proper when (1) a putative class consists of at least 100 proposed members; (2) after aggregation, there is greater than $5 million in controversy; and (3) "any member of a class of plaintiffs is a citizen of a different state from any defendant." 28 U.S.C. § 1332(d)(2). In his Memorandum of Points and Authorities in Support of Plaintiff's Motion to Remand ("Remand Mem."), Valikhani does not dispute that there are more than 100 proposed members of either class or that at least one member of each nationwide class is a citizen of a different state from Qualcomm. The only issue presented by Valikhani's motion is whether the amount in controversy exceeds $5 million.

In removal cases where the complaint fails to allege a specific amount in controversy, "the district court must determine if the amount in controversy is facially apparent from the complaint." *Tompkins v. Basic Research LL*, No. 08-CV-0244, 2008 WL 1808316, at *2 (E.D. Cal. Apr. 22, 2008) (citing *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)). In the event that the amount in controversy is not facially apparent, the court then determines whether it is more likely than not that the amount in controversy meets the appropriate threshold. *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003). That standard is easily satisfied here.

### A. It Is Facially Apparent that the Amount in Controversy Is at Least $5 Million.

A court may determine that the amount in controversy is "facially apparent" even if the plaintiff fails to specify an amount sought in recovery. *See, e.g., Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 545 (5th Cir. 2006) ("[A]lthough the petition did not seek recovery of a specific amount, we are satisfied that the petition, seeking damages for severe injuries suffered by at least 500 people and attorneys' fees, makes it 'facially apparent' that at least $5 million is in controversy, in the aggregate."); *Yong v. Hyatt Regency Sacramento*, No. 06-CV-2257, 2007 WL 471008, at *1 (E.D. Cal. Feb. 9, 2007) ("[I]t is clear from the nature of [plaintiff's] claims for

/////

1  compensatory damages, emotional distress damages, punitive damages, and attorneys fees that
2  the action seeks relief well above the amount in controversy requirement.").

3        As Qualcomm stated in its removal petition, it is facially evident from the sheer size of the
4  purported classes that the amount in controversy exceeds $5 million. Valikhani's complaint
5  defines the Service Class to include at least all of the 76 million subscribers to the two largest
6  GSM-based carriers in the United States. (Compl. ¶ 94.) Every single one of these subscribers is
7  alleged to be affected by Qualcomm's alleged anticompetitive conduct—regardless of whether
8  they have a UMTS-compliant device—because supracompetitive fees are alleged to be distributed
9  through carriers' service fees to all of their subscribers. (Compl. ¶¶ 82, 84.) In support of
10 remand, Valikhani notes that "while Plaintiff alleges the existence of 76 million GSM subscribers
11 in the United States, not all of these subscribers use the UMTS standard." (Remand Mem.
12 at 4:15-17.) Regardless, Valikhani alleges that all 76 million subscribers are class members who
13 were charged supracompetitive fees by their carriers. Moreover, the amount in controversy is
14 determined based upon the allegations in the complaint itself and not plaintiff's characterizations
15 of the complaint in a brief supporting remand. *Piazza v. EMPI, Inc.*, No. 07-CV-0954, 2008 WL
16 590494, at *14 (E.D. Cal. Feb. 29, 2008) ("In removal cases, the amount in controversy is
17 determined based on the plaintiff's complaint at the time that the notice of removal is filed.").

18       In light of the putative class of 76 million subscribers, simple arithmetic dictates that at
19 least $5 million is in controversy. Valikhani's Complaint asks for treble damages, which, as he
20 concedes (Remand Mem. at 6:24-25), are taken into account in determining the amount in
21 controversy. *Chabner v. United Life Ins. Co.*, 225 F.3d 1042, 1046 n.3 (9th Cir. 2000); see *In re
22 Intel Corp. Microprocessor Antitrust Litig.*, 436 F. Supp. 2d 687, 690 (D. Del. 2006) (including
23 treble damages in determining the amount in controversy exceeds $5 million). To evade Federal
24 jurisdiction, even setting aside his requests for attorneys' fees and injunctive relief, Valikhani
25 would have to seek actual damages of less than $1.7 million (*i.e.*, one-third of $5 million), in the
26 aggregate, on behalf of all 76 million members of the Service Class, not to mention all members
27 of the Device Class.
28 /////

-6-

DLA PIPER US LLP
SAN DIEGO

08 CV 0786 WQH (JMA)

Valikhani's contention that the complaint does not on its face seek damages of at least $1.7 million (before trebling) borders on the absurd. Even focusing solely upon the 76 million-strong Service Class, the Court would have to read the complaint to plausibly seek damages of less than $0.025 per class member in order to avoid exceeding the threshold. That would plainly be unreasonable. Moreover, the Court would have to ignore the additional second alleged Device Class (which is a subset of a worldwide population of over 300 million) as well as Valikhani's requests for attorneys' fees and injunctive relief, both of which are also relevant to the amount in controversy. *See Lowdermilk v. United States Bank Nat'l Assoc.*, 479 F.3d 994, 1000 (9th Cir. 2007) ("We have held that attorneys' fees [are] properly included in the amount in controversy in a class action."); *Tompkins*, 2008 WL 1808316, at *4 ("The amount in controversy to be considered also includes either the defendant's cost of compliance with an injunction or the plaintiff's benefit from the injunction.") (*citing In re Ford Motor Co.*, 264 F.3d 952 (9th Cir. 2001)).

Indeed, if Valikhani actually were seeking less than $0.025 in actual damages for each class member, then that would raise serious questions about whether he has the best interests of the class in mind and is fit to serve as class representative. *Lowdermilk*, 479 F.3d at 999 n.5 ("The Plaintiff may undermine her case for serving as class representative by pleading a lesser amount in controversy."). That is particularly true where, as here, there is another putative class action based upon the exact same allegations expressly seeking greater damages on behalf of the same purported class.[1] In short, Valikhani's suggestion that there might actually be less than $5 million in controversy here is disingenuous and inconsistent with the face of the complaint—a point that is emphasized by Valikhani's refusal, when asked by Qualcomm, to stipulate that the requested damages are less than $5 million. (Huth Decl. ¶ 4.)

/////

/////

---

[1] The *Meyer* complaint's request for monetary damages is limited to its state law claims under the Cartwright Act and the UCL and seeks only injunctive relief under the Sherman Act. (Meyer Compl. ¶¶ 109, 124.)

-7-

### B. The Evidence Shows that the Amount in Controversy Exceeds $5 Million.

Even if the amount in controversy were not facially evident from the complaint—which it is—a preponderance of the evidence shows in any event that the jurisdictional threshold is satisfied. *See Matheson*, 319 F.3d at 1090; *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005) (stating that the removing party bears the burden of proving by a preponderance of the evidence that the amount in controversy is satisfied) (quoting *Singer*, 116 F.3d at 376). The preponderance standard does not require the removing party to prove to a legal certainty that the amount in controversy exceeds $5 million. *See Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-05 (E.D. Cal. 2008) (noting that the removing party's burden is "not daunting" and the removing party "is *not* obligated to 'research, state, and prove the plaintiff's claims for damages'") (citation omitted); *In re Intel Corp.*, 436 F. Supp. 2d at 690 (finding that the amount in controversy exceeds $5 million without determining the value of each individual class member's claim). Rather, the removing party must show only that it is more likely than not that the plaintiff's claims exceed the minimum. *Helm v. Alderwoods Group, Inc.*, No. 08-CV-1184, 2008 WL 2002511, at *4 (N.D. Cal. May 7, 2008).

In determining whether this standard is met, the Court should consider "facts presented in the removal petition as well as any 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (quoting *Matheson*, 319 F.3d at 1090); *see also Willingham v. Morgan*, 395 U.S. 402, 407 n.3 (1969) ("[I]t is proper to treat the removal petition as if it had been amended to include the relevant information contained in later-filed affidavits."); *Tompkins*, 2008 WL 1808316, at *4-5 (declarations attached to removing party's response to plaintiff's motion for remand established that amount in controversy exceeded $5 million); *Piazza*, 2008 WL 590494, at *14 (rejecting argument that additional evidence cannot be considered after initial removal petition).

#### 1. The Size of the Purported Class and the Wireless Industry Demonstrates that the Damages Sought by Plaintiff Exceed $5 Million

In this case, the magnitude of the amount in controversy is easily inferred from the size of Valikhani's class. Qualcomm need not, as Valikhani suggests, support Valikhani's case by

-8-

supplying the alleged "cost to end consumers of the anticompetitive conduct." (Remand Mem. at 4:18-19.) To the contrary, courts squarely hold that a party can establish the amount in controversy by introducing evidence directed solely to the size of the class. *In re Intel Corp.*, 436 F. Supp. 2d at 690. Thus, to remove under CAFA, the removing party needs only to show that the amount of damages allegedly sought for each class member is an implausibly low figure. *Id.*

Qualcomm's removal petition meets that standard. Valikhani alleges a Service Class of 76 million members and a Device Class that includes all persons in the United States who purchased a UMTS-capable cellular device. Valikhani does not allege the size of the Device Class, but Qualcomm estimates that over 14 million UMTS devices have been sold in the United States from 2005 through 2007. (Leyva Decl. ¶ 3.) As a result, in order for the amount in controversy to fall below $5 million given Valikhani's request for treble damages, the average amount of damages would have to be less than $0.025 per member of the Service Class or Device Class. This is an implausibly low figure.

This conclusion is further reinforced by the size of the wireless industry in the United States. In calendar year 2007, the two largest GSM-based carriers had combined service revenues of $58 billion. (Huth Decl. Ex. B, at 3 (AT&T wireless service revenues), Ex. C, at 6 (T-Mobile service revenues); *id.* at 3 (Euro to U.S. Dollar conversion rate).) Similarly, Qualcomm's UMTS licensees had estimated revenues of over $2.5 billion on the sale of UMTS devices in the United States. (Leyva Decl. ¶ 4.) Valikhani's allegations of broad anticompetitive conduct spanning three years in an industry that annually brings in revenues in the billions of dollars necessarily implicate an amount in controversy exceeding $5 million.

**2. The Cost of Complying with the Requested Injunction Would Alone Exceed $5 Million**

In addition to the treble damages outlined above, Valikhani seeks injunctive relief against Qualcomm. Under CAFA, the amount in controversy to be considered includes injunctive relief, *Tompkins*, 2008 WL 1808316 at *4 (citing *In re Ford Motor Co.*, 264 F.3d 952), and the relevant amount for determining the value is the greater of the benefit to the plaintiff or the cost to the defendant, *In re Ford Motor Co.*, 264 F.3d at 958. In this case, Valikhani seeks to enjoin more

-9-

1  than the alleged anticompetitive conduct. (Compl. ¶ 110) ("Plaintiff . . . seeks . . . injunctive
2  relief enjoining the UMTS Licensing Practices and other acts alleged herein."). Not only does the
3  requested injunction extend beyond Qualcomm's UMTS Licensing Practices, but Valikhani
4  defines "UMTS Licensing Practices" to encompass *all* of Qualcomm's licensing activities, not
5  only the allegedly anticompetitive ones. (Compl. ¶ 48.)

6        The cost to Qualcomm of complying with such a broad-based injunction easily would
7  exceed $5 million. In fiscal year 2007, Qualcomm's Technology Licensing Segment ("QTL")
8  had total revenues of $2.77 billion (Huth Decl. Ex. D, at 4), of which at least $1 billion is from
9  royalties derived from licensee UMTS sales worldwide. (Leyvas Decl. ¶ 5.) Valikhani's
10 requested injunction would have to affect only a very small fraction of Qualcomm's UMTS
11 licensing business for the amount in controversy to exceed $5 million. Yet Valikhani asks for an
12 injunction reaching virtually every aspect of Qualcomm's UMTS licensing practices. Given the
13 scope of relief that he is seeking, Valikhani cannot seriously contend that the cost to Qualcomm
14 would not exceed $5 million.

## IV.  CONCLUSION

For the foregoing reasons, Qualcomm respectfully asks this Court to deny Valikhani's motion to remand.

Dated: June 9, 2008

DLA PIPER US LLP

By /s/ William S. Boggs
    william.boggs@dlapiper.com

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer

Attorneys for Defendant
QUALCOMM INCORPORATED

DLA PIPER US LLP
SAN DIEGO

-10-

08 CV 0786 WQH (JMA)