# EXHIBIT A

COPY
FILED

08 APR 10 PM 3: 56

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____

DEPUTY

1  Alan Himmelfarb (Cal. Bar. No. 90480)
   KAMBEREDELSON, LLC
2  2757 Leonis Blvd.
   Los Angeles, CA 90058
3  (323) 585-8696
   ahimmelfarb@kamberedelson.com
4
5  Jay Edelson
   Ethan Preston
   KAMBEREDELSON, LLC
6  The Monadnock Building
   53 West Jackson, Suite 550
7  Chicago, IL 60604
   (312) 589-6370
8
   Karin E. Fisch
9  Orin Kurtz
   ABBEY SPANIER RODD & ABRAMS, LLP
10 212 East 39th Street
   New York, NY 10016
11 (212) 889-3700
12 Counsel for Plaintiff

'08 CV 0655 WQH LAB

13      IN THE UNITED STATES DISTRICT COURT
14      FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15  JESSE MEYER, an individual, on his own        Civil Action No.
    behalf and on behalf of all similarly situated,
16
17          Plaintiff,                             CLASS ACTION COMPLAINT

18          v.

19  QUALCOMM INCORPORATED, a
    Delaware corporation,
20
            Defendant.                             BY FAX
21

22      Jesse Meyer ("Plaintiff"), for his complaint, alleges as follows upon information and

23  belief, based upon, *inter alia*, investigation conducted by and through his attorneys, except as to

24  those allegations pertaining to Plaintiff, which are alleged upon knowledge:

25                        NATURE OF THE CLAIM

26  1.   This is a national class action brought under the Sherman Act and the Cartwright Act on

27       behalf of all persons who (1) purchased one or more cellular devices that either contain

28       the Wideband Code Division Multiple Access ("WCDMA") technology or that are

---

Class Action Complaint                           1

EXHIBIT _A_ PAGE _3_

compatible with the Universal Mobile Telecommunications System ("UMTS") standard (the "Device Class") and (2) purchased cellular service from any carrier in the United States which bundles its cellular service with subsidized UMTS-compliant devices (the "Service Class").

2. This complaint arises from defendant QUALCOMM Incorporated's ("Qualcomm") illegal and anticompetitive conduct in the markets for the technology and chipsets that operate cell phones employing WCDMA, a third generation ("3G") technology that is implemented through the UMTS standard. Qualcomm, by its intentional deception of private standards-determining organizations ("SDOs") has monopolized certain markets for cellular telephone technology and components.

3. Qualcomm holds certain patents that it has asserted are "essential" to WCDMA technology and the UMTS standard. Thus, in order to maintain fair competition in the UMTS markets, international and United States SDOs only adopted UMTS as a mobile telephone standard after Qualcomm represented in writing that it would license its patents on fair, reasonable and non-discriminatory terms (that is, so-called "FRAND") terms.

4. The adoption of the UMTS standard led mobile telephone services carriers to invest billions of dollars in developing UMTS phone systems, and has led cellular device manufacturers to spend billions of dollars investing in technology compliant with the UMTS standard. After spending so much money to develop UMTS phone systems, cellular telephone services carriers and cellular device manufacturers cannot economically switch to another standard and thus are locked into the UMTS standard.

5. After the UMTS standard was adopted, Qualcomm disregarded its FRAND commitments. With the power of its WCDMA patents entrenched in the UMTS standard, Qualcomm has coerced device manufacturers and service carriers who are locked into the UMTS standard into paying supracompetitive prices to license Qualcomm's WCDMA technology.

6. Qualcomm's anticompetitive licensing practices impose enormous costs on UMTS

EXHIBIT___A___PAGE___4___

device manufacturers. These costs are passed on to consumers. If the participants in the UMTS standard-setting process had known that Qualcomm would not license its patents on FRAND terms, they could have and would have selected a different standard that did not implicate Qualcomm's patents, resulting in a more competitive market for UMTS devices and ultimately cheaper UMTS devices for consumers.

7.    Qualcomm's licensing practices violate the Sherman Act (15 U.S.C. §§ 1, 2), California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726), and California's unfair competition law (Cal. Bus. & Prof. Code § 17200). This lawsuit seeks remedies for consumers against Qualcomm, including damages (and treble damages under the Cartwright Act), restitution, and injunctive relief restraining Qualcomm from similar anticompetitive acts in the future under the Clayton Act (15 U.S.C. §§ 15, 26), the Cartwright Act (Cal. Bus. & Prof. Code § 16750), and the unfair competition law (Cal. Bus. & Prof. Code § 17203).

## PARTIES

8.    Plaintiff Jesse Meyer ("Plaintiff") is a resident of Oakland, California.

9.    Plaintiff receives cellular service from AT&T/Cingular and purchased a Motorola Razr V3xx on June 1, 2007 in an AT&T store for $121.24. AT&T subsidized the purchase of his cell phone.

10.    Defendant QUALCOMM Incorporated is a Delaware corporation that maintains its headquarters at 5775 Morehouse Drive, San Diego, California. Qualcomm commercializes technology involved in cellular communications and applications. The revenues from Qualcomm's Technology Licensing Segment ("QTL"), which licenses the patents relevant to this complaint, comprised 27%, 32%, and 35% of total consolidated revenues in fiscal years 2004, 2005, and 2006, respectively. QTL's revenues for fiscal year 2006 were $2.63 billion, and were $1.84 billion and $1.33 billion in fiscal years 2005 and 2004, respectively.

## JURISDICTION AND VENUE

11.    This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff

EXHIBIT  A  PAGE  5

asserts a claim under the Sherman Act and seeks injunctive remedies under the Clayton Act on behalf of himself and all others similarly situated.

12. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). Defendant is a Delaware corporation headquartered in California. Plaintiff asserts claims on behalf of a proposed class whose members are scattered throughout the fifty states and the U.S. territories. On information and belief. the aggregate of these claims exceed the sum or value of $5,000,000 and the total number of class members exceeds 100. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

13. This Court has personal jurisdiction over Defendant pursuant to Cal. Code Civ. Proc. § 410.10 because it maintains its corporate headquarters in, and the majority of the acts alleged herein were committed in, California and, specifically, the Southern District of California. Venue is proper before this Court under 28 U.S.C. § 1391(b) and(c).

## THE STRUCTURE OF THE WIRELESS INDUSTRY

### A. Wireless Carriers, Cell Phone Manufacturers, and Chipset Manufacturers

14. Wireless carriers provide cell phone service to consumers. Carriers operate wireless systems that enable consumers to place and receive telephone calls. and send and receive data, on cell phones.

15. Many companies around the world manufacture cell phones, and the manufacturers typically sell those phones to carriers, which in turn arrange for sale of the phones to consumers.

16. Cell phones contain, among other components, one or more computer chipsets that deliver the cell phones' core ability to communicate with the wireless system.

### B. The Role of Standards Development Organizations

17. For a carrier's wireless system to function properly. all of the system's components (e.g., base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other. This means that regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufacturers the system's

Class Action Complaint                    4



EXHIBIT A PAGE 6

components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system.

18.   Because of this demand for interoperability, several SDOs have worked with the wireless industry to develop wireless communications standards.

19.   On a worldwide basis, the International Telecommunications Union ("ITU") is the central telecommunications SDO. The ITU is an international organization comprised of governments and firms in the private sector, which coordinates the operation of telecommunications systems and services and advances the development of communications technology. The ITU's standardization activities are designed to foster the growth of new technologies, such as mobile telephony and the Internet, as well as the emerging global information infrastructure which handles a mix of voice, data and multimedia signals. The ITU develops internationally agreed technical and operating standards to foster interconnection of the world's communications systems.

20.   The Telecommunications Industry Association ("TIA") is the leading U.S.-based SDO for the communications and information technology industry. The TIA is comprised of member companies that manufacture or supply products and services used in global communications. The European Telecommunications Standards Institution ("ETSI") is an SDO based in France with a leadership role in Europe. The Alliance of Telecommunications Industry Solutions ("ATIS") is an SDO based in the United States.

21.   In the past several years, standards bodies specific to wireless technology standards have developed. The Third Generation Partnership Project ("3GPP") has focused on the evolution of GSM and UMTS technology.

22.   The ownership of relevant intellectual property ("IP") and related IP licensing practices are critical issues in SDOs' consideration of standards proposals. If the implementation of a standard requires the use of particular IP, such as a patent, the IP owner may have the ability to prevent, delay or distort the development of technology implementing that standard (sometimes referred to as "patent hold-up") and thereby undermine the purpose of the SDO. Accordingly, SDOs typically require that their members declare whether

EXHIBIT __A__ PAGE __4__

they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory ("FRAND") terms. Patents necessary to implement a particular standard are known as "essential patents" for the standard to which they relate. Each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard.

**C.     Cellular Standards**

23.    Two technology paths, or families of standards, are in widespread use today: "CDMA," which stands for "code division multiple access," and "GSM," which stands for "global system for mobility." Among major cellular service providers in the US, Verizon Wireless and Sprint Communications operate CDMA-path networks, and Cingular (now AT&T) and T-Mobile operate GSM-path networks.

24.    The CDMA and GSM paths have evolved through four generations, which reflect the evolution and improvement of these technologies over time. This complaint refers to the first generation as "1G," the second generation as "2G," and so on. The 1G standard used in the United States is the Advanced Mobile Phone System ("AMPS"). Cellular carriers are required to provide AMPS service until early 2008. See Public Mobile Services and Personal Communications Services, 67 Fed. Reg. 77,175 (Dec. 17, 2002) (codified at 47 C.F.R. 22.901(b)).

25.    2G standards reflect the advent of digital technology and the replacement of analog standards. The two primary 2G standards are 1) Code Division Multiple Access ("CDMA") and 2) Global System for Mobile communications ("GSM"). By 2000, essentially all cellular devices on the market employed either the GSM 2G standard or the CDMA 2G standard.

26.    Carriers are in the process of deploying newer technologies that cannot be neatly characterized as either 2G or 3G, and may be called 2.5G or 2.75G. On the GSM branch, GSM carriers have implemented the GPRS and EDGE standards, which offer

Class Action Complaint                    6

EXHIBIT ___A___ PAGE ___8___

respectively faster data speeds. Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report, 21 FCC Rcd 10947, ¶ 107 (Sept. 26, 2006) ("Eleventh Report"). Likewise, on the CDMA branch, CDMA carriers have deployed the CDMA2000 and the EVDO standards, again offering respectively faster data speeds. Id., ¶ 108.

27.    3G standards evolved from the specifications defined in the International Mobile Telecommunications-2000 standard ("IMT-2000"). 3G standards support greater concentrations of voice and data subscribers and higher data rates at lower incremental cost than 2G standards. The two 3G standards most widely slated for implementation in the United States are UMTS (operating on the GSM branch) and 3G CDMA (operating on the CDMA branch). UMTS allows substantially faster data transfer speeds than the GPRS or EDGE standards. Id., ¶ 107.

28.    Thus, the evolution of cellular standards is as follows:

| GENERATION | GSM Path | CDMA Path |
|---|---|---|
| 3g | UMTS | CDMA 2000/3G CDMA |
| 2.5g/2.75g | GPRS/EDGE | CDMA 2000/EVDO |
| 2g | GSM | CDMA |
| 1g | Advanced Mobile Phone System | |

29.    Contemporary cell phones primarily use 2G and 3G standards. Other standards built on top of the UMTS standard will allow still faster download speeds -- for instance, High Speed Data Packet Access ("HSDPA") technology may double the download speeds of UMTS. Id.

30.    The CDMA and GSM technology paths are not interoperable; equipment and technologies used in one cannot be used in the other. For this reason, each technology path has its own standard or set of standards.

31.    The UMTS standard was created by the ETSI and its SDO counterparts in the United States and elsewhere after a lengthy evaluation of available alternative equipment and technologies. The UMTS standard was designed to permit economical transition from

EXHIBIT ___A___ PAGE ___9___

2G GSM-based systems to a 3G standard; UMTS therefore works with WCDMA and is reverse-compatible with GPRS/EDGE operating systems and GSM operating systems.

32. An industry-wide standard necessarily eliminates previously available alternative technologies, which can no longer be used and are no longer competitive. The adoption of an industry-wide standard, therefore, confers monopoly power on the holders of patents essential to implementing that standard.

## SUBSTANTIVE ALLEGATIONS

33. Qualcomm supplies some of the essential technology that the ETSI ultimately included in the UMTS standard, and holds intellectual property rights ("IPRs"), such as patents, in this technology.

34. Given the potential for owners of IPRs, through the exercise of their rights, to exert undue control over the implementation of industry-wide standards, the ETSI requires a commitment from vendors whose technologies are included in standards to license their technologies on FRAND terms. Neither ETSI nor the other relevant SDOs further define FRAND.

35. The ETSI included Qualcomm's proprietary technology in the UMTS standard only after, and in reliance on, Qualcomm's commitment to license UMTS technology on FRAND terms. Qualcomm's "essential" technology is called wideband CDMA ("WCDMA," which is a GSM-compatible technology and should not be confused with the CDMA technology path).

36. Qualcomm's WCDMA patents are essential to the manufacture of UMTS-compliant cell phones and other UMTS-compliant devices, and are also essential for the implementation of the UMTS standard. The licensing of Qualcomm's patents therefore is a barrier to entry into the relevant product market. Certainly, Qualcomm takes that position and is heavily engaged in patent litigation to that effect. One of Qualcomm's recent 10-Ks states: "[O]ur intellectual property rights include a valuable patent portfolio that includes *patents essential to implementation of each of the 3G CDMA alternative standards . . ."* QUALCOMM Incorporated, *Form 10-K For the Fiscal Year Ended*

EXHIBIT __A__ PAGE __10__

*September 24, 2006,* at 10-11 (emphasis added). "[A]t this time most, if not all, companies recognize that any company seeking to develop, manufacture and/or sell products that use CDMA technologies [including WCDMA] will require a patent license from us." *Id.* at 23-24.

37. **Transition to 3G Is Path-Dependent.** The CDMA and GSM standards are mutually incompatible: CDMA phones cannot be used with GSM carriers, and vice versa. Moreover, technologies built on top of the GSM standard are not compatible with technologies built on top of the CDMA standard.

38. Consequently, the transition from 2G to 3G is path-dependent: it is immensely cheaper for carriers to upgrade from CMDA to 3G CDMA and from GSM to WCDMA than it is to switch from CDMA to WCDMA or from GSM to CDMA2000. By making the transition to the next generation of the technology that a carrier has already selected — whether CDMA or GSM for 2G services — the carrier can avoid the generally insurmountable expense entailed in switching between technologies.

39. In Qualcomm's own words, "the CDMA2000 mode enables a direct and more economical conversion for current cdmaOne networks. . . . [The WCDMA] infrastructure network has been specifically designed to be compatible with the GSM network, which is why it is expected that most GSM operators will migrate to WCDMA rather than to CDMA2000." *Id.* at 10.

40. **Lock-in Effect.** Due to the high cost of switching between the two major technology paths, carriers (and cellular device manufacturers) face a substantial "lock-in" effect after implementation of the UMTS standard. Qualcomm's technology is not interchangeable with or substitutable for other technologies.

41. **SDOs and Commitments to FRAND Licensing.** To guard against anticompetitive patent hold-up, most SDOs (including all SDOs relevant to this Action) require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms. The absence of irrevocable FRAND assurances may cause an SDO to withhold approval of standards known to incorporate

Class Action Complaint                                        9

EXHIBIT____A____ PAGE____11____

essential, proprietary technologies. The FRAND commitments, or lack thereof, are therefore key indicators of the cost of implementing a potential technology. In this case, due to the "lock in" effect associated with a carrier's choice operating standard, industry participants' mutual representation and commitment to license any intellectual property applicable to the UMTS standard on FRAND terms was an essential part of the formulation and adoption of the UMTS standard.

42.    **Qualcomm's Representations of FRAND Licensing to SDOs.** Upon information and belief, Qualcomm made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that Qualcomm would license any of its essential WCDMA patents on FRAND terms prior to the adoption of the UMTS standard. Essentially, Qualcomm monopolized markets for WCDMA technology by inducing the relevant SDOs to include Qualcomm's patented technology as an essential element of the UMTS standard. On information and belief, Qualcomm made these representations from its headquarters, located in California.

43.    Qualcomm's WCDMA technology was incorporated into the UMTS standard only after, and in reliance on, Qualcomm's commitment to license the patents for the WCDMA technology on FRAND terms. The selection of Qualcomm's technology excluded other patent holders competing to have their patents incorporated into the standard which would have licensed their patents on FRAND terms. However, even if Qualcomm's WCDMA technology was the only candidate for inclusion in the UMTS standard, it still would not have been selected by the relevant SDOs absent a FRAND commitment. This is because each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing terms before the SDO will agree to include the technology that depends upon those patents in any industry standard.

44.    Qualcomm's false commitments to license its patents on FRAND terms were intended to, and did, cause the SDOs to adopt the UMTS standard. Qualcomm's misrepresentations conferred an unfair advantage and bias in the competitive process in favor of WCDMA's inclusion in the UMTS standard. By distorting choices through

EXHIBIT A PAGE 12

deception, Qualcomm obscured the relative merits of alternatives and prevented an efficient selection process. Qualcomm also obscured the costs of including its proprietary technology in the standard. Qualcomm has taken advantage of industry participants who now are locked into the UMTS standard by violating its FRAND commitments, thus extracting supracompetitive royalties for the licensing of its WCDMA patents.

## QUALCOMM'S UMTS LICENSING PRACTICES ARE ANTICOMPETITIVE

45. Qualcomm never intended to offer its patent portfolio on FRAND terms. Qualcomm's commitment to FRAND licensing to the relevant SDOs was intentionally false.

46. After the widespread adoption of the UMTS standard, Qualcomm reneged on its FRAND commitments to the ETSI and other SDOs as alleged in more detail below. Qualcomm's licensing of the UMTS patents ("UMTS Licensing Practices" or "UMTS Licensing") have not been fair or reasonable, nor have they been non-discriminatory.

47. Qualcomm has used its monopoly power in the WCDMA market, as well as its false commitment to license its WCDMA patents of FRAND terms, to force industry participants into accepting Qualcomm's UMTS Licensing Practices. Qualcomm has unnaturally prolonged high prices for UMTS chipsets and UMTS devices, and has significantly deterred non-price competition (improved products and functionality). Consequently, prices for UMTS chipsets are supracompetitive, and innovation in, e.g., enhanced functionality has been undermined.

48. Qualcomm's Acquisition of Market Power. As any other patentee, Qualcomm exercises exclusive control over the market for its WCDMA-related patents. Qualcomm derives its market power in the UMTS market from the incorporation of WCDMA-related patents into the UMTS standard and the widespread adoption of that standard. Qualcomm's deceptive conduct, in the context of a consensus-driven private standard-setting environment, harmed (and continues to harm) competition and provides Qualcomm with monopoly power over the UMTS chipset market.

49. Qualcomm communicates with its licensees and potential licensees, and its UMTS

EXHIBIT A PAGE 13

Licensing Practices emanate, from its headquarters in California. Qualcomm's UMTS Licensing Practices include, but are not limited to, the following:

50. **Discrimination Against Non-Qualcomm UMTS Chipsets via WCDMA Patent Royalty Rates.** On information and belief, UMTS Licensing requires cellular manufacturers to pay multi-million dollar fees, which may be waived, but only on a discriminatory basis – for example, if cell phone manufacturers agree to purchase Qualcomm's UMTS chipsets exclusively. No legitimate relationship exists between licensing of cell phone technology and the purchase of chipsets.

51. Qualcomm's royalty rate discrimination furthers no legitimate competitive interest or business need. Rather, Qualcomm's royalty rate discrimination is intended to harm, and has the effect of harming, competition in the UMTS chipset market.

52. **Discrimination Against Non-Qualcomm UMTS Chipsets via WCDMA Patent Royalty Calculations: Price Netting.** Qualcomm's UMTS Licensing also discriminates through a form of tying products together, called "price netting." The royalty paid under UMTS Licensing is based on the end-user price for the entire UMTS device, if the cell phone uses a chipset made by a competitor of Qualcomm. However, if licensees use a Qualcomm chipset, they may deduct (or "net out") the price paid to Qualcomm for the Qualcomm chipset from the end-user price of the UMTS device before calculating the royalty. "Price-netting" explicitly ties the patent royalty (fees paid on a license for Qualcomm's WCDMA patents) to UMTS chipsets manufactured by Qualcomm. "Price-netting" does not further any legitimate business interest, but rather is intended to harm competition. This UMTS Licensing Practice ensures that every non-Qualcomm UMTS chipset purchased by a device manufacturer carries a hefty financial penalty.

53. UMTS Licensing's discrimination against non-Qualcomm UMTS chipsets does not reflect any legitimate competitive interest or business need, but is intended to and does harm competition in the UMTS chipset market.

54. Qualcomm executives have publicly confirmed that UMTS Licensing involves price discrimination. Qualcomm's President, Steve Altman, stated in the earnings call for

EXHIBIT __A__ PAGE __14__

Qualcomm's 2005 fourth quarter: "We have provided a small discount for using our chips to companies currently selling WCDMA handsets in Europe, which we believe to be nothing more than legitimate and lawful price examination [sic]." *Full Transcript of Qualcomm's 4Q05 Conference Call — Prepared Remarks (QCOM)*, at http://seekingalpha.com/article/4317-full-transcript-of-qualcomms-4q05-conference-call-prepared-remarks-qcom (November 16, 2005).

55.  **UMTS Licensing Requires Unfair and Discriminatory Double Royalty Payments.** Upon information and belief, Qualcomm requires licenses from both chipset manufacturers and cell phone manufacturers. This UMTS Licensing Practice requires that cellular device manufacturers pay a royalty rate based on the sales price of each UMTS cell phone sold: chipset manufacturers cannot sell UMTS chipsets to cell phone manufacturers without a Qualcomm license, and UMTS device manufacturers cannot buy UMTS chipsets from manufacturers without a Qualcomm license. Further, device manufacturers pay the same royalty regardless of whether they purchased the UMTS chipset or manufactured it themselves – although (as alleged above) manufacturers do receive a discount if they purchase the chipsets directly from Qualcomm. Hence, Qualcomm's royalty scheme enables it to collect royalties at two levels of the UMTS device market.

56.  By requiring an individual license from each chipset supplier and UMTS device manufacturer, Qualcomm has also gained control over the interactions between suppliers and manufacturers, which is used to discriminate between customers depending on whether they use Qualcomm or non-Qualcomm chipsets.

57.  On information and belief, Qualcomm has threatened UMTS device manufacturers with termination of their licenses and patent and/or breach of contract litigation if they purchase UMTS chipsets from any company that does not have its own license from Qualcomm. Qualcomm has made these threats notwithstanding its knowledge that at least some of those cell phone manufacturers have paid a royalty on UMTS chipsets and are licensed to sell UMTS cell phones incorporating UMTS chipsets. None of the other

EXHIBIT __A__ PAGE __15__

patent owners with patents essential to the UMTS standard require this double royalty. This double royalty violates Qualcomm's FRAND obligations, not only because it is unfair and unreasonable, but also because it imposes different effective royalty rates (for the same bundle of rights) on UMTS device manufacturers that use third party UMTS chipsets than on those that use self-manufactured chipsets. This exacerbates the effect of UMTS Licensing's discrimination against manufacturers that use non-Qualcomm UMTS chipsets and increases costs to consumers.

58. **UMTS Licensing Extends Royalty Payments to Unpatented Components of UMTS Chipsets.** Upon information and belief, UMTS Licensing requires royalty payments on certain components of a UMTS chipset that are not covered by Qualcomm's WCDMA patents. This UMTS Licensing Practice discriminates against other UMTS chipset manufacturers who may seek to improve and enhance the functionality of their UMTS chipsets. This UMTS Licensing Practice is unreasonable, unfair, and anticompetitive, because it dampens the economic incentives of UMTS licensees to improve and add functionality to UMTS chipsets.

59. **UMTS Licensing Requires Unreasonable Royalty Demands Contrary to FRAND Commitments.** The royalty rates charged by Qualcomm to UMTS chipset manufacturers for Qualcomm's WCDMA technology are far greater than the rates charged by any other company proclaiming to be an essential WCDMA patent holder.

60. In addition, Qualcomm publicly represents that it charges the same royalty rate for licensing its WCDMA patents as it does for its 3G CDMA patents, even though its patents cover a much smaller proportion of the UMTS standard than the 3G CDMA standard. Thus, *Qualcomm's patents add far less value to the 3G UMTS standard than to the 3G CDMA standard, though Qualcomm charges the same license rate for both.* This UMTS Licensing Practice lessens competition in the UMTS market and encourages competition in the 3G CDMA market. Using this UMTS Licensing Practice as leverage, Qualcomm has increased its market power over the entire market for 3G cellular devices.

Class Action Complaint                    14

EXHIBIT ___A___ PAGE ___16___

61. Steve Altman stated at Qualcomm's May 5, 2005 Spring Analyst Meeting that Qualcomm's licensees are obliged to pay the same royalty rates regardless of whether any of its patents expire and regardless of the number or percentage of WCDMA essential patents held, provided that at least "one claim of one patent applies." Qualcomm's 2006 10-K states:

> Generally, we have licensed substantially all of our patents to our CDMA licensees. Under each of our existing license agreements covering multiple CDMA standards, the royalty rate paid to us for sales of licensed 3G CDMA (regardless of whether it is CDMA2000, WCDMA, TD-CDMA or TD-SCDMA) subscriber products *is no less than the rate that such licensee pays for its licensed second generation cdmaOne* [2G CDMA] *subscriber products.*

QUALCOMM Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006*, at 10-11 (emphasis added).

62. Similarly, Qualcomm has rejected attempts by other WCDMA essential patent holders to set up a government-or-SDO-approved ceiling on the royalty rate at which all WCDMA technology for cell phones would be licensed in order to encourage adoption and proliferation of the technology.

63. **UMTS Licensing Requires Unfair Grant-back Provisions.** Upon information and belief, Qualcomm demands that UMTS licensees grant back to Qualcomm licenses for their own patents on terms much more favorable to Qualcomm. This UMTS Licensing Practice requires UMTS licensees to provide to Qualcomm substantially broader licenses for their own patents than what Qualcomm grants to the UMTS licensees. This UMTS Licensing Practice violates Qualcomm's FRAND commitments because the grant-back provisions are not reciprocal, but are overly broad. Qualcomm's insistence on an asymmetrical grant-back has the additional anticompetitive effect of discouraging innovation by Qualcomm's licensee-competitors and thus, undermines competition for UMTS chipsets and technology. This UMTS Licensing Practice is anticompetitive, because it creates an imbalance of power between Qualcomm and its competitors that threatens to seriously hamper those competitors over the long-term. It is also discriminatory in that it affects licensees with extensive relevant patent portfolios more

EXHIBIT ___A___ PAGE __17__

than it affects those without such a portfolio.

64. **Pricing Data Exchange Under UMTS Licensing Is Anticompetitive.** Upon information and belief, UMTS Licensing requires UMTS chipset licensees to provide to Qualcomm sensitive sales and pricing information, even when those licensees are competing directly with Qualcomm. This UMTS Licensing Practice discourages price competition and lacks any legitimate business justification. The effect is to prevent competition to the detriment of consumers.

65. **Qualcomm Offers Incentives to Device Manufacturers to Foreclose Competition in the UMTS Chipset Market.** Upon information and belief, Qualcomm provides discounts, marketing incentives, payments and/or other rewards to cell phone manufacturers who use Qualcomm UMTS chipsets exclusively. These inducements undermine competition from other UMTS chipset manufacturers by increasing the costs of firms who seek to sell UMTS chipsets to device manufacturers relative to Qualcomm's costs, and by defeating competition that would expand UMTS chipset output, improve quality and reduce the price of UMTS cell phones. These inducements may amount to tens of millions of dollars per cell phone manufacturer licensee.

66. **UMTS Licensing Harms Competition.** Collectively and individually, Qualcomm's UMTS Licensing Practices have restrained, eliminated, curbed, and reduced competition and undermined innovation in the UMTS chipset market, as well as the market for UMTS-capable devices. Competition could accelerate the decline in prices in the UMTS device market and facilitate other non-price competition, including advances in functionality and quality. Qualcomm intended to restrain competition when it implemented the UMTS Licensing Practices, to protect itself from competition on the merits.

67. The anticompetitive impact of UMTS Licensing can be inferred from Qualcomm's own statements. For instance, out of 36 HSDPA-capable devices on the market, only two use non-Qualcomm chipsets. Qualcomm, *QUALCOMM Press Conference*, at 18 (Feb. 12, 2007), at http://www.qualcomm.com/press/PDF/3gsm07_pressbriefing.pdf. Qualcomm

EXHIBIT __A__ PAGE __18__

provides manufacturers with the chipset for all 41 laptops with HSDPA-embedded chipsets. *Id.* at 19. Qualcomm has over 80 UMTS vendor licensees. *Id.* at 20. Indeed, revenue from UMTS Licensing composes more and more of Qualcomm's overall income: Qualcomm estimates that "the ratio of WCDMA reported royalties to total reported royalties was 49% [in fiscal year 2006], up from 41% reported in [fiscal year 2004]." QUALCOMM Incorporated, *Form 10-K For the Fiscal Year Ended September 24, 2006,* at 45.

## THE RELEVANT PRODUCT MARKETS

68. **Device Market.** The relevant product market ("Device Market") is the global market for UMTS-capable devices.

69. Plaintiff is an end consumer in the UMTS device market. Plaintiff purchased a Motorola Razr V3xx on June 1, 2007.

70. Plaintiff has suffered harm from Qualcomm's anticompetitive UMTS Licensing Practices. Both UMTS chipset and UMTS device manufacturers suffer direct anticompetitive harm from Qualcomm's UMTS Licensing Practices. This anticompetitive harm includes supracompetitive prices and impaired non-price competition in innovation of UMTS functionality. Because the entire UMTS chipset and device industries are uniformly subject to the effects of UMTS Licensing, no individual competitor in those markets has any economic incentive to absorb these costs. Instead, UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the vendors ultimately pass those costs on to end consumers, such as Plaintiff.

71. Since the inception of cellular service in the United States, cellular carriers have competed not only through their cellular service, but have also bundled their services with cellular devices compatible with (and necessary to use) that cellular service. Carriers have subsidized the cost of these bundled devices for over fifteen years.

72. Despite these subsidies, end consumers who purchase their devices through cellular carriers pay more for UMTS devices than they would in the absence of the

EXHIBIT ___A___ PAGE __19__

anticompetitive effects of Qualcomm's UMTS Licensing. Indeed, the carriers' ability to offer subsidies on UMTS devices is curtailed and limited by those same anticompetitive effects. Further, end consumers pay sales tax on the entire cost of the device notwithstanding the carriers' subsidy. UMTS devices are no longer a niche market, but now constitute a burgeoning new consumer technology, and are well on their way to becoming the next ubiquitous consumer standard in cellular technology. Qualcomm executives estimated in a 2006 earnings conference call that approximately 96 million WCDMA units shipped in 2006, up from 50 million units in 2005. *QUALCOMM Inc. F2Q06 (Quarter ending Mar 26, 2006) Earnings Conference Call Transcript (QCOM),* at http://seekingalpha.com/article/9210-qualcomm-inc-f2q06-quarter-ending-mar-26-2006-earnings-conference-call-transcript-qcom (Apr. 20, 2006). Qualcomm's recent estimate for UMTS sales in 2007 is 180 million units. *QUALCOMM F3Q07 (Qtr End 6/30/07) Earnings Call Transcript,* at http://seekingalpha.com/article/42372-qualcomm-f3q07-qtr-end-6-30-07-earnings-call-transcript (July 20, 2007).

73.   **Alternative Device Market.** Qualcomm has leveraged its market power over UMTS devices and chipsets to increase its market power over the entire market for cellular devices using any 3G standard.

74.   Qualcomm exercises exclusive control over the patents needed to use the 3G CDMA standard, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm substantially controls the patent portfolio needed to manufacture 3G CDMA devices.

75.   The market for 3G CDMA-related patents is significant because of the adoption of the 3G CDMA standard by, among others, Verizon Wireless and Sprint Communications. Qualcomm therefore derives significant market power from its 3G CDMA patents.

76.   The UMTS Licensing Practices undermine competition between UMTS device and chipset manufacturers and the manufacturers of 3G CDMA devices and chipsets. Through the UMTS Licensing Practices, Qualcomm imposes an anticompetitive penalty on competitors seeking to manufacture UMTS devices and chipsets. Qualcomm uses its

EXHIBIT __A__ PAGE 20

market power over the IPRs necessary to use the 3G CDMA standard to eliminate, limit, or mitigate this penalty for manufacturers of 3G CDMA devices and chipsets. Consequently, the UMTS Licensing Practices make 3G CDMA device and chipsets a more attractive market than UMTS devices and chipsets, while deterring investment in the UMTS standard.

77.    Because UMTS and 3G CDMA are the only standards that current 3G chipset and device manufacturers can use, the UMTS Licensing Practices can reasonably be expected to drive chipset and device manufacturers from investing and competing in the UMTS standard to investing and competing in the 3G CDMA standard. The 3G CDMA standard benefits from the network effects of increased investment, making it more attractive relative to the UMTS standard (or any other possible alternative cellular standard). Because there are relatively fewer IPR owners with an interest in the 3G CDMA standard, additional investments in the 3G CDMA standard and additional competition in the market for 3G CDMA devices increases Qualcomm's market power over the entire 3G cellular device market.

78.    Qualcomm uses its market power over UMTS devices and chipsets to increase its market power over the entire 3G cellular device market by deterring investment in the UMTS standard (or any other possible alternative standard to the 3G CDMA standard) and driving investment into the 3G CDMA standard. Qualcomm's leveraging of its market power comes at the expense of competition in the market for UMTS devices and chipsets: the UMTS Licensing Practices have the effect of prolonging high prices for and undermining innovation in UMTS chipsets and UMTS devices.

79.    In addition and/or in the alternative to the Device Market, the relevant product market is the global market for 3G cellular devices ("Alternate Device Market").

## THE RELEVANT SERVICE MARKET

80.    The subsidies that cellular carriers provide to their subscribers are not costless, and some portion of the carriers' cellular service fees is attributable to these subsidies. In effect, the carriers distribute the cost of these subsidies to each and every one of their

subscribers (regardless of whether these subscribers used or purchased a subsidized cellular device).

81. Some portion of carriers' costs of subsidizing the purchase of UMTS-compliant devices is attributable to Qualcomm's anticompetitive conduct. Carriers pay supracompetitive prices to purchase UMTS devices that can be sold to their cellular service customers at subsidized prices. These supracompetitive fees are passed on to the carriers' consumers.

82. On information and belief, however, the supracompetitive fees attributable to Qualcomm's anticompetitive conduct are not distinctly allocated to the price of the UMTS devices sold through the carriers to their cellular subscribers. Rather, these supracompetitive fees are effectively distributed through carriers' service fees to all their customers. Plaintiff and the other cellular service subscribers have paid higher prices for their cellular service because of Qualcomm's anticompetitive conduct.

83. Plaintiff does not seek to determine whether cellular carriers' rates are reasonable, but rather to eliminate and redress the anticompetitive impact of Qualcomm's conduct which impact may be measured, in part, by cellular carriers' fees.

84. The relevant service market ("Service Market") is the cellular service of every carrier which bundles its cellular service with subsidized UMTS-compliant devices in the United States.

## CLASS CERTIFICATION ALLEGATIONS

85. Plaintiff seeks certification of a Device Class and a Service Class. The Device Class seeks injunctive relief under federal and state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased a UMTS-capable cellular device. The Service Class seeks injunctive relief under federal and state antitrust laws, and money damages (including treble damages under the Cartwright Act (Cal. Bus. & Prof. Code § 16750)) for persons who purchased cellular service from a carrier that bundled its cellular services with subsidized UMTS-capable devices.

86. Plaintiff seeks certification under Rule 23(a), Rule 23(b)(2) and Rule 23(b)(3).

Class Action Complaint                               20

## Allegations for Certification of Device Class Pursuant to Rule 23(a)

87.     **Definition of the Device Class.** Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased a UMTS-capable cellular device (the "Device Class"). Excluded from the Device Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

88.     **Device Class Numerosity.** Joinder of all Device Class members is impracticable. Qualcomm itself estimates some 326 million UMTS devices were sold globally in the last three years. Qualcomm estimates that UMTS-based phone sales represented approximately 41% of all manufacturer handset sales in Western Europe during the period from April 2006 through June 2006. *QUALCOMM Incorporated, Form 10-K For the Fiscal Year Ended September 24, 2006*, at 45. There were an estimated 2.3 million 3G cellular handsets and more than 2.3 million HSDPA-capable PC cards in service in the United States at the end of 2005. *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services, Eleventh Report*, 21 FCC Rcd 10947, ¶ 165 (Sept. 26, 2006) ("*Eleventh Report*").

89.     **Device Class Commonality.** Common questions of fact and law exist as to all Device Class members and predominate over the questions affecting only individual Class members. These common questions include:

(a)     Whether Qualcomm's patents are essential to manufacturing UMTS chipsets or UMTS devices;

(b)     Whether Qualcomm has represented its patents are essential to manufacturing UMTS chipsets or UMTS devices to relevant manufacturers, and said manufacturers have relied on those representations;

(c)     Whether Qualcomm represented or committed that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

EXHIBIT _A_ PAGE _23_

(d)   Whether Qualcomm intentionally misrepresented that it would license its patents on FRAND terms to SDO participants involved in the selection and formulation of the UMTS standard;

(e)   Whether Qualcomm has committed the UMTS Licensing Practices alleged above;

(f)   Whether the UMTS Licensing Practices alleged above are fair, reasonable and non-discriminatory;

(g)   Whether Qualcomm reneged on its commitments to license its UMTS patents on FRAND terms;

(h)   Whether the UMTS Licensing Practices have anticompetitive effects, including supracompetitive pricing and impair non-price competition in the form of deterred innovation;

(i)   Whether Qualcomm's UMTS Licensing Practices violate the Section 1 of the Sherman Act;

(j)   Whether Qualcomm's UMTS Licensing Practices violate the Section 2 of the Sherman Act;

(k)   Whether the UMTS Licensing Practices' anticompetitive effects are passed on to end consumers of UMTS devices;

(l)   What portion of end-user prices for UMTS devices are attributable to Qualcomm's anticompetitive conduct alleged herein;

(m)   Whether UMTS Licensing creates a trust in violation of the California Cartwright Act;

(n)   Whether Qualcomm's UMTS Licensing Practices are unlawful and otherwise unfair, and thereby constitutes a violation of California's unfair competition law; and

(o)   Whether Plaintiff and the Device Class are entitled to relief, and the nature of such relief.

90.   **Device Class Typicality.** Plaintiff's claims are typical of the claims of other Device Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Device Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

**Allegations for Certification of Service Class Pursuant to Rule 23(a)**

91.   **Definition of the Service Class.** Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this Complaint against Defendant on behalf of himself and all persons who purchased cellular service from any carrier in the United States which bundles its

EXHIBIT _A_ PAGE 24

cellular service with subsidized UMTS-compliant devices (the "Service Class").
Excluded from the Service Class are Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents has a controlling interest and their current or former employees, officers and directors; and 3) the legal representatives, successors or assigns of any such excluded persons.

92. **Service Class Numerosity.** Joinder of all Service Class members is impracticable. In December 2005, the two largest GSM-based carriers collectively had roughly 76 million subscribers. *See Eleventh Report*, Table 4. Both these carriers subsidize their subscribers' purchase of UMTS devices, and the size of their subscriber base is sufficient for numerosity without considering any regional cellular carriers.

93. **Service Class Commonality.** Common questions of fact and law exist as to all Service Class members and predominate over the questions affecting only individual Class members. In addition to the common questions raised by the Device Class, these common questions include:

   (a)    Whether the UMTS Licensing Practices' anticompetitive effects are passed on to cellular subscribers of carriers which subsidize their subscribers' purchase of UMTS devices;

   (b)    What portion of prices for cellular service are attributable to Qualcomm's anticompetitive conduct alleged herein;

   (c)    Whether Plaintiff and the Service Class are entitled to relief, and the nature of such relief.

94. **Service Class Typicality.** Plaintiff's claims are typical of the claims of other Service Class members, as the wrongful conduct of Defendant threatens the Plaintiff and other Service Class members with the same injury and/or damages arising out of and based upon the same transactions, made uniformly to the Plaintiff and the public.

### Allegations Common to the Device Class and Service Class

95. **Adequate Representation.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Device and Service Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to the members of either Class, and Defendant has no defenses unique to

EXHIBIT A PAGE 25

Plaintiff.

96.   **Predominance and Superiority.** This class action is appropriate for certification, because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Classes is impracticable. The damages suffered by each individual member of the respective Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendant. It would be virtually impossible for the Class or Subclass members individually to obtain effective relief from the misconduct of Defendant. Even if members of the Class or Subclass themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

97.   **Policies Generally Applicable to the Classes.** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the members of both Classes, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Classes as a whole. The policies of the Defendant challenged herein apply and affect the Classes uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct, not on facts or law applicable only to Plaintiff.

98.   **Market Power.** Qualcomm acquired market power - the power to raise prices and restrict output – in the Relevant Markets through the incorporation of its WCDMA patents in the UMTS standard and the widespread adoption of the UMTS standard by cellular carriers.

99.   **Willful Acquisition of Monopoly Power Through Intentional Misrepresentation.**

EXHIBIT A   PAGE 26

Qualcomm acquired monopoly power by intentionally misrepresenting to the relevant SDOs and their members that Qualcomm would license its WCDMA patents on fair, reasonable, and non-discriminatory terms.

100. **SDOs' Adoption of UMTS Standard.** The UMTS standard was adopted in a consensus-oriented, private standard-setting environment. Every relevant SDO and all of their members relied on Qualcomm's intentional misrepresentations about its commitment to license its WCDMA patents on FRAND terms.

101. **Qualcomm Reneged on its FRAND Commitments.** Qualcomm has reneged on its commitments to licensing under FRAND terms. Qualcomm's UMTS Licensing is unfair, unreasonable, and discriminatory – and has serious anticompetitive effects.

102. **Leveraging Monopoly Power.** Qualcomm exercises exclusive control over its 3G CDMA-related patents, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm uses its market power over UMTS devices and chipsets as a leverage to increase its market power over the entire 3G cellular device market by deterring investment in the UMTS standard (or any other possible alternative cellular standard) and driving investment into the 3G CDMA standard.

103. **Causal Antitrust Injury.** Defendant's actions have injured Plaintiff and the Device and Service Class members and threaten them with additional antitrust injury in the form of more expensive UMTS cellular devices, reduced selection, and lessened non-price competition. Plaintiff and the Class Members have sustained antitrust injuries from the Defendant's actions in the form of increased costs for UMTS cellular devices than they would have otherwise.

### Count I: Violation of the Sherman Act, 15 U.S.C. § 1

104. Plaintiff incorporates the above allegations by reference.

105. Qualcomm committed to the relevant SDOs that it would license its WCDMA patents, which are essential to the UMTS standard, on FRAND terms. This commitment was an intentional misrepresentation.

106. The relevant SDOs and their members relied on Qualcomm's false commitment to license its WCDMA patents essential to the UMTS standard. and adopted and implemented the UMTS standard.

107. Qualcomm's UMTS Licensing constitutes a contract. combination in the form of trust or otherwise in restraint of trade or commerce and violates Section 1 of the Sherman Act (15 U.S.C. § 1). Qualcomm imposes the UMTS Licensing on its licenses through deceptive and coercive conduct. and Qualcomm's licensees adhere to those restraints involuntarily.

108. The UMTS Licensing has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers. to end consumers of UMTS devices and cellular services). as well as impaired non-price competition in the form of deterred innovation.

109. Plaintiff. on his own behalf and on behalf of the members of the Device and Service Class. seeks injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein. and the cost of this suit. including reasonable attorneys' fees. under the Clayton Act (15 U.S.C. § 26).

### Count II: Violation of the Sherman Act, 15 U.S.C. § 2

110. Plaintiff incorporates the above allegations by reference.

111. Qualcomm committed to the relevant SDOs that it would license its WCDMA patents. which are essential to the UMTS standard, on FRAND terms. This commitment was an intentional misrepresentation.

112. The relevant SDOs and their members relied on Qualcomm's false commitment to license its WCDMA patents essential to the UMTS standard, and adopted and implemented the UMTS standard.

113. Through this intentional misrepresentation, Qualcomm willfully acquired monopoly power over the Device Market.

EXHIBIT A PAGE 28

114. Qualcomm's anticompetitive acts violate Section 2 of the Sherman Act (15 U.S.C. § 2).

115. In addition, Qualcomm has leveraged its monopoly power over UMTS devices and chipsets to acquire monopoly power over the Alternate Device Market.

116. The investment required to adopt a particular cellular standard effectively prevents cellular carriers from switching standards. Switching standards would be prohibitively expensive for cellular carriers. Cellular carriers have adopted one of two 3G cellular standards: UMTS or 3G CDMA.

117. Cellular devices that do not use cellular standards supported by the carriers cannot be competitive (or economically successful), because their utility is nil or extremely limited. The commercial reality is that 3G device and chipset manufacturers must use either the UMTS standard or the 3G CDMA standard. Hence, if Qualcomm deters investment by device and chipset manufacturers in the UMTS standard, it effectively diverts investment into the 3G CDMA standard.

118. Qualcomm exercises exclusive control over the patents needed to use the UMTS standard, and derives significant market power over the market for UMTS devices through the incorporation of its WCDMA patents in the UMTS standard and the widespread adoption of the UMTS standard by cellular carriers.

119. Qualcomm exercises exclusive control over the patents needed to use the 3G CDMA standard, and derives significant market power over the market for 3G CDMA devices from those patents. Qualcomm also derives significant revenue from its 3G CDMA-related patents.

120. Qualcomm substantially controls the patent portfolio needed to manufacture 3G CDMA devices. To the extent Qualcomm has the power to force cellular device and chipset manufacturers to adopt the 3G CDMA standard, it is increasing its market power over the Alternate Device Market.

121. Qualcomm's UMTS Licensing deters investment in the UMTS standard, and forces, diverts, and induces investment in the 3G CDMA standard.

122. Qualcomm willfully acquired monopoly power over the entire Alternate Device Market

EXHIBIT____A____ PAGE__29__

by leveraging its monopoly power over UMTS devices and chipsets through the UMTS Licensing Practices. The UMTS Licensing Practices deter investment in the UMTS standard (or any other possible alternative standard to the 3G CDMA standard) by device and chipset manufacturers and divert investment into the 3G CDMA standard.

123. Qualcomm has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation.

124. Plaintiff, on his own behalf and on behalf of the members of the Device and Service Class, seeks injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including reasonable attorneys' fees, under the Clayton Act (15 U.S.C. § 26).

## Count III: Violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726

125. Plaintiff incorporates the above allegations by reference.

126. Through the UMTS Licensing, Qualcomm and its various licensees formed a combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in manufacturing, making, sale and/or purchase of UMTS devices. Qualcomm used (and continues to use) coercive and deceptive tactics to impose restraints upon otherwise uncooperative licensees, and procured (and continues to procure) the unwilling cooperation of these licensees through threats and intimidation. The UMTS Licensing therefore creates a trust prohibited by California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726).

127. In addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices constitute a trust in violation of the Cartwright Act, even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and

EXHIBIT A   PAGE 30

Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for the UMTS patents and engaging in the UMTS Licensing Practices.

128. The UMTS Licensing has caused antitrust injury to Plaintiff and the other members of the Device and Service Classes and threatens additional antitrust injury if it is allowed to continue. This antitrust injury consists of damages from supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred innovation.

129. Plaintiff, on his own behalf and on behalf of the other Device and Service Class members, seeks treble damages (with interest), injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the cost of this suit, including reasonable attorneys' fees, under the Cartwright Act (Cal. Bus. & Prof. Code § 16750).

### Count IV: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

130. Plaintiff incorporates the above allegations by reference.

131. Qualcomm's UMTS Licensing Practices, as alleged above, are unlawful business acts or practices.

132. The UMTS Licensing Practices are unfair business acts or practices. In addition or in the alternative to the foregoing allegations, the UMTS Licensing Practices are unfair or deceptive business acts or practices even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm committed an unfair or deceptive business act or practice by simply reneging on its commitment to FRAND licensing for the UMTS patents.

133. The UMTS Licensing has damaged Plaintiff and the other members of the Device and Service Classes and threatens damage if it is allowed to continue. This damage consists of supracompetitive prices (which are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services), as well as impaired non-price competition in the form of deterred

EXHIBIT ___A___ PAGE ___31___

innovation.

134.  Plaintiff, on his own behalf and on behalf of the members of the Device and Service

Classes, seeks injunctive relief, including restitution of all supracompetitive fees, under

California's unfair competition law (Cal. Bus. & Prof. Code § 17203).

WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor

and against Defendant as follows:

(a)  Certifying the action as a class action and designating Plaintiff and his
counsel as representatives of the Device Class and the Service Class;

(b)  With respect to Count III, treble damages in an amount to be determined
at trial against Qualcomm and in favor of the Device Class and the
Service Class;

(c)  With respect to Counts I, II, III, and IV an injunction against further
anticompetitive acts, and the costs of the suit, including reasonable
attorneys' fees, against Qualcomm and in favor of the Device Class and
the Service Class;

(d)  With respect to Count IV, equitable relief including an accounting, a
constructive trust and restitution, in an amount to be determined at trial,
and attorneys' fees, against Qualcomm and in favor of the Injunctive
Class;

(e)  Awarding pre- and post-judgment interest; and

(f)  Granting such other and further relief as the Court may deem just and
proper.

## JURY TRIAL DEMAND

The Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: April 9, 2007

By: _____

Alan Himmelfarb (Cal. Bar. No. 90480)
KAMBEREDELSON, LLC
2757 Leonis Blvd.
Los Angeles, CA 90058
(323) 585-8696
ahimmelfarb@kamberedelson.com

Jay Edelson
Ethan Preston
KAMBEREDELSON, LLC
53 West Jackson Ave., Suite 550
Chicago, IL 60604

Class Action Complaint                    30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(312) 589-6370
jedelson@kamberedelson.com
epreston@kamberedelson.com

Karin E. Fisch
Orin Kurtz
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

EXHIBIT __A__ PAGE __33__

# EXHIBIT B

 **AT&T**  **ATTINC.** (T)

175 E HOUSTON, RM 9-P-03
ATTN : SHARON HALL
SAN ANTONIO, TX 78205
210. 821.4105
http://www.att.com/

# EX-13

**AT&AMP;T 2007 ANNUAL REPORT**
**10-K Filed on 02/27/2008 - Period: 02/26/2008**
File Number 001-08610

GSI

Management's Discussion and Analysis of Financial Condition and Results of Operations, continued
Dollars in millions except per share amounts

Segment Results

Our segments are strategic business units that offer different products and services and are managed accordingly. As a result of our acquisitions of BellSouth and ATTC, we revised our segment reporting to represent how we now manage our business, restating prior periods to conform to the current segments. Our operating segment results presented in Note 4 and discussed below for each segment follow our internal management reporting. We analyze our various operating segments based on segment income before income taxes (see Note 4). Each segment's percentage of total segment operating revenue and income calculations is derived from our segment results table in Note 4 and reflects amounts before eliminations. We have four reportable segments: (1) wireless, (2) wireline, (3) advertising & publishing and (4) other.

The wireless segment accounted for approximately 35% of our 2007 total segment operating revenues as compared to 37% in 2006 and 32% of our 2007 total segment income as compared to 27% in 2006. This segment offers wireless voice and data communications services across the United States, providing cellular and PCS services. This segment reflects 100% of the results reported by AT&T Mobility, which was our wireless joint venture with BellSouth prior to the December 29, 2006 acquisition and is now a wholly–owned subsidiary of AT&T. Prior to the acquisition, although we analyzed AT&T Mobility's revenues and expenses under the wireless segment, we eliminated the wireless segment in our consolidated financial statements. In our 2006 and prior consolidated financial statements we reported our 60% proportionate share of AT&T Mobility's results as equity in net income of affiliates.

The wireline segment accounted for approximately 59% of our 2007 total segment operating revenues as compared to 57% in 2006 and 55% of our 2007 total segment income as compared to 47% in 2006. This segment provides both retail and wholesale landline communications services, including local and

long–distance voice, switched access, IP and Internet access data, messaging services, managed networking to business customers, AT&T U–verse<sup>SM</sup> TV service (U–verse) and satellite television services through our agency agreements with EchoStar Communications Corp. (EchoStar) and the DIRECTV Group, Inc. (DIRECTV). With the BellSouth acquisition, we now provide local service in 22 states ("in–region").

The advertising & publishing segment accounted for approximately 5% of our 2007 total segment operating revenues as compared to 4% in 2006 and 9% of our 2007 total segment income as compared to 12% in 2006. This segment includes our directory operations, which publish Yellow and White Pages directories and sell directory and Internet–based advertising. This segment also includes the results of our Internet–based advertising business, YELLOWPAGES.COM (YPC), which was a joint venture with BellSouth prior to the December 29, 2006 acquisition and is now a wholly–owned subsidiary of AT&T. For segment reporting disclosure, we have carried forward the deferred revenue and deferred cost balances for BellSouth at the acquisition date in order to reflect how the segment is managed. This is different from consolidated reporting purposes as under Statement of Financial Accounting Standards No. 141, "Business Combinations" (FAS 141), BellSouth deferred revenue and expenses from directories published during the 12–month period ending with the December 29, 2006 acquisition date are not recognized and therefore were not included in the opening balance sheet. For management reporting purposes, we continue to amortize these balances over the life of the directory (typically 12 months). Thus, our advertising & publishing segment results for 2007 include revenues of $964 and expenses of $308, related to directories published in the Southeast region during 2006, prior to our acquisition of BellSouth. These amounts are eliminated in our consolidated results (see Note 4).

The other segment accounted for approximately 1% of our 2007 total segment operating revenues as compared to 2% in 2006 and 4% of our 2007 total segment income as compared to 14% in 2006. This segment includes results from Sterling Commerce, Inc. (Sterling), customer information services, payphone, and all corporate and other operations. Additionally, this segment includes our portion of the results from our international equity investments. Prior to December 29, 2006, this segment also included our results from AT&T Mobility as equity in net income of affiliates, as discussed above.

The following tables show components of results of operations by segment. We discuss significant segment results following each table. We discuss capital expenditures for each segment in "Liquidity and Capital Resources."

5

EXHIBIT B PAGE 35

Management's Discussion and Analysis of Financial Condition and Results of Operations, continued
Dollars in millions except per share amounts

Wireless
Segment Results

| | 2007 | 2006 | 2005 | Percent Change 2007 vs. 2006 | 2006 vs. 2005 |
|---|---|---|---|---|---|
| Segment operating revenues | | | | | |
| Service | $ 38,678 | $ 33,788 | $ 30,673 | 14.5% | 10.2% |
| Equipment | 4,006 | 3,749 | 3,795 | 6.9 | (1.2) |
| Total Segment Operating Revenues | 42,684 | 37,537 | 34,468 | 13.7 | 8.9 |
| Segment operating expenses | | | | | |
| Cost of services and equipment sales | 15,991 | 15,057 | 14,388 | 6.2 | 4.6 |
| Selling, general and administrative | 12,594 | 11,446 | 11,645 | 10.0 | (1.7) |
| Depreciation and amortization | 7,079 | 6,462 | 6,608 | 9.5 | (2.2) |
| Total Segment Operating Expenses | 35,664 | 32,965 | 32,641 | 8.2 | 1.0 |
| Segment Operating Income | 7,020 | 4,572 | 1,827 | 53.5 | -- |
| Equity in Net Income (Loss) of Affiliates | 16 | 40 | (11) | (60.0) | -- |
| Minority Interest 1 | (198) | (169) | (103) | (17.2) | (64.1) |
| Segment Income | $ 6,838 | $ 4,443 | $ 1,713 | 53.9% | -- |

1 Minority interest is recorded as "Other Income (Expense) – Net" in the consolidated statements of income.

Accounting for AT&T Mobility
The wireless segment reflects 100% of the results reported by AT&T Mobility (formerly Cingular), which was our wireless joint venture with BellSouth prior to the December 29, 2006 acquisition, at which time it became a wholly-owned subsidiary of AT&T. Prior to the BellSouth acquisition (see Note 2), we accounted for our 60% economic interest in AT&T Mobility under the equity method since we shared control equally with BellSouth. This means that our consolidated results in 2006 and 2005 included our 60% share of AT&T Mobility's results in "Equity in net income of affiliates" in our consolidated statements of income. Following the BellSouth acquisition, AT&T Mobility became a wholly-owned subsidiary and AT&T Mobility's results are included as operating revenues and expenses in our consolidated statements of income. Accordingly, results from this segment for the last two days of 2006 were included in our operating revenues and expenses and not in the "Equity in net income (loss) of affiliates" line. However, for all the periods presented, the wireless segment reflects 100% of the results reported by AT&T Mobility based on the management of the business.

Dobson Acquisition
In November 2007, we acquired Dobson Communications Corporation (Dobson). Dobson marketed wireless services under the Cellular One brand and had provided roaming services to AT&T subsidiaries since 1990. Dobson had 1.7 million subscribers across 17 states, mostly in rural and suburban areas with a population covered of more than 12.6 million people. Dobson was incorporated into our wireless operations subsequent to our acquisition. Our 2007 results included net revenue of $141 and expense of $109 from Dobson.

Wireless Customer and Operating Trends
As of December 31, 2007, we served 70.1 million wireless customers, compared to 61.0 million at December 31, 2006 and 54.1 million at December 31, 2005. Approximately 70% of our wireless customer net additions in 2007 were retail customer additions, and 75% of these additions were postpaid customer additions. Contributing to our net additions and retail customer growth was improvement in customer turnover (customer churn) levels due to our strong network performance and attractive products and services offerings, including the Apple iPhone, which were partially offset by a slowing growth rate of new wireless users reflecting a maturing domestic wireless industry. The improvement in churn levels benefited from network and customer service improvements and continued high levels of advertising. Also contributing to the increase in net additions was a significant increase in prepaid gross additions. Gross customer additions were 20.1 million in 2007, 19.2 million in 2006 and 18.5 million in 2005. Postpaid customer gross additions declined primarily due to higher postpaid market penetration and market maturation, as well as lower industry postpaid churn.

As the wireless industry continues to mature, we believe that future wireless growth will become increasingly dependent on our ability to offer innovative services, which will encourage existing customers to upgrade their current services and handsets and will attract customers from other providers, as well as on our ability to minimize customer churn. Average service revenue per user/customer (ARPU) increased 2.2% compared to 2006 primarily due to increased data services ARPU growth. In 2007, data services ARPU grew 46.9% compared to 2006. The continued increase in data revenue was related to increased use of text messaging, Internet access, e-mail and other data services, which we expect to grow as we continue expanding our third-generation (3G) services. The growth in data ARPU was partially offset by a decline in voice service ARPU of 4.1% compared to 2006, reflecting a higher percentage of prepaid and reseller customers, which provide significantly lower ARPU than postpaid customers, and continued shifts to all-inclusive rate plans that offer lower monthly charges. We expect continued pressure on voice service ARPU.

6

Management's Discussion and Analysis of Financial Condition and Results of Operations, continued
Dollars in millions except per share amounts

ARPU declined 1.1% in 2006 due to decreases in local service, net roaming and other revenue per customer mostly offset by a 44.8% increase in data ARPU and increased long-distance revenue per customer. In 2006, local service revenue per customer declined primarily due to the two reasons discussed above as well as free mobile-to-mobile plans that allow our wireless customers to call other AT&T Mobility customers at no charge and, to a lesser extent, Rollover® minutes. An increase in customers on Rollover plans tends to lower ARPU, since unused minutes (and associated revenue) are deferred until subsequent months for up to one year.

The effective management of customer churn also is critical to our ability to maximize revenue growth and to maintain and improve margins. Customer churn is calculated by dividing the aggregate number of wireless customers who cancel service during each month in a period by the total number of wireless customers at the beginning of each month in that period. Our customer churn rate was 1.7% in 2007, down from 1.8% in 2006 and 2.2% in 2005. The churn rate for postpaid customers was 1.3% in 2007, down from 1.5% in 2006 and 1.9% in 2005. The decline in postpaid churn reflects higher network quality, more affordable rate plans and broader network coverage as well as exclusive devices and free mobile-to-mobile calling among our wireless customers. Churn levels were slightly negatively impacted by ongoing transition of customers from our older analog and Time Division Multiple Access (TDMA) platforms to our advanced Global System for Mobile Communication (GSM) network. We plan to cease operating our analog and TDMA networks in early 2008. The increasing mix of prepaid and reseller customers in our customer base are also expected to pressure churn rates in the future.

Wireless Operating Results
Our wireless segment operating income margin was 16.4% in 2007, 12.2% in 2006 and 5.3% in 2005. The higher margin in 2007 was primarily due to revenue growth of $5,147, which exceeded our increase in operating expenses of $2,699. The higher margin in 2006 was primarily due to revenue growth of $3,069, which exceeded our increase in operating expenses of $324.

Service revenues are comprised of local voice and data services, roaming, long-distance and other revenue. Service revenues increased $4,890, or 14.5%, in 2007 and $3,115, or 10.2%, in 2006 and consisted of:
- Data revenue increases of $2,692, or 63.3%, in 2007 and $1,579, or 59.0%, in 2006. The increase in 2007 is primarily due to the increased number of data users and an increase in data ARPU of 46.9%, which primarily resulted from increased use of text messaging, e-mail, data access and media bundling services. Our significant data growth also reflects an increased number of subscribers using our 3G network. The increase in 2006 was related to increased use of text messaging and Internet access services, which resulted in an increase in data ARPU of 44.8%. Data service revenues represented approximately 18.0% of our wireless segment service revenues in 2007 and 12.6% in 2006.
- Voice revenue increases of $2,135, or 7.3%, in 2007 and $1,592, or 5.8%, in 2006. The increase in 2007 was primarily due to an increase in the number of average wireless customers of approximately 12.1%, partially offset by a decline in voice ARPU of 4.1%. The increase in 2006 was primarily due to an increase in the average number of wireless customers of 11.5%, partially offset by competitive pricing pressures and the impact of various all-inclusive calling and prepaid plans. Included in voice revenues for both periods were increases in long-distance and net roaming revenue due to increased international usage.

Equipment revenues increased $257, or 6.9%, in 2007 and decreased $46, or 1.2%, in 2006. The increase in 2007 was due to higher handset revenues reflecting increased gross customer additions and customer upgrades to more advanced handsets, partially offset by increased equipment discounts and rebate activity. The slight decrease in 2006 was due to a decline in handset revenues as a result of increased rebates and equipment return credits and lower priced handsets, mostly offset by increased sales of handset units, handset upgrades and accessories.

Cost of services and equipment sales expenses increased $934, or 6.2%, in 2007 and $669, or 4.6%, in 2006. The 2007 increase was primarily due to increased equipment sales expense of $1,140 due to the overall increase in sales as well as an increase in sales of higher-cost 3G devices, the introduction of the Apple iPhone handset and an increase in the number and per-unit cost of handset accessory sales. Total equipment costs continue to be higher than equipment revenues due to the sale of handsets below cost, through direct sales sources, to customers who committed to one-year or two-year contracts or in connection with other promotions.

7

Management's Discussion and Analysis of Financial Condition and Results of Operations, continued
Dollars in millions except per share amounts

Cost of services declined $206 in 2007. This decline was due to lower interconnect, roaming and long–distance expenses related to network and systems integration and cost–reduction initiatives, as well as cost reductions from the continued migration of network usage from the T–Mobile USA (T–Mobile) network in California and Nevada to our networks in these states. Our remaining purchase commitment to T–Mobile for this transition period was $51 at December 31, 2007. These decreases were partially offset by higher network usage, with increases in total system minutes of use (MOU) of 13.5%, and associated network system expansion and increased network equipment costs.

Expenses increased in 2006 primarily due to increases in network usage and associated network system expansion. Cost of services increased $492, or 5.3%, in 2006 due to the following:
- Increases in network usage with a total system MOU increase of 20.6% related to the increase in customers. Additionally, average MOUs per customer increased 8.2%.
- Higher roaming and long–distance costs, partially offset by a decline in reseller expenses. The reseller decrease resulted from a decrease in MOUs on the T–Mobile network of more than 50% for 2006.
- Integration costs, primarily for network integration, of $229.

Equipment sales expenses increased $177, or 3.5%, in 2006 due to increased handset upgrades of 11.2% and an increase in the average cost per upgrade and accessory sold, partially offset by a decline in the average cost per handset sold to new customers.

Selling, general and administrative expenses increased $1,148, or 10.0%, in 2007 and decreased $199, or 1.7%, in 2006.

The increase in selling, general and administrative expenses in 2007 was due to the following:
- Increases in selling expenses of $572 due to increases in sales and advertising expenses and Apple iPhone–related costs, partially offset by a decrease in net commission expense, which was consistent with the increase in prepaid plan sales as a percentage of total retail sales.
- Increases of $572 in customer service and other expenses primarily due to increased bad–debt expense of $338 and other support costs of $234, partially offset by a decline of $191 in billing expenses, lower information technology (IT) costs and customer service expenses.
- Increases in upgrade commission and residual expenses of $195 due to increased prepaid plan costs and higher handset upgrade activity.

The decline in selling, general and administrative expenses in 2006 was due to the following:
- Decreases in billing and bad–debt expense of $378 primarily due to fewer account write–offs and cost–savings related to transitioning to one billing system.
- Decreases in other administrative expense of $106 due to a decline in legal–related expenses, lower employee costs and employee–related benefits due to a decrease in the number of employees, lower IT and other professional services expense and a federal excise tax refund accrual.
- Decreases in customer service expense of $87 due to a decline in the number of outsourced call center professionals and lower billing expenses.
- Increases of $147 primarily related to increased prepaid card replenishment costs and higher migration and upgrade transaction costs.
- Increases in other expense of $129 due to higher warranty, refurbishment and freight costs.
- Increases in selling expense of $96 due to an increase in sales expense, partially offset by a decrease in net commission expenses. The decline in net commission expense was due to reductions in average activation and agent branding expense, partially offset by an increase in direct commission expense.

The expenses above also include merger integration costs of $123 in 2006, such as employee–termination costs, rebranding and advertising and customer service and systems integration costs.

Depreciation and amortization increased $617, or 9.5%, in 2007 and decreased $146, or 2.2%, in 2006. The increase in 2007 was primarily due to an increase of $1,522 in amortization of identifiable intangible assets related to our acquisition of BellSouth's 40% ownership interest, partially offset by declining amortization of identifiable AT&T Wireless Services, Inc. (AWE) intangible assets acquired by AT&T Mobility in 2004, which are principally amortized using the sum–of–the–months–digits method of amortization. Expenses also increased due to accelerated depreciation on TDMA assets and ongoing capital spending for network upgrades and expansion. The 2007 increase was partially offset by decreases in depreciation expense of $905 in 2007 due to certain network assets becoming fully depreciated and purchase accounting adjustments on certain network assets related to acquiring BellSouth's 40% ownership interest of AT&T Mobility.

8

# EXHIBIT C

 **DEUTSCHE TELEKOM AG** (DT)

FRIEDERICH EBERT ALLEE 140
D53113 BONN GERMANY, l8
492. 281.8190
http://www.deutschetelekom.de/

# 20-F

**FORM 20-F**
**Filed on 02/28/2008 – Period: 12/31/2007**
File Number 001-14540

GSI

EXHIBIT _C_ PAGE _39_

Table of Contents

As filed with the Securities and Exchange Commission on February 28, 2008

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## Form 20–F

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2007

### Commission file number 001–14540

# Deutsche Telekom AG
*(Exact Name of Registrant as Specified in its Charter)*

**Federal Republic of Germany**
*(Jurisdiction of Incorporation or Organization)*

**Friedrich–Ebert–Allee 140, 53113 Bonn, Germany**
*(Address of Registrant's Principal Executive Offices)*

*Guido Kerkhoff*
*Chief Accounting Officer*
*Deutsche Telekom AG*
*Friedrich–Ebert–Allee 140, 53113 Bonn, Germany*
*+49–228–181–0*
*G.Kerkhoff@telekom.de*
*(Name, Telephone, E–mail and/or Facsimile number and Address of Company Contact Person)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
| --- | --- |
| American Depositary Shares, each representing one Ordinary Share | New York Stock Exchange |
| Ordinary Shares, no par value | New York Stock Exchange* |

Securities registered or to be registered pursuant to
Section 12(g) of the Act:

**NONE**
*(Title of Class)*

Securities for which there is a reporting obligation pursuant to
Section 15(d) of the Act:

**NONE**
*(Title of Class)*

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

**Ordinary Shares, no par value: 4,361,297,603 (as of December 31, 2007)**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.

Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

☐ U.S. GAAP    ☒ International Financial Reporting Standards as issued by the International Accounting Standards Board    ☐ Other

If "Other" has been checked in response to the previous question indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act).

Yes ☐    No ☒

*Not for trading, but only in connection with the registration of American Depositary Shares.

EXHIBIT   C   PAGE 40

<u>**Table of Contents**</u>
**Exchange Rates**

Unless otherwise indicated, all amounts in this Annual Report are expressed in euros.

As used in this document, "euro," "EUR" or "€" means the single unified currency that was introduced in the Federal Republic and ten other participating Member States of the European Union on January 1, 1999. "U.S. dollar," "USD" or "$" means the lawful currency of the United States. "British pound sterling" or "GBP" means the lawful currency of the United Kingdom. As used in this document, the term "noon buying rate" refers to the rate of exchange for euros, expressed in U.S. dollars per euro, in the City of New York for cable transfers payable in foreign currencies as certified by the Federal Reserve Bank of New York for customs purposes, as required by Section 522 of the U.S. Tariff Act of 1930, as amended. Unless otherwise stated or as converted in accordance with our currency translation policy as set forth in "Summary of accounting policies—Currency translation" in the notes to the consolidated financial statements, conversions of euros into U.S. dollars have been made at the rate of EUR 1.00 to USD 1.4603, which was the noon buying rate on December 31, 2007.

So that you may more easily ascertain how the trends in our financial results might have appeared had they been expressed in U.S. dollars, the following table shows, for the periods indicated, the average, high, low and period-end, noon buying rates for euros, expressed in U.S. dollars per EUR 1.00:

| Year or Month | Average(1) | High | Low | Period–End |
|---|---|---|---|---|
| | | (in $ per €) | | |
| 2003 | 1.1411 | 1.2597 | 1.0361 | 1.2597 |
| 2004 | 1.2478 | 1.3625 | 1.1801 | 1.3538 |
| 2005 | 1.2400 | 1.3476 | 1.1667 | 1.1842 |
| 2006 | 1.2661 | 1.3327 | 1.1860 | 1.3197 |
| 2007 | 1.3797 | 1.4862 | 1.2904 | 1.4603 |
| 2007 | | | | |
| August | — | 1.3808 | 1.3402 | 1.3641 |
| September | — | 1.4219 | 1.3606 | 1.4219 |
| October | — | 1.4468 | 1.4092 | 1.4468 |
| November | — | 1.4862 | 1.4435 | 1.4688 |
| December | — | 1.4759 | 1.4344 | 1.4603 |
| 2008 | | | | |
| January | — | 1.4877 | 1.4574 | 1.4841 |
| February (through February 27) | — | 1.5132 | 1.4495 | 1.5132 |

(1)  The average of the noon buying rates on the last business day of each month during the relevant period.

On February 27, 2008, the noon buying rate was USD 1.5132 per EUR 1.00.

Our shares trade on German stock exchanges, including the Frankfurt Stock Exchange, in euros. Fluctuations in the exchange rate between the euro and the U.S. dollar will affect the U.S. dollar equivalent of the euro price of the shares on the German stock exchanges and, as a result, are likely to affect the market price of our ADSs on the New York Stock Exchange. When we declare cash dividends, they are declared in euros, and exchange rate fluctuations affect the U.S. dollar amounts you would receive if you are a holder of American Depositary Receipts (ADRs) evidencing ADSs upon conversion of cash dividends on the shares represented by your ADSs.

6

EXHIBIT __C__ PAGE __41__

Table of Contents

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

EUR 0.1 billion by Makedonski Telekominikacii A.D. was recorded in the reporting year, as was the dividend payment by Magyar Telekom for 2005 and 2006 amounting to EUR 0.2 billion, for which there were no comparable payments in the prior year.

A positive effect also resulted from the fact that a buy-back of shares for EUR 0.7 billion in connection with the merger of T-Online International AG into Deutsche Telekom AG was recorded in the prior year, for which there was no comparable outflow in the reporting period.

(39)  Segment reporting

In November 2006, the International Accounting Standards Board (IASB) issued IFRS 8 "Operating Segments." IFRS 8 replaces IAS 14 "Segment Reporting" and must be applied to reporting periods beginning on or after January 1, 2009. Deutsche Telekom has opted for early adoption of IFRS 8, beginning with the financial year ending on December 31, 2007. According to IFRS 8, reportable operating segments are identified based on the "management approach." This approach stipulates external segment reporting based on the Group's internal organizational and management structure and on internal financial reporting to the chief operating decision maker. In the Deutsche Telekom Group, the Board of Management of Deutsche Telekom AG is responsible for measuring and steering the business success of the segments and is considered the chief operating decision maker within the meaning of IFRS 8.

In contrast to the former reporting structure, Deutsche Telekom reports on five operating segments, which are independently managed by bodies responsible for the respective segments depending on the nature of products and services offered, brands, sales channels, and customer profiles. The identification of Company components as business segments is based in particular on the existence of segment managers who report directly to the Board of Management of Deutsche Telekom AG and who are responsible for the performance of the segment under their charge. In accordance with IFRS 8, Mobile Communications Europe and Mobile Communications USA are reported separately as operating segments, since internal reporting and management channels in the Mobile Communications segment have been changed. Prior-year figures have been adjusted accordingly.

Information on the Group's segments is presented below.

The **Mobile Communications Europe** operating segment bundles all activities of T-Mobile International AG in Germany, the United Kingdom, the Netherlands, Austria, Poland, and the Czech Republic, as well as Deutsche Telekom's other mobile communications activities in Slovakia, Croatia, Macedonia, Montenegro, and Hungary.

The **Mobile Communications USA** operating segment combines all activities of T-Mobile International AG in the U.S. market.

All entities in the Mobile Communications Europe and Mobile Communications USA operating segments offer mobile voice and data services to consumers and business customers. The T-Mobile subsidiaries also market mobile devices and other hardware in connection with the services offered. In addition, T-Mobile services are sold to resellers and to companies that buy network services and market them independently to third parties (mobile virtual network operators, or MVNOs).

The **Broadband/Fixed Network** operating segment offers consumers and small business customers traditional fixed-network services on the basis of a state-of-the-art infrastructure, broadband Internet access, and multimedia services. This segment also conducts business with national and international network operators and with resellers (wholesale including resale). In addition, it provides wholesale telecommunications services for

F-80

EXHIBIT  C  PAGE 42

Table of Contents

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Deutsche Telekom's other operating segments. Outside Germany, the Broadband/Fixed Network segment has a presence in both Western and Eastern Europe: In Western Europe, it is represented by subsidiaries in Austria and Switzerland. The subsidiary T–Online France was sold in the second quarter and the subsidiary T–Online Spain in the third quarter of 2007. In Eastern Europe's markets, the operating segment has operations primarily in Hungary including Macedonia, Montenegro, Bulgaria and Romania (Magyar Telekom), Croatia (T–Hrvatski Telekom), and Slovakia (Slovak Telekom).

The **Business Customers** operating segment is divided into two operating business units: T–Systems Enterprise Services, which supports around 60 multinational corporations and large public authorities, and T–Systems Business Services, which serves around 160,000 large and medium–sized business customers. T–Systems is represented by subsidiaries in more than 20 countries, with a particular focus on the Western European countries of Germany, France, Spain, Italy, the United Kingdom, Austria, Switzerland, Belgium, and the Netherlands. The service provider offers its customers a full range of information and communication technology (ICT) from a single source. It realizes integrated ICT solutions on the basis of its extensive expertise in these two technological areas. T–Systems develops and operates infrastructure and industry solutions for its key accounts. Products and services offered to medium–sized enterprises range from low–cost standard products and high–performance networks based on the Internet Protocol (IP) to developing complete ICT solutions.

Group units and subsidiaries that are not directly allocated to one of the aforementioned operating segments are included in the **Group Headquarters & Shared Services** segment. Group Headquarters is responsible for strategic and cross–segment management functions. All other operating functions not directly related to the aforementioned segments' core business are assumed by Shared Services. These include the Real Estate Services division, whose activities include the management of Deutsche Telekom AG's real estate portfolio, and DeTeFleetServices GmbH, a full–service provider of fleet management and mobility services. Vivento, which is also part of Shared Services, is responsible for placing employees and creating employment opportunities. Shared Services primarily has activities in Germany. Real Estate Services also has operations in Hungary and in Slovakia offering facility management services. The main Shared Services subsidiaries include DeTeImmobilien, Deutsche Telekom Immobilien und Service GmbH, GMG Generalmietgesellschaft mbH, DFMG Deutsche Funkturm GmbH, PASM Power and Air Condition Solution Management GmbH & Co. KG, DeTeFleetServices GmbH, and Vivento Customer Services GmbH. Since the beginning of the 2007 financial year, the Group Headquarters & Shared Services segment has also included the shared services and headquarters functions of Magyar Telekom. Deutsche Telekom reported these functions as part of the Broadband/Fixed Network operating segment until the end of 2006.

The reconciliation summarizes the elimination of links between segments.

The measurement principles for Deutsche Telekom's segment reporting structure are based on the IFRS principles adopted in the consolidated financial statements. Deutsche Telekom evaluates the segments' performance based on their profit/loss from operations (EBIT), among other factors. Revenue generated and goods and services exchanged between segments are calculated on the basis of market prices.

Segment assets and liabilities include all assets and liabilities that are attributable to operations and whose positive or negative results determine profit/loss from operations (EBIT). Segment assets include in particular intangible assets; property, plant and equipment; trade and other receivables; and inventories. Segment liabilities include in particular trade and other payables, and significant provisions. Segment investments include additions to intangible assets and property, plant and equipment.

Where entities accounted for using the equity method are directly allocable to a segment, their share of profit/loss after income taxes and their carrying amount is reported in this segment's accounts.

F–81

EXHIBIT __C__ PAGE 43

Table of Contents

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The Group's non-current assets and net revenue are shown by region. These are the regions in which Deutsche Telekom is active: Germany, Europe (excluding Germany), North America and Other countries. The Europe (excluding Germany) region covers the entire European Union (excluding Germany) and the other countries in Europe. The North America region comprises the United States and Canada. The "Other countries" region includes all countries that are not Germany or in Europe (excluding Germany) or North America. Non-current assets are allocated to the regions according to the location of the assets in question. Non-current assets encompass intangible assets; property, plant and equipment; investments accounted for using the equity method as well as other non-current assets. Net revenue is allocated according to the location of the respective customers' operations.

| | | Net revenue | Intersegment revenue | Total revenue | Profit (loss) from operations (EBIT) (millions of €) | Interest income | Interest expense | Share of profit (loss) of associates and joint ventures accounted for using the equity method | Income taxes |
|---|---|---|---|---|---|---|---|---|---|
| Mobile Communications Europe | 2007 | 20,000 | 713 | 20,713 | 2,436 | 208 | (495) | 0 | 635 |
| | 2006[1] | 17,700 | 755 | 18,455 | 2,746 | 168 | (514) | 77 | 13 |
| | 2005[1] | 16,673 | 945 | 17,618 | 1,487 | 164 | (531) | 131 | (554) |
| Mobile Communications USA | 2007 | 14,050 | 25 | 14,075 | 2,017 | 99 | (457) | 6 | (518) |
| | 2006[1] | 13,608 | 20 | 13,628 | 1,756 | 68 | (408) | 3 | 651 |
| | 2005[1] | 11,858 | 29 | 11,887 | 1,519 | 14 | (271) | 2 | 2,035 |
| Broadband/Fixed Network | 2007 | 19,072 | 3,618 | 22,690 | 3,250 | 522 | (62) | 46 | (84) |
| | 2006[2] | 20,366 | 4,149 | 24,515 | 3,356 | 256 | (41) | 31 | (241) |
| | 2005[2] | 21,447 | 4,395 | 25,842 | 5,264 | 407 | (47) | 54 | (175) |
| Business Customers | 2007 | 8,971 | 3,016 | 11,987 | (323) | 91 | (99) | 0 | (47) |
| | 2006[2] | 9,301 | 3,568 | 12,869 | (835) | 61 | (99) | (86) | (50) |
| | 2005[2] | 9,328 | 3,817 | 13,145 | 458 | 45 | (107) | 3 | (28) |
| Group Headquarters & Shared Services | 2007 | 423 | 3,445 | 3,868 | (1,973) | 1,015 | (3,309) | 2 | (1,361) |
| | 2006[2] | 372 | 3,386 | 3,758 | (2,138) | 1,055 | (3,043) | (2) | 342 |
| | 2005[2] | 298 | 3,279 | 3,577 | (1,010) | 1,033 | (3,064) | (1) | (1,474) |
| Total | 2007 | 62,516 | 10,817 | 73,333 | 5,407 | 1,935 | (4,422) | 54 | (1,375) |
| | 2006 | 61,347 | 11,878 | 73,225 | 4,885 | 1,608 | (4,105) | 23 | 715 |
| | 2005 | 59,604 | 12,465 | 72,069 | 7,718 | 1,663 | (4,020) | 189 | (196) |
| Reconciliation | 2007 | — | (10,817) | (10,817) | (121) | (1,674) | 1,647 | 0 | 1 |
| | 2006 | — | (11,878) | (11,878) | 402 | (1,311) | 1,268 | 1 | 255 |
| | 2005 | — | (12,465) | (12,465) | (96) | (1,265) | 1,221 | 25 | (2) |
| Group | 2007 | 62,516 | — | 62,516 | 5,286 | 261 | (2,775) | 54 | (1,374) |
| | 2006 | 61,347 | — | 61,347 | 5,287 | 297 | (2,837) | 24 | 970 |
| | 2005 | 59,604 | — | 59,604 | 7,622 | 398 | (2,799) | 214 | (198) |

1   In contrast to the previous presentation of the three strategic business areas Mobile Communications, Broadband/Fixed Network and Business Customers together with Group Headquarters & Shared Services, reporting as of December 31, 2007 is structured in five operating segments for the first time: Mobile Communications Europe, Mobile Communications USA, Broadband/Fixed Network, Business Customers, and Group Headquarters & Shared Services.

2   Since January 1, 2007, reporting of Magyar Telekom has included a further breakdown of results into the Business Customers and Group Headquarters & Shared Services segments. In previous periods these results were only reported under the Broadband/Fixed Network segment. Prior-year figures have been adjusted accordingly.

EXHIBIT _C_ PAGE 44

# EXHIBIT D

**QUALCOMM** **QUALCOMM INC/DE** (QCOM)

5775 MOREHOUSE DR
SAN DIEGO, CA 92121
858. 587.1121
http://www.qualcomm.com

# 10-K

**FORM 10-K**
**Filed on 11/08/2007 – Period: 09/30/2007**
File Number 000-19528

**GSI**



Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10−K

(Mark One)

☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended September 30, 2007

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission file number 0−19528

# QUALCOMM Incorporated
(Exact name of registrant as specified in its charter)

| Delaware | 95−3685934 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 5775 Morehouse Drive San Diego, California | 92121−1714 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (858) 587−1121

Securities registered pursuant to section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $0.0001 par value | NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
YES ☑ NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
YES ☐ NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
YES ☑ NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S−K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10−K or any amendment to this Form 10−K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b−2 of the Exchange Act. (Check one):
Large Accelerated Filer ☑     Accelerated Filer ☐     Non−Accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act). YES ☐ NO ☑

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of March 30, 2007 was $68,727,571,532.*

The number of shares outstanding of the registrant's common stock was 1,636,486,963 as of November 6, 2007.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Definitive Proxy Statement to be filed with the Commission pursuant to Regulation 14A in connection with the registrant's 2008 Annual Meeting of Stockholders, to be filed subsequent to the date hereof, are incorporated by reference into Part III of this Report. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission not later than 120 days after the conclusion of the registrant's fiscal year ended September 30, 2007.

* Excludes the Common Stock held by executive officers, directors and stockholders whose ownership exceeds 5% of the Common Stock outstanding at March 30, 2007. This calculation does not reflect a determination that such persons are affiliates for any other purposes.

EXHIBIT __D__ PAGE __46__

Table of Contents

**QUALCOMM Incorporated**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Japan Fair Trade Commission has also received unspecified complaints alleging the Company's business practices are, in some way, a violation of Japanese law. The Company has not received the complaints but has submitted information and documents to the Japan Fair Trade Commission.

Although there can be no assurance that unfavorable outcomes in any of the foregoing matters would not have a material adverse effect on the Company's operating results, liquidity or financial position, the Company believes the claims made by other parties are without merit and will vigorously defend the actions. Other than amounts relating to the *Broadcom Corporation v. QUALCOMM Incorporated* and *QUALCOMM Incorporated v. Broadcom Corporation* matters, the Company has not recorded any accrual for contingent liabilities associated with the other legal proceedings described above, based on the Company's belief that additional liabilities, while possible, are not probable. Further, any possible range of loss cannot be estimated at this time. The Company is engaged in numerous other legal actions arising in the ordinary course of its business and believes that the ultimate outcome of these actions will not have a material adverse effect on its operating results, liquidity or financial position.

*Purchase Obligations.* The Company has agreements with suppliers and other parties to purchase inventory, other goods and services and long–lived assets and estimates its noncancelable obligations under these agreements for fiscal 2008 to 2012 to be approximately $760 million, $118 million, $75 million, $59 million and $32 million, respectively, and $8 million thereafter. Of these amounts, commitments to purchase integrated circuit product inventories for fiscal 2008 and 2009 comprised $586 million and $29 million, respectively.

*Leases.* The Company leases certain of its facilities and equipment under noncancelable operating leases, with terms ranging from less than one year to 30 years and with provisions for cost–of–living increases with certain leases. Rental expense for fiscal 2007, 2006 and 2005 was $60 million, $47 million and $39 million, respectively. The Company leases certain property under capital lease agreements that expire at various dates through 2038. Capital lease obligations are included in other liabilities. The future minimum lease payments for all capital leases and operating leases as of September 30, 2007 are as follows (in millions):

|  | Capital Leases | Operating Leases | Total |
|---|---|---|---|
| 2008 | $     6 | $     75 | $     81 |
| 2009 | 6 | 63 | 69 |
| 2010 | 6 | 50 | 56 |
| 2011 | 6 | 35 | 41 |
| 2012 | 6 | 28 | 34 |
| Thereafter | 170 | 139 | 309 |
| Total minimum lease payments | $   200 | $   390 | $   590 |
| Deduct: Amounts representing interest | (109) | | |
| Present value of minimum lease payments | 91 | | |
| Deduct: Current portion of capital lease obligations | — | | |
| Long–term portion of capital lease obligations | $     91 | | |

**Note 10. Segment Information**

The Company is organized on the basis of products and services. The Company aggregates three of its divisions into the Qualcomm Wireless & Internet segment. Reportable segments are as follows:

- Qualcomm CDMA Technologies (QCT) — develops and supplies CDMA–based integrated circuits and system software for wireless voice and data communications, multimedia functions and global positioning system products;
- Qualcomm Technology Licensing (QTL) — grants licenses to use portions of the Company's intellectual property portfolio, which includes certain patent rights essential to and/or useful in the manufacture and sale of certain wireless products, including, without limitation, products implementing cdmaOne, CDMA2000, WCDMA, CDMA TDD and/or OFDMA standards and their derivatives, and collects license fees and royalties in partial consideration for such licenses;

F–25

EXHIBIT___D___ PAGE___47___

Table of Contents

QUALCOMM Incorporated
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

- Qualcomm Wireless & Internet (QWI) --- comprised of:
  - Qualcomm Internet Services (QIS) --- provides technology to support and accelerate the convergence of the wireless data market, including its BREW and QChat products and services;
  - Qualcomm Government Technologies (QGOV) — provides development, hardware and analytical expertise to United States government agencies involving wireless communications technologies; and
  - Qualcomm Enterprise Services (QES) — formerly Qualcomm Wireless Business Solutions, provides satellite and terrestrial–based two–way data messaging, position reporting and wireless application services to transportation and logistics fleets, construction equipment fleets and other enterprise companies. QES also sells products that operate on the Globalstar low–Earth–orbit satellite–based telecommunications system and provides related services.
- Qualcomm Strategic Initiatives (QSI) — manages the Company's strategic investment activities, including MediaFLO USA, Inc. (MediaFLO USA), the Company's wholly–owned wireless multimedia operator subsidiary. QSI makes strategic investments to promote the worldwide adoption of CDMA–based products and services.

During the first quarter of fiscal 2007, the Company reassessed the intersegment royalty charged to QCT by QTL and determined that the royalty should be eliminated starting in fiscal 2007 for management reporting purposes to, among other reasons, recognize other value that QTL has increasingly been realizing from QCT. As a result, QCT did not record a royalty to QTL in fiscal 2007, and prior period segment information has been adjusted in the same manner for comparative purposes.

During the first quarter of fiscal 2007, the Company also reorganized the Qualcomm Wireless Systems (QWS) division, which sells products and services to Globalstar, into the QES division in the QWI segment. Revenues and operating results related to the QWS business were included in other nonreportable segments as a component of reconciling items through the end of fiscal 2006. Prior period segment information has been adjusted to conform to the new segment presentation.

The Company evaluates the performance of its segments based on earnings (loss) before income taxes (EBT). EBT includes the allocation of certain corporate expenses to the segments, including depreciation and amortization expense related to unallocated corporate assets. Certain income and charges are not allocated to segments in the Company's management reports because they are not considered in evaluating the segments' operating performance. Unallocated income and charges include certain investment income, certain share–based compensation and certain research and development expenses and marketing expenses that were not deemed to be directly related to the businesses of the segments. The table below presents revenues, EBT and total assets for reportable segments (in millions):

| | QCT * | QTL * | QWI * | QSI | Reconciling Items * | Total |
|---|---|---|---|---|---|---|
| **2007** | | | | | | |
| Revenues | $5,275 | $2,772 | $828 | $    1 | $      (5) | $ 8,871 |
| EBT | 1,547 | 2,340 | 88 | (240) | (109) | 3,626 |
| Total assets | 921 | 29 | 200 | 896 | 16,449 | 18,495 |
| **2006** | | | | | | |
| Revenues | $4,332 | $2,467 | $731 | $  — | $      (4) | $ 7,526 |
| EBT | 1,298 | 2,233 | 78 | (133) | (320) | 3,156 |
| Total assets | 651 | 60 | 215 | 660 | 13,622 | 15,208 |
| **2005** | | | | | | |
| Revenues | $3,290 | $1,711 | $682 | $  — | $     (10) | $ 5,673 |
| EBT | 980 | 1,535 | 62 | 10 | 222 | 2,809 |
| Total assets | 518 | 16 | 169 | 442 | 11,334 | 12,479 |

*                                                                As adjusted

Segment assets are comprised of accounts receivable and inventories for QCT, QTL and QWI. The QSI segment assets include certain marketable securities, notes receivable, wireless licenses, other investments and all

F–26

EXHIBIT ___D___ PAGE ___48___

Table of Contents

QUALCOMM Incorporated
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

assets of QSI's consolidated subsidiary, MediaFLO USA, including property, plant and equipment. QSI's assets related to the MediaFLO USA business totaled $457 million, $329 million and $98 million at September 30, 2007, September 24, 2006 and September 25, 2005, respectively. QSI's assets also included $16 million, $19 million and $61 million related to investments in equity method investees at September 30, 2007, September 24, 2006 and September 25, 2005, respectively. Reconciling items for total assets included $215 million, $228 million and $188 million at September 30, 2007, September 24, 2006 and September 25, 2005, respectively, of goodwill and other assets related to the Qualcomm MEMS Technologies division (QMT), a nonreportable segment developing display technology for mobile devices and other applications. Total segment assets differ from total assets on a consolidated basis as a result of unallocated corporate assets primarily comprised of cash, cash equivalents, certain marketable securities, property, plant and equipment, deferred tax assets, goodwill and certain other intangible assets of nonreportable segments. The net book values of long-lived assets located outside of the United States were $89 million, $69 million and $44 million at September 30, 2007, September 24, 2006 and September 25, 2005, respectively. The net book values of long-lived assets located in the United States were $1.7 billion, $1.4 billion and $978 million at September 30, 2007, September 24, 2006 and September 25, 2005, respectively.

Revenues from each of the Company's divisions aggregated into the QWI reportable segment were as follows (in millions):

|  | 2007 | 2006* | 2005* |
|---|---|---|---|
| QES | $      501 | $      490 | $      479 |
| QGOV | 57 | 47 | 50 |
| QIS | 272 | 194 | 153 |
| Eliminations | (2) | — | — |
| Total QWI | $      828 | $      731 | $      682 |

*     As adjusted

Other reconciling items were comprised as follows (in millions):

|  | 2007 | 2006* | 2005* |
|---|---|---|---|
| Revenues: |  |  |  |
| Elimination of intersegment revenues | $      (39) | $      (28) | $      (20) |
| Other nonreportable segments | 34 | 24 | 10 |
|  | $       (5) | $       (4) | $      (10) |
| Earnings (loss) before income taxes: |  |  |  |
| Unallocated research and development expenses | $     (341) | $     (331) | $      (45) |
| Unallocated selling, general, and administrative expenses | (268) | (298) | (17) |
| Unallocated cost of equipment and services revenues | (39) | (41) | — |
| Unallocated investment income, net | 718 | 455 | 339 |
| Other nonreportable segments | (158) | (92) | (50) |
| Intracompany eliminations | (21) | (13) | (5) |
|  | $     (109) | $     (320) | $      222 |

*     As adjusted

During fiscal 2007, share-based compensation expense included in unallocated research and development expenses and unallocated selling, general and administrative expenses totaled $221 million and $227 million, respectively. During fiscal 2006, share-based compensation expense included in unallocated research and development expenses and unallocated selling, general and administrative expenses totaled $216 million and $238 million, respectively. Unallocated cost of equipment and services revenues was comprised entirely of share-based compensation expense.

F-27

EXHIBIT   D   PAGE   49

Table of Contents

**QUALCOMM Incorporated**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Specified items included in segment EBT were as follows (in millions):

|  | QCT | QTL | QWI | QSI |
|---|---|---|---|---|
| **2007** | | | | |
| Revenues from external customers | $5,244 | $2,771 | $821 | $ 1 |
| Intersegment revenues | 31 | 1 | 7 | — |
| Interest income | 2 | 14 | 1 | 7 |
| Interest expense | — | — | 1 | 5 |
| **2006** | | | | |
| Revenues from external customers | $4,314 | $2,465 | $723 | $— |
| Intersegment revenues | 18 | 2 | 8 | — |
| Interest income | 1 | 5 | 3 | 6 |
| Interest expense | 1 | — | 1 | 2 |
| **2005** | | | | |
| Revenues from external customers | $3,281 | $1,710 | $672 | $— |
| Intersegment revenues | 9 | 1 | 10 | — |
| Interest income | — | 5 | 2 | 4 |
| Interest expense | — | — | 1 | 1 |

Intersegment revenues are based on prevailing market rates for substantially similar products and services or an approximation thereof, but the purchasing segment records the cost of revenues (or inventory write–downs) at the selling segment's original cost. The elimination of the selling segment's gross margin is included with other intersegment eliminations in reconciling items. During fiscal 2007, $16 million of QCT's intersegment revenues related to inventory that was fully reserved by QWI, the purchasing segment. Effectively all equity in losses of investees (Note 5) was recorded in QSI in fiscal 2007, 2006 and 2005.

The Company distinguishes revenues from external customers by geographic areas based on the location to which its products, software or services are delivered and, for QTL's licensing and royalty revenue, the domicile of its licensees. Sales information by geographic area was as follows (in millions):

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| United States | $ 1,165 | $ 984 | $ 1,015 |
| South Korea | 2,780 | 2,398 | 2,083 |
| Japan | 1,524 | 1,573 | 1,210 |
| China | 1,875 | 1,266 | 596 |
| Other foreign | 1,527 | 1,305 | 769 |
|  | $ 8,871 | $ 7,526 | $ 5,673 |

**Note 11. Acquisitions**

During fiscal 2007, the Company acquired three businesses for total cash consideration of $178 million. An additional $6 million in consideration payable in cash through June 2008 was held back as security for certain indemnification obligations. The Company is in the process of finalizing the accounting for the acquisitions and does not anticipate material adjustments to the preliminary purchase price allocations. Goodwill recognized in these transactions, of which $21 million is expected to be deductible for tax purposes, was assigned to the QCT and QWI segments in the amounts of $74 million and $10 million, respectively. Technology–based intangible assets recognized in the amount of $46 million are being amortized on a straight–line basis over a weighted–average useful life of 3 years.

On January 18, 2006, the Company completed its acquisition of all of the outstanding capital stock of Flarion Technologies, Inc. (Flarion), a privately held developer of OFDMA technology for approximately $613 million in consideration. Upon achievement of certain agreed upon milestones during the third quarter of fiscal 2006, the Company incurred additional aggregate consideration of $195 million. Total consideration consisted of approximately $414 million in cash (of which $75 million was paid in fiscal 2007), $357 million in shares of QUALCOMM stock (of which $3 million was issued in fiscal 2007) and the exchange of Flarion's existing vested options and warrants with an estimated aggregate fair value of approximately $37 million. In addition, the Company assumed Flarion's existing unvested options with an estimated aggregate fair value of $68 million, which is

F–28

EXHIBIT _____ PAGE _____