EVAN R. CHESLER (*pro hac vice*)
PETER T. BARBUR (*pro hac vice*)
ELIZABETH L. GRAYER (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: 212.474.1000
Facsimile: 212.474.3700

WILLIAM S. BOGGS (Bar No. 053013)
BRIAN A. FOSTER (Bar No. 110413)
TIMOTHY S. BLACKFORD (Bar No. 190900)
DLA PIPER US LLP
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: 619.699.2700
Facsimile: 619.699.2701

Attorneys for Defendant
QUALCOMM INCORPORATED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERDAD VALIKHANI, an individual, on behalf of himself, the general public and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED, a Delaware corporation, and DOES 1-100,<br><br>Defendants. | CASE NO. 08 cv 0786 WQH (JMA)<br><br>**QUALCOMM INCORPORATED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT**<br><br>Date:    July 28, 2008<br>Time:    11:00 a.m.<br>Judge:   Hon. William Q. Hayes |

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   THE COMPLAINT'S ALLEGATIONS ...................................................................2

    A.    The Parties ...................................................................................................2

    B.    The Wireless Industry ..................................................................................3

    C.    The UMTS Standard ....................................................................................4

    D.    Alleged Licensing Conduct .........................................................................5

    E.    Plaintiff's Theory of Injury .........................................................................6

    F.    Plaintiff's Causes of Action .........................................................................6

III.  ARGUMENT ...........................................................................................................7

    A.    Motion to Dismiss Standard ........................................................................7

    B.    Plaintiff Lacks Standing to Prosecute Any of the Claims He Asserts ....................8

        1.    Plaintiff Lacks the "Antitrust Standing" to Pursue a Claim Under the Cartwright Act ...........................................................................9

            a.    Plaintiff's Theory of Causation Is Too Indirect to Support Antitrust Standing ..............................................................10

            b.    Plaintiff Has Not Suffered Antitrust Injury ...................................12

        2.    Plaintiff Lacks Standing to Pursue a Claim Under California's Unfair Competition Law ..............................................................15

    C.    Plaintiff Fails to State a Claim for Relief Under Any Cause of Action Asserted ...............................................................................................16

        1.    Plaintiff Fails to State a Claim Under the Cartwright Act Because He Alleges Only Unilateral Conduct .....................................16

        2.    Plaintiff Cannot State a UCL Claim .........................................................19

IV.   CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Albrecht v. Herald Co.,*
    390 U.S. 145 (1968).........................................................................17

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co.,*
    190 F.3d 1051 (9th Cir. 1999) .............................................9, 12, 13

*Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.,*
    241 F.3d 696 (9th Cir. 2001) ..............................................................10

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983).......................................................7, 9, 12, 13

*Balistreri v. Pacifica Police Dept.,*
    901 F.2d 696 (9th Cir. 1990) .................................................................7

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,*
    118 F.3d 178 (3d Cir. 1997) ..................................................................9

*Bell Atlantic Corp. v. Twombly,*
    __ U.S. __, 127 S. Ct. 1955 (2007)....................................7, 8, 19

*Blair v. All American Bottling Corp.,*
    No. 86-CV-1426, 1988 WL 150814 (S.D. Cal. Aug. 9, 1988) ..............19

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ................................................................14

*Californians for Disability Rights v. Mervyn's, LLC,*
    39 Cal. 4th 223 (2006) .........................................................................15

*Cargill Inc. v. Budine,*
    No. 07-CV-349, 2007 WL 2506451 (E.D. Cal. Aug. 30, 2007).....12, 14

*Cellular Plus, Inc. v. Super. Ct.,*
    14 Cal. App. 4th 1224 (1993) ................................................................8

*Chavez v. Whirlpool Corp.,*
    93 Cal. App. 4th 363 (2001) ................................................................19

*City of Pittsburgh v. W. Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) ..................................................................7

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,*
    836 F.2d 173 (3d Cir. 1988) .............................................................7, 8

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984)..............................................................................16

DLA PIPER US LLP
SAN DIEGO

WEST\21445915.1
336110-000167

08 CV 0786 WQH (JMA)

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Dimidowich v. Bell & Howell,*
  803 F.2d 1473 (9th Cir. 1986) ....................................................................16, 17

*Eagle v. Star-Kist Foods, Inc.,*
  812 F.2d 538 (9th Cir. 1987) .................................................................7, 10, 14

*Express, LLC v. Fetish Group, Inc.,*
  464  F. Supp. 2d 965 (C.D. Cal. 2006) ..............................................................19

*Freeman v. San Diego Ass'n of Realtors,*
  77 Cal. App. 4th 171 (1999) ...............................................................................18

*G.H.I.I. v. MTS, Inc.,*
  147 Cal. App. 3d 256 (1983) .......................................................8, 16, 17, 18

*Hall v. Time, Inc.,*
  158 Cal. App. 4th 847 (2008) ............................................................................16

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) .............................................................................10, 13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........................10, 11, 12, 13, 14

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  536 F. Supp. 2d 1129 (N.D. Cal. 2008) ...........................................................14

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.,*
  No. 07-CV-00043, 2007 WL 4976364 (C.D. Cal. 2007) .............................18

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
  232 F.3d 979 (9th Cir. 2000) .........................................................................9, 10

*Laster v. T-Mobile USA, Inc.,*
  407 F. Supp. 2d 1181 (S.D. Cal. 2005) ............................................................15

*Lowell v. Mother's Cake & Cookie Co.,*
  79 Cal. App. 3d 13 (1978) ..................................................................................16

*Lucas v. Bechtel Corp.,*
  800 F.2d 839 (9th Cir. 1986) .............................................................................12

*Mailand v. Burckle,*
  20 Cal. 3d 367 (1978) .........................................................................................17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
  269 F. Supp. 2d 1213 (C.D. Cal. 2003) ...........................................10, 12, 14

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
  465 U.S. 752 (1984).......................................................................16, 17, 18

DLA PIPER US LLP
SAN DIEGO

WEST\21445915.1
336110-000167

08 CV 0786 WQH (JMA)

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Morrison v. Viacom, Inc.*,
 66 Cal. App. 4th 534 (1998) ..................................................................10

*Newport Components, Inc. v. NEC Home Elec., Inc.*,
 671 F. Supp. 2d 1525 (C.D. Cal. 1987) ................................................18

*O'Brien v. Camisasca Auto. Mfg., Inc.*,
 161 Cal. App. 4th 388 (2008) ................................................................15

*Olsen v. Breeze, Inc.*,
 48 Cal. App. 4th 608 (1996) ..................................................................19

*Rosenbluth Int'l., Inc. v. Super. Ct.*,
 101 Cal. App. 4th 1073 (2002) ..............................................................19

*Rutman Wine Co. v. E. & J. Gallo Winery*,
 829 F.2d 729 (9th Cir. 1987) ...................................................................7

*SC Manufactured Homes, Inc. v. Liebert*,
 162 Cal. App. 4th 68 (2008) ..................................................................19

*Toscano v. PGA Tour, Inc.*,
 201 F. Supp. 2d 1106 (E.D. Cal. 2002) ..................................................9

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004)................................................................................16

*Vinci v. Waste Mgmt., Inc.*,
 36 Cal. App. 4th 1811 (1995) ................................................................10

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
 178 F. Supp. 2d 1099 (C.D. Cal. 2001) ................................................19

*W. Mining Council v. Watt*,
 643 F.2d 618 (9th Cir. 1981) ...................................................................7

## STATUTES

15 U.S.C. § 1.................................................................................................16, 18

Cal. Bus. & Prof. Code § 16720 .......................................................................6

Cal. Bus. & Prof. Code § 16726 .......................................................................6

Cal. Bus. & Prof. Code § 17200 *et seq* .......................................................6, 15

Cal. Bus. & Prof. Code § 17204 .....................................................................15

Federal Rule of Civil Procedure 12(b)(6) ......................................................1, 7

1

## TABLE OF AUTHORITIES
### (continued)

2                                                                          <u>Page(s)</u>

3                          **MISCELLANEOUS**

4    7 Areeda & Hovenkamp, *Antitrust Law* ¶ 1451e (2d ed. 2004) ......................................................17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Qualcomm Incorporated ("Qualcomm") respectfully submits this memorandum of points

2    and authorities in support of its motion to dismiss pursuant to Federal Rule of Civil Procedure

3    12(b)(6).

4    **I.    PRELIMINARY STATEMENT**

5        In July 2005, Broadcom Corporation ("Broadcom") filed an action in the United States

6    District Court for the District of New Jersey alleging anticompetitive conduct by Qualcomm in

7    alleged markets for so-called third generation ("3G") cellular technology and semiconductor

8    "chipsets". *Broadcom Corp. v. Qualcomm Inc.*, 05-CV-3350 (D.N.J.). Almost three years later,

9    on April 18, 2008, Plaintiff Merdad Valikhani ("Plaintiff") filed the present action purporting to

10   claim injury from the same alleged anticompetitive conduct. His claim, however, is asserted on

11   behalf of a putative class of cell phone customers and cellular service subscribers that allegedly

12   suffered harm in markets for cell phones and cellular service. Qualcomm does not supply cell

13   phones or provide cellular service. Rather, as alleged in the complaint, Qualcomm licenses

14   intellectual property to chipset manufacturers, who in turn sell chipsets to cellular device

15   manufacturers, who then sell devices to cellular carriers and vendors, who finally sell to end users

16   like Plaintiff, at prices that are subsidized at least in part by the end users' cellular carriers.

17   Plaintiff is neither a competitor in that marketplace, nor a purchaser of any Qualcomm product

18   (*e.g.*, Qualcomm intellectual property). Plaintiff's Complaint takes aim exclusively at

19   Qualcomm's licensing practices—alleging that such practices force market participants into

20   consenting to unfair terms—but Plaintiff is not alleged ever to have taken a license from

21   Qualcomm or to have been offered one.

22       Even though Plaintiff is neither a consumer nor a competitor in any market in which

23   Qualcomm sells a product, and even though he has had almost three years to investigate how

24   Qualcomm's conduct might actually have affected him, his Complaint is little more than a

25   photocopy of Broadcom's 2005 complaint, bereft of any facts suggesting that cell phone

26   purchasers are directly injured by a company that does not supply cell phones. Specifically,

27   Plaintiff lacks standing for at least three reasons. *First*, standing under the Cartwright Act is

28   limited to those who suffer a direct and proximate injury from the alleged misconduct. Plaintiff

-1-

1  alleges an injury that is entirely derivative of at least three intermediaries in the supply chain:

2  "UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device

3  manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the

4  vendors ultimately pass those costs on to end consumers, such as Plaintiff". (Compl. ¶ 72.) Only

5  these intermediaries are alleged to have suffered "direct" injury. Because of this, and because

6  Qualcomm's licensed technology is alleged to be just one technology among many in the cell

7  phone that Plaintiff ultimately purchased, any alleged injury is far too remote to support standing.

8  *Second*, because Qualcomm is not alleged to supply cell phones or offer cellular service—either

9  directly or indirectly—Plaintiff's alleged injuries in these markets cannot amount to an "antitrust

10  injury". This defect is also fatal to Plaintiff's standing to pursue an antitrust claim. *Third*,

11  Plaintiff lacks standing under California's Unfair Competition Law because, in light of the

12  convoluted chain of causation that he alleges, Plaintiff does not and cannot allege that he lost

13  "money or property as a result" of Qualcomm's alleged misconduct. For these reasons alone,

14  Plaintiff's Complaint should be dismissed.

15      Even if Plaintiff were to have standing, the Complaint fails to state a claim under either of

16  the two causes of action that it asserts. *First*, under California's Cartwright Act, there can be no

17  "combination in restraint of trade" without allegations that Qualcomm did more than unilaterally

18  decide how it was going to license its intellectual property and to whom. Because Plaintiff has

19  alleged *no* facts—much less the specific facts required under clear precedent—suggesting that

20  Qualcomm's unilateral licensing conduct coerces involuntary counterparties into a

21  "combination", the Complaint fails to state a claim under the Cartwright Act. *Second*, because

22  Plaintiff's claim under California's Unfair Competition Law must rise or fall on the strength of

23  his antitrust claim, this cause of action should be dismissed as well.

24  **II.    THE COMPLAINT'S ALLEGATIONS**

25      **A.    The Parties**

26      Plaintiff is alleged to be a cellular service subscriber and cell phone "end consumer".

27  (Compl. ¶¶ 8, 71.) He allegedly purchased an LG cell phone from his cellular service provider,

28  AT&T, which subsidized the purchase. (Compl. ¶ 8.) He purports to represent two classes of

1   other "end customers":  (1) a nationwide class of persons who purchased cell phones containing

2   "the Wideband Code Division Multiple Access ('WCDMA') technology or that are compatible

3   with the Universal Mobile Telecommunications System ('UMTS') standard" (the so-called

4   "Device Class"); and (2) a nationwide class of persons who "purchased cellular service from any

5   carrier in the United States which bundles its cellular service with subsidized

6   UMTS-compliant devices" (the "Service Class").  (Compl. ¶ 1.)

7           Qualcomm is alleged to develop and supply technology involved in cellular

8   communications and applications.  (Compl. ¶ 9.)  As alleged, Qualcomm broadly licenses its

9   intellectual property rights, including its patents, through its Qualcomm Technology Licensing

10  ("QTL") business unit.  (Compl. ¶ 9.)  Qualcomm is not alleged to make or sell cell phones or any

11  other mobile wireless devices, nor is it alleged to provide mobile wireless service to subscribers.

12      **B.      The Wireless Industry**

13          According to the Complaint, the wireless industry is made up of carriers, wireless device

14  manufacturers, chipset manufacturers and technology suppliers such as Qualcomm.  Wireless

15  carriers are alleged to provide cell phone service to consumers.  (Compl. ¶ 16.)  These carriers,

16  according to the Complaint, operate wireless systems that enable consumers to place and receive

17  telephone calls and send and receive data on cellular devices.  (Compl. ¶ 16.)  Carriers allegedly

18  bundle their services with cell phones compatible with that carrier's cellular service.

19  (Compl. ¶ 73.)  In offering this bundle, carriers are alleged to subsidize their subscribers' cell

20  phone purchases, as is alleged to have been the case with Plaintiff's purchase.  (Compl. ¶ 73.)

21  Cell phone manufacturers, which produce these wireless devices, typically sell the phones to

22  wireless carriers.  (Compl. ¶ 17.)  A cell phone allegedly contains a number of components

23  including one or more computer "chipsets" that allow the wireless device to communicate with

24  the wireless system and other devices.  (Compl. ¶ 18.)  As alleged in the Complaint, Qualcomm

25  "commercializes technology involved in cellular communications and applications", including by

26  licensing its patents to manufacturers of these chipsets.  (Compl. ¶ 9.)

27  /////

28  /////

1    To ensure the interoperability of wireless products made by different manufacturers, the

2  industry has formed certain "standards determining organizations", or "SDOs", primarily made

3  up of representatives from the industry. (Compl. ¶¶ 19-20.) SDOs allegedly take varying

4  approaches to proprietary intellectual property rights ("IPR"), such as patents, that cover

5  technology incorporated into a standard. According to the Complaint, SDOs typically require

6  their members to declare whether they believe they hold patents necessary for compliance with

7  the particular standard, and if so, require them to agree that they will license such patents on so-

8  called "fair, reasonable, and non-discriminatory" ("FRAND") terms. (Compl. ¶ 24.) The

9  relevant SDOs, as alleged, do not further define the concept of FRAND. (Compl. ¶ 36.)

10    The two cellular standards alleged in the Complaint to be widely used are referred to as

11  Global System for Mobility ("GSM") and Code Division Multiple Access ("CDMA").

12  (Compl. ¶ 25.) In the United States, the Complaint alleges that cellular carriers such as Verizon

13  Wireless and Sprint Communications operate CDMA-path networks while others, such as AT&T

14  and T-Mobile, operate GSM-path networks. (Compl. ¶ 25.) According to the Complaint,

15  equipment and technology typically are designed for use with one of these particular standards;

16  thus, the equipment and technology used in GSM-path networks typically cannot be used in a

17  CDMA-based system. (Compl. ¶ 32.)

18    The Complaint refers to GSM and CDMA as "second generation" or "2G" cell phone

19  technologies. (Compl. ¶¶ 26-27.) As alleged, the industry now is in the process of migrating to

20  cell phone technologies known as "third generation" or "3G" technologies. (Compl. ¶¶ 28-29.)

21  Operators on the GSM branch allegedly are upgrading their systems to be compliant with a 3G

22  standard known as "UMTS". (Compl. ¶ 33.) According to the Complaint, this standard uses an

23  air interface technology called wideband-CDMA or "WCDMA". (Compl. ¶ 33.) The 3G

24  technologies allegedly used most often by CDMA carriers are referred to as "CDMA2000" and

25  "3G CDMA". (Compl. ¶¶ 28-29.)

26    **C.    The UMTS Standard**

27    Plaintiff's Complaint centers on Qualcomm's alleged conduct in the standardization

28  process for UMTS. The UMTS standard is alleged to have been created by a European SDO

1    known as "ETSI" (the European Telecommunications Standards Institute), along with its United

2    States counterparts.  (Compl. ¶¶ 22, 33.)  Qualcomm allegedly supplies some of the "essential"

3    technology that ETSI ultimately included in the UMTS standard, including patents relating to the

4    WCDMA air interface technology.  (Compl. ¶¶ 35, 37-38.)  According to the Complaint,

5    Qualcomm committed to ETSI that it would license its "essential" technology on so-called

6    "FRAND" terms.  (Compl. ¶ 37.)  In alleged reliance on that commitment, ETSI then included

7    Qualcomm's proprietary technology in the UMTS standard.  (Compl. ¶ 37.)  The Complaint

8    alleges that, after the adoption and implementation of the UMTS standard, industry participants

9    were forced to use Qualcomm technology due to a "lock-in" effect that allegedly made

10   Qualcomm's technology non-interchangeable with other technologies.  (Compl. ¶ 42.)

11          **D.      Alleged Licensing Conduct**

12          In alleged violation of its commitments to ETSI, Qualcomm is alleged to have engaged in

13   licensing practices (so-called "UMTS Licensing") that allegedly have not been fair, reasonable or

14   non-discriminatory.  (Compl. ¶ 48.)  Specifically, Qualcomm is accused of:  (1) allegedly

15   discriminating among licensees of the essential WCDMA technology by charging more and

16   higher fees to those who do not use Qualcomm's UMTS chipsets (Compl. ¶¶ 52-57); (2) allegedly

17   demanding royalties on parts of UMTS chipsets for which it did not own patents (Compl. ¶ 60);

18   (3) allegedly demanding that UMTS licensees grant back to Qualcomm licenses for their own

19   proprietary technologies on terms much more favorable to Qualcomm (Compl. ¶ 65); (4)

20   allegedly charging double royalties to UMTS cell phone manufacturers who use non-Qualcomm

21   UMTS chipsets (Compl. ¶¶ 57-59); (5) allegedly discouraging price competition by demanding

22   sensitive sales and pricing information from Qualcomm's UMTS chipset licensees (Compl. ¶ 66);

23   and (6) allegedly providing discounts, incentives and payments to cell phone manufacturers who

24   use only Qualcomm UMTS chipsets (Compl. ¶ 67).[1]

25          The Complaint does not allege which companies have accepted these licensing terms or

26   whether any industry participants have refused the terms.  Instead, Plaintiff alleges generally that

27   _____
     [1]   These, along with many of the other allegations in Plaintiff's Complaint, are lifted wholesale
28   from the Second Amended Complaint filed by Broadcom in the New Jersey Action.  *See*
     Qualcomm's Mem. in Supp. of Transfer (Dkt. 10) at 2-4.

DLA PIPER US LLP
  SAN DIEGO

WEST\21445915.1                                                      08 CV 0786 WQH (JMA)
336110-000167

1   industry participants were forced into accepting Qualcomm's UMTS Licensing Practices because

2   of Qualcomm's "exclusive control over the market for its WCDMA-related patents". (Compl. ¶¶

3   49-50.)

4       **E.**    **Plaintiff's Theory of Injury**

5           Plaintiff is an alleged "end-consumer" cell phone purchaser and cellular service

6   subscriber. (Compl. ¶¶ 8, 71.) The Complaint does not allege that Qualcomm makes, supplies,

7   markets or sells consumer cell phones, or that Qualcomm provides cellular service to subscribers.

8   Plaintiff is not alleged to have requested or taken a license from Qualcomm or otherwise to have

9   purchased any product or service from Qualcomm. The Complaint instead alleges that certain

10  "UMTS chipset and UMTS device manufacturers" suffer "direct anticompetitive harm from

11  Qualcomm's UMTS Licensing Practices". (Compl. ¶ 72.) According to the Complaint, the

12  unnamed UMTS chipset manufacturers then "pass UMTS Licensing costs down to UMTS device

13  manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the

14  vendors ultimately pass those costs on to end consumers, such as Plaintiff". (Compl. ¶ 72.)

15      **F.**    **Plaintiff's Causes of Action**

16          On the basis of the foregoing allegations, conclusions and theories, Plaintiff asserts two

17  causes of action.

18          *First*, Plaintiff asserts a claim under California's Cartwright Act, Cal. Bus. & Prof. Code

19  §§ 16720, 16726, on the basis of an alleged "combination of capital, skill and/or acts by two or

20  more persons for the purpose of creating restrictions and preventing competition in

21  manufacturing, making, sale and/or purchase of UMTS devices". (Compl. ¶ 107.) Under this

22  cause of action, Plaintiff seeks treble damages (with interest), injunctive relief, attorneys' fees and

23  costs. (Compl. ¶ 110.)

24          *Second*, Plaintiff asserts a claim under California's Unfair Competition Law ("UCL"),

25  Cal. Bus. & Prof. Code § 17200 *et seq.*, contending that Qualcomm's UMTS licensing practices

26  are unlawful, unfair and deceptive business acts or practices within the meaning of the UCL.

27  (Compl. ¶¶ 111-15.) As relief for this cause of action, Plaintiff seeks an injunction and

28  restitution. (Compl. ¶ 115.)

## III.    ARGUMENT

### A.    Motion to Dismiss Standard

Dismissal is proper under Rule 12(b)(6) when a plaintiff lacks standing to bring the causes of action asserted in the Complaint. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir. 1987).[2] A Rule 12(b)(6) motion also must be granted when, on the face of a complaint, there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory". *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Although factual allegations are assumed true for purposes of a 12(b)(6) motion and reasonable inferences construed in a plaintiff's favor, a court need not accept as true unreasonable inferences or conclusory allegations cast in the form of factual allegations. *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). An obvious corollary to this rule is that a plaintiff must plead more than "magic words" or antitrust jargon to avoid dismissal; any such legal conclusions must be supported by allegations of fact. *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) ("The pleader may not evade [antitrust] requirements by merely alleging a bare legal conclusion." (citations omitted)); *see also Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988) ("[T]he pleader may not evade the requirements of proper pleading by merely alleging a bare legal conclusion." (quotations and citation omitted)).

The Supreme Court recently reaffirmed this basic principle, holding it particularly applicable to antitrust claims, in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007). Observing that "antitrust discovery can be expensive", the Court cautioned that "'a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed'". *Id.* at 1967 (*quoting Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983)). Against this standard, "a plaintiff's obligation to provide the 'grounds' of 'his entitlement to

---

[2]   In light of Qualcomm's pending motion to transfer this action to the United States District Court for the District of New Jersey (Dkt. 10), this memorandum relies on both Ninth Circuit and Third Circuit case law, which are consistent in all respects material to this motion.

1  relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

2  cause of action will not do". *Id.* at 1964-65 (internal citations omitted).  Instead, as the Court

3  held, plaintiffs asserting antitrust claims must set forth enough "factual matter" to "nudge[] their

4  claims across the line from conceivable to plausible". *Id.* at 1965, 1974; *see also PepsiCo*, 836

5  F.2d at 182 ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the

6  federal courts counsel against sending the parties into discovery when there is no reasonable

7  likelihood that the plaintiffs can construct a claim from the events related in the complaint."

8  (internal quotation marks omitted)).

9      Similarly, California courts demand a "high degree of particularity in the pleading of

10  Cartwright Act violations". *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (1983) (internal

11  citations omitted).  "[G]eneralized allegations of civil antitrust violations are usually insufficient

12  and the unlawful combination or conspiracy must be alleged with specificity." *Id.* (citation

13  omitted); *see also Cellular Plus, Inc. v. Super. Ct.*, 14 Cal. App. 4th 1224, 1236 (1993)

14  ("[P]laintiff cannot merely restate the elements of a Cartwright Act violation.  Rather, in order to

15  sufficiently state a cause of action, the plaintiff must allege in its complaint certain facts in

16  addition to the elements of the alleged unlawful act so that the defendant can understand the

17  nature of the alleged wrong and discovery is not merely a blind 'fishing expedition' for some

18  unknown wrongful acts.").

19      **B.    Plaintiff Lacks Standing to Prosecute Any of the Claims He Asserts.**

20      Plaintiff's claims should be dismissed because Plaintiff lacks standing. *First*, Plaintiff

21  lacks the "antitrust standing" necessary to pursue claims under the Cartwright Act because (a)

22  antitrust standing requires that any injury flow "directly" from the alleged misconduct, and the

23  Complaint utterly fails to assert a coherent theory of proximate cause to connect any alleged

24  anticompetitive conduct to Plaintiff's alleged injury; and (b) Plaintiff has not alleged and cannot

25  allege the "antitrust injury" necessary to prosecute his antitrust claims when, as an end consumer

26  of cell phones and service, he does not compete with Qualcomm in the sale of relevant

27  technology and has not purchased any such technology from Qualcomm. *Second*, Plaintiff has no

28  standing to prosecute a suit under California's UCL because he cannot trace any "lost money or

1   property" formerly in his possession to money or property that Qualcomm now possesses "as a

2   result of" its alleged misconduct.

3        **1.    Plaintiff Lacks the "Antitrust Standing" to Pursue a Claim Under the**

4            **Cartwright Act**

5        "Antitrust standing" is a threshold requirement that every plaintiff must satisfy to bring a

6   private suit under California's Cartwright Act. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232

7   F.3d 979, 987 (9th Cir. 2000) ("[A]ntitrust standing is required under the Cartwright Act.").

8   Standing under these laws is more restrictive than standing under Article III of the U.S.

9   Constitution because, in passing the Sherman Act on which the Cartwright Act is based, Congress

10  expressly did not intend to afford a private remedy to anyone injured by an antitrust violation

11  simply upon a showing of but-for causation. *See Assoc. Gen. Contractors*, 459 U.S. at 534-35 &

12  n.31.  Instead, standing under the antitrust laws requires a "further determination whether the

13  plaintiff is a proper party to bring a private antitrust action". *Id.* at 535 n.31.  The touchstones of

14  this inquiry are "plaintiff's harm, the alleged wrongdoing of the defendants, and the relationship

15  between them". *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1054 (9th Cir. 1999)

16  (citation omitted).

17       In *Associated General Contractors of California* ("*AGC*"), the Supreme Court identified a

18  separate set of factors that determine whether a plaintiff has standing to bring an antitrust action.

19  These factors include (1) the causal directness of the alleged injury; (2) whether the injury is an

20  "antitrust injury" (*i.e.*, "of a type that Congress sought to redress in providing a private remedy

21  for violations of the antitrust laws"); (3) "the existence of more direct victims" of the alleged

22  antitrust injury; and (4) "problems of identifying damages and apportioning them" among those

23  directly and indirectly harmed. *AGC*, 459 U.S. at 538-45.  The two most important factors are

24  proximate causation and antitrust injury. *See Barton & Pittinos, Inc. v. SmithKline Beecham*

25  *Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) ("Antitrust injury is a necessary but insufficient

26  condition of antitrust standing."); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1116-17

27  (E.D. Cal. 2002) ("A plaintiff who complains of an injury that is too remote from the alleged

28  /////

1  restraint or that is derivative of an injury suffered by a third party absent from the suit is generally

2  unable to establish antitrust standing.").

3      Plaintiff must meet the *AGC* requirements to have standing under the Cartwright Act.[3]

4  *See Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 548 (1998) (requiring plaintiffs to plead a

5  cognizable antitrust injury to bring a Cartwright Act claim); *Vinci v. Waste Mgmt., Inc.*, 36 Cal.

6  App. 4th 1811, 1814-16 (1995) (applying *AGC* factors to assess standing under the Cartwright

7  Act); *see also Knevelbaard*, 232 F.3d at 987 ("Antitrust standing is required under the Cartwright

8  Act.").

9      As set forth below, Plaintiff lacks antitrust standing.

10         **a.    Plaintiff's Theory of Causation Is Too Indirect to Support**

11               **Antitrust Standing**

12      Plaintiff's attempts to trace his alleged injury back to Qualcomm fail to meet the

13  proximate cause requirements of antitrust standing.  To have standing under the Cartwright Act,

14  the plaintiff's injury must be the direct and proximate result of the defendant's alleged

15  anticompetitive conduct. *See Knevelbaard*, 232 F.3d at 989 (standing under the Cartwright Act

16  requires "not a mere causal link, but a direct effect") (quotations and citation omitted).  "A direct

17  relationship between the injury and the alleged wrongdoing has been one of the 'central elements'

18  of the proximate causation determination, and a plaintiff who complained of harm flowing merely

19  from the misfortunes visited upon a third person by the defendant's acts generally has been said

20  to stand at too remote a distance to recover." *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris,*

21  *Inc.*, 241 F.3d 696, 701 (9th Cir. 2001) (internal quotation marks omitted); *see also Eagle*, 812

22  _____

23  [3] Although the Cartwright Act departs from the rule in *Illinois Brick*, in which the United States
Supreme Court prohibited indirect purchasers from maintaining an action for damages under the

24  Sherman Act, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-29 (1977), California law is clear
that the Cartwright Act's more expansive standing provision does not dispense with the

25  requirement that an antitrust plaintiff allege an antitrust injury and proximate causation. *See In re
Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1087 (N.D.

26  Cal. 2007) ("[W]hile the Cartwright Act directly contradicts federal law insofar as indirect
purchaser standing is generally concerned, it does not follow from this either that indirect

27  purchaser status is itself sufficient under California law to establish antitrust standing, or that
California law necessarily eschews the general test for antitrust standing as set forth in *AGC*");

28  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1221 (C.D. Cal.
2003) (same).

1  F.2d at 541 ("The chain of causation between the injury and the alleged restraint in the market

2  should lead directly to the 'immediate victims' of any alleged antitrust violation.").

3      Plaintiff's theory of causation is far too attenuated to support standing.  On the face of the

4  Complaint, there are at least three intermediaries between Plaintiff and any alleged antitrust

5  violation:  "UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device

6  manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the

7  vendors ultimately pass those costs on to end consumers, such as Plaintiff".  (Compl. ¶ 72.)

8  Plaintiff additionally alleges that Qualcomm supplies only "some" of the technology essential to

9  UMTS (Compl. ¶ 35), representing a "smaller proportion of the UMTS standard than the 3G

10 CDMA standard" (Compl. ¶ 62).  This means that each device allegedly containing Qualcomm

11 technology also contains numerous other technologies, any of which might impact the final price

12 actually paid by Plaintiff.  The Complaint contains no allegations plausibly suggesting that,

13 within the final purchase price of a given device, the cost of any alleged antitrust violation is

14 traceable or somehow distinguishable from this multitude of other factors.

15      These allegations are insufficient under well-established law.  For example, in *In re*

16 *Dynamic Random Access Memory (DRAM) Antitrust Litigation*, retail computer purchasers

17 sought to assert a Cartwright Act claim against the manufacturers of DRAM, a computer

18 component.  516 F. Supp. 2d 1072, 1091 (N.D. Cal. 2007) ("*DRAM I*").  There, as here, the

19 challenged product (DRAM computer memory) was a "ubiquitous component in all manner of

20 personal electronic devices that are purchased for end use".  *Id.* at 1091.  Determining that

21 plaintiffs' injury was too remote to support standing, the court observed:

22      "[E]ach product in which DRAM is a component, contains numerous
        other components, all of which *collectively* determine the final price
23      actually paid by plaintiffs for the final product.  In other words, the price
        for the actual product paid by plaintiffs is reflective of much more than
24      just the component price for DRAM.  Yet plaintiffs' complaint sets forth
        no allegations that demonstrate that, within the final purchase price of a
25      given product purchased by plaintiffs for 'end use,' the ultimate cost of the
        DRAM component is somehow directly traceable and/or distinguishable.
26      Seen from this viewpoint, the directness of plaintiffs' injury—with respect
        to those who purchased DRAM as a component product—is too remote to
27      warrant tipping this factor in favor of standing."

28  /////

1    *Id.* at 1092 (emphasis in original). Plaintiff's theory of causation here is even more attenuated

2    than that in *DRAM I*. As Plaintiff concedes, cell phone service providers subsidize the price of

3    devices for their subscribers. (Compl. ¶¶ 73-74.) This alone would make it difficult, if not

4    impossible, to trace any alleged price inflation back to Qualcomm.

5         The remoteness of Plaintiff's injury is underscored by the allegation that, in contrast to the

6    purported class of end-user purchasers, "UMTS chipset and UMTS device manufacturers suffer

7    *direct* anticompetitive harm from Qualcomm's UMTS Licensing Practices". (Compl. ¶ 72

8    (emphasis added).) This allegation concedes that Plaintiff's supposed injury is entirely derivative

9    of injuries allegedly suffered by other parties. As the Supreme Court held in *AGC*, "[t]he

10    existence of an identifiable class of persons whose self interest would normally motivate them to

11    vindicate the public interest in antitrust enforcement diminishes the justification for allowing a

12    more remote party . . . to perform the office of a private attorney general". 459 U.S. at 542.

13    Under Plaintiff's own theory of the supply chain, a variety of other entities besides himself all

14    would have greater motivation than Plaintiff to enforce the antitrust laws in the form of a private

15    right of action—as vividly confirmed by Plaintiff's attempt to ride the coat tails of an identical

16    action filed three years ago by Broadcom, a provider of wireless chipsets. Accordingly, Plaintiff

17    is the wrong person to enforce the antitrust laws. *See Cargill Inc. v. Budine*, No. 07-CV-349,

18    2007 WL 2506451, at *6 (E.D. Cal. Aug. 30, 2007) (holding that, because "both the competitors

19    and purchasers [were] in the better legal position to raise antitrust claims", the plaintiff's injury

20    "was too remote"); *Grokster*, 269 F. Supp. 2d at 1222 (dismissing for lack of standing under the

21    Cartwright Act because another entity was "the primary target of the conduct alleged and would

22    suffer the principal injury").

23                    **b.    Plaintiff Has Not Suffered Antitrust Injury**

24         Antitrust injury is critical in the standing analysis. *See Lucas v. Bechtel Corp.*, 800 F.2d

25    839, 844 (9th Cir. 1986) ("The [antitrust injury] factor is of tremendous significance."). It

26    requires the plaintiff to plead an "injury of the type the antitrust laws were designed to prevent

27    and that flows from that which makes defendant's acts unlawful". *Am. Ad. Mgmt.*, 190 F.3d at

28    1056 (citations and quotations omitted). Critically, in order to plead antitrust injury, a plaintiff

-12-

1    must be either "a consumer []or a competitor in the market in which trade was restrained". *AGC*,

2    459 U.S. at 539; *see also Am. Ad. Mgmt.*, 190 F.3d at 1057 ("Parties whose injuries, though

3    flowing from that which makes the defendant's conduct unlawful, are experienced in another

4    market do not suffer antitrust injury."). In light of this requirement, indirect purchasers—even

5    when *Illinois Brick* does not apply—lack standing "where the ultimate goods they purchased—

6    and which were the alleged source of artificially raised prices—were part of a market that was

7    secondary to the allegedly [relevant] market". *DRAM I*, 516 F. Supp. 2d at 1090.

8          Plaintiff fails to allege antitrust injury here because neither he, nor the class that he

9    purports to represent, is alleged to have purchased any product that Qualcomm sells. The putative

10   class consists of "end consumers" in the market for cell phones (the alleged "device market") or

11   in the market for cellular service (the alleged "service market"). (Compl. ¶¶ 70-86.) Qualcomm

12   is not alleged to sell cell phones or cellular service or otherwise to participate in either of these

13   markets. Instead, the Complaint challenges Qualcomm's "UMTS Licensing" which allegedly

14   occurs in completely different markets, including "the market for its WCDMA-related patents"

15   (Compl. ¶ 50), "markets for WCDMA technology" (Compl. ¶ 44), and the "UMTS chipset

16   market" (Compl. ¶¶ 50, 53, 55, 67-68). No members of the putative class are alleged to have

17   licensed "WCDMA-related patents" or "WCDMA technology", or to have purchased a "UMTS

18   chipset". Rather, these "end consumers" buy cell phones and cell service in markets that,

19   although allegedly affected by Qualcomm, are entirely separate from any market in which

20   Qualcomm is alleged to sell a product.

21         Courts routinely dismiss complaints brought by consumers that, as here, allege

22   anticompetitive conduct in a market in which they have not purchased a product. Again, the

23   *DRAM* case is instructive. Notwithstanding that plaintiffs in that case had brought claims under

24   California's Cartwright Act—and thus were not barred by *Illinois Brick* from seeking damages—

25   the court dismissed the complaint for lack of standing. Determining that the DRAM purchasers

26   had not suffered antitrust injury, the court held that "plaintiffs who are purchasing products in

27   which DRAM is a component, rather than DRAM itself, are participating in a secondary market

28   that is incidental to the primary price-fixed market (*i.e.*, the market for DRAM modules

-13-

1    themselves)". *DRAM I*, 516 F. Supp. 2d at 1091. Even after plaintiffs in that case added new

2    allegations that the DRAM components had no free-standing use, that increases in prices of

3    DRAM led to corresponding increases in the cost of computers, and that demand for DRAM was

4    determined by computer end-buyers, the court still dismissed for lack of standing. *In re Dynamic*

5    *Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1134-35 (N.D. Cal.

6    2008) ("*DRAM II*"); *accord Cargill*, 2007 WL 2506451, at *5 (dismissing antitrust claims for

7    lack of standing because the plaintiff was not a participant in the market where the alleged

8    anticompetitive conduct took place); *Grokster*, 269 F. Supp. 2d at 1221 ("As [plaintiff] is neither

9    a competitor nor customer in the restrained market, and because its injury is incidental, and not

10   integral, to the alleged anticompetitive scheme, [plaintiff] does not have standing.").[4]

11        Precisely as in *DRAM I* and the other cases cited above, any purchases made here by the

12   putative class occur at best in "a secondary market that is incidental to the primary price-fixed

13   market" alleged (*i.e.*, the market for licenses to Qualcomm's patented technology). *DRAM I*, 516

14   F. Supp. 2d at 1091. Although Plaintiff alleges that he might benefit consequentially from an

15   injunction against Qualcomm's licensing practices, that is plainly insufficient under *DRAM I*.

16   Not every party with a but-for injury is entitled to bring suit as a private attorney general to

17   enforce the antitrust laws. *See Eagle*, 812 F.2d at 540 ("The class of persons entitled to obtain

18   such damages has been limited by the Supreme Court . . . through the doctrine of antitrust

19   standing." (internal quotation marks omitted)). Rather, Plaintiff must have suffered *antitrust*

20   *injury*, and because Qualcomm is not alleged to sell any product that Plaintiff purchased, either

21   directly or indirectly, Plaintiff lacks standing to bring an antitrust claim.

22   /////

23   _____

24   [4]  Similarly, in Broadcom's antitrust suit against Qualcomm, the Third Circuit Court of Appeals affirmed, on standing grounds, the district court's dismissal of Broadcom's claim that Qualcomm monopolized the alleged markets for 3G CDMA technology and chipsets. The court held that

25   Broadcom failed both of the key *AGC* factors. *First*, the court noted that Broadcom had not alleged an antitrust injury because "Broadcom d[id] not allege that it sells goods in the same

26   relevant market [*i.e.*, CDMA] as Qualcomm". *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 321 (3d Cir. 2007). *Second*, the court observed that "[a]ny causal connection, moreover, is highly

27   speculative. Injury to Broadcom is extremely remote, and there is no apparent reason why Qualcomm's competitors in the CDMA markets could not assert a monopoly maintenance claim".

28   *Id.*

1        **2.**     **Plaintiff Lacks Standing to Pursue a Claim Under California's Unfair**

2                         **Competition Law**

3           Plaintiff also lacks standing to prosecute a claim under California's Unfair Competition

4 Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* The UCL, which prohibits practices that

5 are either "unfair", or "unlawful", or "fraudulent", once had a standing provision that permitted

6 "any person acting for the general public to sue for relief from unfair competition". *Californians*

7 *for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006). In November 2004,

8 however, California voters passed Proposition 64, which eliminated such "private attorney

9 general" suits. *See O'Brien v. Camisasca Auto. Mfg., Inc.*, 161 Cal. App. 4th 388, 398 (2008)

10 ("The former law, the voters determined, had been misused by some private attorneys who file

11 frivolous lawsuits as a means of generating attorney's fees without creating a corresponding

12 public benefit." (internal quotations and alterations omitted)). Now, after the passage of

13 Proposition 64, standing for UCL suits is restricted to persons "who ha[ve] suffered injury-in-fact

14 and ha[ve] lost money or property *as a result of* such unfair competition". Cal. Bus. & Prof.

15 Code § 17204 (emphasis added). Accordingly, "a showing of causation is required as to each

16 representative plaintiff". *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1194 (S.D. Cal.

17 2005); *O'Brien*, 161 Cal. App. 4th at 400 ("as a result of" language "unavoidably implicates

18 causation").

19           In light of Proposition 64, Plaintiff cannot have standing to prosecute a UCL claim. For

20 all the same reasons that proximate cause is absent in the context of Plaintiff's antitrust standing

21 (*see supra* Section III.B.1.a.), Plaintiff similarly cannot allege in support of his UCL claim a

22 coherent chain of causation suggesting that any "money or property" was somehow lost "as a

23 result of" Qualcomm's alleged misconduct. Indeed, the Complaint fails even to mention this

24 critical language of Proposition 64. Instead, in support of his UCL claim, Plaintiff relies on the

25 same theory of causation alleged in support of his antitrust claims, namely that "supracompetitive

26 prices . . . are passed down from Qualcomm's licensees to UMTS vendors, including cellular

27 carriers, to end consumers of UMTS devices and cellular services". (Compl. ¶ 109.) On the face

28 of this allegation, any "money or property" that Plaintiff allegedly has "lost" is impossible to

1    trace back to Qualcomm's alleged misconduct.  Accordingly, Plaintiff's UCL cause of action

2    must be dismissed.  *See Hall v. Time, Inc.*, 158 Cal. App. 4th 847, 852-53 (2008) (no standing

3    where, even if plaintiff were to suffer injury in fact, plaintiff made no causation showing).

4          **C.**    **Plaintiff Fails to State a Claim for Relief Under Any Cause of Action Asserted**

5          Even if Plaintiff were to have standing, his Complaint should be dismissed because it does

6    not state a claim under the Cartwright Act or the UCL.

7              **1.**    **Plaintiff Fails to State a Claim Under the Cartwright Act Because He**

8                   **Alleges Only Unilateral Conduct**

9          Like Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act "prohibits the

10    combination of resources of two or more independent interests for the purpose of restraining

11    commerce and preventing market competition".  *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.

12    App. 3d 13, 23 (1978); *see also G.H.I.I.*, 147 Cal. App. 3d at 265 ("The Cartwright Act is

13    patterned after the federal Sherman Anti-Trust Act and decisions under the latter act are

14    applicable to the former." (internal citation omitted)).

15          To state a claim under either law, a plaintiff must allege joint conduct or concerted action;

16    "[i]ndependent action is not proscribed".  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752,

17    761 (1984).  It is well-settled that the federal antitrust laws do not preclude a trader from

18    unilaterally determining the parties with whom it will deal and the terms on which it will transact

19    business.  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408

20    (2004).  Similarly, the Cartwright Act reaches only single-firm conduct.  *Dimidowich v. Bell &*

21    *Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (holding that a challenge to unilateral conduct is

22    "not cognizable under the Cartwright Act, for it fails to allege any combination").  A claim under

23    the Cartwright Act therefore must be based upon conspiratorial rather than unilateral practices.

24    *Id.; see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-69 (1984);

25    *Monsanto*, 465 U.S. at 761.

26          The alleged "UMTS Licensing Practices", which represent the sum total of Qualcomm's

27    alleged anticompetitive conduct, consist entirely of Qualcomm's unilateral choices in determining

28    with whom it will deal and the terms on which it will transact business.  The Complaint nowhere

1  alleges that Qualcomm conspired with any counterparty to restrain trade.  Nor does the Complaint

2  attribute to any party other than Qualcomm any intent to restrain trade.  In an attempt to

3  overcome these deficiencies, Plaintiff tries to manufacture concerted action by alleging—in

4  conclusory fashion—that Qualcomm's licensing constitutes a combination because "Qualcomm

5  imposes the UMTS Licensing . . . through deceptive and coercive conduct, and Qualcomm's

6  licenses [sic] adhere to those restraints involuntarily".  (Compl. ¶ 107.)  In short, Plaintiff's entire

7  theory of liability under the Cartwright Act rests on the conclusory assertion of an "involuntary

8  conspiracy".

9          These allegations fail to state a claim for at least two reasons.

10          *First*, Plaintiff's theory of "involuntary conspiracy" is foreclosed by the Supreme Court's

11  decision in *Monsanto*.  465 U.S. at 761.[5]  Before that decision, several cases had held that conduct

12  by a single party at times might constitute an actionable "combination" if such conduct "procures

13  the unwilling cooperation of another" through "coercion, threats or intimidation".  *See, e.g.*,

14  *G.H.I.I.*, 147 Cal. App. 3d at 268 (Cartwright Act); *Albrecht v. Herald Co.*, 390 U.S. 145, 149-50

15  (1968) (Sherman Act § 1).  In *Monsanto*, however, the Supreme Court held that any allegedly

16  conspiring parties must possess "a conscious commitment to a common scheme designed to

17  achieve an unlawful objective".  465 U.S. at 764 (internal quotation marks omitted).  The

18  Supreme Court's requirement of a "common scheme" is directly inconsistent with the notion of a

19  coerced conspiracy, and therefore "even the most circumscribed reading [of *Monsanto*] does not

20  permit finding an agreement on the basis of unwilling compliance".  7 Areeda & Hovenkamp,

21  *Antitrust Law* ¶ 1451e (2d ed. 2004); *see also Dimidowich*, 803 F.2d at 1478 (noting that,

22  although "there is a line of cases that supports the proposition that a manufacturer may form a

23  'conspiracy' or 'combination' under the antitrust laws if it imposes restraints on dealers or

24  customers by coercive conduct and they involuntarily adhere to those restraints . . . [,] the

25  precedential value of this line of cases has been cast into some doubt by *Monsanto*"); *Newport*

26

---

27  [5] Because "[t]he Cartwright Act is patterned after the federal Sherman Anti-Trust Act", the *Monsanto* decision is applicable to Cartwright Act claims as it would be to claims under the Sherman Act. *See Mailand v. Burckle*, 20 Cal. 3d 367, 376 (1978); *see also G.H.I.I.*, 147 Cal.

28  App. 3d at 265.

-17-

1   *Components, Inc. v. NEC Home Elec., Inc.*, 671 F. Supp. 2d 1525, 1546 (C.D. Cal. 1987) (same;

2   dismissing "Plaintiff's claim of 'involuntary' conspiracy"). Indeed, we have found no case

3   decided since *Monsanto* in which a Court found an antitrust violation based on Plaintiff's

4   "involuntary conspiracy" theory. For this reason alone, Plaintiff cannot state a plausible antitrust

5   claim under the Cartwright Act.

6        *Second*, even assuming that Plaintiff's legal theory were cognizable, Plaintiff's allegations

7   are insufficient. Even when courts entertain such a theory, they hold that charges of antitrust

8   coercion cannot rest solely on allegations that the defendant used its economic leverage, market

9   power or position to force an agreement from alleged victims. *See, e.g., Freeman v. San Diego*

10   *Ass'n of Realtors*, 77 Cal. App. 4th 171, 197 (1999) (holding insufficient allegations that

11   defendants somehow "used their 'market power and position'" to cause an alleged boycott by

12   involuntary participants). Otherwise, every contract involving a powerful market participant

13   could give rise to a "conspiracy" under the Cartwright Act. Instead, courts require a plaintiff to

14   plead *facts* describing the particular conduct or acts comprising the alleged compulsion or

15   coercion. *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. 07-CV-00043, 2007 WL

16   4976364, at *9, *10 (C.D. Cal. 2007) (dismissing Sherman Act § 1 claim because "[plaintiff] did

17   not allege any facts regarding the alleged compulsion and coercion—for example, *who* coerced

18   *whom*, *when* the coercion took place, *how* the coercion was effected, and *what* comprised the

19   conspiracy" (emphasis in original)); *G.H.I.I.*, 147 Cal. App. 3d at 269 ("[W]e agree with

20   [defendants] that the Cartwright Act causes of action against [two defendants] contain no specific

21   allegations of coercion; rather, it is claimed that these two [defendants] employed economic

22   leverage to convince distributors to grant them price discounts and other beneficial terms. The

23   lack of any averment of coercion or a combination renders these causes of action defective.").

24        Because Plaintiff does not allege *any* facts regarding the supposed coercion—for example,

25   who specifically was coerced, when the coercion took place, and how the coercion was

26   effectuated—his Complaint fails to state a plausible claim under the Cartwright Act. *See*

27   *Twombly*, 127 S. Ct. at 1971 n.10 (references to "specific time, place or person" are important

28   elements in providing notice to defendant); *see also Blair v. All American Bottling Corp.*, No. 86-

1    CV-1426, 1988 WL 150814, at *3 (S.D. Cal. Aug. 9, 1988) (dismissing allegations of involuntary

2    combination where complaint "failed to identify the alleged unnamed co-conspirators"); *Chavez*

3    *v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 373 (2001) (dismissing Cartwright Act claim and

4    holding insufficient "unspecified 'threats, coercion, intimidation and boycott' to cause the dealers

5    to comply").

### 2.    Plaintiff Cannot State a UCL Claim

7    For the same reasons that Plaintiff does not state a claim under the Cartwright Act,

8    Plaintiff's claims under the "unfair" and "unlawful" prongs of the UCL also fail. "If the same

9    conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the

10   same reason . . . the determination that the conduct is not an unreasonable restraint of trade

11   necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool*

12   *Corp.*, 93 Cal. App. 4th 363, 375 (2001); *see also SC Manufactured Homes, Inc. v. Liebert*, 162

13   Cal. App. 4th 68, 93 (2008) ("In that plaintiff cannot allege a Cartwright Act violation . . . , the

14   cause of action for a violation of the UCL also cannot stand.").

15   Nor can Plaintiff state a claim under the UCL's "fraudulent" prong. In the UCL context,

16   "fraudulent" is a term of art that refers only to practices that are likely to deceive the public; it is

17   not synonymous with common-law fraud. *See Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608, 618

18   (1996). Consequently, it is "necessary under the 'fraudulent' prong to show deception to some

19   members of the public". *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099,

20   1121 (C.D. Cal. 2001). The Complaint does not allege any deception of the public. Instead, it is

21   alleged that "Qualcomm committed an unfair and deceptive business act or practice by simply

22   reneging on its commitment to FRAND licensing". (Compl. ¶ 113.) On the face of the

23   Complaint, this supposed commitment was made to ETSI, not to the public, and accordingly

24   cannot be deemed "fraudulent" within the meaning of the UCL. *Rosenbluth Int'l., Inc. v. Super.*

25   *Ct.*, 101 Cal. App. 4th 1073, 1077 (2002) (holding that "sophisticated" entities receive no

26   protection under the UCL's "fraudulent" prong); *see also Express, LLC v. Fetish Group, Inc.*, 464

27   F. Supp. 2d 965, 980 (C.D. Cal. 2006) (dismissing claim under fraudulent prong because plaintiff

28

1  "d[id] not point to any evidence suggesting that the representations concerning the copyright were

2  disseminated to the public, let alone likely to deceive the public").

3  **IV.    CONCLUSION**

4      For the foregoing reasons, Qualcomm respectfully asks this Court to grant Qualcomm's

5  motion to dismiss.

6

7  Dated:  June 13, 2008                   DLA PIPER US LLP

8                             By /s/ William S. Boggs

9                               william.boggs@dlapiper.com

10                          CRAVATH, SWAINE & MOORE LLP

11                          Evan R. Chesler
                         Peter T. Barbur

12                          Elizabeth L. Grayer

13                          Attorneys for Defendant
                         QUALCOMM INCORPORATED

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28