David C. Parisi, Esq. (162248)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
(818) 990-1299 (phone)
(818) 501-7852 (facsimile)
dcparisi@parisihavens.com

Attorneys for plaintiff Merdad Valikhani,
on behalf of himself, the general public
and all others similarly situated

### UNITED STATES DISCRICT COURT

### SOUTHER DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERDAD VALIKHANI, an individual, on behalf of himself, the general public and all others similarly situated, ) ) ) | CASE NO. 08 cv 0786 WQH (JMA) |
| ) ) | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS** |
| Plaintiff, ) ) | |
| v. ) ) | |
| QUALCOMM INCORPORATED, a Delaware Corporation, and DOES 1-100, inclusive, ) ) ) ) | **NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |
| Defendants, ) ) ) | **Date:      July 28, 2008**<br>**Time:      11:00 a.m.**<br>**Judge:   Hon. William Q. Hayes** |

# TABLE OF CONTENTS

I.    INTRODUCTION                                                                      1

II.   VALIKHANI HAS STANDING TO ASSERT HIS CLAIMS                                       2

      A.    Valikhani Has Standing to Bring a Cartwright Act Claim                      2

            1.    Valikhani Alleges a Cartwright Act Claim Under California Law          2

                  a.    Valikhani Alleges an Antitrust Injury Under the Cartwright Act   2

                  b.    Valikhani Alleges Proximate Causation                            6

            2.    California Law Controls Valikhani's Standing Under the Cartwright
                  Act                                                                    8

            3.    Complexities in Proving the Amount of Damages Are Not Grounds
                  for Dismissing Valikhani's Cartwright Act Claim                       10

      B.    Valikhani Has Standing to Bring a UCL Claim                                 12

III.  VALIKHANI PROPERLY STATED HIS CLAIMS                                              13

      A.    Valikhani's Allegations of Involuntary Antitrust Conspiracy State
            Antitrust Claims                                                            13

      B.    Valikhani Alleges a UCL Claim                                               16

IV.   CONCLUSION                                                                        18

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

## **TABLE OF AUTHORITIES**

### **Cases**

*American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051 (9th Cir. 1999) ............................................................................................. 3, 6

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ............................................................................. 2, 3

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal.App.3d 1341 (1987) ................... 8

*Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 2007) ............................................................ 15

*Biljac Assocs. v. First Interstate Bank*, 218 Cal.App.3d 1410 (1990) ............................. 18

*Blair v. All Am. Bottling Corp.*, No. 86-1426, 1988 WL 150814 (S.D. Cal. Aug. 9, 1988) ................................................................................................................................ 14

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) .................................... 3, 7, 8

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ............................. 1, 17

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) ............................................................. 9

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ....................... 14

*Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224 (1993) ............................. 4, 5

*Cel-Tech Commc's, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163 (1999) 16, 17, 18

*City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361 (9th Cir. 1992) .............................. 14

*Crown Oil Corp. v. Superior Court*, 177 Cal.App.3d 604 (1986) ...................................... 8

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995) ........................... 15

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986) ........................................ 14

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ........................................................ 11

*GHK Assocs. v. Mayer Group, Inc.*, 224 Cal.App.3d 856 (1990) ............................. 11, 13

*Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945) ................................................... 9

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) .................................... 9, 13

*Hosp. Blfg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738 (1976) ............................................ 16

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ................................................. 2, 8, 9, 10

iii

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003)......................................3

*In re Cipro Cases I and II*, 121 Cal.App.4th 402 (2004) ...............................................8, 11

*In re Ditropan XL Antitrust Litigation*, 529 F.Supp.2d 1098 (N.D. Cal. 2007)...............12

*In re Dura Pharm., Inc. Sec. Litig.*, 452 F.Supp.2d 1005 (S.D. Cal. 2006) .....................11

*In re Dynamic Random Access Memory (DRAM II)*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008)..................................................................................................................................10

*In re Napster, Inc. Copyright Litig.*, 354 F. Supp.2d 1113 (N.D. Cal. 2005) ....................5

*In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181 (S.D.N.Y. 2000) ...................15

*In re Sugar Antitrust Litig.*, 588 F.2d 1270 (9th Cir. 1978) .............................................9

*In re Sugar Industry Antitrust Litig.*, MDL No. 201, 1976 WL 1374 (N.D. Cal. May 21, 1976)..............................................................................................................................11

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000) ....................3, 4, 6, 7

*Isakesen v. Vermont Castings, Inc.*, 644 F.Supp. 1098 (W.D. Wisc. 1986).....................14

*Kiseskey v. Carpenters' Trust for S. Cal.*, 144 Cal.App.3d 222 (1983) .............................7

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ......................4, 5

*Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709 (1982).........................................2, 4, 5

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002) ...........................................11

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003)......................................................................................................................5

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ................................13, 14

*Morrison v. Viacom, Inc.*, 66 Cal.App.4th 534 (1998)..................................................2, 3

*Munson v. Del Taco, Inc.*, 522 F.3d 997 (9th Cir. 2008) ...................................................9

*Newport Components, Inc. v. NEC Home Electronics (U.S.A.), Inc.*, 671 F. Supp. 1525 (C.D. Cal. 1987) ...............................................................................................14

*Ostrofe v. H. S. Crocker Co., Inc.*, 740 F.2d 739 (9th Cir. 1984) ..................................4, 7

*Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal.App.4th 688 (2007).................17

*Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal.App.4th 1073 (2002)...........................17

*Salve Regina College v. Russell*, 499 U.S. 225 (1991)............................................................9

*Shersher v. Superior Court*, 154 Cal.App.4th 1491 (2007).................................................12

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) ...............11

*Tele Atlas N.V. v. Navteq Corp.*, 397 F.Supp.2d 1184 (N.D. Cal. 2005) ..........................16

*Union Carbide Corp. v. Superior Court*, 36 Cal3d 15 (1984) .....................................8, 10

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586 (1970)....................11

*Vinci v. Waste Management, Inc.*, 36 Cal. App.4th 1811 (1995).........................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

Deriding Mr. Valikhani's Complaint as "little more than a photocopy of Broadcom's 2005 complaint," Qualcomm argues that it is immune from antitrust liability because Valikhani is too far downstream in UMTS devices supply chain to state an antitrust claim. (Def.'s Mem. 1.)  *Cf. Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) (Broadcom stated a variety of antitrust claims on the facts alleged in Broadcom's 2005 complaint).  In essence, Qualcomm's instant Motion to Dismiss asks the Court to rule that, while Broadcom may assert antitrust claims, the end consumers who ultimately purchase cellular devices using UMTS technology are too remote to have remedies – they do not have so much as a claim for an injunction to staunch the bleeding.

The Complaint alleges Qualcomm's licensing practices have harmed consumers of UMTS devices by causing them to pay "supracompetitive prices" and by impairing "non-price competition in the form of deterred innovation" in the UMTS cellular devices available on the market. (Compl. ¶ 109.) The Complaint explicitly alleges how "UMTS chipset manufacturers pass UMTS Licensing costs down to UMTS device manufacturers, UMTS device manufacturers pass those costs down to their vendors, and the vendors ultimately pass those costs on to end consumers, such as Plaintiff." (*Id*. ¶ 72.)

In its arguments that Valikhani does not have standing to remedy these injuries, Qualcomm ignores the differences between claims for injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26), claims under the Cartwright Act (Cal. Bus. & Prof. Code § 16750), and claims for damages under Section 4 of the Clayton Act (15 U.S.C. § 15). Indirect purchasers like Valikhani have standing under the Cartwright Act, as well as under California's unfair competition law (Cal. Bus. & Prof. Code § 17203) ("UCL").  Unable to rest on its standing arguments, Qualcomm moves for dismissal on the alternative grounds that the Complaint suffers from a variety of pleading defects.  Qualcomm's motion to dismiss should be denied because 1) the expressed intent of the California legislature is to

confer standing on indirect purchasers like Valikhani, and 2) Valikhani has stated a cause of action each of the counts set forth in the Complaint.

## II.     VALIKHANI HAS STANDING TO ASSERT HIS CLAIMS

### A.     Valikhani Has Standing to Bring a Cartwright Act Claim

Qualcomm's argument against Valikhani's California antitrust claim fails. The California legislature specifically expanded the Cartwright Act to provide standing to indirect purchasers in reaction to the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Application of the standing analysis from *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) to Valikhani's Cartwright Act claim would violate California's antitrust policy.

#### 1.     Valikhani Alleges a Cartwright Act Claim Under California Law

Valikhani alleges the necessary elements to state a claim under the Cartwright Act. A Cartwright Act plaintiff must demonstrate "an antitrust violation was the proximate cause of his injuries" and "antitrust injury." *Morrison v. Viacom, Inc.*, 66 Cal.App.4th 534, 548 (1998) (quoting *Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 723 (1982)). Despite its assertion that Cartwright Act claims are "universally . . . subject to the *AGC* requirements for standing," Qualcomm concedes that the elements of a Cartwright Act claim are simply "antitrust injury and proximate causation." (Def.'s Mem. 10, 11.)

##### a.     Valikhani Alleges an Antitrust Injury Under the Cartwright Act

Valikhani sustained an antitrust injury when Qualcomm reduced and restrained competition.  Valikhani's Complaint alleges the type of injury that the antitrust laws were intended to remedy: "supracompetitive prices" for UMTS cellular devices. (Compl. ¶109.) Supracompetitive prices paid by indirect purchasers constitute antitrust injury. *See In re*

**PARISI & HAVENS** LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

*Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F.Supp.2d 188, 211-12 (E.D.N.Y. 2003) (where drug consumers alleged defendants' conduct delayed competition and "caus[ed] plaintiffs to pay inflated prices," those "allegations of antitrust injury [were] equally formidable" to those in *In re Warfarin*). *See also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) (delay of cheaper generic drugs from anticompetitive conduct was the "kind of injury [that] was undoubtedly a *raison d'etre* of the Sherman Act").

Qualcomm takes *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051 (9th Cir. 1999) out of context when it quotes it for the proposition that "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." (Def.'s Mem. 12-13, quoting *Am. Ad Mgmt.*, 190 F.3d at 1057.) *American Ad* was careful to explain that "parties whose injuries are 'inextricably intertwined' with the injuries of market participants" fall into an "exception to the market participant requirement." *Am. Ad*, 190 F.3d at 1057 n.5 (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982)). Here, where UMTS components have no economic value absent demand for UMTS devices, Valikhani's injury was inextricably intertwined with the injury Qualcomm sought to cause. *Cf. In re Warfarin*, 214 F.3d at 400 (end users' antitrust injury "inextricably intertwined" with defendant's antitrust violation, where Coumadin had no economic value absent demand of "ultimate consumer"). Qualcomm's selective quotation from *American Ad* obscures its actual holding that, while "[a] number of our opinions do use the phrase 'competitor or consumer' as a rough gloss on the . . . 'market participant' test," "it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Id.* at 1058.

Under the Cartwright Act, an antitrust injury is "the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful." *Morrison*, 66 Cal.App.4th at 548. *See also Cellular Plus, Inc. v.*

*Superior Court*, 14 Cal.App.4th 1224, 1234, 1235 (1993). In *Cellular Plus*, one of the defendants' independent sales agents had standing to recover lost sales resulting from inflated prices due to the defendants' price fixing – they were deemed to have standing because they "were directly involved in [the defendant's] chain of distribution." *Cellular Plus*, 14 Cal.App.4th at 1234. In *Kolling*, a newspaper distributor had standing under the Cartwright Act when the defendant terminated his territory when he failed to participate in anticompetitive practices, because the termination "resulted directly from [antitrust] scheme and the publisher's attempts to further it." *Kolling*, 137 Cal.App.3d at 724.[1] Mr. Valikhani's injuries here are consistent with those in *Cellular Plus* and *Kolling* because they are "inextricably intertwined" with Qualcomm's antitrust violation: absent demand by end consumers for UMTS devices, UMTS components would be "[i]rrelevant." *In re Warfarin*, 214 F.3d at 400.

California courts have refused to adopt a market participant requirement for antitrust injury and have found the Cartwright Act applies to anyone injured by the reduction of competition from a Cartwright Act violation. While "the exact parameters of 'antitrust injury' under section 16750 have not yet been established[,] . . . the scope of that term is broader than under federal law." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 991 (9th Cir. 2000) (quoting *Cellular Plus*, 14 Cal.App.4th at 1234, punctuation omitted).[2] The *Cellular Plus* court expressly declined to apply the defendants' authorities which "merely define[d] the term 'antitrust injury' for purposes of federal antitrust laws, such as

---

[1]     It is helpful to contrast the ruling in *Vinci v. Waste Management, Inc.*, 36 Cal. App.4th 1811 (1995) which found that a plaintiff did not have standing without an allegation that "he was so essential to the anti-competitive scheme that his discharge was itself an anti-competitive act." *Id.*, 36 Cal.App.4th at 1817 (distinguishing *Ostrofe*, 740 F.2d at 742).

[2]     Qualcomm misstates *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) as holding that "standing under the Cartwright Act requires 'not a mere causal link, but a direct effect.'" (Def.'s Mem. 10 quoting *Knevelbaard*, 232 F.3d at 989.) In fact, the full sentence from *Knevelbaard* makes it clear that this language applies to an antitrust claim "[***u***]*nder federal law*." *Knevelbaard*, 232 F.3d at 989 (emphasis supplied).

**PARISI & HAVENS** LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

1  the Clayton Act." *Cellular Plus*, 14 Cal.App.4th at 1234. "[T]he more restrictive definition

2  of 'antitrust injury' under federal law does not apply to section 16750." *Knevelbaard*, 232

3  F.3d at 991 (quoting *Cellular Plus*, 14 Cal.App.4th at 1234); *Metro-Goldwyn-Mayer Studios*

4  *Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1223-24 (C.D. Cal. 2003). The Cartwright Act

5  is "designed to protect *the public, as well as more immediate victims*, from a restraint of

6  trade or monopolistic practice which has an anticompetitive impact on the market." *Cellular*

7  *Plus*, 14 Cal.App.4th at 1232 (quoting *Kolling*, 137 Cal.App.3d at 724) (emphasis supplied).

8  "***The statute does not confine its protection to consumers, or to purchasers, or to***

9  ***competitors***, or to sellers. . . . The Act is comprehensive in its terms and coverage,

10  protecting all who are made victims of the forbidden practices by whomever they may be

11  perpetrated." *Id*.,14 Cal.App.4th at 1233 (citation, punctuation omitted) (emphasis in

12  original).

13

14      Some federal courts have imputed a market participation requirement to antitrust

15  injury under the Cartwright Act, despite the categorical language from *Cellular Plus* quoted

16  above.[3] However, even these courts recognize that "under California law, an indirect

17  purchaser of goods or services is deemed to participate as a customer in the relevant market

18  and thus may suffer a cognizable antitrust injury." *In re Napster, Inc. Copyright Litig.*, 354

19  F. Supp. 2d 1113, 1125 (N.D. Cal. 2005) (citing *Grokster*, 269 F.Supp.2d at 1224; investor

20  in file-sharing software company had standing with respect to "exercise of dominion and

21  control over" company but did not with respect to "unidentified future investments in the

22  online music distribution market"). Even if the market participation requirement were

23  applicable to Valikhani's Cartwright Act claim, "it is not the status as a consumer or

24  _____

25      [3]    *Grokster* holds that the Cartwright Act's antitrust injury element requires market
participation. *Grokster, Ltd.*, 269 F. Supp. 2d at 1224. *Grokster*'s support for this

26  proposition is a citation to *Knevelbaard*. *Id*. (citing *Knevelbaard*, 232 F.3d at 987-89). The
portion of *Knevelbaard* which *Grokster* cites is an undifferentiated standing analysis under

27  both federal and California law, and does not hold that antitrust injury under the Cartwright
Act has a market participation requirement. *Knevelbaard*, 232 F.3d at 987-89.

28

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Am. Ad*, 190 F.3d at 1058.

### b.    Valikhani Alleges Proximate Causation

Valikhani alleges proximate cause because his injury was reasonably foreseeable. Valikhani's antitrust injuries – "supracompetitive prices" and "impaired non-price competition" for UMTS cellular devices – were also eminently foreseeable and inextricably intertwined with the injury Qualcomm sought to cause. (Compl. ¶109.) Qualcomm makes the false claim that there are "at least three intermediaries between" it and Valikhani to support the argument that Valikhani is too far removed from Qualcomm to have standing to assert antitrust claims.  In fact, there are only two intermediaries between Valikhani and Qualcomm – the device's manufacturer and its vendor (LG and AT&T, respectively).

Qualcomm does not bother explaining why indirect purchasers one or two intermediaries removed from the defendant should have antitrust standing, while purchasers three intermediaries away should not.

*In re Warfarin* rejected essentially the precise argument Qualcomm advances here.[4] In that case, the defendant (DuPont) caused the FDA to delay the market entry of a generic drug competitive with its own drug, Coumadin. The plaintiffs were a class of Coumadin users with the same attributes that Qualcomm argues bar Valikhani from asserting he has antitrust standing: they were "'third' position in the chain of distribution from [the defendant] to [the] user." *In re Warfarin*, 214 F.3d at 400. *In re Warfarin* found that even these indirect purchasers had standing to assert a Section 16 claim, because their antitrust

---

[4]    Qualcomm asserts that "Ninth Circuit and Third Circuit case law . . . are consistent in all respects material to [Qualcomm's] motion." (Def.'s Mem. 7 n.2.) Valikhani's position remains that if this case proceeds in this Court, it should be governed by Ninth Circuit law, but otherwise takes no position with respect to this assertion. However, the result in *In re Warfarin* is correct and would be persuasive with the Ninth Circuit.

**PARISI & HAVENS** LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

Opposition to Motion to Dismiss                                              No. 08 cv 0786 WQH (JMA)

injury (increased prices) was inextricably intertwined with the defendant's antitrust violation:

> The class members here [are] "foreseeable and necessary victims" of DuPont's efforts to exclude the generic drug from the market. . . . Coumadin consumers clearly suffer[ed] antitrust injury. Coumadin purchasers were the target of DuPont's antitrust violation. ***Regardless of the existence of the various links of middlemen, if there were no ultimate consumer of Coumadin, prices charged for the drug by DuPont to distributors, pharmacies, etc., would be irrelevant.*** The excess amount paid by Coumadin users . . . is "inextricably intertwined" with the injury DuPont aimed to inflict . . . ***It is difficult to imagine a more formidable demonstration of antitrust injury.***

*In re Warfarin*, 214 F.3d at 400 (emphasis supplied). Ninth Circuit law is in accord. *Cf. Ostrofe v. H. S. Crocker Co., Inc.*, 740 F.2d 739, 746 (9th Cir. 1984) (plaintiff had antitrust standing where his injury was "an integral part of the scheme to eliminate competition"). Here, there would be no market for UMTS components without end user's demand for UMTS devices. Qualcomm cannot credibly claim surprise that its conduct injured the millions of purchasers of UMTS devices like Valikhani.[5] Valikhani's injury was foreseeable, if not inevitable.

    In California, proximate cause is a question of fact that cannot be determined on a motion to dismiss or a demurrer "[u]nless there are only undisputed facts from which only one conclusion can be drawn." *Kiseskey v. Carpenters' Trust for S. Cal.*, 144 Cal.App.3d 222, 233 (1983) (intentional tort).  In 1978, the California legislature "immediate[l]y" responded to the *Illinois Brick* decision by adding "the following paragraph[:] 'Such action may be brought by any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless of whether such injured*

---

[5]    Whether Qualcomm had the "specific intent" to injure Valikhani is irrelevant. *McCready*, 457 U.S. at 479. *McCready* recognized antitrust violations create standing for consumers in "that area of the economy . . . endangered by [the] breakdown of competitive conditions," and specifically rejected the argument that "the sector of the economy [where an antitrust violation had] its most direct anticompetitive effects" were not in the violation's "proximate range." *Id.* at 480. While Qualcomm's antitrust violation's most direct effects might be limited to the market for UMTS components, competitive conditions have broken down throughout the entire supply chain for UMTS devices.

7

1    *person dealt directly or indirectly with the defendant.*'" *Crown Oil Corp. v. Superior Court*,

2    177 Cal.App.3d 604, 609 (1986) (quoting Cal. Bus. & Prof. Code § 16750) (emphasis in

3    original). Accordingly, California courts have endorsed many indirect purchaser suits. *Id.*

4    (class action by users of industrial gas purchased indirectly); *In re Cipro Cases I and II*, 121

5    Cal.App.4th 402 (2004) (class of indirect purchasers of prescription drug); *B.W.I. Custom*

6    *Kitchen v. Owens-Illinois, Inc.*, 191 Cal.App.3d 1341 (1987) (class of indirect purchasers of

7    glass containers); *Crown Oil* (class of indirect purchasers of coconut oil).

8

9        Qualcomm is effectively asking the Court to circumvent or frustrate the California

    legislature's intent to provide indirect purchasers with a remedy under the Cartwright Act.

10   The California Supreme Court has held that courts "must take care to avoid . . . thwart[ing]

11   the legislative intent [to] retain the availability of indirect-purchaser suits as a viable and

12   effective means of enforcing California's antitrust laws." *Union Carbide Corp. v. Superior*

13   *Court*, 36 Cal3d 15, 21 (1984). *Union Carbide* found that the 1978 amendment implied "a

14   mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of

15   California antitrust suits." *Id.*, 36 Cal.3d at 21. The 1978 amendments to the Cartwright Act

16   necessarily apply to those aspects of antitrust standing at issue in *McCready*, as well as

17   those at issue in *Illinois Brick*. Nothing would be accomplished by eliminating the *Illinois*

18   *Brick* bar against indirect purchaser claims if the same claims nonetheless floundered under

19   *AGC*'s general standing rules because they were too "remote."

20

21            **2.**      **California Law Controls Valikhani's Standing Under the**

22                  **Cartwright Act**

23        Basic principles of federalism mandate that the Court apply California law, not a

24   federal court's interpretation of the same.

25

26          The source of substantive rights enforced by a federal court under diversity
          jurisdiction, it cannot be said too often, is the law of the States. Whenever that

27         law is authoritatively declared by a State, whether its voice be the legislature
          or its highest court, such law ought to govern in litigation founded on that law,

28         whether the forum of application is a State or a federal court

*Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 112 (1945). If a state's highest court has not answered a question of that state's law, "federal courts must predict how the state's highest court would resolve it . . . look[ing] to existing state law without predicting potential changes in that law." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002). "[I]n the absence of a pronouncement by the highest court of a state, [we] must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1002 (9th Cir. 2008) (citation, punctuation omitted). This Court does not owe any other district court's interpretation of California law any particular deference because that court sits in California. *See Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (court of appeals must review district court's determination of state law *de novo*).

Federal law does not prevent California from providing indirect purchasers a claim for damages under the Cartwright Act. "It is one thing to consider the congressional policies identified in *Illinois Brick* . . . in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law." *California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989). "[N]othing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws." *Id*. States' freedom to define their own antitrust law follows the usual rule that "state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *Id*. at 105. California must be free to set its own policy and define its own antitrust laws. *In re Sugar Antitrust Litig.*, 588 F.2d 1270, 1273 (9th Cir. 1978) (California legal system "should be free to settle the question" of whether indirect purchasers have standing to bring Cartwright Act claim).

The Court cannot apply the *In re DRAM* cases to Valikhani's Cartwright Act claim without violating the legislative intent of the 1978 amendment to the Cartwright Act. Although Qualcomm characterizes the *In re DRAM* cases as "well-established law," they are

9

**PARISI & HAVENS** LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

in fact Qualcomm's only authority for the proposition that Valikhani lacks standing under the Cartwright Act. (Def.'s Mem. 11.) There are ample grounds to doubt the correctness of this holding: the *In re DRAM* court itself "acknowledge[d] [that its] ruling . . . is not without controversy or uncertainty, given the state of the law on the issues raised herein with respect to antitrust injury. *Indeed, the court does not expect to be the last word on this issue.*" *In re Dynamic Random Access Memory (DRAM II)*, 536 F. Supp. 2d 1129, 1142 (N.D. Cal. 2008) (emphasis added). If the Court follows *In re DRAM* and applies the *AGC* factors to Valikhani's claim, it will frustrate the legislative intent behind the 1978 amendment to the Cartwright Act providing for indirect purchaser claims.

**3.    Complexities in Proving the Amount of Damages Are Not Grounds for Dismissing Valikhani's Cartwright Act Claim**

Qualcomm's assertion that it will be "difficult, if not impossible, [for Valikhani] to trace any alleged price inflation back to Qualcomm" cannot justify stripping Valikhani of standing under the Cartwright Act. (Def.'s Mem. 12.) *Illinois Brick*'s primary concern in denying indirect purchasers standing was the complexity of proving damages. *Illinois Brick*, 431 U.S. at 737-746. The California legislature plainly considered and rejected this concern when it provided indirect purchasers standing. The California Supreme Court has found that the 1978 amendment was an "implie[d] legislative endorsement of" the dissent in *Illinois Brick*, which held that the bar against indirect purchaser claims "weakens the effectiveness of the private treble-damages action as a deterrent to antitrust violations by, in most cases, precluding consumers from recovering for antitrust injuries." *Union Carbide*, 36 Cal.3d at 21, 679 P.2d at 18. Denying indirect purchasers standing under the Cartwright Act because the calculation of damages was too difficult would frustrate the 1978 amendment.

The difficulty in proving Valikhani's damages that Qualcomm perceives does not make pleading the fact that Valikhani was damaged more difficult. "[T]he liberal pleading requirements of Rule 8(a)" apply to causation allegations; Valikhani is not obliged to plead causation with particularity. *In re Dura Pharm., Inc. Sec. Litig.*, 452 F.Supp.2d 1005, 1022

10

(S.D. Cal. 2006) (on remand from *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)). The allegation that Qualcomm's conduct caused supracompetitive retail prices for UMTS devices "is a claim at least plausible enough to survive a motion to dismiss, whatever difficulty might arise in establishing" the amount of the supracompetitive overcharge passed on to end consumers. *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (RICO damages).

Any anticipated complexities and burdens entailed by calculating Valikhani's Cartwright Act damages do not strip Valikhani of the claim altogether. At the outset, Valikhani seeks injunctive relief under the Cartwright Act. Moreover, California law places the "select[ion of] formula most appropriate to compensate the injured party" for all proximately caused damages within the Court's discretion. *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 599 (1970) (citing Cal. Civ. Code 3333.) When the "fact of damages is certain, the amount of damages need not be calculated with absolute certainty." *GHK Assocs. v. Mayer Group, Inc.*, 224 Cal.App.3d 856, 873 (1990) (citation omitted). Hence, the Court is free to determine "the total amount of overcharges to the class as a whole . . . based on a standard economic formula described in" expert testimony. *In re Cipro Cases I and II*, 121 Cal.App.4th at 409-418. "The use of such a formula is an accepted method of proving aggregate damages to the class. In many cases such an aggregate calculation will be far more accurate than summing all individual claims." *Id*.[6] "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where, as here, it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits." *GHK*, 224 Cal.App.3d at 873-74. *Accord Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)

---

[6]    *Cf. In re Sugar Industry Antitrust Litig.*, MDL No. 201, 1976 WL 1374, at *27 (N.D. Cal. May 21, 1976) ("[t]he only requirement under the federal antitrust laws for the utilization of [proof of damages from formula presented by economists or through

1  (competitor antitrust claim). The Court has sufficient flexibility in managing the calculation

2  of damages to avoid the pitfalls Qualcomm claims to foresee.

3  **B.    Valikhani Has Standing to Bring a UCL Claim**

4

5  Qualcomm's argument with respect to Valikhani's UCL claim is not entirely clear.

6  The Complaint notes that Qualcomm's licensing practices result in supracompetitive prices

7  for UMTS components in a variety of ways and, as Qualcomm notes, these

8  "'supracompetitive prices . . . are passed down from Qualcomm's licensees to UMTS

9  vendors, including cellular carriers, to end consumers of UMTS devices and cellular

10  services.'" (*Cf.* Compl. ¶¶ 52-69, 72 *with* Def.'s Mem. 16.) Despite this clear allegation of

11  causation, Qualcomm cavils that the Complaint does not allege "a coherent chain of

12  causation" because the supracompetitive overcharge Valikhani paid for his UMTS phone "is

13  impossible to trace back to Qualcomm's alleged misconduct." (*Id*.) If Qualcomm means that

14  Valikhani's allegation fails to establish causation under the UCL as a matter of law because

15  he is an indirect purchaser, its argument is contrary to well-established law. In *Shersher v.*

16  *Superior Court*, 154 Cal.App.4th 1491 (2007), the court found that the UCL supports a

17  claim for restitution arising from a manufacturers' false representations about its product

18  which the plaintiffs purchased from a retailer. *Cf. id*., 154 Cal.App.4th 1500 (comparing to

19  restitution claim by property owners against bank that charged plaintiff's escrow and title

20  companies improper fees that were "passed on to consumers as higher fees for separate

21  services or higher fees for escrow services generally"). *In re Ditropan XL Antitrust*

22  *Litigation*, 529 F.Supp.2d 1098 (N.D. Cal. 2007) found that indirect purchasers stated a

23  UCL claim against a prescription drug manufacturer where that manufacturer caused

24  indirect purchasers to pay supracompetitive prices for its drug. *Id*. at 1102-05. Valikhani's

25  status as an indirect purchaser does not impair his ability to identify the sums subject to

26  restitution under his UCL claim.

27  _____

28  scientifically sound statistical techniques] is that any statistics or techniques employed must

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

Opposition to Motion to Dismiss                              No. 08 cv 0786 WQH (JMA)

### III.    VALIKHANI PROPERLY STATED HIS CLAIMS

Perhaps aware that its standing arguments withstand scrutiny, Qualcomm advances a variety of alternate reasons why Valikhani cannot bring his claims. These alternate reasons fare no better than Qualcomm's standing arguments. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), upon which Qualcomm relies heavily, does not bar antitrust claims for involuntary conspiracies, and it is beyond cavil that such a conspiracy exists – and has been pled – here. Qualcomm has monopoly power because it has the ability to raise prices and reduce competition: market share is merely a proxy for market power, and Qualcomm's lack of market share in the relevant market is irrelevant. Lastly, the Third Circuit already held that Qualcomm's alleged conduct violated the antitrust law. Valikhani's complaint alleges unlawful acts and therefore states a claim under the UCL.

### A.    Valikhani's Allegations of Involuntary Antitrust Conspiracy State Antitrust Claims

Valikhani's Cartwright Act claims allege involuntary restraints of trade where Qualcomm's licensees unwillingly adhere to the restraints of trade embodied in Qualcomm's UMTS licenses. (Compl. ¶¶ 107) Qualcomm erroneously asserts *Monsanto* forecloses involuntary conspiracy claims. (*Cf.* Def.'s Mem. 17-18.)

*Monsanto* cannot foreclose Valikhani's Cartwright Act claim. Qualcomm concedes California courts have already found that involuntary conspiracies can violate the Cartwright Act. *See, e.g.*, *G.H.I.I. v. MTS, Inc.*, 147 Cal.App. 3d 256, 265-70 (1983). (*Cf.* Def.'s Mem. 18.) The use of federal precedent to foreclose a California claim contradicts one of federalism's bright-line rules: when predicting the development of state law, "federal courts look to existing state law without predicting potential changes in that law." *Hemmings*, 285 F.3d at 1203. California law has not changed since *G.H.I.I.*, and it is not the role of this Court to change California law.

---

produce a reasonable estimate of total damages").

**PARISI & HAVENS** LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

1      More to the point, *Monsanto* did not end involuntary conspiracy claims. It merely

2  applied the standard of a "conscious commitment to a common scheme designed to achieve

3  an unlawful objective" to a Section 1 claim arising from a dealer's termination for deviating

4  from a resale price-fixing scheme. *Monsanto*, 465 U.S. at 764. Its holding was purely

5  evidentiary – to demonstrate such a "conscious commitment," one had to prove not only that

6  a dealer conformed to a suggested price, but that the manufacturer solicited a

7  communication from the dealer in which the dealer committed to the set price, and that the

8  dealer complied. *Id*. at 764 n.9 (proof of a conspiracy "means . . . ***that evidence must be***

9  ***presented*** both that the distributor communicated its acquiescence or agreement, and that

10  this was sought by the manufacturer") (emphasis added). *Cf. Isakesen v. Vermont Castings,*

11  *Inc.*, 644 F.Supp. 1098, 1100-01 (W.D. Wisc. 1986) (*Monsanto* defines "evidentiary

12  standard" for Section 1 claims), *rev'd on other grounds*, 825 F.2d 1158 (7th Cir. 1987).

13      If the Ninth Circuit once doubted that *Monsanto* barred involuntary conspiracy cases,

14

15  it has since dispelled that doubt: "a conspiracy to monopolize may exist even where one of

the conspirators participates involuntarily or under coercion."[7] *City of Vernon v. S. Cal.*

16

*Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992). *See also Cascade Health Solutions v.*

17

*PeaceHealth*, 515 F.3d 883, 917 (9th Cir. 2008) (same). The Ninth Circuit's continuing

18

acceptance of involuntary conspiracies is in accord with the consensus of post-*Monsanto*

19

authorities from other Circuits on the issue.

20

21

22

_____

23      [7]    Qualcomm's reliance on the *dicta* in *Dimidowich v. Bell & Howell*, 803 F.2d
1473, 1478-79 (9th Cir. 1986) and *Newport Components, Inc. v. NEC Home Electronics*

24  *(U.S.A.), Inc.*, 671 F. Supp. 1525, 1546 (C.D. Cal. 1987) is misplaced. ***Although both cases***
***expressed doubt about involuntary conspiracies after*** **Monsanto***, neither case was decided*

25  *on those grounds*. *Dimidowich*, 803 F.2d at 1478 ("we need not decide whether
[involuntary conspiracies survive *Monsanto*," as plaintiff "failed to show that he was

26  coerced into adhering to [defendant's] policy or that he acquiesced in it"); *Newport*, 671 F.
Supp. at 1546 (plaintiff did not allege it "assented to or participated in the alleged price-

27  fixing conspiracy"); *Blair v. All Am. Bottling Corp.*, No. 86-1426, 1988 WL 150814, at *3

28  (S.D. Cal. Aug. 9, 1988) (laundry list of basic pleading defects).

**PARISI & HAVENS** LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

1    Formal contracts between Qualcomm and its licensees with the anticompetitive terms

2    alleged in Valikhani's Complaint satisfy *Monsanto*'s evidentiary standard for conspiracy,

3    even where the contracts were coerced. *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d

4    1421, 1426-27 (9th Cir. 1995). The antitrust violations Valikhani alleges are embodied in

5    the licenses themselves: if there is enough factual detail about the licenses to survive

6    *Twombly* (discussed below), then factual detail about the coercive tactics Qualcomm used to

7    achieve the licenses is irrelevant. There can be little doubt that these licenses exist (or that

8    the threat of patent litigation played a role in the licensees decision to accept the same).

9    Broadcom's allegations and its litigation of those allegations for three years should be

10   sufficient substantiation on that count. If it is not, then the Court should take judicial notice

11   of the statements in Qualcomm's most recent 10-K that:

12
13   > [*M*]*ost, if not all, companies recognize that any company seeking to develop,*
     > *manufacture and/or sell products that use [the UMTS standard] will require*
     > *a patent license from* [***Qualcomm***.] . . . [As part of] continu[ing] to
14   > vigorously defend [its] intellectual property rights [over the UMTS standard]
     > and [its] right to continue to receive a fair return for our innovations[,]
15   > [Qualcomm] [p]olic[es] unauthorized use of [its]. . . technologies [including
     > its patents on the UMTS standard.]
16
17   QUALCOMM Incorporated, Form 10-K for the fiscal year ended September 30, 2007, at 8,

     15, 20. *See also id*. at 37 (arbitration against Nokia over Nokia's UMTS license).
18

19   Nevertheless, Qualcomm asserts that Valikhani has not alleged the coercion of its

20   licensees in detail. Valikhani is an ordinary consumer and he is neither privy to

21   communications between Qualcomm and its licensees nor in a position to allege "who

22   specifically was coerced, when the coercion took place, and how the coercion was

23   effectuated" without discovery. (Def.'s Mem. at 18.) "Consumer antitrust plaintiffs like

24   [Valikhani] have less ability to determine the details of this alleged conspiracy than would

25   competitors." *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 191 (S.D.N.Y.

26   2000). Valikhani has alleged "enough fact to raise a reasonable expectation that discovery

27   will reveal evidence" to support his claim. *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965

28   (2007). *Twombly* does not mean Valikhani has to meet an arbitrary level of detail defined by

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299

1  Qualcomm. Moreover, Qualcomm's argument here is disingenuous, because it required its

2  licensees to enter into non-disclosure agreements which, for instance, prevented Broadcom

3  from alleging Qualcomm's licensing practices in detail. *Broadcom Corp. v. Qualcomm Inc.*,

4  Case. No. 05-03350 (D.N.J.), Dkt. No 14 at ¶ 13. Where the details of an antitrust violation

5  are in the defendants' exclusive knowledge, the plaintiff is not required to plead those

6  details. *See Tele Atlas N.V. v. Navteq Corp.*, 397 F.Supp.2d 1184, 1189-90 (N.D. Cal. 2005).

7  *See also Hosp. Blfg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976) (in antitrust cases,

8  "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted

9  very sparingly" because "the proof is largely in the [defendants'] hands"). Valikhani's

10  allegations are sufficient to withstand a Rule 12(b)(6) attack: the longevity of the proceeding

11  between Broadcom and Qualcomm leaves little doubt that the events alleged by Valikhani

12  occurred and that Qualcomm is on full notice of those allegations.[8]

13
14  **B.    Valikhani Alleges a UCL Claim**

15      Even if Qualcomm's arguments that Valikhani did not allege unfair or deceptive acts

16  were valid, it would not foreclose Valikhani's UCL claim.  Valikhani also alleges that

17  Qualcomm's acts were unlawful. (Compl. ¶ 112.) The UCL prohibits "any unlawful, unfair

18  or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200 (2008). The UCL is

19  "written in the disjunctive"; unlawful acts violate the UCL just as much as fraudulent or

20  unfair acts. *Cel-Tech Commc's, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180

21  (1999) (citation, punctuation omitted). The UCL "borrows violations of other laws and

22  treats them as unlawful practices" which are "independently actionable" under the UCL. *Id*.,

23  20 Cal.4th at 180 (punctuation, citation omitted). The Third Circuit found that Broadcom's

24  2005 complaint alleged a variety of antitrust violations. *Broadcom Corp. v. Qualcomm Inc.*,

25  ────────────
26      [8]    If the Court nonetheless finds that Valikhani still has not plead sufficient
   detail, Valikhani asks that he be granted access to discovery already produced by Qualcomm
27  to Broadcom under an appropriate protective order, so that he can replead his claim in
   sufficient detail without burdening Qualcomm with his own discovery. Manual for Complex
28

1  501 F.3d 297. As Valikhani's Complaint is supposedly "little more than a photocopy of

2  Broadcom's 2005 complaint," Valikhani necessarily alleges those same unlawful acts with

3  sufficient detail to support his UCL claim. (Def.'s Mem. 1.)

4
5      However, Qualcomm's arguments that Valikhani has failed to state a UCL claim are

6  unfounded. Deceptive statements to third parties that cause a UCL plaintiff to lose "money

7  or property" are grounds for a UCL claim. *Overstock.com, Inc. v. Gradient Analytics, Inc.*,

8  151 Cal.App.4th 688, 716 (2007) (upholding a UCL claim for asserting that false stock

9  analysis was intended to decrease plaintiff's stock price). Qualcomm's cases on this point

10  are wholly distinguishable. *Cf.*, *e.g.*, *Rosenbluth Int'l, Inc. v. Superior Court*, 101

11  Cal.App.4th 1073 (2002) (finding that equity principles precluded private individual who

12  "personally did not suffer any injury as the result" of a travel agency's alleged acts against

13  its corporate clients could not bring representative claim under pre-Proposition 64 UCL).

14      Likewise, Valikhani alleges a UCL claim under its unfairness prong. It is true that the

15  UCL's "unfairness" prong requires a competitive injury, but Valikhani has alleged

16  "supracompetitive prices" and "impaired non-price competition." (Compl. ¶ 114.) *Cf. Cel-*

17  *Tech*, 20 Cal.4th at 189 (competitor's lowered prices were only actionable under UCL if

18  those prices were predatory and intended to eliminate, rather than foster, competition).

19  However, even if Valikhani's antitrust claims failed for whatever reason, the UCL has even

20  broader application than the Cartwright Act. The UCL applies to "conduct that . . . violates

21  the policy ***or spirit*** of [the antitrust laws] because its effects ***are comparable to*** or the same

22  as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-*

23  *Tech*, 20 Cal.4th at 187 (UCL broader than Unfair Practices Act) (emphasis added).  Even if

24  Valikhani's antitrust claims falter because Qualcomm's licensing practices were not found

25  to be an actionable antitrust conspiracy, Valikhani would still have his UCL claim. *Eddins v.*

26  *Redstone*, 134 Cal.App.4th 290, 344 (Cal. Ct. App. 2005) (affirming summary judgment

27  _____

28  Litigation § 20.2 (4th ed. 2004) (in related cases, "[r]elevant discovery already completed

1   against Cartwright Act claim for lack of evidence of conspiracy affirmed, but reversing

2   summary judgment against UCL for related acts); *Biljac Assocs. v. First Interstate Bank*,

3   218 Cal.App.3d 1410, 1422 (1990) ("it is not generally necessary to show a trust or

4   conspiracy in [a] [UCL claim] as opposed to one brought under the Cartwright Act"). If the

5   Cartwright Act certainly does not expressly permit Qualcomm's conduct, it does not

6   foreclose Valikhani's UCL claim. "[M]erely because some other statute . . . does not, itself,

7   provide for the action or prohibit the challenged conduct" does not foreclose a UCL claim.

8   *Cel-Tech*, 20 Cal.4th at 182-83.

9
    **IV.   CONCLUSION**
10

11      Valikhani has standing to pursue his antitrust claims. Valikhani has suffered antitrust

12   injury and such injury is inextricably intertwined with Qualcomm's anticompetitive

13   conduct.

14
        In addition, all of Valikhani's causes of action against Qualcomm are sufficiently
15
    pleaded.  Federal law recognizes involuntary conspiracies and California is in accord.
16
    Valikhani need not allege market share because he has alleged the existence of market
17
    power. Finally, even if Valikhani is found to lack standing to pursue his antitrust claims, he
18
    has alleged a cause of action under the UCL.
19

20      The motion to dismiss should be denied in its entirety.

21   DATED: July 15, 2008              PARISI & HAVENS LLP
22

23                                     By:  s/David C. Parisi
24                                     Attorneys for plaintiff Merdad Valikhani, on
                                       behalf of himself, the general public and all others
25                                     similarly situated

26                                     E-mail: dcparisi@parisihavens.com

27   _____

28   should ordinarily be made available to litigants in the other cases").

PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299