1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  MERDAD VALIKHANI, an individual, on behalf of himself, the general public 12  and all others similarly situated, | CASE NO. 08cv786 WQH (JMA) **ORDER** |
| 13                                          Plaintiff, vs. 14  QUALCOMM INCORPORATED, a Delaware corporation, and DOES 1-100, 15 16                                          Defendant. | |

HAYES, Judge:

17

18          The matter before the Court is the Motion to Dismiss (Doc. # 26) filed by Defendant

Qualcomm Incorporated.

19
                          **Factual Allegations in the Complaint**
20

21          A.       The Parties

22          On April 30, 2008, Plaintiff Merdad Valikhani initiated this action by filing the Class

23  Action Complaint (Doc. # 1).  Plaintiff is a resident of Los Angeles County, CA.  *Complaint,*

24  ¶ 8.  Plaintiff purchased a subsidized LG-CU500 cell phone from AT&T and receives cellular

25  phone service from AT&T.  Defendant Qualcomm Incorporated ("Qualcomm") is a Delaware

26  corporation headquartered in San Diego, California. *Id.,* ¶ 9.  Qualcomm "commercializes

27  technology involved in cellular communications and applications," and owns patents

28  significant in the wireless communications industry.  *Id.*  Qualcomm generates billions of

dollars in revenues by licensing its patents.  *Id.*

B.     The Wireless Industry

The wireless communications industry consists of many components, including wireless carriers providing cell phone service to consumers, cell phone manufacturers manufacturing cell phones, and cell phone component manufacturers manufacturing parts of cell phones. *Id.,* ¶¶ 16-18.  In order "[f]or a carrier's wireless system to function properly, all of the system's components (e.g. base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other." *Id.,* ¶ 19.  This means that "regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufacturers the system's components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system." *Id.*

Because of this "demand for interoperability," telecommunication standards determining organizations ("SDOs") have created industry and global-wide standards for wireless carriers, cell phone manufacturers and component makers. *Id.,* ¶ 20. "Two technology paths, or families of standards, are in widespread use today: 'CDMA,' which stands for 'code division multiple access;' and 'GSM,' which stands for 'global system for mobility.'" *Id.,* ¶ 25.  The CDMA and GSM paths have evolved through four generations, and carriers are in the process of deploying "newer technologies that cannot neatly be characterized as either [second generation] or [third generation]." *Id.,* ¶ 26-28.  "The CDMA and GSM standards are mutually incompatible." *Id.,* ¶ 39.  Thus, the transition from second generation to third generation standards is "path-dependent." *Id.*

The Universal Mobile Telecommunications System ("UMTS") standard was "designed to permit economical transition from [second generation] GSM-based systems to a [third generation] standard." *Id.,* ¶ 33.  An industry-wide standard, such as the UMTS, "necessarily eliminates previously available alternative technologies," and "confers monopoly power on the holders of patents essential to implementing that standard." *Id.,* ¶ 34.

When telecommunication SDOs consider implementing new standards, "[t]he ownership of relevant intellectual property (IP) and related IP licensing practices are critical issues." *Id.,* ¶ 24. "If the implementation of a standard requires the use of particular [intellectual property], such as a patent, the [intellectual property] owner may have the ability to prevent, delay or distort the development of technology implementing that standard (sometimes referred to as 'patent hold-up') and thereby undermine the purpose of the SDO." *Id.* "Accordingly, SDOs typically require that their members declare whether they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory (FRAND) terms." *Id.* "Patents necessary to implement a particular standard are known as 'essential patents' for the standard to which they relate," and "[e]ach SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard." *Id.*

C.    Qualcomm's Patents and Licensing Practices

Qualcomm holds certain patents that are "essential" to Wideband Code Division Multiple Access ("WCDMA") technology. *Id.,* ¶¶ 1, 3. WCDMA is a third generation technology that is implemented through the UMTS standard. *Id.,* ¶ 2. Qualcomm's "WCDMA patents are essential to the manufacture of UMTS-compliant cell phones and other UMTS-compliant devices, and are also essential for the implementation of the UMTS standard." *Id.,* ¶ 38. "The licensing of Qualcomm's patents therefore is a barrier to entry into the relevant product market." *Id.*

Before the relevant SDOs included Qualcomm's technology and intellectual property in the UMTS standard, "Qualcomm made repeated and express written representations to SDOs . . . that Qualcomm would license any of its essential WCDMA patents on FRAND terms prior to the adoption of the UMTS standard." *Id.,* ¶ 44. Qualcomm's WCDMA technology was incorporated into the UMTS standard only after, and in reliance on Qualcomm's commitment to license its patents on FRAND terms. *Id.,* ¶ 45.

1    After the relevant SDOs adopted the UMTS standard, Qualcomm did not license its

2    UMTS-related patents in a fair, reasonable, and non-discriminatory manner.  *Id.,* ¶ 48.

3    Qualcomm used "its monopoly power in the WCDMA market, as well as its false commitment

4    to license its WCDMA patents on FRAND terms, to force industry participants into accepting

5    Qualcomm's UMTS Licensing Practices." *Id.,* ¶ 49.  In doing so, Qualcomm "has unnaturally

6    prolonged high prices for UMTS chipsets and UMTS devices, and has significantly deterred

7    non-price competition (improved products and functionality).  Consequently, prices for UMTS

8    chipsets are supracompetitive, and innovation in, e.g., enhanced functionality has been

9    undermined." *Id.*  Qualcomm's anticompetitive licensing practices include, but are not limited

10   to discrimination against non-Qualcomm UMTS chipsets with regard to royalties, requiring

11   unfair grant-back provisions, and requiring unfair pricing data exchange.  *Id.,* ¶¶ 47-69.

12       D.    <u>Relevant Markets</u>

13       "The relevant product market . . . is the global market for UMTS-capable devices." *Id.,*

14   ¶ 70.

15       Both UMTS chipset and UMTS device manufacturers suffer direct
         anticompetitive harm from Qualcomm's UMTS Licensing Practices.  This
16       anticompetitive harm includes supracompetitive prices and impaired non-price
         competition in innovation of UMTS functionality.  Because the entire UMTS
17       chipset and device industries are uniformly subject to the effects of UMTS
         Licensing, no individual competitor in those markets has any economic
18       incentive to absorb these costs.  Instead, UMTS chipset manufacturers pass
         UMTS Licensing costs down to UMTS device manufacturers, UMTS device
19       manufacturers pass those costs down to their vendors, and the vendors ultimately
         pass those costs on to end consumers.
20

21   *Id.,* ¶ 72.  Plaintiff is an end consumer, and has consequently suffered harm from Qualcomm's

22   anticompetitive UMTS Licensing Practices.  *Id.,* ¶¶ 71-72.

23       The relevant service market "is the cellular service of every carrier which bundles its

24   cellular service with subsidized UMTS-compliant devices in the United States."  *Id.,* ¶ 86.

25   Cellular carriers provide subsidies to their subscribers, but these subsidies are not costless

26   because "some portion of the carriers' cellular service fees is attributable to these subsidies."

27   *Id.,* ¶ 82.  Carriers pay supracompetitive prices to purchase UMTS devices that can be sold to

28   their cellular service customers at subsidized prices.  *Id.,* ¶ 83.  These "supracompetitive fees

are passed on to the carriers' consumers." *Id.* Some portion of these fees are attributable to Qualcomm's anticompetitive conduct. *Id.*

E.   Causes of Action

Count I: Violation of California's Cartwright Act, sections 16720 and 16726 of the California Business and Professions Code

Qualcomm and its licensees "formed a combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in manufacturing, making, sale and/or purchase of UMTS devices." *Id.,* ¶ 107. Qualcomm coerced the "unwilling cooperation of these licensees through threats and intimidation," which "therefore creates a trust prohibited by California's Cartwright Act." *Id.* Qualcomm's licensing practices constitute a trust in violation of the Cartwright Act "even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for the UMTS patents and engaging in the" unlawful licensing practices. *Id.,* ¶ 108. Qualcomm's licensing practices have caused antitrust injury and threaten additional antitrust injury in the form of supracompetitive prices and impaired non-price competition that consists of deterred innovation. *Id.,* ¶ 109. Plaintiff requests "injunctive relief enjoining the UMTS Licensing Practices and other acts alleged herein, and the costs of the suit, including reasonable attorneys' fees," and treble damages. *Id.,* ¶ 110.

Count II: Violation of California's Unfair Competition Law, section 17200, *et seq.,* of the California Business and Professions Code

Qualcomm's UMTS licensing practices are "unfair business acts or practices." *Id.,* ¶ 112. Qualcomm's licensing practices are "unfair or deceptive business acts or practices even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm committed an unfair or deceptive business act or practice by simply reneging on its commitment to FRAND licensing for the UMTS patents." *Id.,* ¶ 113. Qualcomm's licensing practices have caused damage and threaten continued damage in the form of supracompetitive prices and impaired non-price competition that consists of deterred

1   innovation.  *Id.,* ¶ 114.   Plaintiff requests "injunctive relief, including restitution of all

2   supracompetitive fees."  *Id.,* ¶ 115.

3                                      **Procedural History**

4        On June 13, 2008, Qualcomm filed the Motion to Dismiss.  On July 15, 2008, Plaintiff

5   filed a Response in Opposition to the Motion to Dismiss (Doc. # 29).  On July 28, 2008,

6   Qualcomm filed a Reply (Doc. # 32).  On December 15, 2008, the Court heard oral argument

7   on the Motion to Dismiss (Doc. # 44).

8                                      **Standard of Review**

9        A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests

10   the legal sufficiency of the pleadings.  *See De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.

11   1978).  A complaint may be dismissed for failure to state a claim under Rule 12(b)(6) where

12   the factual allegations do not raise the right to relief above the speculative level.  *See Bell*

13   *Atlantic v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Conversely, a complaint may not be

14   dismissed for failure to state a claim where the allegations plausibly show that the pleader is

15   entitled to relief.  *See id.* (citing Fed R. Civ. P. 8(a)(2)).  In ruling on a motion pursuant to Rule

16   12(b)(6), a court must construe the pleadings in the light most favorable to the plaintiff, and

17   must accept as true all material allegations in the complaint, as well as any reasonable

18   inferences to be drawn therefrom.  *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003);

19   *see also Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996).

20        The allegations in the complaint "may not evade [antitrust] requirements by merely

21   alleging a bare legal conclusion."  *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729,

22   736 (9th Cir. 1987). "[A] district court must retain the power to insist upon some specificity

23   in pleading before allowing a potentially massive factual controversy to proceed," especially

24   in light of the fact that "antitrust discovery can be expensive."  *Twombly,* 550 U.S. 544.

25   Plaintiffs alleging antitrust claims must set forth enough "factual matter" to "nudge[] their

26   claims across the line from conceivable to plausible."  *Id.*  California courts similarly demand

27   a "high degree of particularity in the pleading of Cartwright Act violations."  *G.H.I.I. v. MTS,*

28   *Inc.,* 147 Cal. All. 3d 256, 265 (1983); *see also Cellular Plus, Inc. v. Superior Court,* 14 Cal.

1    App. 4th 1224, 1236 (1993).

2                                                        **Analysis**

3    **I.      Standing under the Cartwright Act**

4              Qualcomm asserts that antitrust standing is a threshold requirement that every plaintiff

5    must satisfy to bring a private suit under the Cartwright Act.  Qualcomm contends that

6    "Plaintiff's theory of causation is far too attenuated to support standing."  *Mot. to Dismiss,* p.

7    11.  Qualcomm contends that "[o]n the face of the Complaint, there are at least three

8    intermediaries between Plaintiff and any alleged antitrust violation," and that each device

9    allegedly containing Qualcomm patented technology "also contains numerous other

10   technologies, any of which might impact the final price actually paid by Plaintiff."  *Id.*

11   Qualcomm contends that Plaintiff "[e]ffectively conced[es] that he is not a consumer in any

12   relevant market" because the Complaint alleges that Plaintiff is an end consumer in the market

13   for cell phones and cellular service, and challenges Qualcomm's UMTS licensing practices,

14   which occur in the completely different market for WCDMA-related patents and technology.

15   *Reply,* p. 5.  Qualcomm contends that Plaintiff's reliance "on a so-called 'exception to the

16   market participant rule', under which antitrust standing can exist where a plaintiff's injuries

17   are 'inextricably intertwined with the injuries of market participants,'" is not proper because

18   Plaintiff "does not and cannot allege that he was a 'direct victim' or the 'necessary means' of

19   Qualcomm's alleged conduct."  *Id.*  Qualcomm contends that courts "routinely dismiss

20   complaints brought by consumers that, as here, allege anticompetitive conduct in a market in

21   which they have not purchased a product," and that "[a]lthough Plaintiff alleges that he might

22   benefit consequentially from an injunction against Qualcomm's licensing practices, not every

23   party with but-for injury is entitled to bring suit as a private attorney general to enforce the

24   antitrust laws."  *Mot. to Dismiss,* p. 13-14.

25            Plaintiff agrees with Qualcomm that antitrust standing is a threshold requirement to

26   bringing a private action under the Cartwright Act, and asserts that he has satisfied the

27   threshold requirement of adequately alleging antitrust standing.  Plaintiff contends that the

28   Complaint alleges that he sustained an antitrust injury when Qualcomm reduced and restrained

competition, and that his injury - being forced to pay supracompetitive prices for UMTS cellular devices - is "the type of injury that the antitrust laws were intended to remedy." *Opposition,* p. 2. Plaintiff contends that he need not be a direct consumer or competitor to bring his claim because indirect purchasers have standing to bring an injunctive antitrust claim under the Cartwright Act. Plaintiff contends that his injury is not too remote to have standing, stating that "there are only two intermediaries between [Plaintiff] and Qualcomm - the device's manufacturer and its vendor." *Id.* at 6. Plaintiff further contends that California courts have not adopted the market participant injury, and "have found the Cartwright Act applies to anyone injured by the reduction of competition from a Cartwright Act violation." *Id.* at 4. Plaintiff states that "[e]ven if the market requirement were applicable to [Plaintiff's] Cartwright Act claim," Plaintiff has standing under the Cartwright Act because his antitrust injuries - "supra competitive prices and impaired non-price competition for UMTS cellular devices - were . . . eminently foreseeable and inextricably intertwined with the injury Qualcomm sought to cause." *Id.* at 6.

The Cartwright Act "sets forth California's antitrust laws." *Cellular Plus, Inc. v. Superior Court of San Diego County,* 14 Cal. App. 4th 1224, 1232 (1993). In order for a private plaintiff to have standing to sue under the Cartwright Act, the plaintiff must prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 1234. The Cartwright Act "is patterned after the federal Sherman Anti-Trust Act . . . , so that decisions under the latter act are applicable to the former." *Kolling v. Dow Jones & Company, Inc.,* 137 Cal. App. 3d 709, 717 (1982). However, standing under California's Cartwright Act is broader than standing under the Sherman Act insofar as the Cartwright Act explicitly permits indirect purchasers to bring suits for damages and injunctive relief, whereas an indirect purchaser may only bring suit for injunctive relief under the Sherman Act. *Cellular Plus,* 14 Cal. App. 4th at 1234. The California courts have held that a plaintiff whose injuries "were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent" has antitrust standing. *Id.* at 1233 (citing *Kolling,*

137 Cal. App. 3d at 724) ("Plaintiff's injuries were not 'secondary' or 'consequential,' since they did not result from injury to third parties; they were not 'remote,' for they were the direct result of the allegedly illegal conduct."). Although the Cartwright Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers," *Cellular Plus,* 14 Cal. App. 4th at 1233, "courts interpreting the Cartwright Act's antitrust standing requirement have consistently followed the 'market participant' rule." *In re Napster, Inc. Copyright Litig.,* 354 F. Supp. 2d 1113, 1125-26 (N.D. Cal. 2005) (citing *MGM Studios, Inc. v. Grokster, Ltd.,* 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003). The plaintiff "must show an injury within the area of the economy that is endangered by a breakdown of competitive conditions." *Kolling,* 137 Cal. App. 3d at 724; *see also Vinci v. Waste Management, Inc.,* 36 Cal. App. 4th 1811, 1816 (1995) (plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").

Plaintiff's status as an end-user, who purchased indirectly from Qualcomm, is not fatal to Plaintiff's standing. However, Plaintiff must allege an injury that is not "secondary, consequential, or remote" in order to have standing under the Cartwright Act. *Cellular Plus,* 14 Cal. App. 4th at 1233. As alleged in this Complaint, there are at least three intermediaries - UMTS chipset manufacturers, UMTS device manufacturers, and UMTS device vendors - between Plaintiff's injury and the alleged antitrust violations, and Qualcomm supplies only "some" of the technology essential to UMTS, such that each device allegedly containing Qualcomm technology also contains other technology which impacts the final price actually paid by Plaintiff. *Complaint,* ¶ 72. The remote nature of Plaintiff's injuries in relation to the alleged antitrust violations is further demonstrated through the allegations in the Complaint that Plaintiff's alleged injuries (payment of inflated prices in the market for cell phones and cellular service) occurred in  separate market from the alleged antitrust violation (the market for WCDMA patents and technology). The Court concludes that Plaintiff's injuries as alleged in the Complaint are too remote to support standing under the Cartwright Act because Plaintiff's injuries occurred in a different market from the allegedly anticompetitive conduct, Plaintiff's injuries are separated by at least three intermediaries to the antitrust violation, and

Plaintiff's injuries were not the direct result of Qualcomm's allegedly unlawful conduct.

The Court concludes the Complaint fails to allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Cellular Plus,* 24 Cal. App. 4th at 1234.   The Court dismisses the Complaint's first cause of action for violation of the Cartwright Act on grounds that Plaintiff lacks standing.

## II.    Standing under California's Unfair Competition Law

Qualcomm contends that standing for UCL lawsuits is restricted to persons "who have suffered injury-in-fact and ha[ve] lost money or property as a result of such unfair competition." *Mot. to Dismiss,* p. 16 (quotations omitted).   Qualcomm contends that a "showing of causation is required as to each representative plaintiff." *Id.*   Qualcomm contends that Plaintiff has no standing to bring his UCL claim because Plaintiff "cannot allege in support of his UCL claim a coherent chain of causation suggesting that any 'money or property' was somehow lost 'as a result of' Qualcomm's alleged misconduct." *Id.* at 17.

Plaintiff contends that the Complaint alleges a coherent chain of causation sufficient to satisfy the standing requirements under the UCL through allegations that "'supracompetitive prices . .  are passed down from Qualcomm's licensees to UMTS vendors, including cellular carriers, to end consumers of UMTS devices and cellular services.'" *Opposition,* p. 12 (quoting *Complaint,* ¶¶ 52-69, 72).   Plaintiff contends that "[i]f Qualcomm means that [Plaintiff's] allegation fails to establish causation under the UCL as a matter of law because he is an indirect purchaser, its argument is contrary to well-established law." *Opposition,* p. 12.

California's UCL permits civil recovery for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  "A private person . . . has standing to assert a UCL claim only if he or she (1) 'has suffered injury in fact,' and (2) 'has lost money or property as a result of the unfair competition.'" *Hall v. Time, Inc.,* 158 Cal. App. 4th 847, 852 (2008) (quoting Cal. Bus. & Prof. Code § 17204).  The second prong of this standing test "imposes a causation requirement.  The phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." *Hall,* 158 Cal. App. 4th

1   at 855 ("We use the word 'causation' to refer both to the causation element of a negligence

2   cause of action . . . and to the justifiable reliance element of a fraud cause of action.").

3         In *Hall,* the plaintiff alleged that defendant Time, Inc. offered customers a free preview

4   period during which customers could review a book and return it to Time, Inc. with no

5   obligation to buy, and that Time, Inc. engaged in unfair competition by sending the customer

6   an invoice before the end of the free trial period in order to induce the customer to immediately

7   send payment for the book. *Hall,* 158 Cal. App. 4th at 850, 857. The court held that the

8   plaintiff lacked standing because he "did not allege he did not want the book or Time's alleged

9   acts or unfair competition induced him to keep a book he otherwise would have returned

10  during the free trial period." *Id.* at 857; *see also Laster v. T-Mobile USA, Inc.,* 407 F. Supp.

11  2d 1181, 1183 (S.D. Cal. 2005) ("Plaintiffs, however, do not include *any* allegations in their

12  [first amended complaint] that they relied on Defendants' advertisements in entering into the

13  transactions. . . . [N]one of the named Plaintiffs allege that they saw, read, or in any way relied

14  on the advertisements; nor do they allege that they entered into the transaction *as a result* of

15  those advertisements.").

16        The Complaint in this case alleges that Qualcomm made misrepresentations to SDOs,

17  which relied on Qualcomm's misrepresentations in incorporating Qualcomm's technology into

18  the UMTS standard. The Complaint alleges that Plaintiff purchased a subsidized LG-CU500

19  cell phone from AT&T and receives cellular phone service from AT&T. Although the

20  Complaint alleges that SDOs relied on Qualcomm's misrepresentations when formulating the

21  UMTS standard, the Complaint does not allege that Plaintiff relied on representations made

22  by Qualcomm when he purchased his cell phone or when he selected his cellular service. The

23  Complaint does not allege that Plaintiff would not have purchased the LG-CU500 cell phone

24  from AT&T, or would not have chosen to receive cellular phone service from AT&T had

25  Plaintiff been aware of Qualcomm's misrepresentations. The Court concludes that Plaintiff

26  has failed to satisfy the second prong of the test for standing under the UCL because the

27  Complaint does not allege that Plaintiff relied on any misrepresentation made by Qualcomm.

28  *See Hall,* 158 Cal. App. 4th at 855. The Court dismisses the second cause of action for

1  violation of California's Unfair Competition Law on grounds that Plaintiff lacks standing.

2                                          **Conclusion**

3        IT IS HEREBY ORDERED that the Motion to Dismiss (Doc. # 23)  is **GRANTED.**

4  The above-captioned action is **DISMISSED.**

5  DATED:  March 3, 2009

6                                          *William Q. Hayes*

7                                          **WILLIAM Q. HAYES**
                                         United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28